## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>APPLE TREE LIFE SCIENCES, INC.,<br><br>Debtor. | Chapter 11<br><br>Case No. 25-12177 (LSS) |
| In re:<br><br>ATP LIFE SCIENCE VENTURES, L.P.,<br><br>Debtor. | Chapter 11<br><br>Case No. 25-12178 (LSS) |
| In re:<br><br>ATP III GP, LTD.,<br><br>Debtor. | Chapter 11<br><br>Case No. 25-12179 (LSS)<br><br>**Objection Deadline: TBD**<br>**Hearing Date: TBD** |

**DECLARATION OF LIAM FAULKNER IN SUPPORT OF RIGMORA BIOTECH INVESTOR ONE LP AND RIGMORA BIOTECH INVESTOR TWO LP'S MOTION FOR AN ORDER (I) DISMISSING THE CHAPTER 11 CASES AND/OR (II) GRANTING RELIEF FROM THE AUTOMATIC STAY**

I, Liam Faulkner, Cayman Islands Attorney, hereby declare as follows:

1.      I am a Partner of Campbells LLP, resident in the Cayman Islands. I was admitted to the Bar of the Cayman Islands in 2015, the Bar of the British Virgin Islands in 2012 and as a solicitor of the Senior Courts of England and Wales in 2009. I have been practising law in the Cayman Islands since 2015 where I specialise in cross-border insolvency, restructuring and litigation. I am a Fellow

of INSOL International, and I have extensive experience in distressed and special situation exempted limited partnership cases.

2.     I am authorised to make this affidavit on behalf of Unicorn Biotech Ventures One Ltd and Unicorn Biotech Ventures Two Ltd in their capacities as general partners of Rigmora Biotech Investor One LP and Rigmora Biotech Investor Two LP respectively (and together, the "**Rigmora LPs**"), who are limited partners of ATP Life Science Ventures, L.P (the "**Partnership**").

3.     Campbells LLP are the attorneys on record for, and I am the attorney with conduct of, two sets of proceedings brought by the Rigmora LPs in the Grand Court of the Cayman Islands concerning the Partnership captioned:

    (a)     Unicorn Biotech Ventures One Ltd (in its capacity as General Partner of Rigmora Biotech Investor One LP) and Unicorn Biotech Ventures Two Ltd (in its capacity as General Partner of Rigmora Biotech Investor Two LP) v ATP III GP, Ltd (in its capacity as General Partner of ATP Life Science Ventures, LP), Cause No FSD 146 of 2025 (JAJ) (the "**Writ Proceedings**"); and

    (b)     In the Matter of ATP Life Science Ventures LP, Cause No FSD 151 of 2025 (JAJ) (the "**Petition Proceedings**" and together the "**Cayman Proceedings**").

4.     As a result of my conduct of the Cayman Proceedings on behalf of the Rigmora LPs, I have personal knowledge of the facts and matters set forth herein. I also have personal knowledge of facts and matters set forth herein by virtue of my formal legal training and more than 10 years' experience as a practising attorney in the Cayman Islands. To the extent any fact or matter is not

within my personal knowledge, I believe such fact or matter to be true and correct to the best of my

knowledge, information and belief, and I set out the source of that knowledge, information or belief.

## A.    General Background

5.    I understand that the entities that are the subject of these Chapter 11 bankruptcy

proceedings are:

(a)    The Partnership, which is a Cayman Islands exempted limited partnership ("**ELP**")

established in 2012. As I explain in further detail below, when the General Partner

filed a Chapter 11 bankruptcy petition in the Delaware bankruptcy court on 9

December 2025 this triggered an automatic winding up of the Partnership as a matter

of Cayman Islands law.

(b)    ATP III GP, Ltd, (the "**General Partner**"), which is a Cayman Islands exempted

limited company and the sole general partner of the Partnership. Dr Seth Harrison is

the sole shareholder and director of the General Partner. From information disclosed

in the Cayman Proceedings, it would appear that the sole function of the General

Partner is to act as the general partner of the Partnership.

(c)    There also exist several companies which provide management services to the

Partnership, one of which is called Apple Tree Life Sciences, Inc. ("**ATLS**"). To the

extent that ATLS provides management or advisory services to the Partnership, that

too would appear to be its sole function.

6.    The Rigmora LPs are Limited Partners in the Partnership, who together have contributed

approximately 98% of the Partnership's capital. I understand from my involvement in the Cayman

Proceedings that Dr Harrison has caused the General Partner to admit certain other limited partners to the Partnership, including his own family trust, Les Pommes LLC, together with several non-capital contributing limited partners who are current or former executive employees of Apple Tree Partners or the Partnership's portfolio companies. However, it is the Rigmora LPs who have the dominant economic interest in the Partnership's business and its assets. The Rigmora LPs have contributed approx. 98% of the Partnership's capital and are entitled to receive approx. 98% of any distribution made by the Partnership.

7.      The Partnership does not have separate legal personality. It is instead the relationship which subsists between the General Partner, the Rigmora LPs and the other limited partners carrying on business with a view to profit. The formation, operation and termination of exempted limited partnerships ("**ELPs**") in the Cayman Islands is governed by the Exempted Limited Partnership Act (2025 Revision) (the "**ELP Act**") and by certain provisions of the Partnership Act (2025 Revision) (the "**Partnership Act**"), certain principles of common law and the provisions of the limited partnership agreement (the "**LPA**") entered into between the parties (as amended from time to time).

8.      The Rigmora LPs are connected to the family trust of Dr Dmitry Rybolovlev, a successful Cypriot businessman of Russian origin who resides in Monaco. More particularly, Rigmora Holdings Limited, a Cypriot entity, is a holding company and an advisor to the trustees of Dr Rybolovlev's family trust of which he is the settlor. Rigmora Holdings is the sole limited partner of both of the Rigmora LPs.

9.      The Rigmora LPs have lost all trust and confidence in the ability of the General Partner to conduct the business of the Partnership as a fiduciary. The Rigmora LPs assert that the General Partner has acted in breach of various duties owed to the Rigmora LPs, including its fiduciary duties

4

and the duty to act in good faith at all times. The Rigmora LPs further believe that there is a need for an investigation into the conduct of the General Partner and its breaches of duty.

10.    By way of background to the dispute:

10.1    On 30 May 2025, the General Partner commenced proceedings by way of Verified Complaint in the Chancery Court of the State of Delaware against the Rigmora LPs seeking various declarations and specific performance in respect of what the General Partner described as a repudiatory anticipatory breach of the LPA (the "**Delaware Chancery Proceedings**").

10.2    A matter of minutes before it filed the Delaware Chancery Proceedings, the General Partner issued eleven capital calls for an aggregate amount in excess of US$100 million, one of which it withdrew and re-issued on 1 June 2025 (the "**Disputed Capital Calls**"). Under the terms of the LPA, the Rigmora LPs had 10 days to pay the capital calls. At the same time the General Partner issued the Disputed Capital Calls, it filed the Delaware Chancery Proceedings and a motion for an expedited trial of the Delaware Chancery Proceedings. The Disputed Capital Calls were not mentioned in the General Partner's Verified Complaint, which instead asserted a claim of "repudiatory" breach of the LPA.

10.3    The Delaware Chancery Proceedings were issued after a series of disagreements between the General Partner and the Rigmora LPs concerning the obligation of the Rigmora LPs to fund further capital calls under the LPA. The Rigmora LPs had maintained the position for more than a year that their total contingent subscription

amounts under the LPA – being the total amount of capital available to the General Partner to call pursuant to the LPA and Cayman law – was set at US$2.425 billion. The Rigmora LPs' position was then (and remains) that they have contributed approximately US$2.7 billion in capital to the Partnership, including deemed contributions. The General Partner disagreed with that position and took the view that the Rigmora LPs' contingent subscription was several hundred million dollars higher, reaching at least $2.85 billion (albeit it has been unable to say with precision exactly how much higher the figure should be). The Rigmora LPs and the General Partner had also disagreed in regards to budgets. Under the terms of the LPA the General Partner can only invest capital in accordance with budgets that have been approved by the Rigmora LPs, and the Rigmora LPs had rejected several budgets proposed by the General Partner as they were concerned about the business strategy that the General Partner was pursuing.

10.4    The relief that the General Partner initially sought in the Delaware Chancery Proceedings was extreme. The orders that the General Partner initially requested included:

(a)    An order that the Rigmora LPs had "*waived*" their rights under the LPA to approve (or reject) budgets proposed by the General Partner on the basis that the Rigmora LPs had unreasonably failed to approve budgets in the past. This would in effect mean that the General Partner would have the unrestricted right to use capital as it pleased.

(b)     An order for specific performance requiring the Rigmora LPs to pay "*$43mm in budgets proposed in January for Aulos and Nine Square* [two Partnership portfolio companies] *which the Family Office LP* [the Rigmora LPs] *has yet to approve*" and to also pay "*up to $331.3mm in remaining capital commitments*".

(c)     An order for specific performance requiring the Rigmora LPs to pay the Partnership "*up to $214.2mm in remaining approved budgets*".

(d)     A finding that the Rigmora LPs' conducted qualified them as a "*Defaulting Partner*" under the LPA and an order permitting the General Partner to "*impose a Default Charge against all of the Family Office LP's* [i.e. the Rigmora LPs'] *interests*". The effect of such an order, if it had been granted, would have been that the General Partner would have been able to seize 50% of the Rigmora LPs' interests in the Partnership and reallocate them to the other limited partners. In effect, this would have resulted in several billion dollars of value being seized from the Rigmora LPs and primarily transferred to Dr Harrison and his family trust (who are both limited partners in the Partnership).

10.5    In response to receiving the Disputed Capital Calls which sought capital above the US$2.425 billion contingent subscription amount the Rigmora LPs issued the Cayman Writ Proceedings on the next business day during which the Grand Court accepted filings (being Monday 2 June 2025). In the Cayman Writ Proceedings the Rigmora LPs are seeking declarations from the Grand Court of the Cayman Islands to the effect that: (i) their contingent subscription was US$2.425 billion; (ii) they had

met or otherwise exceeded that amount in capital contributions to the Partnership; (iii) and the Disputed Capital Calls were not issued in compliance with the General Partner's powers under the LPA and were not issued in good faith and in the best interests of the Partnership as they were required to have been under Cayman Islands law.

11.     On 6 June 2025 the Rigmora LPs also presented a winding up petition – the Petition Proceedings –pursuant to Section 36(3) of the ELP Act and Section 92(e) of the Companies Act (2025 Revision) (the "**Companies Act**"), and/or in the alternative pursuant to section 35 of the Partnership Act. The Rigmora LPs commenced the Petition Proceedings because they had lost all trust and confidence in the General Partner's ability to manage the assets that the General Partner held on trust for the Rigmora LPs. This loss of trust and confidence was for variety of reasons, including the extreme relief that the General Partner had sought in the Delaware Proceedings (which essentially amounted to an attempt by the General Partner to seize billions of dollars worth of assets from the Rigmora LPs and transfer them to Dr Harrison) as well as the high pressure litigation tactics that the General Partner (which owes fiduciary duties to the Rigmora LPs) had deployed in relation to the commencement of the litigation. I outline in further detail below what the consequences will be if the Cayman Court issues a winding up order.

12.     The Delaware Chancery Court published its reasons dismissing the majority of the General Partner's claims on 5 December 2025 (the "**Delaware Opinion**"), although it ordered the Rigmora LPs to specifically perform obligations under the LPA to pay c.$96 million of the Disputed Capital Calls. Although the Delaware Chancery Court agreed that the Rigmora LPs' contingent subscription commitments were limited to $2.425 billion – and rejected the General Partner's

position that the contingent subscription commitments were at least $2.85 billion – the Delaware Opinion concludes that approximately $390 million of equity interests that were deemed contributed to the Partnership by the Rigmora LPs pursuant to Amendment 20 to the LPA did not count against the Rigmora LPs' contingent subscription commitment. As a result, the Delaware Opinion concluded that the Rigmora LPs' had uncalled commitments of approximately $125 million (prior to the payment of any of the Disputed Capital Calls).

13.    The Petition Proceedings, which are proceedings between the General Partner and the Rigmora LPs, have been on foot for over six months. By the consent of the parties, a trial has been fixed for 12-16 January 2026, and the Honourable Justice Asif KC, being the Judge assigned to the Cayman Proceedings, has set aside 19-23 January 2026 to write his judgment following the trial. The Rigmora LPs reasonably expect the learned Judge to deliver his judgment shortly following the conclusion of trial.

14.    If the Rigmora LPs succeed on the Petition Proceedings, independent liquidators will be appointed as officers of the Grand Court over the assets of the Partnership with a statutory mandate to wind down the Partnership's affairs on an orderly basis and distribute its assets to stakeholders in accordance with the statutory scheme. The net effect of this process is that the Partnership's assets essentially switch from being held by the general partner on trust for the limited partners, to being owned by the limited partners directly. The liquidation will be conducted under the supervision of the Court with all stakeholders having an opportunity to have notice of any applications for sanction and to appear and be heard on those applications. It will be an orderly liquidation conducted by an independent fiduciary (i.e. the liquidators), with the benefit of advice from independent legal counsel of their choice. The liquidators would also have flexibility as to

what they do with the Partnership's assets: their options would include selling the assets (i.e. the portfolio companies) and distributing the proceeds to the Partnership's limited partners or by distributing direct ownership of the assets to the limited partners if that is their preference. Furthermore, if the liquidators were to form the view that providing capital from the Partnership to the portfolio companies would help to maintain, or even improve, their value then that is something that would be within their powers to do and which they likely would do if they decided that this would help to maximise the distributions that are ultimately made to the limited partners.

15.    The assets of the Partnership exceed its liabilities by a significant magnitude. The Partnership is not insolvent and it is the Rigmora LPs who will have a 98% economic interest in a liquidation of the Partnership.

**B.    The distinct characteristics of a Cayman Exempted Limited Partnership**

16.    A Cayman Islands Exempted Limited Partnership is a unique creature of statute arising from the ELP Act. They have some similarities with traditional partnerships as understood under Cayman and English law, but because they are created by statute, the Cayman Islands Parliament has created a modified version of partnership with unique elements which distinguish them from ordinary (or general) partnerships.

17.    The characteristics of ELPs under Cayman law were addressed by Parker J in Re Padma Fund LP[1] and subsequently in Kuwait Ports Authority v Port Link GP Limited[2], with his analysis in the latter case being cited with approval by the Court of Appeal. A recent overview of ELPs provided

---

[1] Re Padma Fund LP at [20]-[29].
[2] [2023] (1) CILR 50 at [24].

by the Privy Council (the highest level court of the Cayman Islands) in <u>Re Aquapoint LP</u>[3] is consistent with those analyses.

18.    Section 3 of the Partnership Act stipulates that a partnership is the relation which subsists between two or more persons carrying on a business with a view to profit. Section 4(2) of the ELP Act modifies this stipulation by providing that to be an ELP, the partnership must consist of:

18.1    at least one person, called the general partner, who in the event that the assets of the ELP are inadequate, is liable for all of the debts and obligations of the ELP; and

18.2    at least one person, called the limited partner, who shall not be liable for the debts or obligations of the ELP in excess of the capital contributed by that person to the ELP, save as provided for in the partnership agreement or otherwise in the limited circumstances specified in sections 20(1) and 34(1) of the ELP Act.

19.    In <u>Williams v Kuwait Ports Authority</u>[4], Martin JA at [30] expressed the view that the "*essence*" of the ELP scheme in Cayman Islands law is "*expressed in section 4(2)*". The effect of the ELP Act is that general partners have sole conduct of the business of the ELP, but in exchange have unlimited liability for the debts and obligations of the ELP in the event that the assets of the ELP are inadequate to discharge those debts as they fall due. As summarised by Lord Richards in <u>Re Aquapoint LP</u> at [33]:

"*An ELP does not have separate legal personality but is a form of partnership … A General*

---

[3] Aquapoint LP (in Official Liquidation) (Appellant) v Xiaohu Fan (Respondent) (Cayman Islands) [2025] UKPC 56 ("**Re Aquapoint LP**").
[4] 15 August 2024, CICA (Civil) Appeal No. 0011 of 2023.

*partner is liable for all the debts and liabilities of an ELP to the extent of any deficit of assets
and is responsible for the conduct and management of the business of the ELP, whilst a
limited partner is normally liable only to the extent provided in the partnership agreement
(section 4(2)).*"

20.    As an ELP is not an entity with separate legal personality, it cannot own property in its

own right. Pursuant to section 16(1) of the ELP Act, any rights or property of every description of

an ELP, including choses in action, shall be held or deemed to be held by the general partner upon

trust for the limited partners in accordance with the terms of the partnership agreement.[5]

21.    Pursuant to section 9(1) of the ELP Act, an Exempted Limited Partnership must be

registered as such with the Registrar of Exempted Limited Partnerships. However, the mere act of

registration does not bestow legal personality on an ELP. It simply registers the exempted limited

partnership relationship between the constituent partners.

22.    The concept of rights or property of the ELP is embedded in the ELP Act. Reference is

made to the same in sections 4(2), 16(1), 16(2), 17(1) and 18 of the ELP Act. Reference to rights or

property of the ELP is to all property, rights and interests in or arising from the capital contributed

by the partners to the general partner in accordance with the limited partnership agreement for the

conduct of the partnership business, and the traceable proceeds of the same.

23.    A partner will usually have an equitable, proprietary interest in the partnership assets to

the extent of their profit and share of the partnership.[6] This is true for Cayman ELPs, in particular

because general partners hold the assets of the partnership on a statutory trust for the limited partners

pursuant to section 16(1) of the ELP Act. The Cayman Islands Court of Appeal confirmed in <u>Kuwait</u>

---

[5] Ibid, at [56]-[57].
[6] Lindley & Banks at 19-02.

Ports Authority v Port Link GP Ltd at [56]-[57] that the assets of the ELP are held by the general partner on trust for each of the partners. Such assets do not form part of the general partner's general assets.

24.    In the case of the Partnership, the General Partner holds approx. 98% of the Partnership's assets on trust, as a fiduciary, for the Rigmora LPs.

25.    Likewise, the concept of debts or obligations of the ELP is also embedded in the ELP Act:

    27.1    Section 16(2) of the ELP Act provides that any debt or obligation incurred by a general partner in the conduct of the business of an ELP shall be a debt or obligation of the ELP; and

    27.2    Section 4(2) of the ELP Act provides that in the event that the assets of the ELP are inadequate, the general partner shall be liable for all debts and obligations of the ELP.

26.    Accordingly, the concept of assets and liabilities of the ELP exists; it is a reference to (a) assets held by the general partner on a statutory trust for the limited partners and (b) liabilities incurred by the general partner, for the purpose of and in the course of the partnership business conducted by the general partner.

27.    The existence of a trust relationship demonstrates that there is a separation in the legal and beneficial interest in the assets. It is the general partner which holds legal title to the assets of the ELP, but the partners collectively who have the beneficial interest in the assets in accordance with their rights under the limited partnership agreement.

**D.    The General Partner acts as a fiduciary and owes duties as such to the Rigmora LPs**

28.    As a fiduciary entrusted with the partnership assets, the general partner is required by statute to maintain various records and registers[7] and to provide true and full information regarding the state of the business and financial condition of the Exempted Limited Partnership on demand from any limited partner, subject to any express or implied terms of the partnership agreement.[8]

29.    When conducting the business of the Partnership, the general partner occupies a fiduciary position and owes duties of such. The classic statement of what is a fiduciary duty, albeit in a company/director context, comes from Millett LJ in *Bristol and West Building Society v Mothew* [1998] Ch 1, which has been cited with approval in the Cayman Islands in a number of cases[9]. In *Renova Resources v Gilbertson* [2012 (2) CILR 416], Foster J in the Grand Court cited with approval the following passages from *Mothew*:

> "*A fiduciary is someone who has undertaken to act for or on behalf of another in a particular matter in circumstances which give rise to a relationship of trust and confidence. The distinguishing obligation of a fiduciary is the obligation of loyalty. The principal is entitled to the single-minded loyalty of his fiduciary. This core liability has several facets. A fiduciary must act in good faith; he must not make a profit out of his trust; he must not place himself in a position where his duty and his interest may conflict; he may not act for his own benefit or the benefit of a third person without the informed consent of his principal. ...*
>
> *The nature of the obligation determines the nature of the breach. The various obligations of a fiduciary merely reflect different aspects of his core duties of loyalty and fidelity. Breach of fiduciary obligation, therefore, connotes disloyalty or infidelity.*"

---

[7]  See Sections 29 and 30 ELP Act.
[8]  See Section 22 ELP Act.
[9]  See *Al Sadik v Investcorp* [2012 (1) CILR 451] (reversed, CICA unrep., 21 September 2016, but not on this point of principle) and *Renova Resources v Gilbertson* [2012 (2) CILR 416] (reversed in part, CICA unrep. 12 September 2017, but not on this point of principle).

30.     Consistent with the high degree of trust and confidence that must be placed in a general partner as a statutory trustee of the assets of the Exempted Limited Partnership, section 19(1) of the ELP Act specifies that:

> *"A general partner shall act at all times in good faith and, subject to any express provisions of the partnership agreement to the contrary, in the interests of the exempted limited partnership."*

31.     The statutory duty of a general partner to act in good faith, and in what it considers to be the best interests of the limited partners, is the fundamental duty to which a general partner of an ELP is subject.

32.     The decision of the General Partner to file for Chapter 11 in the name of and on behalf of the Partnership was an exercise of a fiduciary power, which the General Partner was required to exercise in good faith having regard to the best interests of the Rigmora LPs as the limited partners with the 98% economic interest in the Partnership. In the absence of any consultation, and having regard to the circumstances surrounding the parties, it is difficult to see how the General Partner could possibly contend that it has complied with its duties.

**E.     Proceedings by or against the ELP**

33.     As an Exempted Limited Partnership lacks legal personality, the Cayman Islands legislative body made provision for how proceedings by or against an exempted limited partnership should be instituted. Relevantly, under Section 33 of the ELP Act:

> *(1)     Subject to subsection (3) legal proceedings by or against an exempted limited partnership may be instituted by or against any one or more of the general partners only, and a limited partner shall not be a party to or named in the proceedings.*

> *(2)     If the court considers it just and equitable any person or a general partner shall have the right to join in or otherwise institute proceedings against any one or more of the*

15

*limited partners who may be liable under section 20(1) or to enforce the return of the*
*contribution, if any, required by section 34(1).*

(3)    *A limited partner may bring an action on behalf of an exempted limited partnership*
*if any one or more of the general partners with authority to do so have, without cause,*
*failed or refused to institute proceedings.*

34.    In his judgment delivered in the Petition Proceedings on 6 November 2025 at paragraphs 32 to 34, the Hon. Justice Asif KC confirmed that, as a matter of Cayman Islands law and consistent with section 33(1) of the ELP Act, an exempted limited partnership (which lacks legal personality) cannot be a party to legal proceedings. Instead, the Petition Proceedings are characterised as proceedings between the Rigmora LPs (as limited partners) and the General Partner (as general partner) and, in substance, concern whether the partnership relationship between those parties should continue or be wound down. The basis upon which a Chapter 11 filing has been made in the name of the Partnership is unclear given the absence of legal personality.

## F.    Winding up an exempted limited partnership

35.    As a partnership is not a separate legal entity, the "dissolution" of a partnership has a different meaning compared to when the word is applied to a company. In the case of a partnership, "dissolution" refers to the moment in time when the ongoing nature of the partnership relationship terminates, even though the partners may continue to be associated together for the purpose of winding up the partnership's affairs. By contrast, the dissolution of a company marks the moment when it ceases to exist as a legal entity.

36.    Prior to the commencement of liquidation, the general partner of the ELP holds legal title to the assets of the partnership on a statutory trust for the partners. Following the commencement of liquidation, the liquidator (whether that be the general partner acting as

liquidator, or a third-party liquidator) holds the legal title to the partnership's assets in a different capacity, that is as a liquidating trustee.

37.    Where the general partner does not act as liquidating trustee, it will be necessary to obtain a vesting order to ensure that legal title to the assets held by the general partner on a statutory trust vests in the new liquidator without further formalities.[10] This is to be contrasted with the liquidation of a company: a company has separate legal personality and can hold legal title to property. When a company commences liquidation, the legal title to the assets remains with the company but the beneficial interest in the assets automatically vests in the liquidators.

38.    In relation to the liquidation of an ELP (as is the case for a general partnership), the liquidator is appointed over the assets and undertakings of the partnership and holds legal title to the assets in that capacity. The role of the liquidator is to wind down the affairs of the ELP on an orderly basis by collecting in and realising the assets of the partnership and distributing those assets in accordance with the statutory scheme, with any surplus assets being distributed to the partners in accordance with their rights and entitlements under the LPA.

39.    In the present case, the assets of the Partnership are primarily the shares it holds in subsidiary portfolio companies and cash. The appointment of liquidators over the assets of the Partnership will not result in (a) the bankruptcy or dissolution of the subsidiary companies or (b) a fire sale of the Partnership's interest in the subsidiary companies. Any liquidator appointed over the assets of the Partnership with a court mandate of winding down the affairs of the Partnership will

---

[10] Section 17 of the ELP Act provides that on the admission or substitution of a general partner, all rights or property of every description of the exempted limited partnership, including all choses in action and any right to make capital calls and receive the proceeds thereof, held or deemed to be held by the general partner or general partners shall vest without the requirement for further formalities in the incoming general partner and any continuing existing general partners and shall be held by it or them in accordance with the ELP Act. There is no equivalent vesting provision in the Act for the appointment of a liquidator so the appointment order would typically need to provide for this.

work with all stakeholders to ensure that the winding up is conducted on an orderly basis in a manner which preserves, and where possible maximises, value for stakeholders.

40.    In circumstances where the Partnership is solvent, it is the limited partners who have the economic interest in the liquidation, in particular the Rigmora LPs who hold a 98% economic interest. In a Cayman Islands liquidation, the liquidators will need to ensure that all creditor claims are paid first, before the surplus assets are distributed to the general and limited partners in accordance with their entitlement arising under the LPA, being the contractual bargain of the parties.

41.    It is important to be very clear on one point that the General Partner and Dr Harrison appear to be misrepresenting. If the Cayman Court orders the Partnership to be wound up then that will result in the dissolution of the Partnership, but <u>not</u> necessarily the Partnership's portfolio companies. The liquidators will aim to maintain the Partnership's portfolio companies if possible, and look to either distribute or sell them to someone who will want to develop these portfolio companies into successful entities. I have seen various media reports in which Dr Harrison has suggested that a winding up order in the Cayman Islands is essentially an order requiring that the portfolio companies themselves be wound up or otherwise destroyed, which is inaccurate. The liquidators would have wide ranging and flexible powers which they could use to keep the portfolio companies alive, and if (as Dr Harrison has repeatedly claimed) the portfolio companies have genuine actual or potential value then the liquidators would be motivated to do so.

42.    If appointed, the liquidators will explore all options for maximising value of the Partnership's assets. That could include a sale of one or more portfolio companies if that option represents the best outcome for stakeholders. Alternatively, the liquidators could implement a corporate restructuring within the liquidation. There a variety of options available and the liquidators

18

will be properly advised by independent counsel and advisors, and subject to the supervision of the Grand Court of the Cayman Islands, whose sanction is required before any assets of the Partnership can be sold or dealt with. Any such sanction application to deal with assets will be on notice to all creditors and the general and limited partners of the Partnership, who will be entitled to appear and make submissions to the Court on the hearing of the sanction application.

**G.    Section 36 of the ELP Act (Dissolution)**

43.    What is now section 36 (Dissolution) of the ELP Act was introduced by the Exempted Limited Partnership (Amendment) Law, 2009 and governs the winding up and dissolution of Exempted Limited Partnerships in the Cayman Islands.

44.    Section 36 of the ELP Act distinguishes between voluntary liquidations and compulsory liquidations. In relation to voluntary liquidations, section 36(1) of the ELP Act provides that:

> "*An exempted limited partnership shall be voluntarily wound up in accordance with the provisions of the partnership agreement –*
>
> (a)    *at the time or upon the occurrence of any event specified in the partnership agreement; or*
>
> (b)    *unless other specified in the partnership agreement, upon the passing of a resolution of all the general partners and a two-thirds majority of limited partners.*"

45.    The jurisdiction of the Cayman Islands courts to wind up an ELP (that is, to appoint liquidators over the partnership assets to wind down the partnership business) on the ground that it is just and equitable to do so is not in doubt. In the recent Privy Council decision of <u>Aquapoint LP</u>,[11] Lord Richards expressed the view, without receiving submissions on the point, that the statutory

---

[11] Re Aquapoint LP at [46].

source of the Court's jurisdiction is section 36(3)(g) of the ELP Act.[12] However, what was not in doubt is that the Cayman Islands court has jurisdiction to wind up an ELP compulsorily where it is just and equitable to do so and for the liquidation to be conducted by independent fiduciaries appointed by the Cayman court, who act as officers of the Court and are subject to the supervision of the Court. In the Petition Proceedings the Rigmora LPs have sought for the Petition Proceedings to be wound up on this just and equitable basis and (as outlined below) the Cayman Court has set aside 15 days in January 2026 to resolve this issue. However, (as further outlined below) as a consequence of the General Partner filing a Chapter 11 bankruptcy petition a winding up of the Partnership automatically commenced on 9 December 2025.

46.    Section 36(3) of the ELP Act provides that except to the extent that the provisions are not consistent with the ELP Act, and in the event of any inconsistencies the ELP Act shall prevail, and subject to any express provisions of the ELP Act to the contrary, the provisions of Part V of the Companies Act and the Companies Winding Up Rules (as revised) shall apply to the winding up of an exempted limited partnership.

47.    Section 36(3)(f) of the ELP Act provides that the Insolvency Rules Committee established pursuant to the Companies Act shall have the power to make rules and prescribed forms for the purpose of giving effect to section 36(3) of the ELP Act or its interpretation. To date, no such rules or prescribed forms have been made.

---

[12] The alternative statutory source being section 35 of the Partnership Act, as applied by section 3 of the ELP Act, or under section 92(e) of the Companies Act, as applied by section 36(3) of the ELP Act.

48.     As a result of section 36(3), various provisions of Part V of the Companies Act apply to a non-voluntary liquidation of an ELP. One of those provisions is section 99 of the Companies Act which provides that:

"*When a winding up order has been made, any disposition of the company's property and transfer of shares or alteration in the status of the company's members made after the commencement of the winding up is, unless the Court otherwise orders, void.*"

49.     In short, this means in the event a winding up order is made in the Petition Proceedings, all dispositions of partnership property or changes in the interests of limited partners from the date the petition was presented on 6 June 2025 are void unless specifically approved (or validated) by the Cayman Court.

## H.     Section 36(7) of the ELP Act

50.     Section 36(7) of the ELP Act provides that:

*The general partner or its legal representative shall promptly serve notice on all limited partners informing the limited partners of –*

(a)     *the death;*

(b)     *the commencement of liquidation, bankruptcy or dissolution proceedings; or*

(c)     *the withdrawal, removal or making of a winding up or dissolution order,*

*in relation to the sole or last remaining qualifying general partner and in this section each event is referred to as an "**event of withdrawal**".*

51.     Section 36(9) then provides that:

*Unless the partnership agreement provides otherwise, if a new qualifying general partner is not elected within ninety days after the service of notice of an event of withdrawal in accordance with subsection (7), in this section referred to as "**the automatic wind up date**", the exempted limited partnership shall be wound up in accordance with the partnership*

*agreement or the orders or directions the court may make or give in accordance with subsection 3(g).*[13]

52.     Under Section 36(10) the winding up is deemed to commence, relevantly, on the automatic wind up date in sub-section (9) or on the date a petition for winding up is presented, in the case of a winding up order being made.

53.     Pursuant to Section 36(13), the affairs of an ELP are required to be wound up by the general partner or other person appointed under the partnership agreement or the court.

54.     Section 36 further provides that the partners of an ELP can agree that the occurrence of certain events will trigger the commencement of a voluntary winding up:

(a)      Section 36(1)(a) provides that an ELP "***shall*** *be voluntarily wound up in accordance with the provisions of the Partnership agreement - (a) at the time or upon the occurrence of any event specified in the partnership agreement*" (emphasis added)

(b)     Section 36(10)(d) provides that the winding up of an exempted limited partnership "***shall*** *be deemed to commence upon the earlier to occur of any of the following- ... (d) the occurrence of an event provided by the partnership agreement upon which the exempted limited partnership is to be wound up*" (emphasis added).

55.     In regards to the Partnership, pursuant to paragraph 10(b) of the LPA it has been agreed that the Partnership "***shall*** *be wound up and dissolved (i) upon any event in respect of the General Partner specified in section 15(5) of the ELP Law*" (emphasis added). The "*ELP Law*" is defined in the LPA by reference to the 2012 Revision "*as amended from time to time*" and the "*events*" identified in s.15(5) of the ELP law are now found at section 36(7) of the ELP law (as outlined in paragraph 50 above), which include (under section 36(7)(b)): *"the commencement of liquidation,*

---

[13] Sub-section 3(g) provides that "*on application by a partner, creditor or liquidator, the court may make orders and give directions for the winding up and dissolution of an exempted limited partnership as may be just and equitable*".

*__bankruptcy__ or dissolution proceedings ... __In relation to the sole or last remaining qualifying general partner__"* (emphasis added).

56.     The commencement of the Chapter 11 Bankruptcy Proceedings in respect of the General Partner (which is the sole general partner of the Partnership) is thus an "*event*" specified in section 15(5) of the ELP law (2012 Revision) and section 36(7) of the ELP law (2025 Revision). The contractually agreed and statutorily mandated consequence under paragraph 10(b) of the LPA together with sections 36(1)(a) and 36(10)(d) of the ELP Law is that a voluntary winding up of the Partnership is deemed to have commenced on 9 December 2025, when the General Partner commenced these bankruptcy proceedings in the Delaware bankruptcy court.

## I.     The Petition Proceedings and the Writ Proceedings

57.     As stated above, the Rigmora LPs presented their petition to wind up the Partnership on 6 June 2025. In these proceedings (the "**Petition Proceedings**") the Rigmora LPs seek the winding up of the Partnership based on:

(a)     continued serious mismanagement and lack of probity in the conduct of the affairs of the Partnership by the General Partner which they allege has resulted in a justifiable loss of trust and confidence in the General Partner's ability to manage the Partnership's affairs in the best interests of the Partnership as a whole (including the extreme relief it sought in the Delaware Proceedings and the way in which it brought those proceedings about, as outlined in paragraphs 10 to 11 above);

(b)     conflicts of interest arising in respect of the General Partner acting through Dr Harrison (including, for example, launching a litigation campaign in which it sought to impose a Default Charge on the Rigmora LPs in a way that would transfer half of

23

their interests in the Partnership to Dr Harrison) and breaches of fiduciary duty by the general partner;

(c)      loss of substratum of the Partnership (i.e. the purpose for which the Partnership was created is no longer being fulfilled); and

(d)      the need for an independent investigation into the conduct of the Partnership's affairs by the General Partner.

58.    Under Cayman Islands law, this is referred to as winding up on just and equitable grounds. The Court's jurisdiction has a statutory footing and in relation to ELPs arises out of section 36(3)(g) of the ELP Act. The same jurisdiction exists in relation to companies and arises under section 92(e) of the Companies Act.

59.    Alongside the Petition Proceedings the Rigmora LPs have also commenced proceedings against the General Partner in which they have challenged the validity of various capital calls that the General Partner issued in late May and early June 2025 (the "**Writ Proceedings**"). Although the Petition Proceedings and the Writ Proceedings are separate proceedings, they are being heard by the same Grand Court judge (the Honourable Justice Jalil Asif KC) and are due to be resolved at the same trial in January 2026. The General Partner has also repeatedly taken the position that the outcome of the Writ Proceedings will heavily affect the outcome of the Petition Proceedings, and although the Rigmora LPs do not agree as to the extent of this impact they do agree that there are overlapping issues in the two sets of proceedings.

**J.      Current status of the Petition Proceedings and the Writ Proceedings**

60.    Both the Petition Proceedings and the Writ Proceedings are currently at a highly advanced stage and if allowed to continue will almost certainly result in a resolution in January 2026. Multiple hearings have taken place already before Justice Asif, during which he has reviewed thousands of pages of written evidence and legal argument along with many hours of verbal argument by the parties' attorneys. As a consequence, Justice Asif now has a detailed understanding of the Partnership and the various issues it is facing.

61.    The General Partner has been actively involved in every stage of the Petition Proceedings and the Writ Proceedings. It has deployed a sizeable legal team from the law firm Walkers, which is one of the largest law firms in the Cayman Islands, as well as two King's Counsel.

62.    As matters stand currently, from 12 January 2026 to 16 January 2026 a joint trial will be taking place before the Honourable Justice Asif KC. Justice Asif has also set aside five days of "*reading time*" from 5 January 2026 to 9 January 2026 in order to prepare for the trial, including reading the various legal pleadings, written evidence, and written legal submissions provided by the parties in advance of the trial. Justice Asif has also set aside from 19 January 2026 to 23 January 2026 to write his judgment — in my experience this means that he will most likely provide his decision on whether to wind up the Partnership, and if so the arrangements that should be put in place for this process, by 23 January 2026 at the latest.

63.    The next scheduled hearing in the Petition Proceedings is a pre-trial conference on 17 December 2025. In Cayman Islands litigation the pre-trial conference is the final hearing that takes place immediately before trial, which is for the purpose of enabling the parties and the Court to deal with any final issues (often simply logistical matters) that need to be resolved before the trial

commences. After the General Partner filed the Chapter 11 petition Walkers wrote to Justice Asif and asked him to vacate the pre-trial conference on the basis that this petition had been issued. Justice Asif declined this request, and said that he wanted to hear from the parties on the Chapter 11 petitions and their potential consequences on the Petition Proceedings and Writ Proceedings.

64.    I have set out below the key events which have occurred in the Cayman Islands proceedings, which I have arranged by topic. As is clear from the below, there has been heavy engagement by the Rigmora LPs, the General Partner, and Justice Asif during the past six months in these proceedings. As is also clear from the below, the General Partner has also made multiple attempts to delay the resolution of the Petition Proceedings and Writ Proceedings, all of which have failed.

**K.    The exchange of pleadings by the Parties**

65.    In Cayman Islands litigation the parties will exchange documents called "pleadings" which set out the various factual allegations made, and admitted or denied, by each party. The pleadings that the parties have exchanged to date have been extensive.

66.    In the Petition Proceedings, the following key pleadings have been filed:

(a)    The Rigmora LPs commenced the Petition Proceedings on 6 June 2025 by filing a 30 page "*Winding Up Petition*", along with 587 pages of evidence, setting out at a high level the key reasons why the Partnership should be wound up.

(b)    After Walkers confirmed in correspondence on 13 June 2025 that it was acting for the General Partner in the Petition Proceedings, on 21 August 2025 it filed a 50 page "*Defence to the Petitioners' Winding Up Petition*" in which it set out the General Partner's responses to the allegations set out in the Winding Up Petition. A key

argument presented by the General Partner in this Defence (which the General Partner has repeated throughout the Petition Proceedings) is that Chancellor McCormick's trial judgment in the Delaware Proceedings would include various factual and legal findings which would effectively be binding on the Cayman Court (by creating issue estoppels and/or *res judicates*). Evidently, the General Partner assumed that these findings would be favourable to the General Partner.

(c)    On 3 September 2025 the Rigmora LPs filed a 20 page "*Reply to the Defence to the Winding Up Petition*" in which it responded to the allegations set out in the General Partner's Defence to the Winding Up Petition.

(d)    On 31 October 2025 Justice Asif issued an order (which the General Partner consented to) permitting the Rigmora LPs to amend the Winding Up Petition to take into account new evidence that had been uncovered during the course of the Cayman Proceedings. The Rigmora LPs then filed a 54 page "*Amended Winding Up Petition*" on 20 November 2025 (which had previously been sent to Walkers in an unfiled form on 23 October 2025).

(e)    On 20 November 2025 the General Partner filed a 78 page "*Amended Defence to the Petitioner's Winding Up Petition*" (as noted above, the General Partner had previously been provided with the Rigmora LP's Amended Winding Up Petition on 23 October 2025). The Amended Defence set out in detail the various ways in which the General Partner considered that Chancellor McCormick's trial judgment would be determinative of issues in the Petition Proceedings.

27

(f)     On 24 November 2025 the Rigmora LPs filed a 26 page "*Amended Reply to the Amended Defence to the Amended Winding Up Petition*".

67.    As noted above, the Writ Proceedings are also taking place in parallel with the Petition Proceedings (and are scheduled to be dealt with at the same trial as the Petition Proceedings). I will not go into detail here in regards to the various documents that have been filed in the Writ Proceedings, save to say that they are extensive and deal with many issues that overlaps with ones that have been raised in the Petition Proceedings. I further note that Justice Asif has criticised the General Partner for the way it has behaved in the Writ Proceedings. Specifically, in a written judgment dated 18 August 2025 in which Justice Asif rejected the General Partner's application to amend an interim injunction that had been put in place previously to maintain the status quo pending the outcome of the Writ Proceedings, Justice Asif noted that: "*I am concerned that what is driving the Defendant's* [i.e. the General Partner] *application is an effort to give the Defendant the strategic advantage of being able to apply economic pressure to the Plaintiffs* [i.e. the Rigmora LPs] *in an inappropriate manner.*" Ex. A.

68.    In the Petition Proceedings the General Partner has repeatedly taken the position that the Partnership is extremely successful and financially very healthy. For example, in paragraph 4 its Amended Defence in the Petition Proceedings dated 20 November 2025 the General Partner has said that the Partnership "*has been hugely successful and its existing investments have resulted in exceptional returns to the Partnership*" and further said that the total value of the Partnership (net asset value plus prior distributions) has most recently been valued at US$6.2 billion. Ex. B. To the extent that the General Partner, or Dr Harrison, have expressed concerns about financial matters in

the Petition Proceedings these concerns have been about the financial position of the portfolio companies owned by the Partnership, not the Partnership itself.

**L.      The General Partner's first stay applications**

69.    On 26 June 2025 the General Partner filed: (i) a summons seeking to stay the Petition Proceedings accompanied by a 23 page affidavit which had 551 pages of evidence; and (ii) a separate summons seeking to stay the Writ Proceedings accompanied by a 23 page affidavit which had 563 pages of evidence exhibited to it (albeit much of it was duplicative) (collectively, the "**Stay Summonses**"). Put briefly, the position taken by the General Partner in the Stay Summonses was that once judgment is issued in the Delaware Proceedings the findings of Chancellor McCormick would effectively resolve many of the issues in the Petition Proceedings and Writ Proceedings (by creating issue estoppels and *res judicata*) and therefore the Cayman proceedings should be stayed until after the Delaware Proceedings have concluded.

70.    On 16 July 2025 the Rigmora LPs served their evidence in answer to the Stay Summonses (which was subsequently filed on 21 July 2025), comprising a 32 page affidavit in the Petition Proceedings with 284 pages of evidence exhibited to it, and a 32 page affidavit in the Writ Proceedings with 416 pages of evidence exhibited to it in the Writ Proceedings (some of which was duplicative).

71.    On 23 July 2025 the General Partner served its reply evidence for the Stay Summonses, comprising a 14 page affidavit in the Petition Proceedings with 9 pages of evidence exhibited to it, and a 14 page affidavit in the Writ Proceedings with 3 pages of evidence exhibited to it.

72.    A hearing took place on 1 August 2025 to resolve the Stay Summonses (this was the same hearing at which the General Partner's application to amend the injunction was heard).

However, partway through the hearing the General Partner voluntarily agreed to withdraw the Stay Summonses. The General Partner also agreed that the trial of the Petition Proceedings and Writ Proceedings should take place in January 2026.

**M.      The General Partner's second stay applications**

73.     On 3 October 2025 a mention hearing (effectively the Cayman Islands equivalent of a status hearing) took place. The day before this hearing the General Partner's Leading Counsel filed 8 pages of legal submissions requesting that the Petition Proceedings and Writ Proceedings be stayed. Again, the reason provided by the General Partner for why a stay was necessary was because Chancellor McCormick's trial judgment would resolve many of the issues in the Cayman proceedings. Justice Asif rejected this application for a stay.

**N.      The General Partner's third stay applications**

74.     On 31 October 2025 a case management conference (the Cayman Islands equivalent of a status conference) took place. During this hearing the General Partner's Leading Counsel made various submissions to the effect that the trial of the Petition Proceedings should not take place in January 2026, as had been previously scheduled with the agreement of the General Partner. Justice Asif rejected these arguments.

**O.      Justice Asif's indication in November 2025 of the appropriate outcome of the Petition Proceedings**

75.     On 2 November 2025, following a hearing on 31 October 2025, Justice Asif issued an *ex tempore* judgment regarding who the proper parties are to the Petition Proceedings.[14] Justice Asif

---

[14]     This was then recorded in a written judgment issued on 6 November 2025: *In the Matter of ATP Life Science Ventures LP* [2025] CIGC (FSD) 106.

ultimately concluded that the Petition Proceedings should be treated as *inter partes* proceedings between the Rigmora LPs and the General Partner with the Partnership as its subject matter. The reason for this was because, as I have explained above, an exempted limited partnership does not have separate corporate personality, and is instead effectively a statutory trust. An exempted limited partnership is therefore unable to perform actions on its own, including that it cannot participate in litigation.

76.    Justice Asif invited any other limited partners of the Partnership to involve themselves in the Petition Proceedings should they so wish. To date, no other Limited Partner has sought to intervene as a party. This is not particularly surprising. The remaining Limited Partners have not contributed any capital to the Partnership and therefore are unlikely to be sufficiently interested in the Partnership to want to get involved. Instead, the Rigmora LPs having contributed approximately 98% of the capital and Dr Harrison / Les Pommes contributing roughly 2% of the capital through interest-free loans provided to Dr Harrison from the Rigmora LPs' predecessors.[15]

77.    Importantly, in his judgment Justice Asif provided a strong indication of his initial views regarding the appropriate outcome of the Petition Proceedings. Specifically, Justice Asif referred to a previous Cayman Islands judgment (known as the One Thousand and One Voices Africa Fund decision) in which a Grand Court judge had commented that the "*fundamental principle*" in Cayman Islands exempted limited partnerships is that "*the wishes of the majority stakeholders prevail*" and that "*The best way for a manager who has lost the confidence of the investors to demonstrate their probity is to step aside, demonstrating that their impugned management of the fund will be vindicated by independent scrutiny. Instead, the importance of their continuing at the helm is*

---

[15] I note for completeness that it is not disputed that these loans have been repaid.

*apparently given priority over the wishes of the investors, and the recalcitrant manager claims to know better than the investors where their best commercial interests lie. Regrettably, whatever unique expertise the scorned manager truly possesses, the distinct impression is created that the determination to cling to office is motivated by self-interest at best, or the desire to forestall independent investigation into suspect dealings at worst.*" Justice Asif commented that, based on the material that he had seen so far (which was extensive) he considered that there was a "*strong similarity*" between the <u>One Thousand and One Voices Africa Fund</u> decision and the present dispute between the Rigmora LPs and the General Partner.

**P.      The Privilege Summonses**

78.     On 2 October 2025 the General Partner filed an application in both the Petition Proceedings and the Writ Proceedings seeking to (on the grounds of legal privilege) exclude various documents that had been shown to the Delaware Court in the Delaware Proceedings (the "**Privilege Summonses**"). The Privilege Summonses were supported by a 24 page affidavit which had 238 pages of evidence exhibited to it.

79.     In response, on 4 November 2025 the Rigmora LPs filed a 27 page affidavit which had 320 pages of evidence exhibited to it.

80.     On 17 November 2025 the General Partner then filed a 16 page affidavit which had 383 pages of evidence exhibited to it. Shortly before the hearing a Campbells attorney then provided a further affidavit setting out additional evidence, in response to which a Quinn Emanuel partner (Andrew Berdon) provided an 11 page unsworn affidavit.

81.     The hearing of the Privilege Summonses took place on 28 November 2025 (prior to which Justice Asif was provided with a combined 51 pages of legal submissions by the Parties).

82.   On 1 December 2025 Justice Asif confirmed that he would reject the Privilege Summonses. In response, Walkers sent Campbells letters on 3 December 2025 and 9 December 2025 in which it said that the General Partner intended to seek leave to appeal the Privilege Summonses (although to date the General Partner has failed to obtain leave). Exs. C, D. However, in those same letters Walkers said that the General Partner was committed to proceeding with a trial of the Cayman Proceedings in January 2026 and would not allow its threatened appeal to prevent the trial from occurring.

**Q.    The filing of witness evidence**

83.   In Cayman Islands litigation witnesses' evidence-in-chief is primarily provided through written witness statement (with the focus of the hearing itself being on cross-examination).

84.   The due date for the parties to file their witness statements was 3:00 pm on 5 December 2025.

85.   The Rigmora LPs filed their witness statements (consisting of three witness statements) before the deadline on 5 December 2025. The General Partner did not. At 09:46 pm on Monday 8 December 2025 Walkers then belatedly provided Campbells with the General Partner's witness statements. These consisted of a 161 page witness statement from Seth Harrison and a 16 page witness statement from the Head of Communications at Apple Tree Partners. Under Cayman Islands law I am not at this stage able to reveal the full contents of these witness statements to the Delaware court, but without waiving privilege I can confirm that nothing in the witness statements indicated to us that the General Partner intended to commence Chapter 11 bankruptcy proceedings. On the contrary, as noted above in paragraph 82, Walkers had sent letters on both 3 December and

9 December in which it had stressed that the General Partner was committed to proceeding to a trial of the Petition Proceedings. Exs. C, D.

**R.      Wasted costs if the trial of the Cayman Proceedings does not go ahead**

86.    As matters stand currently the Petition Proceedings are at a highly advanced stage procedurally. As is set out in the Consent Order for Directions (the terms of which the General Partner consented to), most of the remaining procedural steps in the lead-up to trial are due to be completed over the next week, with any final procedural matters that remain unsettled to be resolved at a pre-trial conference scheduled to take place on 17 December 2025. Ex. E. As mentioned, the Honourable Justice Asif KC has fixed the trial of the Petition Proceedings together with the Writ Proceedings for 5 days commencing on 12 January 2026. His Lordship has also fixed reading time of 4 days from 6 January 2026. In case it assists the Court, I note that Judges of the Grand Court of the Cayman Islands typically list reading time as part of the trial fixture in order that they have time to conduct proper pre-reading in advance of oral submissions and testimony. His Lordship has also indicated to the parties that he has arranged his diary so as to have the balance of the week commencing 19 January 2026 available to write his judgment in order to hand down his decision as soon as possible following the conclusion of the trial.

87.    It would be difficult to overstate the enormous level of wasted costs to the Partnership and the Rigmora LPs, and inconvenience to the Cayman court, that would be created if the trial of the Petition Proceedings and Writ Proceedings does not go ahead. These items include:

87.1    As explained above, Justice Asif has set aside 15 days to deal with the trial. Justice Asif is a very busy and in-demand judge and this is therefore a significant time commitment for him to have made. In light of the very late stage at which the Chapter

34

11 Petitions have been filed, if the trial does not go ahead there will be a high likelihood that Justice Asif will be unable to reallocate this time to other Cayman Islands litigants.

87.2    Significant preparations have been made, and costs incurred, so that the relevant parties to the Cayman Proceedings can attend the trial. The Rigmora LPs' key principals have rearranged their business affairs in order to be physically present in the Cayman Islands for the trial, and have also had to incur various non-refundable costs (both financial and administrative) on matters such as visas, accommodation, logistical arrangements while they attend the trial, etc.

87.3    The Rigmora LPs have engaged extensively in the Cayman Proceedings for six months to date, during which it has incurred millions of dollars in legal fees. Again, all of these fees will be wasted if the trial of the Cayman Proceedings does not proceed.

87.4    The General Partner has also engaged extensively in the Cayman Proceedings for the past six months, during which it has been represented by a large legal team from the Cayman Islands law firm Walkers (which is widely understood to be one of the most expensive law firms in the Cayman Islands with some of its partners charging US$2,000 per hour), along with two King's Counsel and with extensive input from Quinn Emanuel (who have sent multiple partners to remotely attend each hearing). While I do not know the precise level of legal fees that the General Partner's lawyers have charged to date, these fees will undoubtedly run to many million dollars.

Furthermore, Walkers has admitted that all of these legal fees have been paid using the Partnership's assets, which as explained above are assets held by the General Partner on trust for the limited partners. Again, if the trial of the Cayman Proceedings does not go ahead these fees will have been wasted.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed at George Town, Cayman Islands on December 12, 2025.

_____
Liam Faulkner