## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Apple Tree Life Sciences, Inc., *et. al.*,[1] | Case No. 25-12177 (LSS) |
| Debtors. | (Joint Administration Requested) |

## DECLARATION OF DR. SETH L. HARRISON
## IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

I, Dr. Seth L. Harrison, managing director and director of ATP III GP, Ltd. (the "General Partner," or "GP"), managing director of ATP Life Science Ventures, L.P. (the "Partnership" or the "Fund"), President and Chief Executive Officer ("CEO") of Apple Tree Life Sciences, Inc. ("ATLS" and, collectively with the General Partner and the Partnership, the "Corporate Debtors"), and director of Apertor Pharmaceuticals, Inc. ("Apertor"), Initial Therapeutics, Inc. ("Initial"), Marlinspike Therapeutics, Inc. ("Marlinspike"), and Red Queen Therapeutics, Inc. ("Red Queen" and, collectively with Apertor, Initial, and Marlinspike, the "Filing Portfolio Companies" or the "Filing PortCos" and, collectively with the Corporate Debtors, the "Debtors") hereby declare (the "Declaration") under penalty of perjury:

### DECLARANT'S BACKGROUND

1.      As stated above, among other things, I serve as the managing director of the GP, a position I have maintained since the inception of the Partnership.

---

[1]      The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number include: Apple Tree Life Sciences, Inc. (4506); ATP Life Science Ventures, L.P. (8224); ATP III GP, Ltd. (6091); Apertor Pharmaceuticals, Inc. (3161); Initial Therapeutics, Inc. (2453); Marlinspike Therapeutics, Inc. (4757); and Red Queen Therapeutics, Inc. (8563) (collectively, the "Debtors").  The location of the Debtors' service address in these chapter 11 cases is 230 Park Avenue, Suite 2800, New York, NY 10169.

2.        I received a Bachelor of Arts from Princeton University, and a Doctor of Medicine and a Master of Business Administration from Columbia University.  Prior to pursuing a career in venture capital, I trained as a surgeon, completing my surgery internship at Columbia Presbyterian Medical Center.  I now have more than 35 years of experience in venture capital investing, company formation, and the development of pharmaceutical and medical device companies.

3.        I have spent my career in the biotechnology and life sciences industry.  I have been involved with the Debtors since the Partnership's inception in 2012.  In particular, as the managing director of the General Partner, I am familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records.

4.        Under my leadership, the Fund reached a total value of approximately $6.5 billion (compared to only approximately $2.1 billion invested in the PortCos (as defined below)) in early 2025, and has made distributions to its limited partners of over $2 billion over the course of its life thus far.  I have successfully guided the Partnership through numerous notable individual successes, many described more fully below, including:

    a.        leading two of its startups, Stoke Therapeutics, Inc. and Akero Therapeutics, Inc. to initial public offerings in 2019, nearly quintupling its cumulative $150 million investment in those startups by 2020.

    b.        in 2018, selling its position in Syntimmune, Inc. for $278 million in up-front consideration and up to an additional $603 million in potential milestone payments tied to the achievement of certain key clinical and regulatory events, compared to an investment of $71 million.

    c.        bringing Braeburn (as defined below), with the Partnership's $600 million investment, to a multibillion dollar valuation after its successful launch of its flagship product to treat opioid use disorder in late 2023.

5.        Except as otherwise indicated, all facts in this Declaration are based upon my personal knowledge, my discussions with the Debtors' management team and advisors, my review of relevant documents and information concerning the Debtors' operations, financial affairs, and

restructuring initiatives, or opinions formed based on my experience and knowledge.  I am over the age of eighteen and authorized to submit this declaration on behalf of the Debtors.  If called upon to testify, I could and would testify competently to the facts set forth in this declaration.

## **INTRODUCTION**

6.      The Debtors comprise a biotechnology venture capital enterprise operating and investing in the United States.  The Partnership is a Cayman Islands exempted limited partnership that operates as the investment fund.  The General Partner manages the Partnership's investments and operations.  ATLS is a Delaware corporation and wholly-owned subsidiary of the Partnership that handles operational expenses, including facility costs, leases, and employee costs.  Since the Partnership's formation in 2012, the Corporate Debtors have invested billions of dollars in life science companies researching and developing potential promising new treatments for life-threatening conditions including cancer, blindness, opioid addiction, and obesity, among others (collectively, the "Portfolio Companies" or "PortCos").  The four Filing PortCos, incorporated in Delaware between 2020 and 2021, are part of a group of 15 companies.  **Exhibit A** attached to this Declaration shows the corporate structure of the Partnership, Managing Partner, and PortCos.  In addition, the following chart is a brief description of the research, development, or production of new medicines being conducted by the PortCos:

| PortCo | Description of Research / Work |
|---|---|
| **PortCos in Preclinical Stage** | |
| Aethon Therapeutics, Inc. ("Aethon") | Aethon researches novel antibody therapies that combine immunotherapy with targeted cancer drugs.  Aethon antibodies are designed to enable the immune system to detect and eliminate tumor cells. |
| **Apertor (Debtor)** | Apertor develops novel molecular glues for cancer therapy. |
| Deep Apple Therapeutics, Inc. ("Deep Apple") | Deep Apple's research focuses on finding novel drugs for metabolic, inflammatory, and cardiometabolic conditions like obesity. |

| PortCo | Description of Research / Work |
|---|---|
| Evercrisp Biosciences, Inc. ("Evercrisp") | Evercrisp's research focuses on finding novel drugs for inflammatory, metabolic, and endocrine diseases.  The founder of Evercrisp is the Nobel Laureate, Dr. Jennifer Doudna, the inventor of gene-editing. |
| **Initial (Debtor)** | Initial develops small-molecule medicines to treat cancer and other life-threatening illnesses. |
| **Marlinspike (Debtor)** | Marlinspike focuses its research on finding key cancer vulnerabilities and developing related therapies. |
| Nereid Therapeutics, Inc ("Nereid") | Nereid is a company founded on technology originating from the laboratory of a prominent scientist at Princeton University.  That research holds the promise of potential treatments for cancers and neurological conditions, among others. |
| Nine Square Therapeutics Corporation ("Nine Square") | Nine Square's research focuses on discovering and developing novel small-molecule therapeutics for severe neurodegenerative diseases and other movement disorders. |
| **Red Queen (Debtor)** | Red Queen develops antiviral treatments for a broad range of viral illnesses, including coronaviruses, influenzas, and RSV. |
| **PortCos in Clinical Stage** | |
| Aulos Bioscience, Inc. ("Aulos") | Aulos is conducting Phase 2 clinical trials for novel immunotherapies targeting metastatic melanoma, with extraordinary emerging results in patients who have failed all prior treatments. |
| Ascidian Therapeutics, Inc. ("Ascidian") | Ascidian has achieved preclinical proof of concept for a first-of-its-kind RNA editing treatment for inherited childhood blindness and is currently conducting a clinical trial for Stargardt disease that requires funding to complete a pediatric cohort. |
| Marengo Therapeutics, Inc. ("Marengo") | Marengo is developing cancer immunotherapies, including a first-in class drug that has been granted Fast Track designation by the FDA for the treatment of advanced colorectal cancer, among other cancers. |
| Replicate Bioscience, Inc. ("Replicate") | Replicate is developing a novel self-replicating RNA technology for the treatment of autoimmune disorders and infectious diseases, including a clinical stage rabies vaccine. |
| **PortCos in Commercial Stage** | |
| Braeburn Inc. ("Braeburn") | Braeburn markets Brixadi, an FDA-approved extended-release injectable treatment for opioid use disorder. |
| Galvanize Therapeutics, Inc. ("Galvanize") | Produces medical devices that treat cancer. |

7.      The Partnership has two majority limited partners:  Rigmora Biotech Investor One LP, and Rigmora Biotech Investor Two LP (together, the "Rigmora LPs").  The Rigmora LPs are ultimately owned by the family trust (the "Family Trust") of billionaire Dr. Dmitry Rybolovlev ("Dr. Rybolovlev"), who was originally born in Russia and now holds Cypriot citizenship.

8.      In October 2022, following Russia's February 2022 invasion of Ukraine, as detailed herein, the Debtors began to experience liquidity issues.  While we learned at the Delaware Chancery Court trial (discussed below) that this was the direct result of the Rigmora LPs' own prior investment strategies, it manifested itself through the Rigmora LPs' stated desire to minimize their ongoing funding obligations to the PortCos and coincided with the difficulties of raising alternate, external capital due to the Rigmora LPs' connection to Dr. Rybolovlev.  While Dr. Rybolovlev has not been sanctioned by the United States, United Kingdom, or European Union (though he is sanctioned by Ukraine), his prior connections to Russia have made it virtually impossible for the Debtors and other entities connected with him to conduct ordinary course and typical financial transactions.  Banks, potential investors, and business partners have often refused to engage with entities connected to him, including the Debtors, due to Know Your Customer ("KYC") regulatory concerns and fears of future sanctions.  As a result, the Debtors face limited ability to obtain outside financing from other sources.  After learning of Dr. Rybolovlev's connection to the Debtors' business, a number of potential investors and partners have pulled out of deals that the parties had already substantially negotiated.

9.      In addition, after a significant surge during and following the Covid pandemic, investment in the biopharmaceutical market began to trend downwards in 2022 due to rising interest rates and economic uncertainty, and the rate of syndications and other exit opportunities slowed.  As a result, when Dr. Rybolovlev became less interested in continuing to invest in

biopharmaceutical research like that conducted by the PortCos (due to his own reputational issues and dwindling liquidity), the Debtors had no access to replacement capital.

10.     As a result of the Rigmora LPs' desire to limit their investments, and despite efforts to accommodate the Rigmora LPs' liquidity concerns through "austerity budgets" and programmatic cuts, the Rigmora LPs ultimately breached their funding obligations under the Partnership's governing agreement (as amended, the "LPA").  The Rigmora LPs refused to fund capital calls totaling approximately $106 million that were issued on May 30, 2025 (the "May 30 Capital Calls") —calls that were made in strict compliance with the parties' contractual agreements and previously approved Budgets.[2]  The Rigmora LPs' refusal to honor the May 30 Capital Calls has directly caused a severe liquidity crisis across the Partnership's portfolio companies.  Because the Rigmora LPs are the chief funding source for the Partnership, and the Partnership is in turn often the only source of funding for its Portfolio Companies, the consequences of the Rigmora LPs' breach of the LPA have been existential.  To date, the Debtors and their affiliates had to terminate close to 100 employees, leaving most of the Portfolio Companies with skeletal workforces barely sufficient to maintain intellectual property and prevent immediate collapse.  Years of research and pre-clinical drug development conducted by the Portfolio Companies have been severely disrupted, with scientists cut off from funding in the middle of critical experiments and clinical trials reduced in scope.  The Rigmora LPs' failure to fund the Marengo capital call specifically led to scientist layoffs, reduced research programs, and an inability to make

---

[2]     As discussed more fully below, the term "Budget" as used herein refers to the budgets provided for pursuant to the terms of the LPA.  Subsection 5(a)(ii)(E) of the LPA authorizes the GP to call capital in amounts sufficient to "invest in Projects approved by the holders of a majority of the Preferred Units in writing in accordance with a budget therefor approved by such holders of Preferred Units."  The Rigmora LPs (which hold the majority of Preferred Units (as defined in the LPA) thus have the right to approve budgets for Projects (defined in the LPA as "investments in pharmaceutical, medical device and other medically-related companies, projects and related activities that are made directly by the Partnership or indirectly by it through Intermediaries") before capital can be called.

commitments that could have led to early approval of its breakthrough cancer medication. Nereid's operations have been completely suspended.  Due to lack of funding, the Portfolio Companies are now unable to progress research while competitors gain ground daily.   For example, Aulos was forced to secure emergency interim financing from its CEO's family office— an unprecedented arrangement for a clinical-stage company—yet even this stopgap will be exhausted by January 2026.  As Joseph Yanchik—a venture partner of the Partnership who serves on the boards of directors of Braeburn, Marengo, Nereid, and Replicate, and has been the primary representative in communications with creditors—testified in connection with the Delaware Chancery Court Action (defined below), the creditors to whom the Portfolio Companies owe outstanding obligations will not hold off much longer waiting for payment, and may initiate legal action or force the Portfolio Companies into an involuntary bankruptcy—at which point the Partnership is "likely to lose the assets" entirely. *See ATP III GP, LTD., in its capacity as Gen. Partner of ATP Life Sci. Ventures, L.P., Plaintiff, v. Rigmora Biotech Investor One LP & Rigmora Biotech Investor Two LP, Defendants.*, 2025 WL 3496987, at \*18 (Del. Ch. Dec. 5, 2025).  The Debtors are at the point where funding needs to continue to maintain the Debtors' core business and maximize the value of its assets.

11.     In response to the Rigmora LPs' continued and unremediated breach of their obligations, the Debtors pursued litigation in Delaware to enforce the parties' agreement (the "Delaware Chancery Court Action").  On December 5, 2025, the Delaware Chancery Court issued a judgment, a copy of which is attached hereto as **Exhibit B**, ordering specific performance of all but one of the May 30 Capital Calls and finding that the Rigmora LPs are contractually obligated to fund them in an amount of $96,960,925.88.  However, the Rigmora LPs may not comply with their funding obligations until judicial process has been exhausted and the Debtors have no other

source of operating funds.  Consequently, as mentioned above, the Debtors can no longer sustain operations without judicial intervention.  Enforcing the Delaware judgment may require additional litigation, appeals, and ultimately collection efforts—a process that could take months or years.

12.     Compounding the problem, in response to the litigation in Delaware Chancery Court, the Rigmora LPs commenced a series of retaliatory proceedings in the Cayman Islands (the "Cayman Proceedings") seeking to avoid their funding obligations, denigrate the integrity and competence of the Partnership's general partner, and wind up the Partnership entirely.  Their strategy is transparent: rather than meet their contractual obligations, the Rigmora LPs seek to liquidate the Partnership through the Cayman Proceedings and thereby starve the Portfolio Companies of funding needed to continue their critical and valuable work.  A Cayman Islands winding up would be catastrophic for all stakeholders.  It would be a pure liquidation and force fire sales or immediate liquidation of the interests in the Portfolio Companies at distressed prices, terminate ongoing clinical trials, and extinguish the value that the Partnership has built since the inception of the PortCos.  The Rigmora LPs appear willing to accept this destruction rather than fund their commitments—a scorched-earth approach that harms everyone, including themselves.

13.     Furthermore, on December 12, 2025, the Rigmora LPs petitioned the Bankruptcy Court for an expedited process to dismiss these Chapter 11 Cases (defined below).  At no time since the filing of these Chapter 11 Cases did the Rigmora LPs contact me or counsel to engage in any dialogue with respect the Chapter 11 Cases.  The Rigmora LPs have clear goals: to preserve their own liquidity and avoid their funding obligations at all costs, including destroying the value of the PortCos, and eliminating the return to their creditors and the Debtors.

14.     Indeed, this value-destroying strategy has been made clear by the Rigmora LPs' tactics in the Cayman Proceedings and Delaware Chancery Court Action.  The Debtors filed the

Delaware Chancery Court Action on May 30, 2025, along with a motion to expedite.  On June 2, the Rigmora LPs filed a retaliatory "Writ" proceeding in the Grand Court of the Cayman Islands ("Cayman Court") seeking to abrogate their funding obligations to the Partnership.  After filing the Cayman Writ, the Rigmora LPs requested a briefing schedule in Delaware allowing them ten days to submit their papers in opposition to the Debtors' motion to expedite.  They used that time to file a new petition in the Cayman court seeking the judicial "winding up" of the Partnership and liquidation of the PortCos.

15.    From that point onward, the Rigmora LPs have time and again sought to use the Cayman Proceedings to hamper the Debtors' enforcement of the LPA in Delaware.  On June 17, 2025, the Debtors issued Default Notices informing the Rigmora LPs that should they fail to contribute capital in response to the May 30 Capital Calls by June 20, and fail to cure that breach within 30 days thereafter, they would be in default as defined in the LPA.  Rather than comply with their funding obligations or litigate the validity of the capital calls in Delaware on an expedited schedule, on June 20 the Rigmora LPs sought and received an *ex parte* order from the Cayman court granting an interim injunction enjoining the Debtors from taking steps to default the Rigmora LPs under the LPA or call additional capital to fund the PortCos or the Debtors' own fees and expenses.  Meanwhile, in Delaware, having granted the Debtors' motion to expedite, on June 27, 2025, the Delaware Chancery Court denied the Rigmora LPs' request to stay the Delaware Chancery Court Action in favor of the Cayman Proceedings, and, after a full trial, the Delaware Chancery Court found that the Rigmora LPs breached their obligations to meet the capital calls at issue and further directed specific performance.  The Cayman Court's interim injunction still stands.

16.     While the Delaware Chancery Court judgment found that the Rigmora LPs are required to contribute more than $96 million in response to the May 30 Capital Calls, and can call up to a total of about $30 million above that sum, those funds are still not readily available to the Debtors and, even if paid, will be inadequate to fund existing Preferred Stock capital commitments as well as the ongoing operations of the Debtors, particularly the funding of clinical trials and other research and development activities of PortCos that have already expended their existing Series A funding (*i.e.*, the funding provided by the Partnership).  The LPA requires that all Partnership investment in Portfolio Company projects be approved in advance by the Rigmora LPs pursuant to Budgets submitted by the Debtors.  With no capital immediately available from the Rigmora LPs, and unable to syndicate with third party venture capital firms due to issues stemming from the Rigmora LPs' association with Russia, the Debtors face funding obligations to the PortCos and ongoing Partnership expenses far in excess of current or foreseeably available resources.  The Debtors have retained Quinn Emanuel Urquhart & Sullivan, LLP ("Quinn Emanuel") as restructuring counsel (having already retained Quinn Emanuel as its counsel in the Delaware Chancery Court Action), along with Potter Anderson & Corroon LLP, Perry M. Mandarino as Chief Restructuring Officer, and B. Riley Restructuring Services, LLC as financial advisor.

17.     Against this background, the Debtors felt compelled to commence these Chapter 11 Cases and seek the protection of the Court.  These Chapter 11 Cases provide the Debtors with the best opportunity to stabilize their business, and, under the Court's supervision, allow the necessary time to agree to a restructuring of the Partnership's capital structure.  The Debtors now seek the Bankruptcy Court's protection to preserve their valuable PortCos, potentially bring in new investors to replace the defaulting limited partners, and maximize value for all stakeholders,

including the other limited partners, employees and creditors of portfolio companies, and ultimately, the patients who may benefit from the medical treatments being developed.

## BACKGROUND

18.     On December 9 and 15, 2025 (the "Petition Date"), the Debtors filed voluntary petitions for relief (these "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") with the United States Bankruptcy Court for the District of Delaware (the "Court").

19.     I submit this Declaration to assist the Court and parties in interest in understanding the circumstances compelling the commencement of these Chapter 11 Cases.  Specifically, to familiarize the Court with the Debtors, their business, and the circumstances leading up to these Chapter 11 Cases, I have organized this Declaration into three sections as follows:

- **Part I** provides an overview of the Debtors' history and operations;

- **Part II** describes the Debtors' pre-petition corporate and capital structure; and

- **Part III** provides an overview of circumstances leading to these Chapter 11 Cases.

## I.     The Debtors' History and Operations

### A.     The Debtors' Corporate History

20.     The Rigmora LPs have been investing with the Debtors for almost fifteen years. As described by the Delaware Chancery Court, at its core this case is "the deeply human story of a fund formed by two doctors-turned-businessmen motivated to develop drug therapies that improve human health, their many successful years of collaboration, the temporary surge in early stage biotech investment spurred by a global response to the pandemic, the geopolitical events and attendant adjustments to risk strategies that strained the parties' relationship, and the complex legal framework governing their dispute." *ATP III GP, LTD.*, 2025 WL 3496987, at *1.  Unfortunately,

those strains on Dr. Rybolovlev have put the Debtors, and the Portfolio Companies which depend on them, in peril.

21.     I first met Dr. Rybolovlev in 2010.  The Rigmora LPs are both ultimately owned by Dr. Rybolovlev's Family Trust via Rigmora Holdings Ltd ("Rigmora Holdings").  The Family Trust is governed by Cypriot law.  The idea that Dr. Rybolovlev and I agreed upon for the Partnership was to use a venture capital model to create a closely-held pharmaceutical company while at the same time creating other successful biotechnology and therapeutic companies that would provide returns along the way.  In progressing toward this goal, we developed many projects, including both biotech companies and some medical technology companies, many of which would succeed and go on to be acquired or go public in successful exits.  We further envisioned that over time the Partnership would choose one or more of the projects or companies to keep within the Partnership through commercialization, potentially taking new products to market and generating cashflow through ongoing marketing and sales activities.  However, Dr. Rybolovlev's ongoing need for nearer-term cash flow precluded us from achieving that goal.

22.     This represented a paradox:   Dr. Rybolovlev enthusiastically funded the establishment of more than a twenty Portfolio Companies performing cutting edge research to create breakthrough medicines that could make a real difference to people suffering with diseases; yet, on the other hand, he wanted cashflow delivered in timeframes that are completely inconsistent with the time (and capital) needed to develop biotech companies.  In the end, this internal conflict became an external conflagration, accelerated by the Ukraine, Dr. Rybolovlev's own liquidity issues, and a several year pull-back in the biotech markets.

23.     Our investing relationship began in 2011, when Dr. Rybolovlev and I established an investment fund to make investments in the life science industry, with $100 million of funding

from Dr. Rybolovlev, via the Family Trust.  Recognizing the promise of what we were investing in, in October 2012, Dr. Rybolovlev provided a $1.425 billion capital commitment to the Partnership.  On October 29, 2012, the Partnership was formed as a Cayman Islands exempted limited partnership through the execution of the LPA, which governs the Partnership's operations. The LPA was executed on November 1, 2012, and has been amended 22 times since (but was only restated after the first amendment).  The LPA establishes the Partnership's core mission: "to invest … in pharmaceutical, medical device and other medically related companies and business projects."  Also on November 1, 2012, the Rigmora LPs made their initial capital commitment of $1.425 billion.

24.      I became a limited partner at the outset of the Partnership, and I have invested $54.7 million in the aggregate.  I split my total capital contributions and pro rata carry in the Partnership between myself, for approximately 45 percent, and Les Pommes (a discretionary trust on behalf of my daughters) for approximately 55 percent.  My investment was originally by way of a loan. Repayment was made out of cash payments, offsets to my management fee, and the transfer of portions of my limited partnership interest in the Partnership.  The loan was subsequently fully repaid.  Les Pommes and I have also contributed to the Partnership in response to every capital call issued to us.

25.      In addition to the Rigmora LPs, Les Pommes, and myself, the Partnership has fourteen additional limited partners (the "Carried Interest LPs").[3]  These limited partners were admitted to the Partnership in exchange for their time, skill, and labor dedicated to converting the Partnership capital (provided predominantly by the Rigmora LPs) to much greater value.  The Carried Interest LPs are extremely talented and successful individuals who entered into business

---

[3]    The Rigmora LPs dispute this number and maintain that there are 12 Carried Interest LPs.

with the Partnership and devoted their work, time, and intellectual property rights based upon the LPA.  The employment agreements of these other limited partners stipulate an assignment of any intellectual property created while employed by the Partnership or its PortCos.

**B.    The Debtors' Operations**

26.    The Partnership currently has fifteen Portfolio Companies.  Each company is co-led by myself and/or at least one of the Partnership's venture partners, who we recruited from the top ranks of pharmaceutical and large biotechnology companies.  We rely on our networks to help found deals, and rely on those same networks (and our own expertise) to develop each company in a capital-efficient way with the aim of creating unmet medical need therapeutics.

27.    As stated in paragraph 6 above, nine of the Portfolio Companies are in the preclinical stage (i.e., they engage in research and discovery of new technologies, working to identify and develop drug candidates for eventual clinical trials); four are in a clinical stage (i.e., they are sponsoring human clinical trials of their drug candidates); and two are in commercial stage (i.e., they are selling their therapies).  We founded all of these companies.  In all of these PortCos, we remain the largest or only investor.  Because we are "landlocked" in terms of being able to syndicate owing to the "Russian effect," all of the non-commercial companies rely on us for funding.

28.    In the absence of syndication opportunities, several of the Portfolio Companies have developed strategic relationships with major pharma and biotechnology companies who contribute non-dilutive capital to fund specific ongoing research and development projects in return for obtaining the right to market and sell the products of that research should they lead to the development of marketed products.  That has enabled those Portfolio Company to survive, even during the Rigmora LPs' default.  In paragraph 6 of this Declaration above, I summarized the

research and work performed by the PortCos; in the following chart, I summarize their funding needs and partnership agreements:

| PortCo | Description of PortCos' Funding Needs and Partnership Agreements |
|---|---|
| **PortCos in Preclinical Stage** | |
| Aethon | Aethon was included in the May 30 Capital Calls for $5 million. |
| | The Partnership has a capital commitment of $8 million in favor of Aethon, which remains unfunded. |
| | Aethon has a $941 million partnership agreement with Revolution Medicines for its oncology programs. |
| **Apertor (Debtor)** | Apertor was included in the May 30 Capital Calls for $7.1 million. |
| | The Partnership has a capital commitment of $21 million in favor of Apertor, which remains unfunded. |
| | Apertor does not have external partnership agreements. |
| Deep Apple | Deep Apple was included in the May 30 Capital Calls for $9 million. |
| | The Partnership has a capital commitment of $9 million in favor of Deep Apple, which remains unfunded. |
| | Deep Apple announced an $812 million collaboration with Novo Nordisk in June 2025, providing milestone-based payments contingent on development progress. |
| Evercrisp | Evercrisp was included in the May 30 Capital Calls for $7 million. |
| | The Partnership has a capital commitment of $49 million in favor of Evercrisp, which remains unfunded. |
| | Evercrisp has no external partnership agreements and is wholly funded by the Partnership. |
| **Initial (Debtor)** | Initial was included in the May 30 Capital Calls for $7 million. |
| | The Partnership has a capital commitment of $21.728 million in favor of Initial, which remains unfunded. |
| | Initial has no external partnership agreements and is wholly dependent on the Partnership funding. |
| **Marlinspike (Debtor)** | Marlinspike was included in the May 30 Capital Calls for $6.3 million. |
| | The Partnership has a capital commitment of $37.275 million in favor of Marlinspike, which remains unfunded. |
| | Initial has no external partnership agreements and is wholly dependent on the Partnership funding. |

| PortCo | Description of PortCos' Funding Needs and Partnership Agreements |
|---|---|
| Nereid | Nereid has successfully developed a breakthrough technology platform that has created drug candidates against highly sought after oncology and neurodegenerative disease targets.  Several corporate partners continue due diligence.  However, Nereid has expended its existing Series A funding, has no external partnership agreements, and is wholly funded by the Partnership. |
| Nine Square | Nine Square has created drug candidates against highly sought after neurodegenerative disease targets.  Several corporate partners continue due diligence.  However, Nine Square expended its existing Series A funding, has no external partnership agreements, and is wholly funded by the Partnership. |
| **Red Queen (Debtor)** | Red Queen was included in the May 30 Capital Calls for $6.4 million. The Partnership has a capital commitment of approximately $23.602 million in favor of Red Queen, which remains unfunded. Red Queen has no external partnership agreements and is wholly dependent on the Partnership funding. |
| **PortCos in Clinical Stage** | |
| Aulos | Aulos requires approximately $20 million to complete a clinical trial and will exhaust current funding in January 2026. However, Aulos expended its Series A funding, has no external partnership agreements and is wholly dependent on Partnership funding to continue its clinical programs. |
| Ascidian | The Partnership has a capital commitment of $6 million in favor of Ascidian, which remains unfunded. Ascidian has a $1.8 billion partnership agreement with Roche Pharmaceuticals, and is in contract negotiations for an additional partnership with a multinational pharmaceutical company. |
| Marengo | The Partnership has a capital commitment of $33 million in favor of Marengo, which remains unfunded. Marengo has secured $3.6 billion in partnership agreements with Ipsen Global and Italian pharmaceutical company Menarini. |
| Replicate | The Partnership has a capital commitment of $13 million in favor of Replicate, which remains unfunded. Replicate has collaboration agreements with Novo Nordisk, the Gates Foundation, and Latin American pharmaceutical company Butantan. |
| **PortCos in Commercial Stage** | |

| PortCo | Description of PortCos' Funding Needs and Partnership Agreements |
|---|---|
| Braeburn | Braeburn has a senior loan facility with Hercules Capital and previously entered into a Royalty Purchase Agreement with the Partnership providing up to $200 million in funding for its commercial launch. |
| | Braeburn is projected to achieve approximately $280 million in revenue in 2025, with a multibillion discounted cash flow ("DCF") valuation. |
| Galvanize | The Partnership has a capital commitment of $102,585 in favor of Galvanize, which remains unfunded. |
| | Galvanize, first syndicated pre-Ukraine war, has outside investors in addition to the Partnership.  It expects to conclude 2025 with approximately $30 million in revenue for its cancer-treating device. |

29.    Total capital of approximately $2.1 billion has been invested in the Portfolio Companies.  In the first quarter of 2025, the Partnership's total value, including distributed and held value, was approximately $6.48 billion, and I believe the potential value of the Portfolio Companies it holds would be exponentially greater if they were properly funded with sufficient cash and assurances of future funding.  The Partnership has made distributions to the limited partners of $2.28 billion (made up of cash and marketable securities), of which approximately $2.1 billion has been paid to the Rigmora LPs.  When benchmarked against the top funds in the industry, as of December 2024 (prior to the Rigmora LPs' defaults and repudiations of the LPA (discussed below), the Partnership has been one of the most successful in the field.  The following are a few examples of the Partnership's successes:

30.    ***Stoke and Akero.***  Two of the Partnership's startups, Stoke Therapeutics, Inc. and Akero Therapeutics, Inc. made initial public offerings in 2019.  The Partnership's total investments in those two companies from 2014 to 2019 was $150.7 million.  In 2020, those positions were distributed to the limited partners at a value of $736.1 million combined—nearly quintuple the amount invested by the Partnership.  The Rigmora LPs received $624.7 million of that distribution.

31.     **_Syntimmune_**.  In 2018, the Partnership sold its position in Syntimmune, Inc. to Alexion Pharmaceuticals for $278 million in up-front consideration and up to an additional $603 million in potential milestone payments tied to the achievement of certain key clinical and regulatory events.  This compared to an investment of $71 million.  The Partnership subsequently brought litigation against Alexion alleging that the acquiror failed to pay one of the milestones when it became due, and that it breached its obligations to use commercially reasonable efforts to develop the drug when it canceled the drug's development program.  The Partnership obtained a judgment in the amount of $130 million against Alexion for the non-payment of the milestone and $181 million for its breach of its obligation to use commercially reasonable efforts to pursue the development of the drug.  Together with pre- and post-judgment interest, those verdicts are estimated to be worth approximately $350 million, with litigation expenses continuing to be paid from Partnership cash during the current funding crisis.

32.     **_Braeburn_**.  Braeburn, a specialty pharmaceutical company, which we founded in 2012 and still wholly own, launched its flagship product to treat opioid use disorder in late 2023 and exceeded initial sales forecasts.  This early commercial success occurred after many years of unprecedented regulatory, manufacturing, and legal challenges that the Partnership successfully managed.  As mentioned above (chart at paragraph 28), Braeburn is valued in the billions of dollars on a DCF basis.  Approximately $722 million of this value has already been distributed to the Rigmora LPs in the form of a royalty contract.  The total invested to date is approximately $600 million, which represents a multiple return which is simply massive on this scale of investment, especially given that cost has already been more than distributed.

### C.     The LPA Structure

33.     By design, the Rigmora LPs were to be the chief funding source for the Partnership, and in turn, the Partnership often serves as the only source of funding for its Portfolio Companies.

This concentration of ownership was intended to give the Partnership the opportunity to create a pharmaceutical company from one or more of the Portfolio Companies.  We and the Rigmora LPs believed that to accomplish this it was necessary to have control of the investments via supermajority ownership.  For this reason, we adopted the strategy of founding companies with relatively large Series A rounds, and explained to founders that we stood ready to provide the Series B ourselves if needed, and, if we syndicated, that we would participate heavily to maintain our supermajority ownership.  But the consequences to companies wholly funded by the Partnership would be that if the Rigmora LPs breached their obligations to contribute capital, the companies would not be able to continue to operate.

34.    To ensure funding, the parties negotiated a bespoke LPA provision to ensure that the Portfolio Companies had adequate funding promised by the Partnership.  Specifically, the LPA provides the General Partner with the discretion to impose a range of potential consequences if a limited partner fails to meet a capital call, including the discretion to impose a default charge of up to 50 percent of the limited partner's interest for each default (the "Global Default Charge").

35.    The LPA is also bespoke in that it grants the Rigmora LPs certain powers to approve in advance the Budgets of the Partnership's investments, but management and control of the Partnership rests exclusively with the GP.  When Dr. Rybolovlev and I first established the Partnership, it was established that the GP must have complete autonomy and control over investments and company management once a Budget had been approved.  Both key terms were agreed by Dr. Rybolovlev at the outset, and the LPA reflects the agreement (and continues to reflect it after 22 amendments).

II.     **The Debtors' Pre-Petition Corporate and Capital Structure.**

A.      **The Debtors' Corporate Structure.**

36.     As set forth in the corporate structure chart attached as **Exhibit A**, I currently own the General Partner and non-debtor Apple Tree Venture Management, LLC ("ATVM").  The limited partners (discussed above) own the Partnership, and the Partnership owns ATLS.

37.     The General Partner, the Partnership and ATLS operate together as an integrated biotechnology venture capital enterprise.  Their relationships are as follows: (i) the Partnership is the primary investment vehicle as the entity that holds the investments in Portfolio Companies and through which capital flows from limited partners to investments; (ii) under the LPA, the General Partner has exclusive authority and control over the Partnership's management, policies, affairs; and (iii) ATLS was established to handle Partnership operational expenses, including facility costs, leases, rents, and employee costs.

38.     ATLS receives a yearly fee, paid in semi-annual installments, from the Partnership to cover these expenses.  By design, ATLS is fully controlled by the General Partner.  The Partnership issued a capital call for the second half of ATLS's 2025 fees on May 30, 2025.  While the Rigmora LPs have breached their obligation to contribute capital in response to that call, ATLS has been funded using internal Partnership resources during the second half of 2025.

39.     The principal place of business of the General Partner, the Partnership, and ATLS is in the United States.  I reside in New York, and we maintain a corporate headquarters for the Partnership, GP, and ATLS in New York City.

40.     The Filing Portfolio Companies are all Delaware corporations with principal places of business in California and Massachusetts.

41.     The remaining Portfolio Companies are also Delaware corporations, with principal places of business in Massachusetts, California, New York, and Pennsylvania.

42.     In addition to the Partnership, the General Partner, ATLS, and the Portfolio Companies, there is a separate management company—ATVM—which I wholly own, and which is the "Management Company" as defined in the LPA (ATLS was established later).  ATVM is paid a management fee and covers certain expenses not allocated to ATLS, including my compensation.  The only compensation that I receive from ATLS is a de minimis salary sufficient to enable me to obtain healthcare benefits from ATLS.  The amount of ATVM's fee was set at $3 million pursuant to the fourteenth amendment to the LPA.  The Rigmora LPs agreed to contribute capital to pay this fee annually in advance.  ATVM is not a Debtor in these cases.

43.     Other than the fact that the Partnership and the GP are a Cayman Islands exempted limited partnership and a Cayman Islands company, respectively, the Debtors have no connection with the Cayman Islands.

**B.      Relevant Aspects of the Debtors' Capital Structure**

44.     Except as set forth in the following paragraph, there is no secured debt owed by the Partnership, the General Partner, or ATLS.  Each of the Portfolio Companies owes secured debt to the Partnership but otherwise has no funded debt.

45.     In or around the fourth quarter of 2023, non-debtor Braeburn (*i.e.*, one of the Portfolio Companies) received a secured loan from Hercules Capital Inc. ("Hercules Capital") for the total amount of $125 million, only the $75 million first tranche of which was drawn (the "Hercules Loan").  The Hercules Loan was obtained to provide working capital for Braeburn and to help fund the commercial launch of Brixadi (*i.e.*, Braeburn's flagship drug for treating opioid use disorder).  The Braeburn Loan is secured by a pledge of all of the Partnership's equity interests in Braeburn.

46. In addition to the unsecured obligations owed by the Partnership, ATP, and ATLS, the Filing Portfolio Companies collectively owe more than $5.4 million to dozens of creditors, excluding amounts owed to ATLS.

47. The Partnership owes more than $221 million in unfunded commitments to certain of the PortCos.

## III. Circumstances Leading to These Chapter 11 Cases.

### A. Family Trust Funding Constraints

48. Beginning in October 2022, Dr. Rybolovlev appeared to become concerned with reducing the funding commitments of the Rigmora LPs. Previously, there had occasionally been times during the life of the Partnership, for example in response to the COVID epidemic, when the GP and Rigmora LPs agreed to more restrictive Budgets, requiring less commitment from the Rigmora LPs. However, this new shift was different, as it was not an agreed course between the GP and the Rigmora LPs, and it contradicted the previously agreed investment plan for the Partnership.

49. As further revealed in connection with the Delaware Chancery Court Action, the focus of Dr. Rybolovlev and the Rigmora LPs on generating cash for themselves and limiting agreed-upon expenditures for the Portfolio Companies manifested in several ways, including: (i) manufactured "disagreements" concerning further funding of the Partnership's existing Portfolio Companies (*i.e.*, companies the Partnership had already invested in, and which were nearing the end of their first funding Budgets); (ii) putting considerable pressure on the General Partner to find alternative sources of funding for Braeburn; and (iii) in late 2023, seeking to assign certain limited partnership interests in the Partnership to special purpose vehicles, without providing the assurances sought by the General Partner that those entities would have the means to meet the Rigmora LPs' existing capital commitments to the Partnership.

22

50.     In the spirit of working with its limited partners, the General Partner diligently pressure-tested Budgets and minimized them to the greatest extent possible, while still seeking to work with the Rigmora LPs in good faith.  The General Partners also conserved cash and reduced the expenditure rate by reducing the number of research programs and headcounts of the Partnership's Portfolio Companies.

**B.     The Ukraine War and Its Impact**

51.     Russia invaded Ukraine in February 2022.  This event fundamentally changed the Partnership's operating environment.  The Rigmora LPs' focus on immediate cash flow and limiting expenditure became even more acute following the invasion.  Dr. Rybolovlev, the ultimate beneficial owner of the Rigmora LPs, is a Russian-born billionaire.  Although Dr. Rybolovlev obtained Cypriot citizenship and is not presently sanctioned by the United States, United Kingdom, or European Union, he is sanctioned by Ukraine.[4]

52.     I believe that broad reluctance of financial institutions and businesses to engage with anyone connected to Russia has had materially adverse consequences for the Rigmora LPs and, by extension, the Partnership.   This is particularly so because, it appears that, contemporaneously, the Family Trust behind the Rigmora LPs had been experiencing an ongoing, self-described, liquidity crisis due to its investment and cash management choices.  The "Russian effect" then created further liquidity constraints for the Rigmora LPs, as they became unable to sell assets, conduct routine financial transactions, or access capital markets due to KYC concerns.

53.     The liquidity crisis forced the Rigmora LPs to adopt an austerity approach to investments, particularly by withholding cash from Partnership investments.  In 2022, Mr. Yuri Bogdanov, who was then an analyst working on financial risk management for the Rigmora LPs

---

[4]     *See*, *e.g.*, https://www.opensanctions.org/entities/Q983847/

(or affiliates), prepared a series of internal memoranda.  Mr. Bogdanov (who later became Co-CEO of Rigmora Holdings), stated in the internal memoranda: "we are in a liquidity crisis," "the only way in this situation to start moving towards the cash buffer is to drastically reduce ATP payments," and "tight controls shall involve clear rules for review and approval of new projects (no funding sources - no new projects)."  In short, the Rigmora LPs decided to cut off committed funding to the Partnership to preserve their own liquidity, regardless of their contractual obligations or the detrimental impact on the Portfolio Companies.

54.    At the same time, it became clear that it was highly unlikely the Partnership would be able to find additional sources of funding beyond the Rigmora LPs because investors and lenders were unwilling to enter into transactions involving Dr. Rybolovlev or entities closely connected with him given the "Russian effect" and associated risk of being caught up in future sanctions that may be imposed on him or his affiliates, and the reputational risks of doing business with him.  Despite the General Partner's attempts to assuage potential investors' concerns in relation to the risks, this did not sufficiently reassure our colleagues in the biotech equity markets. In fact, since the Ukraine invasion, despite manifold attempts across the portfolio, and our history of successful syndications and familiarity with various funding groups, not a single portfolio company syndication was accomplished other than the Series C funding of Galvanize—the Series B had been completed before the Ukraine invasion.  Dr. Rybolovlev's ties to Russia have had a dramatic impact on the Partnership's ability to access additional capital.  Fortunately, these KYC issues have not prevented certain Portfolio Companies from out-licensing the rights to the technology or product candidates of a portfolio company.  These "business development" deals with pharmaceutical and biotechnology companies have enabled them to survive in the wake of the Rigmora LPs' defaults.

55.     The limitations of syndication due to KYC issues was compounded by the downturn in the broader biotechnology markets.  As described by Dr. Rybolovlev in connection with the Delaware Chancery Court Action, he perceived that whereas during the surge, the market presented opportunities for syndication or other exits for startups in the preclinical stage of research and development, those possibilities dried up as a result of the 2022 market contraction, causing him to be less interested in continuing to invest in the Partnership's preclinical assets.  *See ATP III GP, LTD.*, 2025 WL 3496987, at *9.  Dr. Rybolovlev also testified that he believed that Portfolio Companies should only keep about six months of working capital on their balance sheets. *Id.* at *14, n.210.

56.     Considering all these factors, not to mention the legal overhang from the Delaware and Cayman trials, it is now impossible to raise capital for the Portfolio Companies absent chapter 11 relief.

**C.     The Braeburn Proceedings, LPA Amendment 22, and Budget Delays**

57.     After numerous regulatory delays, Braeburn was eventually able to bring a drug, Brixadi, to market in 2023.  Its commercial launch has been very successful to date, resulting in substantial valuations when measured by projected DCF (typically, in pharmaceutical companies, such DCF values are used and considered reasonably reliable when companies pass their 18-month mark post launch, and their go-to-market strategies have been analyzed and tested; each of these factors are true of Braeburn).  Braeburn thus holds a great deal of promise, but its valuation has also created tension with the Rigmora LPs related to their over-arching desire to reduce their commitment to funding the Partnership while generating cash for themselves.  Specifically, while the billions of dollars in Braeburn remain in the Fund, it remains vulnerable to the application of a default charge should the Rigmora LPs default on a commitment to contribute capital in response to a capital call issued to fund a PortCo or approved Partnership fees and expenses.  The Rigmora

LPs, in need of cash and mindful of their exposure to a default charge, made two separate demands for distribution of the Partnership's Braeburn assets.  It withdrew its first request voluntarily in 2023, and when I did not acquiesce to its 2024 demand, on August 2, 2024, the Rigmora LPs filed litigation with the Cayman Court to compel the distribution (the Braeburn Proceeding").  This was eventually resolved via settlement agreement and amendment 22 to the LPA, which were signed on December 20 and 23, 2024, respectively.  Amendment 22 was intended to outline the parties' understanding going forward.

58.    As discussed above, Dr. Rybolovlev, through the Rigmora LPs, holds approval rights over the Partnership's projects (essentially the Portfolio Companies); we would propose a project, which he was free to accept or reject, and if approved, we would manage the project.  The authorization to invest in a project took the form under the LPA of a "Budget," a formal document that we exchanged and signed with each project.  Until late 2024, the process by which the Rigmora LPs exercised their Budget approval rights typically began with informal discussions among the Rigmora LPs' Chief Investment Officer (a role held by several individuals over time), Dr. Rybolovlev, and myself.  For each investment in a Portfolio Company, Dr Rybolovlev and I met— usually in person—to discuss the opportunity, its prospects for commercial and scientific success, and funding needs.  Once Dr. Rybolovlev informally approved the investment, the General Partner would prepare an investment memorandum (the "IM[s]") and a request for formal Budget approval.  After formal Budget approval, the Partnership would enter into stock purchase agreements with the relevant Portfolio Companies.  The IMs explained the potential of the proposed deals, although no requirement to produce IMs existed in the LPA.  Once a Budget was formally approved by the Rigmora LPs in writing, the GP had authority to call capital and manage the investment without further approval.  For example, the Rigmora LPs never saw the

Partnership's stock purchase agreements with the Portfolio Companies, did not expect to see them, and never asked to see them.

59.     On December 24, 2024, I sent the Rigmora LPs (addressed to Dr. Rybolovlev) an email containing certain Budget requests. The Rigmora LPs responded (via Mr. Bogdanov) with onerous diligence requests as a delay tactic to avoid approving the new Budgets. Indeed, as Mr. Bogdanov testified, when these diligence requests were sent, he was not aware whether it would be possible to meet them, nor whether or not the Rigmora LPs already had access to this information. *See ATP III GP, LTD.*, 2025 WL 3496987, at *13. Further, the Rigmora LPs have no employees with the biopharmaceutical experience that would be needed to evaluate this information. *See ATP III GP, LTD.*, 2025 WL 3496987, at *4, *25. The foregoing was a drastic departure from the decade-plus course of performance between the parties that I described above. However, as described, following the resolution of the Braeburn Proceeding, and Mr. Bogdanov's elevation from analyst to CEO of the Rigmora LPs, the Rigmora LPs began to manufacture delays to approving new Budgets. These delay tactics persisted through April 2025.

**D.     The Rigmora LPs' Breach of Their Obligations**

60.     In light of the obvious strategy to manufacture delay on approval of new Budgets, I understood that the only capital the Partnership could expect to receive from the Rigmora LPs would be capital called within existing approved Budgets. I therefore adopted a "needs-must" approach, to work within the Rigmora LPs' constraints. On May 5, 2025, pursuant to previously-approved Budgets, and in order to maintain basic operations, the Partnership made capital calls for approximately $3.6 million (the "May 5, 2025 Capital Calls").

61.     Following this, the GP developed a reallocation proposal, which consisted of suggesting moving some of the approved Budget amounts to clinical companies (the "Reallocation Proposal"). After initial discussions regarding the Reallocation Proposal, a follow-up call took

place on May 12, 2025, involving the parties' attorneys (at the Rigmora LPs' request) (the "May 12 Call"). During the May 12 Call, the Rigmora LPs' attorneys expressed to me that the Reallocation Proposal was evidence that I had no faith in the early-stage companies, which was false.

62.     Despite my efforts, the Rigmora LPs have refused to honor their obligations. On May 15, 2025, Mr. Bogdanov sent an email (the "May 15 Email") that marked a point of no return. In the May 15 Email, Mr. Bogdanov described the early-stage companies as dead-ends, and contorted the purpose of my Reallocation Proposal, misstating that I held a similar view that the funding of the early-stage companies would be a waste of the assets of the Partnership. In the May 15 Email, Mr. Bogdanov further declared that the Partnership should cease funding seven portfolio companies, claiming, without any asserted basis, that these companies had "no way for a path to commercial success." He conditioned any further funding discussions on the GP's agreement to "wind down or liquidate" these companies. This demand was extraordinary and improper for several reasons, but most importantly, the Rigmora LPs had already approved Budgets for these companies and were contractually obligated to fund them.

63.     In response to the May 15 Email, on May 30, 2025 the General Partnership issued capital calls totaling approximately $101.1 million (after certain revisions made on June 1). These calls were made in accordance with previously approved Budgets (and fees owed to ATLS), calculated to provide approximately six months of operating capital for the portfolio companies, and well within the Rigmora LPs' remaining capital commitments under the LPA.

64.     The Rigmora LPs refused to pay any of the May 30 Capital Calls, and they have now been in breach of their obligations for over six months. The Rigmora LPs' conduct has had devasting effects on the Portfolio Companies, their employees, and ultimately the patients who

stand to benefit from their life-saving research.  As a direct consequence of the funding default, nearly 100 full-time employees have been terminated across the Portfolio Companies, including key executives who could no longer sustain the uncertainty surrounding the Partnership's ability to fund operations.  In addition, the lack of funding has severely disrupted years of research and pre-clinical drug development, with outstanding scientists cut off from funding in the middle of critical experiments and clinical trials reduced in scope, increasing the risk of not achieving important clinical results.  Moreover, most of the Portfolio Companies have substantially downsized their operations, maintaining only skeletal workforces both to preserve intellectual property and know how, and to have critical scientists at the ready to restart value-adding research projects as soon as funded; the ATLS venture partner team, all veterans of pharmaceutical R&D, are able to steer the projects wearing their multiple Portfolio Company C-suite hats, which has been our centralized management model.  However, if we are not able to reinitiate funding, we risk that the loss of momentum will become irreversible.  We are also acutely aware that competitors gain ground daily and that our extremely attractive companies, that may have in fact achieved more than others in their fields, are languishing due to lack of financing while others, with less substance, have gone on to finance and develop their technologies.  We believe, in good faith, that the potential remains in a triaged portfolio; our team and our founders are ready to restart and compete.  But we cannot continue to fight a war of attrition with Dr. Rybolovlev and the Rigmora LPs.  We must be allowed to get back to the business of conducting research to develop life-saving treatments and medication.  We seek the approval of this Court to continue the work of the Portfolio Companies as a viable, value-maximizing alternative to the liquidation that the Rigmora LPs are attempting to impose via the Cayman Proceedings.

65.     The situation is dire.  In one case, Aulos, a clinical-stage company developing a novel immunotherapy for cancer, was forced to secure emergency funding from the family office of its own CEO to prevent the collapse of its phase 2 clinical trials—an arrangement that is to my knowledge both unprecedented in the biotech industry and unsustainable.  Aulos will exhaust those funds by January 2026, and we are seeking funding for Aulos, among other companies in the portfolio, in our first day motions for relief.  Similarly, and by way of giving but two further examples, Marengo has been forced to lay off scientists and reduce programs that could have led to early approval of its breakthrough cancer medicine, and Nereid's operations have been suspended entirely and work on its cancer treatment development candidates has stopped.

**E.     The Delaware Chancery Court Action, the Rigmora LP's Retaliation, and Delaware Chancery Court Ruling**

66.     The Partnership filed suit against the Rigmora LPs in the Delaware Chancery Court on May 30, 2025, seeking specific performance of the duty to contribute capital in response to the May 30 Capital Calls issued against approved Budgets and the Rigmora LPs' duty to consider the approval of new Budgets honestly, rationally, and in good faith.  The relief sought was entirely designed to benefit the Portfolio Companies.

67.     The Partnership filed the Verified Complaint and Motion to Expedite in the Delaware Chancery Court on May 30, and on May 31 transmitted copies of those papers to counsel from Latham & Watkins ("Latham") who appeared with the Rigmora LPs on the May 12 Call. The Rigmora LPs immediately engaged in obstructive tactics.  First, the Rigmora LPs refused to permit Latham to accept service of the Verified Complaint, effectively requiring that the papers be hand delivered to registered agents in the British Virgin Islands.  Next, rather than litigate on the

merits in Delaware, as they had agreed to do,[5] on June 2, 2025, the Rigmora LPs filed a retaliatory Writ in the Cayman Court effectively mirroring the claims filed in Delaware.

68.     Shortly thereafter, counsel from Debevoise appeared to litigate the motion to expedite.  In a seemingly, but misleadingly, constructive vein, Debevoise requested the courtesy of a ten-day period to file their papers in opposition to the Partnership's motion to expedite the first-filed Delaware Chancery Court Action.  The Partnership honored that request, wishing to cooperate reasonably with the Rigmora LPs.  However, the Rigmora LPs abused that courtesy by using that 10-day period to prepare and file a "winding up" petition in the Cayman Court alleging that the General Partner's filing of the Delaware Chancery Court Action was somehow a breach of its duties to the Rigmora LPs, and seeking a judicial liquidation of the Partnership.

69.     Clearly concerned that the expedited Delaware proceedings could result in a finding that the Rigmora LPs were in default and subject to the remedies available to the General Partnership upon their designation as a "Defaulting Partner" (as defined in the LPA), the Rigmora LPs appeared *ex parte* in the Cayman Court on June 12, 2025, to seek provisional remedies, including the entry of an injunction barring the Partnership from (i) taking any additional steps towards having the Rigmora LPs declared to be Defaulting Partners, and (ii) calling any additional capital.  After a hearing, the Cayman Court issued an injunctive order on June 20, 2025, which did not enjoin further proceedings in Delaware.  Even with this injunction in hand, the Rigmora LPs continued their effort to stymie the Delaware Chancery Court Action, filing an expedited motion

---

[5]     The LPA provides that any litigation between the parties can be filed in either Delaware or the Cayman Islands, and contains a provision whereby both parties waive their right to contest jurisdiction or convenience in either jurisdiction.  Under those circumstances, ATP's first-in-time filing in Delaware should have established Delaware as the sole jurisdiction to hear the claims and defenses of the parties in respect of ATP's right to call capital and the Rigmora LPs' obligation to consider new Budgets for companies at the end of their current Budget commitments honestly, rationally, and in good faith.  The Delaware Chancery Court agreed with this analysis in denying the Rigmora LPs' motion to dismiss or stay the Delaware Chancery Court Action.  *See ATP III GP, LTD.*, 2025 WL 3496987, at *16; *see also infra*, at ¶ 70.

to stay the Delaware litigation in favor of the later-filed, retaliatory cases filed in the Cayman Court.

70.     On June 13, 2025, the Chancellor granted the Partnership's motion to expedite the Delaware litigation (over the Rigmora LPs' objection).  *See ATP III GP, LTD.*, 2025 WL 3496987, at *15.  On June 27, 2025, the Chancellor denied the Rigmora LPs' motion for a stay of the Delaware Chancery Court Action, holding that "[the Rigmora LPs'] motion relied on convenience defenses that it waived in the LPA," and that "ATP's allegations supported a finding of irreparable harm to multiple Delaware entities absent expedition."  *Id.* at *16.  The Chancellor's rulings did not dissuade the Rigmora LPs from pursuing those duplicative proceedings in the Cayman Court. The Rigmora LPs' prosecution of duplicative litigation has doubled the cost of litigation, and created an enormous workload for the GP and its operatives, which, in turn, has resulted in the Rigmora LPs accusing the GP and the Partnership of wasting Partnership assets on the litigation.

71.     In the course of the Delaware litigation, and in response to discovery-related disputes between the parties, the Delaware Chancery Court "continued the September trial to October based on [the Rigmora LPs'] claim that [the Partnership's] late-produced documents prejudiced its ability to prepare for trial."  *Id.*  However, this too proved to be a deceptive ploy, and the Rigmora LPs again attempted to shift the litigation into the Cayman Court, this time by using the continuance to file an emergency motion seeking the appointment of provisional liquidators to take control of the Partnership.  *Id.*  In response, the Partnership filed a status quo motion with the Delaware Court, and, after an initial hearing, at which the Chancellor criticized Debevoise for misleading her into granting the trial adjournment, the Rigmora LPs withdrew their emergency motion in the Cayman Court and agreed to apprise the Delaware Court of any change in position on this matter.

72.    The parties presented evidence in a two-day trial on October 16-17 with post-trial briefing in November 2025.  On December 5, 2025, Chancellor Kathaleen McCormick issued a final judgment in the Partnership's favor.  Key findings include:

a.    "ATP has proven by clear and convincing evidence that Rigmora must meet Capital Calls within approved portfolio company budgets."

b.    "There is no factual basis to question ATP's good faith."  This necessarily refers the efforts of GP and ATLS to seek to save the Portfolio Companies.

c.    The Rigmora LPs' arguments that milestones in old investment memoranda somehow excused their funding obligations were rejected: "No evidence suggests that anyone intended the performance milestones identified in the investment memoranda to serve as conditions to [the Rigmora LPs'] obligation to fund budgets that it approved."

d.    "On balance, the equities favor ATP.  [The Rigmora LPs have] the funds available to meet the Capital Calls.  Moreover, the portfolio companies are developing treatments for serious medical conditions, including childhood blindness, various cancers, obesity, and neurodegenerative diseases.  The public interest strongly favors preserving potentially life-saving research programs."

73.    Despite this clear judicial ruling, the Rigmora LPs have failed to make any payments to the Debtors, or any payments with respect to the May 30 Capital Calls, as of the date hereof, which has caused severe damage to the Portfolio Companies, including, as mentioned above, employee termination, competitive harm, research disruption, and ultimately the destruction of value and setting back potential advances in human health.  It is such a sad state that Dr. Rybolovlev, a doctor, who sought to deploy his fortune to improve human health, is now, in vengeance, seeking to destroy it.  We simply seek this court's help in preventing him from doing so.

**F.    The Debtors' Chapter 11 Cases and Next Steps.**

74.    In consultation with the Debtors' advisors retained to navigate the chapter 11 reorganization process, the Debtors will soon submit a plan of reorganization that addresses all of

the factors outlined above.  The plan is still subject to substantial modification, but roughly envisions the following steps:

    a.      Stabilization of PortCos through bridge funding;

    b.      Stemming litigation costs; and

    c.      Negotiation and confirmation of a plan of reorganization.

75.    More information on the Debtors' requested relief in these Chapter 11 Cases and the Debtors' restructuring efforts is included in the *Declaration of Perry M. Mandarino, Chief Restructuring Officer of the Debtors, in Support of Chapter 11 Petitions and First Day Motions* (the "Mandarino Declaration"), filed contemporaneously herewith.

*[Remainder of page intentionally left blank]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Executed this 15th day of December, 2025.

_/s/ Dr. Seth L. Harrison_____

Dr. Seth L. Harrison
Managing Director and Director of APT III GP, Ltd., Managing Director of ATP Life Science Ventures, L.P., President and Chief Executive Officer of Apple Tree Life Sciences, Inc., Director of Apertor Pharmaceuticals, Inc., Initial Therapeutics, Inc., Marlinspike Therapeutics, Inc., and Red Queen Therapeutics, Inc.

# EXHIBIT A

**Corporate Organizational Structure**

# ATP Life Science Ventures, L.P.
## Organizational Chart



# ATP Life Science Ventures, L.P.
## Portfolio Company Ownership



# ATP Life Science Ventures, L.P.
## Portfolio Company Ownership (cont.)

| | Initial Investment Date | Invested to Date | Ownership % |
|---|---|---|---|
| **Pool ATP IV** | | | |
| Corvidia Therapeutics | SOLD | | |
| Syntimmune | SOLD | | |
| Tendyne | SOLD | | |
| Tusker Medical | SOLD | | |
| | | | |
| **Pool ATP V-1** | | | |
| Initial Therapeutics | 2020 | $53.3 | 84.1% |
| Nine Square Therapeutics | 2020 | $50.0 | 87.5% |
| | | | |
| **Pool ATP V-2** | | | |
| Aethon Therapeutics | 2022 | $17.0 | 77.5% |
| Apertor Pharmaceuticals | 2020 | $29.0 | 87.2% |
| Aulos Bioscience | 2020 | $60.0 | 69.8% |
| Deep Apple Therapeutics | 2021 | $43.0 | 78.7% |
| Evercrisp Biosciences | 2021 | $26.0 | 83.4% |
| Marlinspike Therapeutics | 2022 | $27.7 | 88.7% |
| Nereid Therapeutics | 2020 | $50.0 | 85.2% |
| Red Queen Therapeutics | 2021 | $27.6 | 90.5% |
| Replicate Bioscience | 2021 | $59.3 | 84.5% |
| | | | |
| **Pool ATP V-3** | | | |
| Ascidian Therapeutics | 2020 | $89.6 | 84.9% |
| Galvanize Therapeutics | 2015 | $127.0 | 23.2% |
| Marengo Therapeutics | 2015 | $56.0 | 81.4% |
| | | | |
| **Pool ATP Braeburn** | | | |
| Braeburn | 2021 | $403.0 | 83.1% |

| Equity Holder | Interest |
|---|---|
| **Pool ATP IV** | |
| (See Appendix) | |
| **Pool ATP V-1** | |
| Rigmora Biotech Investor One LP | 49.00% |
| Rigmora Biotech Investor Two LP | 51.00% |
| **Pool ATP V-2** | |
| Rigmora Biotech Investor One LP | 49.00% |
| Rigmora Biotech Investor Two LP | 51.00% |
| **Pool ATP V-3** | |
| Rigmora Biotech Investor One LP | 48.04% |
| Rigmora Biotech Investor Two LP | 51.00% |
| SLH | 0.45% |
| Les Pommes | 0.51% |
| **Pool ATP Braeburn** | |
| Rigmora Biotech Investor One LP | 49.00% |
| Rigmora Biotech Investor Two LP | 51.00% |

# ATP Life Science Ventures, L.P.
## Appendix

**ATP IV - EQUITY PROFILE**

| Type | Entity | Units o/s | |
|------|--------|-----------|---|
| Preferred Units | Rigmora Biotech Investor Two LP | 407,757 | 49.13% |
| Preferred Units | Rigmora Biotech Investor Two LP - (loan repayment units) | 17,357 | 2.09% |
| Preferred Units | Rigmora Biotech Investor One LP | 391,767 | 47.20% |
| Preferred Units | SLH | 6,177 | 0.74% |
| Preferred Units | Les Pommes | 6,947 | 0.84% |
| Investment Common Units | Rigmora Biotech Investor Two LP | 402,990 | 43.7000% |
| Investment Common Units | Rigmora Biotech Investor Two LP - (loan repayment units) | 17,357 | 1.8800% |
| Investment Common Units | Rigmora Biotech Investor One LP | 385,467 | 41.8000% |
| Investment Common Units | SLH | 6,177 | 0.6700% |
| Investment Common Units | Les Pommes | 6,947 | 0.7500% |
| Investment Common Units | AB * | 11,067 | 1.2000% |
| Founder Units | SLH | 44,585 | 4.8300% |
| Founder Units | Les Pommes | 47,638 | 5.1700% |
| Incentive Common Units | MGMT | 198,635 | |
| | | **1,950,867** | |

* 1.425% of 90%

## **EXHIBIT B**

**Delaware Chancery Court Decision**

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| ATP III GP, LTD., in its capacity as General Partner of ATP Life Science Ventures, L.P., | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 2025-0607-KSJM |
| RIGMORA BIOTECH INVESTOR ONE LP and RIGMORA BIOTECH INVESTOR TWO LP, | ) ) ) ) | |
| Defendants. | ) ) | |

### POST-TRIAL MEMORANDUM OPINION

Date Submitted: December 3, 2025
Date Decided: December 5, 2025

Michael A. Barlow, Shannon M. Doughty, Morgan R. Harrison, QUINN EMANUEL URQUHART & SULLIVAN LLP, Wilmington, Delaware; Garrett B. Moritz, Roger S. Stronach, A. Gage Whirley, ROSS ARONSTAM & MORITZ LLP, Wilmington, Delaware; Andrew M. Berdon, Rachel E. Epstein, Kathryn D. Bonacorsi, Jonathan M. Acevedo, Taylor L. Jones, Jenny Braun, QUINN EMANUEL URQUHART & SULLIVAN, LLP, New York, New York; Jessica T. Reese, John F. Ferraro, QUINN EMANUEL URQUHART & SULLIVAN, LLP, Boston, Massachusetts; *Counsel for Plaintiff ATP III GP, Ltd.*

Blake Rohrbacher, Daniel E. Kaprow, Christine J. Chen, Zachary R. Greer, Benjamin O. Allen, RICHARDS, LAYTON & FINGER, P.A, Wilmington, Delaware; Shannon Rose Selden, William H. Taft V, Zachary Saltzman, Natascha Born, Carl Micarelli, Sebastian Dutz, DEBEVOISE & PLIMPTON LLP, New York, New York; *Counsel for Defendants Rigmora Biotech Investor One LP and Rigmora Biotech Investor Two LP.*

**McCORMICK, C.**

The plaintiff is the general partner of a Cayman exempted limited partnership that holds a portfolio of Delaware life science companies. The plaintiff sued its limited partners to enforce capital calls, to force them to work in good faith to approve budgets for the portfolio companies, and to obtain declarations concerning the plaintiff's rights under the fund agreement. The funding freeze at issue here placed several of the portfolio companies at risk of insolvency, and so the court entered a highly expedited schedule leading to trial.

This post-trial decision orders specific performance of all but one of the capital calls and otherwise sides with the limited partners. The plaintiff's effort to force budget approvals rests on an implied contractual duty of good faith recognized under Cayman law, a duty that constrains the exercise of discretionary contractual rights when it is implied. Although Cayman law recognizes this implied duty, no court has implied the duty in the context of an exempted limited partnership. This court will not be the first. And the plaintiff's requested declarations that are ripe, which also implicate primarily Cayman law, do not relate to the capital call or budgeting issues that warranted expedition of this case. They relate mainly to issues pending parallel proceedings in a Cayman court. This court thus defers to the Cayman court on those issues.

That's a highly abbreviated summary of what follows. Given the precarious position of the affected portfolio companies, the court worked hard to issue this decision promptly.[1] Wasting no time on wordsmithing, this introduction foregoes an

---

[1] The plaintiff requested that the court issue this decision on or by December 5, 2025.

extensive and riveting account of the facts learned at trial—the deeply human story of a fund formed by two doctors-turned-businessmen motivated to develop drug therapies that improve human health, their many successful years of collaboration, the temporary surge in early stage biotech investment spurred by a global response to the pandemic, the geopolitical events and attendant adjustments to risk strategies that strained the parties' relationship, and the complex legal framework governing their dispute.  Although the court streamlined the decision given the press of time, these details and more follow.

## I.    FACTUAL BACKGROUND

Trial took place on October 16 and 17, 2025.  The record comprises 1,930 trial exhibits, live testimony from five fact witnesses and three expert witnesses, deposition testimony from four fact witnesses, and 57 stipulations of fact.[2]  These are the facts as the court finds them after trial.

---

[2] This decision cites to: C.A. No. 2025-0607-KSJM docket entries (by docket "Dkt." number); trial exhibits (by "JX" number); the trial transcript, Dkts. 277–79 ("Trial Tr."); and stipulated facts set forth in the Parties' Stipulation and Pre-Trial Order, Dkt. 209 ("PTO").  The parties called the following fact witnesses: Yuri Bogdanov (Rigmora CEO), Seth Harrison (ATP Founder and Managing Partner), Spiros Liras (ATP Venture Partner), Dmitry Rybolovlev (Rigmora Founder), and Joseph Yanchik (ATP Venture Partner).  The parties called the following expert witnesses: Ilonna Rimm (Rigmora Biotechnology Investing Expert), Mark Robbins (ATP Biotechnology Investing Expert), and Ilya Strebulaev (Rigmora Venture Capital Expert). The parties submitted the deposition transcripts of the live witnesses and called the following witnesses by deposition only: Michael Ehlers (ATP Chief Scientific Officer, Venture Partner, and Portfolio Company Officer & Director), William Engels (ATP CFO), Daniel Finkelman (ATP General Counsel), and Alexey Yakovlev (Rigmora CFO).  Depositions transcripts are cited using the witnesses' last name and "Dep. Tr."

## A.    The Fund And The Limited Partnership Agreement

In 2012, Dr. Seth Harrison and Dr. Dimitry Rybolovlev formed Apple Tree Partners IV, L.P., which was later renamed to ATP Life Science Ventures, L.P., a Cayman Islands exempted limited partnership (the "Fund").[3]

Both Harrison and Rybolovlev were medical doctors.  Harrison received his M.D. from Columbia Medical School[4] and worked as a surgeon at a New York City hospital for a year.[5]  He then left the field of medicine to attend Columbia Business School.[6]  After business school, in the 1990s, he joined a large venture capital firm and formed Apple Tree Partners I to hold his life-science investments.[7]

Rybolovlev received his medical degree in 1990 from Perm Medical Institute and practiced medicine for a year after.[8]  He switched careers in the 1990s when the Soviet Union was privatizing.[9]  Rybolovlev acquired stakes in multiple companies before consolidating his investments in the most successful, a fertilizer manufacturer named Uralkali.[10]  Rybolovlev acquired voting control of Uralkali by 2000, instituted "western style" corporate governance mechanisms,[11] and took it public in 2007 on the

---

[3] PTO ¶ 23.

[4] Trial Tr. at 7:22–8:1 (Harrison).

[5] *Id*. at 8:1–3 (Harrison).

[6] *Id*. at 8:2–16 (Harrison).

[7] *Id*. 8:13–21 (Harrison).

[8] *Id*. at 345:2–14 (Rybolovlev).

[9] *Id*. at 346:8–347:1 (Rybolovlev).

[10] *Id*. at 347:2–16 (Rybolovlev).

[11] *Id*. at 347:20–348:5 (Rybolovlev).

London Stock Exchange.[12]    Rybolovlev sold his interests in Uralkali in 2010, personally earning around $5 billion through the transaction.[13]

Rybolovlev decided to invest the proceeds in companies addressing the "three major ways" in which, in his view, the future of "humanity will benefit the most": "health, . . . food, and entertainment."[14]  He ultimately invested in a diverse array of companies intended to fulfill these goals, including a cellular-based meat producer and AS Monaco Football Club.[15]  To promote human health, Rybolovlev met with fund managers in the U.S. "to find an optimal way to invest in biotech industry."[16]  He ultimately determined to replicate the investment strategy that led to his success with Uralkali, creating a "family-owned pharma company" using the "apparatus" of "venture capital."[17]

In 2010, a biotech analyst at Merrill Lynch introduced Harrison to Rybolovlev.[18]  Harrison liked Rybolovlev's investment strategy.[19]  Harrison and Rybolovlev formed the Fund to invest in and develop biotechnology.[20]

---

[12] *Id.* at 348:6–7 (Rybolovlev).

[13] *Id.* at 348:11–13 (Rybolovlev).

[14] *Id.* at 351:2–6 (Rybolovlev).

[15] *Id.* at 351:7–352:6 (Rybolovlev).

[16] *Id.* at 349:24–350:5 (Rybolovlev).

[17] *Id.* at 16:18–23 (Harrison); *id.* at 350:6–9 (Rybolovlev).

[18] *Id.* at 9:10–14 (Harrison).

[19] *Id.* at 350:14–17 (Rybolovlev).

[20] *Id.*; *id.* at 9:24–10:10 (Harrison); *id.* at 349:20–351:9 (Rybolovlev); JX-1 (LPA) at 3; JX-1574 ("Bloch Report") ¶ 15.

4

ATP III GP, Ltd. ("ATP") serves as the General Partner of the Fund, and Harrison is the manager of ATP.[21]  The Fund's largest limited partners, contributing approximately 98% of the Fund's overall capital,[22] are Defendants Rigmora Biotech Investor One LP and Rigmora Biotech Investor Two LP, both owned by Rybolovlev's family trust.[23]  The Rigmora entities are successors-in-interest to the original limited partners Blue Horizon Enterprise Ltd. and Ezbon International Ltd. (together with the Rigmora entities, "Rigmora").[24]

On November 1, 2012, the parties entered into the First Amended and Restated Limited Partnership Agreement (the "LPA"), which governs the Fund's operations.[25]  The LPA is governed by the law of the Cayman Islands.[26]  The parties have amended the LPA twenty-two times.[27]

---

[21] PTO ¶¶ 13, 15.

[22] JX-1237 at 4 (contributions through 2024); JX 1302 at 3–5 (showing Defendants' combined contributions accounted for about 98% of the Fund's ~$2.309 billion of capital contributions as of December 31, 2024); PTO ¶¶ 57, 59–61, 63 (contributions in 2025); Trial Tr. at 469:11–22, 470:12–17 (Yakovlev) (explaining how to navigate JX-1237 and calculate total contributions); *id.* at 208:10–18 (Strebulaev).  Harrison and Les Pommes have contributed $54.7 million combined.  JX-1400 ¶ 44; Trial Tr. 11:16–12:5 (Harrison).

[23] PTO ¶¶ 17–20; *see also* Trial Tr. at 270:12–271:3, 271:13–15 (Bogdanov).

[24] PTO ¶ 18; *see also* Trial Tr. at 11:4–7, 25:10–17 (Harrison).

[25] LPA; *see also* PTO ¶¶ 24–25.

[26] LPA ¶ 18(g).

[27] JX-1–JX-6 (LPA and LPA Ams. 1–5); JX-8–JX-17 (LPA Ams. 6–15); JX-19 (LPA Am. 16); JX-89 (LPA Am. 17); JX-126 (LPA Am. 18); JX-132 (LPA Am. 19); JX-222 (LPA Am. 20); JX-480 (LPA Am. 20); JX-1068 (LPA Am. 22).

At issue here, the LPA provides a framework for making capital calls and approving budgets.[28]   Also relevant to this litigation, the LPA contains an "Exculpation Provision" that protects ATP from liability for actions taken in good faith that are not willful fraud, willful misconduct, gross negligence, or an intentional and material breach of the LPA.[29]   It as well contains a "Discretionary-Action Provision" that grants ATP the discretion to take action against any limited partner who breaches the LPA.[30]   The LPA's "Global Default Provision" authorizes ATP as General Partner to declare a Limited Partner who failed to honor its capital call obligations a "Defaulting Partner," and outlines a set of remedies that ATP can elect to pursue.[31]   Those remedies include imposing a "Default Charge" by reducing the limited partner's preferred units.[32]

### B.    The Historical Budgeting Process

The LPA authorizes the General Partner to call capital for "Projects approved by" the Limited Partners "in writing" and "in accordance with a budget therefor approved" by the Limited Partners.[33]   The LPA thus granted Rigmora the right to approve budgets for projects before the General Partner can call capital for those projects.

---

[28] LPA ¶ 5(a); LPA Am. 3 ¶ 3.

[29] LPA ¶ 2(g).

[30] *Id.* ¶ 18(g)(iv).

[31] *Id.* 5(c).

[32] *Id.*

[33] LPA Am. 3 ¶ 5(a)(iii).

6

Until late 2024, the process by which the parties agreed on budgets began with informal discussions among Rigmora's Chief Investment Officer (whoever occupied that position at the time), Harrison, and Rybolovlev.[34]  For each new Series A investment, Harrison and Rybolovlev met—often in person, although Harrison lives in the United States and Rybolovlev lives in Switzerland—to discuss the opportunity, its prospects for commercial and scientific success, and funding needs.[35]

Rybolovlev personally approved every new investment informally.[36]  Once he did so, ATP prepared a packet of materials to secure formal approval.[37]  The packet included things like a CFIUS memorandum,[38] a request for formal budget approval,[39] and an investment memorandum.[40]

ATP employees drafted the investment memoranda,[41] which served as a "roadmap from the implementation of a project all the way to the delivery of value as measured by exits."[42]  The investment memoranda included the investment thesis, the investment rationale, and an assessment of the quality of the company's

---

[34] Trial Tr. at 14:1–24 (Harrison).

[35] *Id.* at 31:15–32:4, 33:5–10 (Harrison); *id.* at 349:9–14, 355:4–12 (Rybolovlev).

[36] *Id.*

[37] *Id.* at 32:19–33:4 (Harrison).

[38] JX-310 at 6–7.

[39] Trial Tr. at 31:15–33:4 (Harrison); *id.* at 355:9–18 (Rybolovlev).

[40] *Id.* at 32:19–33:4 (Harrison); *id.* at 245:13–17, 251:3–13 (Liras).

[41] *Id.* at 132:8–12 (Harrison).

[42] *Id.* at 241:21–24 (Liras).

founders.[43]  The memoranda also contained performance milestones by which ATP could "measure progress against stated goals."[44]

As Harrison explained, milestones supplied a useful starting point in projecting a portfolio company's performance, but the initial milestones identified in the investment memoranda became less important in middle and later stages of the investment.[45]  As the portfolio companies were "developing drugs from new technologies" and "working with teams of scientists of various stripes," their progress could not easily be predicted from the outset and they would often pivot if their initial strategy was not progressing well.[46]

In this litigation, Rigmora argues that the milestones served as conditions to Rigmora's obligation to fund approved budgets.[47]  For this purpose, Rigmora cites to evidence reflecting the significance that ATP placed on milestones.[48]  But that

---

[43] *See, e.g.,* JX-150 at 8.

[44] Trial Tr. at 242:1–6 (Liras).  They also included risk mitigation strategies, which could involve analyses of comparable companies to assess the novelty of the science and its potential value to patients and investors.  *Id.* at 242:6–10 (Liras).

[45] Trial Tr. at 134:5–135:13 (Harrison).

[46] *Id.*

[47] JX-1579 ("Rimm Report") Figs. 5–11; *see also, e.g.*, JX-243 at 32 (Evercrisp) (dividing funding into "six milestone-driven tranches"); JX-114 at 1, 7, 32–33 (Apertor) (establishing $50m financing in "milestone-driven tranches"); JX-269 at 27 (Red Queen) (establishing tranches "based on milestones and progress").

[48] *See* Dkt. 269 ("Rigmora Post-Trial Br.") at 8, 28 (citing investment memoranda explaining the significant of milestones, JX-243 at 32, JX-309 at 4, JX-269 at 27; Ehlers's testimony that milestones were valuable for focusing the company's management and protecting investors, Trial Tr. at 403:20–404:2 (Ehlers); and Harrison's investment deck characterizing the Fund's investing practices as "[d]iscipline funding" consisting of "[m]ilestone-based tranches infused over time," JX-2280 at 6).

evidence reflects that ATP viewed milestones as important tools for managing the portfolio companies.  No evidence suggests that anyone intended the performance milestones identified in the investment memoranda to serve as conditions to Rigmora's obligation to fund budgets that it approved.  Harrison and Rybolovlev never discussed nor negotiated the milestones.[49]  Rigmora lacked the substantive expertise to set or track performance milestones.[50]  Only two of the approved budgets contained any express milestones, and they were based on corporate strategy metrics.[51]  The fact that certain of the Rigmora approved budgets contained express milestones suggests that the parties did not intend to condition the other budgets on milestones contained in the investment memoranda.

After formal budget approval, the Fund would enter into Series A stock purchase agreements with the relevant portfolio companies.[52]  ATP viewed the Series A commitments as key to recruiting top scientists and staff.[53]  This is because most of the Fund's portfolio companies rely on funding from the Fund exclusively.[54]

---

[49] *Id*. at 33:11–14 (Harrison).

[50] Bogdanov Dep. Tr. at 31:2–9; 45:23–46:10; 46:11–15; Blöchlinger Dep. Tr. at 37:17–25; Yakovlev Dep. Tr. at 30:23–31.

[51] *Id*. at 33:23–34:5 (Harrison); JX-1192 at 2.

[52] Trial Tr. at 34:19–35:2 (Harrison).

[53] JX-1174 at 2.

[54] Trial Tr. at 20:8–21:1 (Harrison).

### C.    Rigmora's Capital Commitments

Since the inception of the Fund, Rigmora agreed to multiple capital commitments.  The LPA limits ATP's right to call capital to the maximum amount of money each limited partner, including Rigmora, committed to the Fund, which the LPA refers to as a limited partner's "Contingent Subscription."[55]  Rigmora's commitments began with an initial commitment of $1.425 billion alongside the November 2012 LPA and were followed by additional commitments negotiated in connection with amendments to the LPA.

### 1.    Rigmora Commits $1.425 Billion To Establish The Fund.

The parties agreed to capitalize the Fund with $1.5 billion initially.[56]  Rigmora would supply $1.425 billion and Harrison would supply the remaining $75 million pursuant to a loan from Rigmora.[57]  Rigmora made its initial capital commitments totaling $1.425 billion on November 1, 2012, under subscription agreements signed by Blue Horizon for $698.25 million and Ezbon for $726.75 million.[58]  The

---

[55] LPA ¶ 5(a)(i).

[56] Trial Tr. at 350:18–23 (Rybolovlev).

[57] PTO ¶¶ 26–27; Trial Tr. at 23:16–25:22 (testifying that Rigmora's total subscription at the time the parties executed the LPA was $1.425 billion when combining Blue Horizon's and Ezbon's subscriptions); JX-212 at 19–23; JX-213 at 19–23; JX-216 at 19–23; Trial Tr. at 25:18–26:3 (Harrison); *id*. at 354:12–19 (Rybolovlev); *see also* JX-1, Sch. D (describing Rigmora's financing of Harrison's capital contributions).

[58] JX-212 at 19–23 (signature pages); JX-213 at 19–23 (signature pages); Trial Tr. at 25:18–22 (Harrison).

subscription agreements were "[s]ubject to the terms and conditions set forth in . . . the [LPA]."[59]

Rigmora also agreed to "make such other capital contributions and payments to the Fund as provided for in the LPA, in the manner and at the times provided in the [LPA]," and to become "bound by the terms of the [LPA]."[60]  ATP's right to call capital, in addition to being limited in amount to each partner's Contingent Subscription, was restricted to contractually specified purposes.

### 2.    The Parties Amend The LPA To Create Investment Pools.

Amendment 13 to the LPA, dated February 4, 2019, introduced a Fund structure through which commitments, assets, and contributions would be allocated and tracked across separate "pools."[61]  The aim of the pool concept was to segregate money so that profits on new investments would not leak to former Fund employees.[62] As Harrison explained, "we had old teams and new teams coming in that would found [sic] new deals.  So we needed to segregate their deals in a pool out of fairness."[63] Pools also allowed the parties to increase capital commitments without having to establish new entities, thus avoiding potential know-your-customer roadblocks.[64]

---

[59] JX-212 ¶ 1; JX-213 ¶ 1.

[60] *Id.*

[61] JX-15 (LPA Am. 13) ¶ 17(a).

[62] Trial Tr. at 27:11–28:9 (Harrison)

[63] *Id.* at 27:13–17 (Harrison).

[64] *Id.* at 27:11–28:9 (Harrison).

Amendment 13 established two pools: Pool A, which held the existing projects, and Pool B, which held the Fund's new projects.[65]  Rigmora was responsible for funding 100% of capital called for Pool B.[66]  Amendment 13 stated that expenses "directly attributable" to a particular pool would be allocated exclusively to that pool with other expenses apportioned between the pools based on the relative cost basis of the remaining assets in each pool.[67]  Amendment 13 identified the "Management Fee" paid to Harrison, and the "Apple Tree Life Sciences, Inc. Fee, or "ATLS Fee" for Fund expenses incurred across the portfolio companies, as expenses attributable to both pools.[68]

Amendment 13 further provided that "separate and distinct records shall be maintained for each Pool, and capital contributions . . . shall also be accounted for separately on a Pool-by-Pool basis."[69]

### 3.    Rigmora Commits An Additional $1 Billion.

Rigmora increased its commitment to the Fund as early-stage biotech investment surged in 2020 and 2021, spurred by the global response to the Covid-19

---

[65] LPA Am. 13 ¶ 17(a).

[66] *Id.*¶ 17(b).

[67] *Id.* ¶ 17(d)).

[68] JX-9 (LPA Am. 7) Schedule A ¶ 3; JX-19 (LPA Am. 13) ¶ 17(d).  ATLS is a wholly owned subsidiary of the Fund that covers Fund operational expenses like facility costs, leases, rents, and employee costs.  JX-9 (LPA Am. 7) Schedule A ¶ 3; Trial Tr. at 17:17–18:4 (Harrison).  The parties allocated the Management Fee and ATLS Fee between the pools according to fixed percentages.  LPA Am. 20 ¶ 6.

[69] LPA Am. 13 ¶ 17(a).

pandemic.[70]  Amendment 17 to the Limited Partnership Agreement, dated September 9, 2020, committed Rigmora to fund an additional $1 billion to be allocated between Pool B and a new Pool C.[71]  Thereafter, Pool A would consist of Rigmora's original $1.425 billion capital commitment and all economics of the Fund not expressly allocated to Pools B or C.  Pools B and C would split Rigmora's new $1 billion commitment.[72]

Amendment 17 further specified that Pool B would contain: Chinook Therapeutics U.S., Inc.; Nine Square Therapeutics Corporation; and Initial Therapeutics, Inc., along with a proportionate share of the Management Fee and ATLS Fee.[73]  Pool C would contain Kynos Therapeutics Ltd and any new projects after the execution of Amendment 17, along with a proportionate share of the ATLS Fee and Management Fee.[74]

Each of these pools would be funded "exclusively" by Rigmora, and "[a]ll capital invested in the Pool C Projects . . . [would] be treated as contributed to [Pool C]."[75]

---

[70] Trial Tr. at 362:7–12 (Rybolovlev); *see also id.* at 402:20–22 (Ehlers); JX-1579 ¶ 19.

[71] Trial Tr. at 29:1–19 (Harrison); JX-89 (LPA Am. 17).

[72] LPA Am. 17 ¶ 20(a)

[73] *Id.*

[74] *Id.*

[75] *Id.* ¶ 20(b).

13

After Amendment 17, the parties executed amended subscription agreements under which Blue Horizon and Ezbon committed to contributing $490 million and $510 million, respectively, to Pools B and C.[76]

In Amendment 19, dated November 27, 2020, the parties renamed Pools A, B, and C, as Pool ATP IV, Pool ATP V-1, and Pool ATP V-2, respectively.[77]   In their testimony, the witnesses further shortened the Pool names to Pool IV, Pool V-1, and Pool V-2,[78] and this decision follows suit.

### D.   Amendment 20 To The Limited Partnership Agreement

In 2021, while investments in early-stage biotech companies still surged, the parties decided to restructure the economic rights and obligations surrounding an existing Pool IV project called Braeburn Inc.  The Fund founded Braeburn in 2012 as "a Phase 1 company."[79]  By 2021, it was "market[ing] a drug for opioid addiction" and had around "$300 million in sales revenue."[80]   Pool IV held Braeburn, but the company was "capital intensive."[81]   So Rybolovlev agreed to fund the capital commitments to Braeburn, and ATP agreed to "change[] . . . carry economics in favor of [Rybolovlev]."[82]   To facilitate this arrangement, the parties amended the LPA to

---

[76] Trial Tr. at 41:11–42:14 (Harrison); JX-99; JX-101.

[77] JX-132 (LPA Am. 19) ¶ 1; Trial Tr. at 28:22–24 (Harrison).

[78] *See, e.g.*, Trial Tr. at 40:19–23 (Harrison).

[79] Trial Tr. at 44:14–19 (Harrison).

[80] *Id.* at 44:13–21 (Harrison).

[81] *Id.* at 45:8–21 (Harrison).

[82] *Id*. at 45:8–24 (Harrison); LPA Am. 20 ¶ 21(b).

"segregate the investment in Braeburn."[83]   Meanwhile, ATP had placed new executives in charge of existing projects.[84]  This, coupled with changes at Braeburn, prompted a wholesale restructuring of Pool IV to allocate existing assets and liabilities to newly created pools and align managers' carried interests with their performance.[85]

In June 2021, the parties executed Amendment 20 to for this purpose.[86] Amendment 20 created two new pools.[87]  The first, "Pool Braeburn," held Braeburn in a segregated fund for which Rigmora would be the exclusive source of capital.[88] The second, "Pool V-3," held seven companies formerly under Pool IV that "hadn't quite made it" and "would be managed by the members of our new team"[89]—Ascidian Therapeutics, Inc., Gala Therapeutics, Inc., Galary, Inc., Galvanize Therapeutics, Inc., Galaxy Medical, Inc., Intergalactic Therapeutics, Inc., and Marengo

---

[83] *Id.* at 44:22–45:2 (Harrison).

[84] *Id.* at 46:6–15 (Harrison).

[85] LPA Am. 20  ¶¶ 21(a), 22(a) (describing Pools V-3 and Braeburn as "consist[ing] of the assets, liabilities, income, gains, losses and expenses associated with the Partnership's investments" in the relevant portfolio companies); Trial Tr. at 44:22–45:11 (Harrison) (Pool Braeburn created to change "carry economics" for investment in Braeburn); *id.* at 39:21–41:10, 46:6–15 (Harrison) (Pool V-3 set up to segregate economics for new managers).

[86] Trial Tr. at 44:11–46:15 (Harrison).

[87] LPA Am. 20 ¶¶ 21, 22.

[88] LPA Am. 20  ¶ 21; *id.* ¶ 21(b) (stating that capital shall be called from Rigmora "exclusively" and that "[n]o other Partner shall be required to contribute capital to or in respect of Pool Braeburn").

[89] Trial Tr. at 46:6–15 (Harrison).

15

Therapeutics, Inc.[90]  Amendment 20 also reduced Rigmora's funding commitments to Pool IV.[91]

The parties dispute whether Rigmora agreed to increase its overall capital commitments through Amendment 20.  Before Amendment 20, Rigmora had committed a total of $2.425 billion: $1.425 billion to Pool IV and $1 billion to Pools V-1 and V-2.[92]  Of that amount, Rigmora had contributed approximately $1.3 billion[93] to Pool IV and $58.5 million to Pools V-1 or V-2.[94]  Rigmora's commitments thus left around $1.067 billion in head room in its Contingent Subscription to achieve the then contemplated projects.[95]  In this litigation, Rigmora argues that $1.067 billion was

---

[90] LPA Am. 20 ¶ 22(a).

[91] LPA Am. 20 ¶ 24.

[92] PTO ¶ 30; JX-212 at 19–23 (Blue Horizon SA signature pages); -213 at 19–23 (Ezbon SA signature pages); LPA Am. 17 ¶ 20(a) (committing an additional $1 billion to Pools B and C); JX-99 ¶ 1; JX-101 ¶ 1; LPA Am. 19 ¶ 1 (renaming Pool A to Pool IV and Pools B and C to Pools V-1 and V-2 respectively).

[93] *See* JX-221, Tab "Capital Contributions – ATP IV," Cells D163, E163 (stating Ezbon and Blue Horizon contributed $662,918,351.14 and $636,921,696.00 to ATP IV respectively, which combined equals $1,299,840,047.14).

[94] *See id.*, Tab "Capital Calls – V-1 and V-2," Adding cells D23 and D47, the totals for Rigmora's contributions to V-1 and V-2,  yields $58,486,530.

[95] As described in the legal analysis, immediately prior to Amendment 20's adoption, Rigmora committed $2.425 billion to the Fund.  PTO ¶ 30; JX-212 at 19–23 (Blue Horizon SA signature pages); JX-213 at 19–23 (Ezbon SA signature pages); LPA Am. 17 ¶ 20(a); JX-99 ¶ 1; JX-101 ¶ 1; LPA Am. 19 ¶ 1.  Rigmora's combined contributions to all pools immediately prior to Amendment 20's adoption was $1,358,326,577.14. JX-221, Tab "Capital Contributions – ATP IV," Cells D163, E163 (showing Rigmora's total contributions to Pool IV as $1,299,840,047.14); *id.*, Tab "Capital Calls – V-1 and V-2," Cells D23, D47 (showing Rigmora's total contributions to Pools V-1 and V-2 as $58,486,530). Subtracting Rigmora's capital contributions of $1,358,326,577.14 from its then current Contingent Subscription of $2.425 billion yields unfunded capital commitments of $1,066,673,422.86.

16

more than enough to accomplish anticipated projects. And the parties did not expressly amend the subscription agreements in connection with Amendment 20 as they had with prior LPA amendments.[96]

But Amendment 20 and communications leading up to it, all during the biotech boom, reflect that the parties anticipated unfunded commitments exceeding $1.067 billion, and total commitments from Rigmora exceeding $2.425 billion.

In May 2021, Harrison emailed a draft outline of the transaction to Rigmora's then-CEO and CIO Anna Kolonchina, who indicated Rigmora's assent to the outline a few days later.[97] The outline included a section titled "Remaining Unfunded Capital Commitments" of approximately $1.385 billion as follows: (1) $20 million for ATP IV; (2) $220 million for ATP V-1; (3) $664 million for ATP V-2; (4) $291 million for new Pool ATP V-3; and (5) $189.95 million for new Pool Braeburn.[98] Adding up Rigmora's obligation for those commitments (approximately $1.384 billion),[99] to its then-funded commitments ($1.3 billion) equals $2.684 billion.

On its face, Amendment 20 reflects a minimum in unfunded commitments of approximately $2.814 billion, more than those of the May 2021 outline.[100]

---

[96] *See* PTO ¶¶ 26–27, 30 (listing amendments to subscription agreements).

[97] JX-195 at 1 (Kolonchina circulated a revised draft and stating it "make[s] sense to start drafting a long form" amendment).

[98] JX-195 at 4–5.

[99] Of that, Rigmora would be responsible for approximately $1.384 billion based on its agreement to fund 99.6028% of Pool IV and Pool V-3 and 100% of the remaining pools. JX-195 at 1, 4–5.

[100] LPA Am. 20.

Amendment 20 reflected anywhere from $304.6 to $309.2 million in contributions to

Pool V-3[101] (more than the $291 million reflected in the outline).  It also reflected a

minimum of $189.9 million to Pool Braeburn plus a commitment to fund additional

securities fees (thus likely more than the flat $189.9 million reflected in the

outline).[102]  Amendment 20 reduced the $1.425 billion commitment to Pool IV

consistent with the email (subtracting approximately $92 million to even the

---

[101] As discussed in the legal analysis, to Pool V-3, Amendment 20 reflected a total commitment of $500 million.  LPA Am. 20 ¶ 22(b).  This included $189,544,660 in "deemed commitments" to the existing investments into the Pool V-3 companies and implied approximately $310.5 million in new commitments.  *Id.*  The new commitments expressly identify two new expenses totaling $305.8 million: $70,853,399 in previously approved, unfunded budgets and $235 million in additional commitments to those companies.  *Id.*  Amendment 20 further states that "Ezbon, Blue Horizon, Harrison, and Les Pommes shall contribute 50.7974%, 48.8054%, 0.1869%, and 0.2103%, respectively," to any unfunded remaining budgets.  *Id.*  Assuming the implied $310.5 million, then Rigmora would be required to contribute approximately $309.2 million.  Assuming the expressly noted $305.8 million, then Rigmora would be required to contribute approximately $304.6 million.  So Amendment 20 reflects anticipated additional capital commitments from Rigmora to Pool V-3 in a range of $304.6 million to $309.2 million.

[102] As discussed in the legal analysis, to Pool Braeburn, Amendment 20 reflected Rigmora's commitment of $189.9 million.  LPA Am. 20 ¶ 21(a).  Amendment 20 also committed Pool Braeburn to "any additional securities of Braeburn acquired by the Partnership after the date of Amendment 20" and fees and expenses related to Pool Braeburn.  *Id.*  ATP's former CFO Engels testified that the Braeburn later purchased $30.6 million in additional Series B shares for Braeburn and called approximately $9 million in expenses to Pool Braeburn.  Engels Dep. Tr. at 355:3–15.  The parties executed a settlement agreement in December 2024 to resolve a dispute that Rigmora initiated in Cayman.  Trial Tr. at 71:5–10 (Harrison).  Pursuant to that settlement, the parties waived the then-remaining $21.3 million in commitments to Pool Braeburn.  Engels Dep. Tr. at 355:16–21; JX-1068 (LPA Am. 22); JX-1072.As Engels explained, these commitments "netted out to a total obligation of $208,355,000." Engels Dep. Tr. at  355:22–356:4.  Even assuming that the parties did not know the precise costs of the additional securities, fees, and expenses at the time of executing Amendment 20, the Amendment anticipated $189.9 million in additonal funding to Braeburn.

commitment to the funds already contributed and adding the then-anticipated $20 million in fees)[103] but did not reduce the $1 billion commitment to Pools V-1/V-2.

And immediately following Amendment 20, ATP began calling committed capital from Rigmora and Harrison. On June 24, 2021, ATP transmitted a capital call to Rigmora for approximately $16.4 million, consisting of $2 million for Pool Braeburn, $1.6 million for Pool V-2, and $12.8 million in expenses charged to the pools, all split among Rigmora and Harrison in line with their commitment obligations to the pools.[104]

This capital call—and every call that followed—included as "Exhibit A" a tracker of the outstanding capital commitments.[105] The tracker included the amount of funds being called from each party on a pool-by-pool basis (including the breakdown of ATLS fees proportionately for each pool), and the amount of unfunded committed capital that would remain following the capital call.[106] Exhibit A to the June 2021 capital call evidenced a total remaining commitment of $1.447 billion.[107] Before this

---

[103] The parties agreed to reduce Pool IV's remaining unfunded commitments from the initial $1.5 billion to approximately $20 million to be used to cover expenses, including the cost of litigating a then-ongoing portfolio company exit. JX-1061 (LPA Am. 20) ¶ 24. The actual cost of expenses related to that litigation, and what was ultimately paid into Pool IV after Amendment 20, totaled around $33.3 million. Engels Dep. Tr. at 321:20–322:22. Adding Rigmora's share of those costs to the amount Rigmora contributed to Pool IV prior to Amendment 20 equals $1,333,059,463.85. *See infra* § II.A.1.

[104] Trial Tr. at 47:10-48:3 (Harrison); JX-230 at 1–2.

[105] JX-230 at 4; Trial Tr. at 48:19–50:18 (Harrison).

[106] *Id.*

[107] JX-224 at 3.

litigation, no one at Rigmora (including then-CEO Kolonchina, who received these calls) ever objected to the accounting.[108]

### E.    Amendment 22 To The Limited Partnership Agreement

Biotech markets retrenched in 2022,[109] and Russia invaded the Ukraine early that year.[110]  Rigmora's investment strategy and risk appetite changed after these events,[111] and the parties' relationship began to strain.[112]  By 2023, Rigmora had started conditioning its capital contributions on budget reductions.[113]  Braeburn had achieved commercial success.[114]  The FDA approved Braeburn's drug Brixadi, transforming Braeburn into a commercial-stage company with multi-billion dollar potential.[115]  In July 2021, Braeburn entered into a royalty purchase agreement with ATP which gave ATP a license to Braeburn's IP and the associated royalty

---

[108] Trial Tr. at 48:19–51:1 (Harrison); *id.* at 474:22–476:10 (Yakovlev) (testifying that he was "not . . . aware" of anyone at Rigmora challenging these records)

[109] *Id.* at 382:10–19 (Rybolovlev).

[110] *Id.* at 199:2–3 (Strebulaev).

[111] JX-463 at 2–3; Trial Tr. at 51:15–52:12 (Harrison).   At trial, Rybolovlev denied that the invasion of Ukraine played a part in Rigmora's decision making.  Trial Tr. at 352:20–353:3 (Rybolovlev).

[112] *See* Trial Tr. at 51:15–52:12 (Harrison).

[113] JX-698.

[114] PTO ¶¶ 48–50.

[115]   *Id.*

payments.[116]  And Rigmora demanded immediate distributions from Braeburn.[117] ATP refused the demand.[118]

Ultimately, ATP sued in the Cayman Islands to compel Braeburn distributions.[119]  In that litigation, Rigmora previewed the defense it would make in this litigation.  On October 10, 2024, Kolonchina filed an affidavit in the Cayman court.[120]  The LPA authorizes the General Partner to request capital calls in "an amount equal to, *but not in excess of*" the "Contingent Subscriptions" as that term is defined in the LPA.[121]  In an October 10, 2024 affidavit, Kolonchina stated, for the first time, that Rigmora's "combined Contingent Subscriptions are US$2.425 billion."[122]  Because Rigmora had already funded $2.6 billion, in Rigmora's view, "it is therefore impossible" that Rigmora had outstanding Contingent Subscriptions.[123]

Rigmora did not stand on its newly formed legal defense in the Cayman litigation but instead agreed to meet its capital obligations.[124]  The day that she filed her affidavit, Kolonchina stated in an email to ATP that Rigmora would pay a

---

[116] JX-586 at 2,

[117] Trial Tr. at 67:9–68:14 (Harrison); PTO ¶¶ 51, 53.

[118] PTO ¶ 52.

[119] PTO ¶ 54; Dkt 57 ("Answer") ¶¶ 98, 100.

[120] JX-1002.

[121] LPA ¶ 5(a)(i) (emphasis added).

[122] JX-1002 ¶¶ 23–26.

[123] *Id.*

[124] JX-998 at 1.

pending capital call although it was "not obligated to do so."[125]  By October 2024, Rigmora was explicitly disclaiming any obligation to respond to capital calls for budgets already approved in writing, insisting that further payments would be made only "on a voluntary basis."[126]

During this time, ATP portfolio companies were nearing the end of their Series A commitments and initial budgets, making new budgets critical.[127]

Harrison flew to Monaco and suggested to Rybolovlev that they settle the Cayman litigation.[128]  This led to a "couple of days of meetings" where they "agreed to the basic outline of a settlement in order to continue to work together."[129]  On December 20, 2024, the parties implemented the settlement terms through Amendment 22 to the LPA.[130]

Through Amendment 22, Rigmora agreed to "discuss" budgets for ATP portfolio companies in exchange for distributions from a newly secured Braeburn royalty valued at approximately $700 million.[131]  Amendment 22 provides:

---

[125] *Id.*

[126] *Id.*

[127] Trial Tr. at 72:6–73:10 (Harrison).

[128] *Id.* at 68:22–69:1 (Harrison).

[129] *Id.* at 68:24–69:4 (Harrison).

[130] *See* LPA Am. 22 ¶ 26; Trial Tr. at 275:6–21 (Bogdanov).

[131]  LPA Am. 22 ¶¶21, 26.  By this time, Braeburn was a successful public company and the Braeburn royalty reflected the Fund's share of the company's cash flows. Trial Tr. at 64:18–65:12 (Harrison).  ATP removed the Braeburn royalty from the Fund into a separate entity, ATP LLC.  *Id.*  Amendment 22 allowed Rigmora to receive distributions from the Braeburn royalty.  LPA Am. 22 ¶ 21.

> From and after the date of [Amendment 22], the General Partner and [Rigmora] shall discuss new budgets for the Partnership in accordance with the process set forth in this Agreement to allow it to invest in Ascidian Therapeutics, Inc., Aulos Bioscience, Inc., Nereid Bioscience, Incorporated, Nine Square Therapeutics Corporation and Replicate Bioscience, Inc. sufficient amounts to enable each of them to operate for a period of twelve months after the remaining unfunded amounts, if any, under their respective existing approved budgets are expected to have been fully utilized . . . .[132]

Amendment 22 noted, on its face, the projected dates by which each company would run out of cash: January 2025 for Aulos, February 2025 for Replicate, April 2025 for Nereid, May 2025 for Nine Square, and first quarter 2026 for Ascidian.[133]

At the same time, Amendments 22 created a "Royalty Financing" contingency. It stated that "[i]f any approval of a new budget is given by [Rigmora], *such approval shall be contingent upon* at least $300 million being realized (including through deemed distributions) by [Rigmora] on a sale or financing of its interest in ATP LLC."[134]  Put differently, no budget for entities identified in Amendment 22 would be approved, and thus subject to capital calls, absent a Royalty Financing.

Harrison expected that the parties would work together to obtain the Royalty Financing.[135]  These expectations were consistent with the terms of Amendment 22, which mandates that, in pursuing the financing, as well as approving budget proposals, each party would "do and perform, or cause to be done and performed, all

---

[132] LPA Am. 22 ¶ 26.

[133] *Id.* ¶ 26.

[134] *Id.* ¶ 26 (emphasis added).

[135] Trial Tr. at 77:24–78:3 (Harrison).

such further acts and things . . . as any other party may reasonably request in order to carry out the intent and accomplish the purposes of this Amendment and the consummation of the transactions contemplated hereby."[136]

### F.  Rigmora's New Management Shifts Funding Priorities And Delays Budget Approvals.

In October 2024, Kolonchina left Rigmora,[137] and Rybolovlev promoted Yuri Bogdanov to CIO and co-CEO.[138]  Rybolovlev had known Bogdanov for two decades.[139] Before Rigmora, Bogdanov had worked for Uralkali in Russia.[140]  Prior to his elevation at Rigmora, Bogdanov worked as a special advisor for several years which entailed giving a "second opinion" and challenging management on investments and other matters.[141]  Bogdanov was promoted due to his "general understanding" of Rigmora's operations.[142]  But Rybolovlev identified drawbacks to his elevation.  For one, "background i[n] auditing" made him "very, very, conservative."[143]  Also, Bogdanov had no prior involvement in the Fund's company budgets nor any meaningful exposure to biotech.[144]

---

[136] LPA Am. 22 ¶ Miscellaneous.

[137] Trial Tr. at 378:7–14 (Rybolovlev)

[138] *Id.* at 271:24–272:7 (Bogdanov).

[139] Trial Tr. at 273:20–274:1 (Bogdanov).

[140] *Id.*

[141] *Id.* at 272:14–20 (Bogdanov).

[142] Rybolovlev Dep. Tr. at 51:5–52:4.

[143] *Id.* at 50:17–51:3.

[144] Trial Tr. at 272:8–24, 316:24–13 (Bogdanov).

1.    **Bogdanov Proposes Drastically Reducing Rigmora's Investment In ATP.**

Years before his elevation, Bogdanov was working as an investment analyst at Rigmora and recommended that Rigmora slash its investment in ATP.[145]  By the fall of 2022, Rigmora's investment strategy and macroeconomic trends landed Rigmora in what Bogdanov described as a "liquidity crisis."[146]   To address it, Bogdanov prepared an internal memorandum proposing a change in investment strategy.[147]

In the memorandum, Bogdanov observed that "two to three years ago" a crisis with similar characteristics had been "resolved by liquidating the private equity portfolio."[148]  He warned that Rigmora's structure, with mainly "venture businesses (biotech [and] gaming) carries similar risks that had led to the current crisis: poorly predictable money inflows (divestments) and massive outflows (capital calls), which will grow exponentially if the divestments are delayed."[149]

Bogdanov's solution was straightforward: "The current cash gap can be closed by drastic reduction in venture investment (and particularly biotech) and divestiture."[150]  Otherwise, Rigmora would remain trapped in "the same logic of

---

[145] JX-446.

[146] *Id.*; *see also* Trial Tr. at 352:10–15 (Rybolovlev) (testifying that Rigmora did "not like to keep a lot of liquidity on hand" because "the money, whether it's cash, it has to work").

[147] JX-446; *see* Trial Tr. at 318:2–321:23 (Bogdanov).

[148] JX-446 at 1.

[149] *Id.*; Trial Tr. at 320:11–18 (Bogdanov).

[150] JX-463 at 2; Trial Tr. at 320:3–7 (Bogdanov).

shifting money from less risk (Private Equity Funds, real estate, boat) to more risky assets with 'fire extinguishing' from time to time" to resolve periodic emergency cash shortages.[151]

According to Bogdanov, Rigmora would "most importantly" re-encounter emergency cash shortages due to "guaranteed obligations on . . . biotech venture projects."[152]  "Biotech ventures" referred to the Fund.[153]  And although the Fund could be "a source of capital gains," it could not "serve as a reliable source of cash for funding [Rigmora's] regular needs."[154]  If Rigmora were to exit its biotech investments, it would gain a "buffer" of at least $300 million—enough to mitigate Rigmora's liquidity crisis and achieve a "stable position" long term.[155]  Bogdanov concluded that the way "to start moving towards the cash buffer" was "to drastically reduce ATP payments."[156]

---

[151] JX-463 at 2; Trial Tr. at 320:19–24 (Bogdanov).

[152] JX-440 at 2 (emphasis added).  This email was sent by Bogdanov's associate, but Bogdanov testified that he is "the author."  Bogdanov Dep. Tr. 162:5–10.

[153] Trial Tr. at 320:8–10 (Bogdanov).

[154] JX-440 at 2.

[155] JX-446 at 1.

[156] JX-462 at 2 (emphasis added); Bogdanov Dep. Tr. at 174:14–21.

Bogdanov believed that Rigmora could achieve "drastic" payment reductions through "tight controls," including "clear rules for review and approval of new projects."[157]   His "priority number one [was] to create the cash buffer."[158]

### 2.    Bogdanov Delays Budget Approvals To Reduce Funding Commitments.

No one gave Bogdanov any "specific instructions" on his new priorities when he became CIO and co-CEO in late 2024.[159]  All indications are that Bogdanov set his fall 2022 plans in motion and began implementing a shift toward reducing long-term investments and building a cash buffer by cutting funds to ATP.

Meanwhile, ATP was on the verge of crisis.  That is what prompted Harrison to make settlement overtures to Rybolovlev, overtures that led to Amendment 22 and Rigmora's commitment to discuss new budgets.  And ATP wasted little time after executing Amendment 22 before sending Rigmora proposed budgets.[160]

Bogdanov had negotiated Amendment 22 for Rigmora and remained ATP's point of contact.[161]   On December 24, 2024, Harrison emailed Bogdanov budget requests for:[162] Auolos, "align[ing] with management's recommendation for the middle scenario of $28M"; Replicate, for "$11M"; and Nine Square, "with a budget

---

[157] JX-462 at 2; Bogdanov Dep. Tr. at 173:16–22.

[158] JX-462 at 2.

[159] Trial Tr. at 342:20–343:3 (Bogdanov).

[160] JX-1079 at 1; Trial Tr. at 79:10–80:5 (Harrison).

[161] Trial Tr. at 271:24–272:7, 275:2–5 (Bogdanov).

[162] JX-1079 at 1.

request of $15M" (the "Budgeting Requests").[163]  Harrison also explained that he had attached materials concerning budgets for: Nereid, which could merge with Marlinspike and "utilize Marlinspike's remaining budget" and therefore required no additional funds; and Ascidian, which would "require more discussion and time to understand" due to "contingent variables" expected to "emerge" in the coming year.[164]

Harrison provided a spreadsheet showing "expected tranching by quarter for 2025," plus access to data rooms with "supporting materials for the new budgets."[165] ATP had not historically provided this level of information when requesting budget approval.[166]  Harrison testified at trial that ATP provided this information "to make sure [Rigmora] understood that after the settlement agreement we were being radically transparent."[167]  Bogdanov forwarded Harrison's email to Rigmora's analyst, Zufar Iskhakov, exclaiming "Let's start.  Merry Christmas!"[168]  This seems like a positive response.  Yet Bogdanov testified in deposition that he did not mean "let's start approving budgets."[169]  And events that followed seem to suggest that he meant "let's start" imposing "tight controls."

---

[163] *Id.*

[164] *Id.*

[165] *Id.*

[166] Trial Tr. at 80:18–81:7 (Harrison).

[167] Trial Tr. at 128:6–9 (Harrison).

[168] JX-1079 at 1.

[169] Bogdanov Dep. Tr. at 228:13–15.

Bogdanov prioritized Replicate, which Harrison had warned would "run out of cash by the third week of January."[170]  Over the holidays, Bogdanov's team prepared a "list of the follow-up diligence questions,"[171] which Bogdanov sent to Harrison.[172]

Bogdanov testified that this was appropriate.  He characterized the list as "basic diligence questions on the company's past performance" and "how the company executed its original plan."[173]  The questions determine the "most important indicators before [] mak[ing] any decision on the new budget."[174]

Harrison, on the other hand, viewed Bogdanov's diligence questions as bizarre.[175]  As he testified, Rigmora "already knew about" Replicate and had "approved the budget[.]"[176]  Replicate had pivoted "from oncology to a rabies vaccine over the course of the fund's investment."[177]  As Harrison explained: "this is a company that we founded I think in 2021 and on which we'd reported extensively, were the sole owner, and we had many, many, many conversations about with [Rybolovlev]."[178]

---

[170] Trial Tr. at 291:11–16 (Bogdanov).

[171] *Id.* 291:17–20 (Bogdanov).

[172] JX-1107 at 1–5.

[173] Trial Tr. at 292:1–8 (Bogdanov).

[174] *Id.* at 292:9–15 (Bogdanov).

[175] Trial Tr. at 129:3–5 (Harrison).

[176] *Id.*

[177] *Id.* at 128:19–23 (Harrison); JX-1107 at 3.

[178] Trial Tr. at 82:23–83:3 (Harrison).

Rigmora's diligence requests ignored this history.  Some of the requests were open-ended, seeking, for example, narratives explaining whether Replicate had "lost its differentiation," and how its "technology evolved over the past four years compared to its main peers."[179]  When confronted on cross-examination about whether he knew if his diligence questions could "be answered in a reasonable amount of time," Bogdanov admitted: "I didn't know."[180]

Rigmora ultimately approved Replicate's budget.[181]  But the budgeting experience for Replicate marked a departure from the parties' historically collaborative approach over the Fund's twelve-year history and, in that way, foretold events to come.

### 3.    To Move Forward, Harrison Proposes Reallocating Committed Funds To Clinical-Stage Companies.

Additional meetings occurred in March 2025 in Monaco to discuss the budgeting efforts contemplated by Amendment 22, including Aulos, Ascidian, and Marengo.[182]  Bogdanov continued to issue requests for extensive information in connection with the budgeting process.[183]  And ATP continued responding to those requests.[184]  The senior management teams for those budgets under review flew

---

[179] *Id.* at 130:4–16 (Harrison); JX-1107 at 3.

[180] *Id.* at 328:17–329:1 (Bogdanov).

[181] *Id.* at 87:4–17 (Harrison); *id.* at 295:13–18 (Bogdanov).

[182] *Id.* at 92:15–18 (Harrison).

[183] *Id.* at 293:3–19 (Bogdanov).

[184] *Id.* at 94:5–24 (Harrison); JX-1222 at 1.

overseas, as did consultant Bill Grossman, whom ATP engaged for Bogdanov's and Rybolovlev's benefit.[185]

The Monaco meetings, however, did not result in approved budgets for Aulos, Ascidian, or Marengo.[186]    Nor had Rigmora made any progress toward Royalty Financing.[187]  With the understanding that the only capital the Fund would receive from Rigmora would be capital called within approved budgets, Harrison proposed as a compromise that the parties reallocate funding to "move some of the clinical projects along."[188]  He proposed reallocating some of the approved budget amounts from the preclinical companies to clinical companies.[189]

Harrison put the reallocation proposal forward although he believed that the preclinical projects had value.[190]  He engaged Rigmora to "attempt to minimize any need for near-term cash funding."[191]  He sought to neutralize Rigmora's "incessant refrain that it faced cash flow issues and that it either could not, or would not, meet the funding needs of the Pool V-1 and V-2 portfolio companies."[192]

---

[185] Trial Tr. at 95:1–18 (Harrison).  Grossman assessed courses of action for Aulos. *Id.* at 95:19–96:6.  Eventually, Rybolovlev deferred to Harrison's expertise before agreeing, in Harrison's words, "we should do Aulos." *Id.* at 95:24–97:15 (Harrison).

[186] *Id.* at 97:16–18 (Harrison).

[187] *Id.* at 98:1–12 (Harrison).

[188] *Id.* at 97:19–98:20 (Harrison).

[189] *Id.* at 98:21–99:2 (Harrison).

[190] *Id.* at 101:19–102:7 (Harrison).

[191] JX-1336 at 1.

[192] *Id.*

###### 4.    In Response To A Hostile Reaction From Rigmora, Harrison Withdraws The Reallocation Proposal.

Rigmora did not agree to Harrison's reallocation proposal.[193]  At first, Rigmora seemed receptive to the approach.  On May 9, Harrison held a Zoom call with Bogdanov, Rybolovlev, and Anna Batarina, an ATP partner.[194]  At this meeting Harrison provided a brief introduction and then offered a more formal presentation.[195]  In response, Bogdanov and Rybolovlev said that a presentation would be unnecessary because it is moving in the right direction, and the next step would be to speak with Rigmora's lawyers.[196]

Harrison spoke with Rigmora's lawyers on May 12, 2025.[197]  Harrison characterized the call as an "ambush."[198]  In his view, the lawyers distorted the purpose and meaning behind his reallocation proposal, saying to Harrison "it's obvious that you think the preclinical companies are worthless, otherwise why would you have proposed this reallocation."[199]  Harrison withdrew the proposal during the May 12 call.[200]

---

[193] Trial Tr. at 99:3–6 (Harrison).

[194] *Id.* at 47:20–23, 99:7–15 (Harrison).

[195] *Id.*

[196] *Id.*

[197] *Id.* at 99:8–100:8 (Harrison).

[198] *Id.* at 100:18–21 (Harrison).

[199] *Id.* at 101:2–12 (Harrison).

[200] *Id.* at 305:2–20 (Bogdanov).

### G.    Rigmora Disclaims Any Outstanding Capital Commitments To ATP.

Rigmora ratcheted up the parties' level of conflict further on May 15, 2025, when Bogdanov emailed ATP an alarming communication (the "May 15 Email").[201]

In the email, Bogdanov declared that the Fund should cease further funding of seven preclinical companies, which he referred to as the "Early-Stage Companies," and which all had approved yet unspent budgets.[202]  He claimed those companies had "no way for a path to commercial success," had "failed to meet the milestones set out in the investment memoranda on which [Rigmora's] initial funding was premised," and there was "no third party interest."[203]  In describing the companies as dead-ends, the May 15 Email contorted the purpose of Harrison's reallocation proposal, misstating that Harrison "hold[s] a similar view" that "further funding of those Early-Stage Companies will waste the ATP Fund's assets."[204]

Although Rigmora had already approved budgets for the preclinical companies, Bogdanov invited a "detailed explanation" of why, despite the companies' supposed unworthiness, Rigmora should "contribute further capital" to the preclinical companies.[205]  Bogdanov stated Rigmora's intent to "comply" with the LPA but

---

[201] JX-1319 at 1.

[202] *Id.*

[203] *Id.*

[204] *Id.*

[205] *Id.*

conditioned its cooperation on whether ATP could "demonstrate that the LPA allows" ATP to call further capital.[206]

And although the parties had just spent months discussing budgets for the four clinical-stage companies, and ATP had called capital for those companies on December 24, 2024, Bogdanov conditioned any further funding for those companies on ATP's agreement to "wind down or liquidate the Early-Stage Companies."[207]

Bogdanov gave ATP an ultimatum: liquidate the preclinical companies with already approved budgets to obtain funding for companies during clinical trials. Rigmora stated that it would not even "consider" the budgets for clinical-stage companies until ATP agreed to release Rigmora from its obligations to meet capital calls for already-approved budgets and abandon existing investments through liquidation or wind down.

The May 15 Email demanded "objective information" to "facilitate the discussion" of any "new budgets"— ignoring the past five months' of data and erecting new hoops for ATP to jump through.[208]

---

[206] *Id.*

[207] *Id.* Bogdanov did not address the two preclinical companies Nereid and Nine Square that had already expended their initial Series A funding. *See id.*

[208] *Id.*

In the penultimate sentence, the May 15 Email stated that Rigmora did "*not presently have any outstanding capital commitments to ATP Fund* and therefore has full discretion on whether to agree to fund any new investment proposals."[209]

### H.    ATP Calls Six Months Of Capital.

The May 15 Email ultimatum left ATP with very few options.  ATP decided to lean on its contractual rights.  On May 30 and June 1, the GP called $87.76 million in capital needed to maintain six months of research activity for ten companies—the seven preclinical companies as well as Replicate, Marengo, and Ascidian—and $19,371,099 in ATLS Fees and partnership expenses (the "Capital Calls").[210]  The capital called and unfunded approved budgets are below:

---

[209] *Id*. (emphasis added).

[210] *See* JX-1387 at 1; JX-1388 at 1; JX-1390 at 1; JX-1391 at 1; JX-1393 at 1; JX-1394 at 1; JX-1395 at 1; JX-1396 at 1; JX-1397 at 1; JX-1398 at 1; JX-1415 at 1; *see also* Trial Tr. at 110:8–21 (Harrison) (testifying that the figures were keyed to estimates for six months of budgets, with the goal of permitting company survival and "following forward on . . . research plans"); *id.* at 392:8–11 (Rybolovlev) (corroborating Harrison's view that six-months' worth of money permits a company's "normal functioning").

| Company | Pool | Capital Called | Unfunded Approved Budget[211] |
|---|---|---|---|
| Aethon | ATP V-2 | $5,000,000 | $8,000,000 |
| Apertor | ATP V-2 | $7,100,000 | $19,400,000 |
| Ascidian | ATP V-3 | $6,000,000 | $6,000,000 |
| Deep Apple | ATP V-2 | $9,000,000 | $9,000,000 |
| Evercrisp | ATP V-2 | $7,000,000 | $49,000,000 |
| Initial | ATP V-1 | $7,000,000 | $19,880,000 |
| Marengo | ATP V-3 | $29,960,000 | $29,960,000 |
| Marlinspike | ATP V-2 | $6,300,000 | $36,275,000 |
| Red Queen | ATP V-2 | $6,400,000 | $23,600,000 |
| Replicate | ATP V-2 | $4,000,000 | $13,000,000 |
| | **TOTAL**: | $87,760,000 | $214,170,000 |

Except for Replicate, for which the GP issued a revised capital call on June 1, 2025, the Capital Calls were due on June 13.[212] The revised Replicate capital call was due June 16, 2025.[213] ATP issued Default Notices on June 17, 2025.[214] With ATLS Fees and the June 1 revision, the Capital Calls totaled $101,103,759. Rigmora has never contributed capital in response to any of the Capital Calls.[215]

## I.    ATP Files This Litigation.

Concurrently with sending the May 30 capital calls, ATP filed this suit.[216] The Verified Complaint (the "Complaint") asserts five Counts.

- In Count I, ATP claims that Rigmora breached the LPA and Amendments 17, 18, and 20 to the LPA, by refusing to engage in

---

[211] JX-1622.

[212] *See* JX-1387 at 1; JX-1388 at 1; JX-1390 at 1; JX-1391 at 1; JX-1393 at 1; JX-1394 at 1; JX-1395 at 1; JX-1396 at 1; JX-1397 at 1; JX-1398 at 1; JX-1415 at 1.

[213] JX-1415 at 1.

[214] *See, e.g.*, JX-1620.

[215] PTO ¶ 78.

[216] Dkt. 1, Verified Complaint ("Compl.") ¶¶ 23, 183–196.

substantive discussions of new budgets, imposing improper conditions to the occurrence of budget discussions, and repudiating any obligation to consider new budgets.

- In Count II, ATP claims that Rigmora breached or repudiated its obligations under the LPA to fund capital calls made consistent with the budgets it approved.

- In Count III, ATP claims that Rigmora breached its implied obligations under Cayman law to act rationally and in good faith in exercising discretionary rights (absent clear language to the contrary) by refusing to consider requests for new budgets for the Fund's clinical-stage portfolio companies.

- In Count IV, ATP seeks a declaration that the Global Default Provisions of the LPA warrant a Global Default penalty on Rigmora—not on a project-by-project or pool-by-pool basis, but across all of the Limited Partner's interests in the Fund.

- In Count V, ATP seeks a declaration that the Fund is entitled to exculpation, under Paragraph 2(g) of the LPA, for filing this action.

ATP moved to expedite proceedings due to the impending shutdown of several of the affected portfolio companies for lack of funding.[217]  The court granted the motion to expedite over Rigmora's opposition and scheduled trial for September.[218]

## J.    Rigmora Files Competing Litigation In The Cayman Islands.

On June 2, Rigmora filed a Writ of Summons against ATP in the Grand Court of the Cayman Islands.[219]  Rigmora resurrected its argument debuted in the prior Cayman litigation—that Rigmora committed $2.425 billion in Contingent Subscription, Rigmora has already made capital commitments in excess of that amount, and thus Rigmora is not required to fund any further capital calls under the

---

[217] Dkt. 1, Pl.'s Mot. to Expedite Proceedings ¶ 1.

[218] Dkt. 31; Dkt. 39 at 43:8–22.

[219] PTO ¶ 11.

LPA.[220]   Four days later, Rigmora filed a Winding Up Petition against ATP in the same court (together with the Writ of Summons, the "Cayman Litigation").[221] Rigmora argued that it had lost trust and confidence in ATP due to ATP's "mismanagement and lack of probity[.]"[222]   And Rigmora sought to accomplish through the Cayman court what Bogdanov had unilaterally demanded in the May 15 Email—a liquidation.

### K.    Forum Jockeying Ensues.

Through motion practice in the competing lawsuits, the parties fought bitterly over the dominance of their preferred forums.  On June 9, 2025, Rigmora moved to dismiss ATP's claims and a motion to stay this proceeding pending the resolution of the Cayman Litigation.  Three days later, Rigmora filed an ex parte summons in the Cayman Litigation seeking an injunction barring ATP from declaring Rigmora in default of the LPA or issuing any further capital calls.[223]  ATP responded by moving to stay the Cayman Litigation.[224]

This court denied Rigmora's motion to dismiss or stay these proceedings, concluding that its motion relied on convenience defenses that it waived in the LPA, and that ATP's allegations supported a finding of irreparable harm to multiple

---

[220] JX-1416 ¶¶ 4–5.

[221] PTO ¶ 11.

[222] JX-1417 ¶ 4.

[223] JX-1434.

[224] JX-1446.

Delaware entities absent expedition.[225]    The Cayman court entered Rigmora's requested injunction and scheduled trial for January 2026 (the "Writ Injunction").[226] And ATP withdrew its motion to stay the Cayman Litigation.[227]

The parties began a sprint to trial in both fora.[228]    The parties engaged in further motion practice in these proceedings, filing a combined five motions to compel in one month.[229]    This court continued the September trial to October based on Rigmora's claim that ATP's late-produced documents prejudiced its ability to prepare for trial.[230]    When seeking a continuance, Rigmora stated that its trial team "may not be able to review [the documents] in time to integrate them into their preparations for the trial[,]" and that "[t]here's no question that there's been actual prejudice" to Rigmora.[231]

Rigmora used its newfound time secured by the continuance to return to the forum fight.    Rigmora filed an emergency motion in the Cayman court based on the late-produced documents, seeking the appointment of provisional liquidators to take

---

[225] Dkt. 56 at 51:10–52:18.  The LPA contains provisions (i) selecting both Delaware and the Cayman Islands as the exclusive forums for related suits, and (ii) waiving all venue and forum non conveniens defenses as to suits filed in Delaware or the Cayman Islands.

[226] JX-1439 ¶¶ 1–2; JX-1446.

[227] JX-1533 ¶ 5.

[228] *Id.* ¶¶ 6, 16.

[229] *See* Dkts. 92, 113, 141, 143, 186.

[230] Dkt. 225.

[231] Dkt. 215 ¶ 7; Dkt. 238 at 13:3–4.

control of the Fund.[232]  The Cayman court scheduled a hearing on the emergency motion for October 31.[233]

ATP responded to Rigmora's new advances in the Cayman Litigation by petitioning this court for an emergency status quo order that would prevent Rigmora from pursuing relief in the Cayman court pending resolution of this action.[234]  After an initial hearing on the motion for a status quo order,[235] Rigmora agreed not to pursue a hearing on the emergency application in the Cayman court before October 31 and would provide notice to this court of any change in position.[236]  The parties ultimately reached a resolution on the status quo order that involved Rigmora withdrawing its emergency application in the Cayman Litigation.[237]

The court held a two-day trial from October 16, 2025 through October 17, 2025.[238]  The parties completed post-trial briefing on November 12, 2025, presented post-trial arguments on November 21, 2025, and submitted the Schedule of Evidence on December 3, 2025.[239]

---

[232] Dkt. 232 (Pl.'s Mot. for Status Quo Order Br.) at 5–6.

[233] *Id.* at 3.

[234] *Id.*

[235] Dkt. 261.

[236] Dkt. 267 at 7:13–8:13.

[237] Dkt. 267 at 7:13–8:13.

[238] Dkt. 259.

[239] Dkt. 265 (ATP Post-Trial Opening Br.); Dkt. 262 (Rigmora Post-Trial Br.); Dkt. 272 ("ATP Post-Trial Reply Br."); Dkt. 282 (Schedule of Evidence).

L.    **The Current Status Of The Portfolio Companies**

The Capital Calls and Budgeting Requests affect 13 portfolio companies—nine preclinical and four in clinical trials.[240]

The eight preclinical companies—Aethon, Apertor, Deep Apple, Evercrisp, Initial, Marlinspike, Nine Square, and Red Queen—have shown merit in addressing a major unmet therapeutic need.  In some instances, initial research and data provided pivot points for the preclinical companies to refocus their efforts on unexpected, more fruitful avenues.  ATP personnel, including Harrison and Venture Partner Spiros Liras, Ph.D., testified to these facts, which were further expounded upon by ATP's expert, Robbins Dr. Mark Robbins, Ph.D, J.D.,[241] whose analysis of the preclinical companies, individually and in aggregate, indicated "significant

---

[240] *See* JX-1390 (Aethon May 30 Capital Call); JX-1391 (Apertor May 30 Capital Call); JX-1393 (Deep Apple May 30 Capital Call); JX-1394 (Evercrisp May 30 Capital Call); JX-1395 (Initial May 30 Capital Call); JX-1397 (Marlinspike May 30 Capital Call); JX-1398 (Red Queen May 30 Capital Call); JX-1387 (Ascidian May 30 Capital Call); JX-1396 (Marengo May 30 Capital Call); JX-1415 (Replicate June Capital Call).  To recap, ATP initially sent a capital call for Replicate on May 30, 2025 for $13 million (JX-1399), but it later issued a revised and superseding capital call for $4 million on June 1.  JX-1415.  ATP sent the Budgeting Requests for Replicate, Ascidian, Aulos, and Nine Square to Rigmora in a December 24, 2024 email.  JX-1079.  ATP never sent Rigmora a formal Budgeting Request to increase Marengo's budget.  Marengo's management first sought additional money from the Fund in its presentation to Rybolovlev and Bogdanov in Monaco on March 12, 2025.  JX-1222, at 147.  They requested the Fund commit an additional $75 million to Marengo above what it had already budgeted for the company.  *Id*.  But Rigmora did not approve the request coming out of the Monaco meetings.  Trial Tr. at 97:16-18 (Harrison).  Later, on May 19, four days after Bogdanov refused to provide further funding or consider additional budgets unless certain "Early Stage Companies" were wound down, ATP asked Rigmora to discuss (in good faith) and approve a new budget for Marengo.  JX-1349.  ATP then estimated Marengo's additional funding needs to be $63 million.  *Id*.

[241] *See, e.g.,* Trial Tr. at 74:13–20 (Harrison); *id*. at 246:23–247:16 (Liras).

scientific and clinical potential."[242]    ATP offered Robbins as an expert on pharmaceutical and biotechnology industry custom and practice to evaluate the scientific and clinical potential of the treatments being developed by the Portfolio Companies.

The four companies in clinical trials—Aulos, Ascidian, Marengo, and Replicate—are similarly promising.[243] ATP has placed each under the direction of a talented group of founders and leaders, including past biotech CEOs who have sold their companies to pharma giants like Bristol Myers Squibb and Amgen for billions of dollars,[244] holders of several patents,[245] and seasoned pharma executives and scientific leaders.[246] The clinical stage companies are all currently engaged in active clinical trials[247] and have generated interest from potential third-party collaborators.[248]

The negative impacts of a funding default for early-stage life sciences companies are severe.  These impacts include "[t]alent loss," "[d]elayed, abandoned,

---

[242] JX-1573 (Robbins Opening) ¶¶ 23(iv), 38; Trial Tr. at 183:13–23 (Robbins).

[243] Robbins Report ¶¶ 15, 124–159,

[244] Id. ¶ 125.

[245] Id. ¶¶ 133–134.

[246] Id. ¶ 155.

[247] Id. ¶¶ 126–128; 137–142; 149–150; 157.

[248] Id. ¶ 131 (Aulos' developing partnerships with Pfizer, Regeneron), ¶ 143 (Replicate's partnership with leading Brazilian pharma company, and negotiations with Novo Nordisk), ¶ 152 (Marengo in partnerships with Ipsen and Gilead), ¶ 158 (Ascidian partnership with Roche, and discussions with Lilly, Regeneron, and Bayer).

disrupted R&D," [d]ifficulty in restarting halted or delayed [] trials," "[d]ifficulty attracting future investments or partners, and [n]egative market perception in general."[249]  The sudden discontinuation of funding can lead creditors to trigger bankruptcy proceedings and force a sale of the companies for "a fraction of their actual value."[250]

ATP has kept the affected portfolio companies alive during this litigation by scaling down operations with the goal of preserving "critical projects" and "key employees," and trying to operate with a skeleton crew without destroying the company.[251] This has involved "mov[ing] companies [] out of facilities, heavy negotiations with landlords, sales of capital equipment, consolidations, reduction of research programs," and terminating approximately 70% of employees across all companies.[252]  One company has been forced to cede platform technology back to the source institution.[253]   Despite entering survival mode at great expense to the companies, ATP does not "believe [the creditors] will hold off for much longer" and that the Fund is "likely to lose the assets."[254]

---

[249] JX-1572 ("Rao Report") ¶ 67; *see also* Trial Tr. at 60:19–61:10 (Harrison); *id.* at 165:5–21 (Yanchik).

[250] Robbins Report ¶ 162; *see also* Trial Tr. at 165:17–21 (Yanchik).

[251] Trial Tr. at 113:14–114:12 (Harrison); *id.* at 163:21–23 (Yanchik); *id.* at 266:3–7 (Liras).

[252] *Id.* at 113:14–20 (Harrison); *id.* at 162:23–163:6 (Yanchik).

[253] *Id.* at 113:21–114:1 (Harrison).

[254] *Id.* at 163:3–6, 165:17–21 (Yanchik).

Operationally, the companies are in a form of "stasis" and could be revived upon receipt of funding.[255]  But the window for revival is closing, because "whenever you stop a research organization, it starts to deteriorate."[256]

## II.    LEGAL ANALYSIS

In the Pretrial Order and in post-trial briefing, the parties narrowed their disputes to four issues.  First, is ATP entitled to specific performance of the Capital Calls under the LPA?  Second, did Rigmora breach a duty, implied by common law, to exercise its discretion to approve budgets in good faith?[257]  Third, is ATP entitled to a declaration that it did not violate the LPA by bringing this action or that Rigmora is a Defaulting Partner as defined in the LPA?  Fourth, is ATP entitled to attorney's fees and expenses incurred in connection with this lawsuit?  ATP bears the burden of proof on each of its claims.[258]

### A.    Capital Calls

The parties' dispute over the Capital Calls centers on two parts of Paragraph 5(a) of the LPA:  Paragraph 5(a)(i), which allows the GP to call capital in amounts up to but not "in excess of" the Limited Partners "Contingent

---

[255] *Id.* at 163:17–165:4 (Yanchik); *see also id.* at 114:2–12 (Harrison).

[256] *Id.* at 164:18–167:2 (Yanchik).

[257] In the Pre-Trial Order, ATP sought a declaration that Rigmora waived or otherwise forfeited its voting and budget approval rights, but dropped this request after trial. *See generally* Dkt. 265 ("ATP Post-Trial Opening Br.").

[258] *See AB Stable VIII LLC v. Maps Hotels & Resorts One LLC*, 2020 WL 7024929, at *49 (Del. Ch. Nov. 30, 2020), *aff'd,* 268 A.3d 198 (Del. 2021).

Subscriptions";[259] and Paragraph 5(a)(ii), which requires that any capital call be for a purpose stated in the LPA.[260]  The parties' competing positions raise two sets of issues: Under Paragraph 5(a)(i), were the Capital Calls in excess of Rigmora's unfunded Contingent Subscriptions?  Under Paragraph 5(a)(ii), were the Capital Calls for contractually specified purposes?  If the first set of issues go ATP's way, the court must also determine whether ATP is entitled to specific performance of the Capital Calls.  To obtain specific performance, ATP bears the burden of showing the existence of terms that it seeks to enforce by clear and convincing evidence.[261]

This contract analysis is governed by Cayman law, consistent with the LPA.[262]  The parties dispute the LPA's meaning.  Under Cayman law, a court interprets a written contract according to "the intention of the parties by reference to what a reasonable person having all the background knowledge which would have been available to the parties would have understood them to be using the language in the

---

[259] LPA ¶ 5(a)(i).

[260] LPA ¶ 5(a)(ii).

[261] Which party bears the burden of proof is a procedural question governed by Delaware law, but the nature of the burden is arguably a substantive issue governed by Cayman law.  *See In re IBP, Inc. S'holder Litig.*, 789 A.2d 14, 53 (Del. Ch. 2001).  Yet Rigmora cited Delaware law on the nature of the burden.  *See* Rigmora Post-Trial Br. at 29 (citing *Vill. Prac. Mgmt. Co. v. West*, 342 A.3d 295, 321 (Del. 2025)).  And ATP did not brief it, so this decision applies Delaware law.

[262] LPA ¶ 18(g)(i) (stating that the "terms and provisions" of the LPA "shall be construed under the laws of the Cayman Islands"); PTO ¶ 25.  The elements to prove a breach are: (1) a valid contract, (2) a breach of that contract, and (3) damages arising from the breach.  JX-1588 ("Phillips Report") ¶ 56 (citing *Chitty on Contracts* at [4-001] (35th ed. 2024); *accord Kuroda v. SPJS Hldgs.*, 971 A.2d 872, 883 (Del. Ch. 2009) (reciting the same elements for a claim of breach of contract under Delaware law)).

context to mean."[263]   The goal is to "ascertain the objective meaning of the language which the parties have chosen to express their agreement."[264]  The court employs "an iterative process by which each suggested interpretation is checked against the provisions of the contract and its commercial consequences are investigated."[265]  But "[c]ommercial common sense is only relevant to the extent of how matters would or could have been perceived by the parties, or by reasonable people in the position of the parties, as at the date that the contract was made."[266]

### 1.    Paragraph 5(a)(i) – Funding Commitments

Rigmora argues that Rigmora has committed $2.45 billion on an aggregate basis as the Contingent Subscription and contributed $2.69 billion, and that the Capital Calls are thus necessarily "in excess of" the Contingent Subscription.[267]  ATP argues that Rigmora made over $545.5 million in unfunded commitments to the pools and over $2.85 billion in total commitments across all pools, leaving head room for the Capital Calls.  ATP also argues that Rigmora's $2.69 billion calculation double-counted pools of funds that were transferred or reallocated, such that Rigmora's

---

[263] Bloch Report ¶ 23 (quoting *Arnold v. Britton*, [2015] UKSC 36 at [15]).

[264] Bloch Report ¶ 23 (quoting *Wood v. Capita* [2017] UKSC 24 at [10]); Phillips Report ¶ 61 (same).

[265] Bloch Report ¶ 25 (citing *Wood*, [2017] UKSC 24 at [12]).

[266] Bloch Report ¶ 24 (citing *Arnold*, [2015] UKSC at [19]; *see also* Phillips Report ¶ 60 (also citing *Arnold*, [2015] UKSC at [15], [17]–[21]).

[267] *See* Rigmora Post-Trial Br. at 32, 38–40.

actual contribution is $2.3 billion.  In all events, therefore, there is head room to meet the Capital Calls.[268]

The parties' dispute on the meaning and application of Paragraph 5(a)(i) thus raises three sub-issues:  What is the Contingent Subscription amount, $2.425 billion as Rigmora contends or over $2.85 billion as ATP argues?  What has Rigmora contributed to date, $2.65 billion as Rigmora contends or $2.3 billion as ATP argues?  And do the Capital Calls of $101,103,759 fall within any delta between the Contingent Subscription and Rigmora's contributions?

### a.     Rigmora's Contingent Subscription is $2.425 billion.

The parties dispute both how to calculate the Contingent Subscription (in the aggregate by Limited Partner or pool-by-pool) and Rigmora's total commitments.  The threshold issue concerning how to calculate the Contingent Subscription is largely beside the point because ATP has not proven that Rigmora committed over $2.85 billion.[269]  ATP reaches the $2.85 billion by adding and deducting the amounts reflected in Amendment 20 to the $2.425 in subscription agreements.

---

[268] ATP Post-Trial Opening Br. at 8–9, 54–58; ATP Post-Trial Reply Br. at 13–14.

[269] It bears noting that Amendment 13 to the LPA seems to mandate a pool-by-pool approach.  Under the heading "Separate Pools," it provided that "all of the Partnership's assets and liabilities shall be divided into two separate pools" and "separate and distinct records shall be maintained for each Pool, and capital contributions, distributions, income, gains, losses and expenses *shall also be accounted on a Pool-by-Pool basis*."  JX-15 ("LPA Am. 13") ¶ 17(a) (emphasis added). ATP satisfied its obligation to track the Contingent Subscription amount on a Pool-by-Pool basis by circulating a detailed "tracker" of funded and unfunded commitments each time it issued a capital call.  *See, e.g.*, JX-230; *see also* Trial Tr. at 48:19–49:21 (Harrison).

Broken down by Pool, beginning with Pool IV, recall that the parties initially contributed $1.5 billion to Pool IV and Rigmora contributed $1.425 billion of that amount.[270]  In Amendment 20, the parties agreed to reduce the Pool IV commitment to the amount already contributed, plus expenses.[271]  By Amendment 20, Rigmora had contributed $1,299,840.047.14 to Pool IV.[272]  The parties originally anticipated $20 million in expenses but ultimately incurred around $33,351,890.42.[273]  Adding

---

[270]  *See* PTO ¶¶ 26–27; JX-212 at 19 (Blue Horizon $698,250,000 subscription); JX-213 at 19 (Ezbon $726,750,000); JX-216 at 18 (Harrison $75 million subscription); JX-1, Sch. D.

[271]  LPA Am. 20 ¶ 24.

[272]  *See* JX-221, Tab "Capital Contributions – ATP IV," Cells D163, E163 (stating Ezbon and Blue Horizon contributed $662,918,351.14 and $636,921,696.00 to ATP IV respectively, which combined equals $1,299,840.047.14).

[273]  It was $33,351,890.42 and Rigmora's 99.6028% of that amount was $33,219,416.71.  *See* JX-224 at 3 (capital call for $320,590 of expenses for Pool IV); JX-382, at 3 (capital call of 4,749,982.91 in expenses for Pool IV); JX-318, at 3 (capital call for $1,960,789.97 in expenses for Pool IV); JX-487 at 3 (capital call for $8,435,798.52 in expenses for Pool IV); JX-568 at 3 (capital call for $4,000,000 in expenses for Pool IV); JX-585 at 3 (capital call for $280,790.62 in expenses for Pool IV); JX-609 at 3 (capital call for $5,000,000 in expenses for Pool IV); JX-652 at 3 (capital call for $5,200,000 in expenses for Pool IV); JX-718 at 3 (capital call for $1,500,000 in expenses for Pool IV); JX-740 at 3 (capital call for $ 368,717.64 in expenses for Pool IV); JX-823 at 3 (capital call for $874,363.01 in expenses for Pool IV); JX-878 at 3 (capital call for $299,903.33 in expenses for Pool IV); JX-1185 at 3 (capital call for $24,533.02 in expenses for Pool IV).  The limited partners also received two capital calls in December 2024 seeking funds relating to the ATLS Fee for the first half of 2025, partnership expenses for the second half of 2024, and the 2024 ATVM management fee.  JX-1075 at 3; JX-1086 at 5.  The calls sought $375,354.80 from Pool IV and about $15 million across all pools.  *See id.*  Rigmora initially refused to fund those calls.  JX-1085.  ATP later discovered that it overcharged the ATLS Fee due to an accounting error and it returned $599,225.46.  JX-1172.  It is unclear how that refund was allocated across the various pools, but later records indicate that the December calls were reconciled to $336,502.41 for Pool IV.  *See* JX-1237, Tab "Pool V-4 Total," Cell E152.

Rigmora's share of the fee to the amount contributed by Rigmora equals $1,333,059,463.85.

Pools V-1 and V-2 are straightforward. Rigmora contributed $1,000,000,000 to Pools V-1 and V-2 in September 2020 in connection with Amendment 17.[274]

Pool V-3 requires some math. According to ATP, Rigmora contribute $310 million to Pool V-3 through Amendment 20. ATP relies on new Paragraph 22(b) of Amendment 20, which provides that:

> ATP V-3 shall have capital commitments of $500,000,000, including without limitation (i) the $189,500,000 of capital deemed to have been contributed as provided below, (ii) the $70,853,399 of capital comprising the Prior Budgeted ATP V-3 Follow-on Investments and (iii) approximately $235,000,000 in investments anticipated to be made in new Portfolio Companies . . . .[275]

This language does not expressly reflect an additional $310 million capital commitment. To reach $310 million, ATP subtracts the "deemed" contributions of $189,544,660 from the total commitment of $500 million.[276] ATP ignores the $70,853,399 in previously approved unfunded budgets for Pool V-3 companies and $235 million, which add up to $305.9 million, not $310 million.

Last is Pool Braeburn. According to ATP, Rigmora contributed $189.9 million to Pool Braeburn through Amendment 20 and agreed to contribute capital sufficient

---

[274] Trial Tr. at 29:1–19, 41:11–42:14 (Harrison); LPA Am. 17; JX-99; JX-101.

[275] LPA Am. 20 ¶ 22(b).

[276] *Id.* Here is the math: $500,000,000 − $189,544,660 = $310,455,340. Rigmora is responsible for 99.6028% of the capital contributions for Pool V-3. *See id.* So, Rigmora is responsible for $309,222,211.39 of the Pool V-3 commitments, which rounds up to $310 million.

to cover additional expenses, which Pool Braeburn ultimately incurred.  ATP relies on new Paragraph 22(b) of Amendment 20, which provides that Pool Braeburn includes "$189,900,000 in unfunded previously approved budgets," as well as "additional securities of Braeburn acquired by the Partnership after the date of Amendment 20," and management fees and expenses discussed in the Amendment.[277] ATP adjusts the $189.9 million based on later events—ATP acquired $30.6 million in additional securities and was allocated $9 million in expenses, bringing the total commitment to $229.5 million.[278]  Through Amendment 22, ATP distributed to Rigmora the royalty held in Pool Braeburn and thus Rigmora "no longer had an obligation to fund the remaining amounts on the royalty purchase agreement," which was $21.3 million.[279]  ATP therefore "reduced the obligation to Pool Braeburn by that amount, which netted out to a total obligation $208,355,000."[280]

In summary, in a snapshot, here is how ATP builds to the "over $2.85 billion" figure:

| Pool | Rigmora's Commitment |
|------|---------------------:|
| Pool IV | 1,333,059,463.85 |
| Pools V-1/V-2 | 1,000,000,000 |
| Pool V-3 | 309,222,211.39 |
| Pool Braeburn | 208,335,616.81 |
| **Total** | 2,850,617,292.05 |

---

[277] LPA Am. 20 ¶ 21(a).

[278] Engels Dep. Tr. at 94:3–10; JX-1565, Cell G8.

[279] Engels Dep. Tr. at 355:22–356:3, 355:16–355:21.

[280] Engels Dep. Tr. at 356:2–4; ATP Post-Trial Reply Br. at 11, although by the court's math, it nets out to $208,200.

Rigmora takes issue with ATP's interpretation of Amendment 20 as a capital commitment.  Rigmora advances three main arguments to that effect: Rigmora first appeals to the commercial context.  Rigmora next argues that interpreting Amendment 20 as a subscription agreement is inconsistent with ATP's contemporaneous representations.[281]  Rigmora last contends that Amendment 20 does not read like a subscription agreement and is not sufficiently clear and convincing in its terms to be treated like one.[282]

Rigmora's first argument based on the commercial context of Amendment 20 is misguided.  Rigmora argues that  Amendment 20 "was entered into less than a year after the $1 billion increase in the LPs' Contingent Subscriptions, when the Fund had over $1 billion in uncalled Contingent Subscriptions remaining."[283]  According to Rigmora, "there was no need to increase the capital commitment when Amendment 20 was executed, no reason to think the parties did so, and no reason to think they would have done so without following the same formalities used to increase the Contingent Subscriptions a few months earlier."[284]

Rigmora's commercial-context argument, however, ignores the plain text of Amendment 20.  As discussed above, on its face, Amendment 20 reflects a minimum in unfunded commitments of approximately $2.814 billion, far more than the $2.425

---

[281] *Id.* at 35–36.

[282] *Id.* at 36–37.

[283] *Id.* at 37; *see* JX-1237 at 4 (schedule of capital activity).

[284] Rigmora Post-Trial Opening Br. at 37.

billion Rigmora conceded.  This argument also ignores that biotech investment was booming in 2021 when the parties entered Amendment 20,[285] Rigmora had not yet entered what Bogdanov would later call a liquidity crisis,[286] Rybolovlev approved all of the budgets at issue in Amendment 20, and Rigmora was ATP's only source of capital.[287]  If not Rigmora, who was expected to fund the approved budgets reflected in Amendment 20?  This commercial context is *ATP's* strongest point.

Rigmora's second argument based on ATP's contemporaneous communications is neutral.  Rigmora is correct that interpreting Amendment 20 as a subscription agreement runs contrary to many of ATP's contemporaneous representations.[288] Before the events that led to this litigation, ATP informed its banks, insurance companies, and portfolio-company landlords that its total committed capital was $2.5 billion, which is equal to Rigmora's $2.425 billion under their subscription agreements and Harrison and his family trust's $75 million.[289]   And ATP's website for the Fund still lists its capital commitments as "$2.65 billion" as it has since 2020.[290] But other contemporaneous documents, like ATP's first post-Amendment 20

---

[285] *See id.* at 7 ("[T]he biotech market peaked in 2020 and 2021, during the COVID pandemic[.]" (citing Trial Tr. at 402:20–22 (Ehlers))).

[286] *See* JX-446 at 1; Trial Tr. at 51:15–52:19 (Harrison).

[287] LPA Am. 20 ¶ 21.

[288] *See generally* Ehlers Dep. Tr. at 35:10–21.

[289] Trial Tr. at 460:12–461:3, 462:10–24, 463:13–464:16 (Engels); JX-834 (communicating to J.P. Morgan that "ATP has approximately $2.5 billion in committed capital").

[290] JX-128 (2020); JX-2128 (Sept. 8, 2025); *see also* About, Apple Tree Partners, https://www.appletreepartners.com/about (accessed Dec. 4, 2025).

capital call to the limited partners[291] and ATP's own accounting of capital

contributions that it sent to Rigmora in March 2025,[292] suggests  Rigmora did

increase its Contingent Subscription through Amendment 20.  These competing

contemporaneous communications work neither for nor against either side.  They

suggest that ATP did not spend a lot of time worrying about the precise amount of

Rigmora's total capital commitments in 2022.  This  is consistent with Harrison's

testimony that the parties' enjoyed a collaborative relationship during that period.[293]

Rigmora's last argument based on the language of Amendment 20 is

compelling.   The parties did not execute any new or amended subscription

---

[291] The first capital call issued shortly after the adoption of Amendment 20 shows unfunded capital commitments stood at $1,461,868,810 total across all limited partners and $1,460,556,241.39 for Rigmora alone.  JX-224, at 3.  This evidence supports ATP's position that Rigmora committed more capital through Amendment 20 as unfunded capital commitments immediately preceding Amendment 20 were $1.067 billion.  *See supra* § I. D.

[292] *See* JX-1237; JX-1237, PX-513, Tab "Amendment Summary," Cells G8, N8, U8, AC8 (reflecting cumulative commitments across Pools V-1, V-2, Braeburn, V-3, and IV of 3,203,669,000.00).  This accounting did not deduct deemed commitments from neither its contribution tabulations nor its tabulations on commitments, so they had no net effect on the limited partner's unfunded commitments.  *See* JX-1237, PX-513, Tab "Pool V-3 Total," Cell B9 (including the $189,544,660 deemed contribution in Pool V-3's contributions); *id.*, Tab "Pool Braeburn Total," Cell B9 (including the $203,669,000 deemed contribution in Pool Braeburn's contribution's calculation); *id.*, Tab "Amendment Summary," Cells G8, N10, U8, AC9, AC11 (listing total capital commitments of $1,000,000,000 billion (Pools V-1 and V-2), $393,569,000 million (Pool Braeburn), $500,000,000 (Pool V-3), and $1,383,360,505.56 (Pool IV) for total commitments of $3,276,929,505.56 across all pools).  The total commitments listed for Pools V-3 and Braeburn include the deemed commitments within Amendment 20, meaning their accounting in the capital contributions has no net effect on the amount of Rigmora's unfunded commitments.  *See id.*, Tab "Amendment Summary," Cells N9, U11.  Total commitments exceeding $3.2 billion indicates Amendment 20 increased Rigmora's Contingent Subscription.

[293] Trial Tr. at 51:21:52:4 (Harrison).

agreements with Amendment 20.  And Amendment 20 does not expressly refer to the Contingent Subscriptions.[294]    The absence of express language referencing Contingent Subscription stands in contrast to Amendments 17 and 18, which both explicitly refer to "Contingent Subscription."[295]  This combination of factors is enough to suggest that the finer details of Rigmora's funding commitments were yet to be ironed out when the parties entered into Amendment 20.

Moreover, Amendment 20 does not make clear the amount of capital that Rigmora was to contribute.  Amendment 20 does not expressly state that Rigmora commits to contributing its share of the $310 million to Pool V-3.  Rather, ATP implies that number by deducting the "deemed contributions" from the contemplated $500 million.[296]  Amendment 20 also does not state that Rigmora will contribute $208 million to Pool Braeburn.  Rather, Amendment 20 states that Rigmora commits $189.9 million plus unspecified future expenses.[297]

In the end, ATP's interpretation of Amendment 20 leaves too much to interpretation.  ATP must demonstrate the contractual terms that it seeks to specifically enforce by clear and convincing evidence.[298]  ATP has not proven an overall Contingent Subscription amount of over $2.85 billion.  Thus, regardless of

---

[294] LPA Am. 20.

[295] LPA Am. 17; LPA Am. 18.

[296] *See* ATP Post-Trial Opening Br. at 10, 13–14.

[297] LPA Am. 20 ¶ 21.

[298] *West*, 342 A.3d at 321.

whether calculated in the aggregate or on a pool-by-pool basis, ATP has proven that Rigmora committed no more than $2.425 billion.

### b.        Rigmora has contributed no more than $2.3 billion.

Ultimately, ATP need not rely on Amendment 20 to secure the relief it seeks. Rigmora claims to have contributed over $2.69 billion to date, well in excess of the $2.425 billion in undisputed commitments.  But the $2.69 billion figure double counts $390 million in "deemed contributions" reallocated through Amendment 20 from Pool IV to Pool V-3 and Pool Braeburn.[299]

Double counting "deemed contributions" of Amendment 20 is inconsistent with the purpose of Amendment 20 as recounted by Rigmora.  According Rigmora, the purpose of Amendment 20 was to "reallocat[e] . . . an *existing* commitment from a different pool[.]"[300]  Amendment 20 was "not a new commitment."[301]  Put differently, the deemed contributions were not new contributions.  Moreover, counting the deemed contributions twice against Rigmora's $2.425 billion Contingent Subscription would result in Rigmora committing less than $2.425 billion to the Fund.[302]  There is no evidence, either in Amendment 20 or elsewhere, that the parties intended to

---

[299] LPA Am. 20 ¶¶ 21(b) (stating initial deemed contributions for Pool Braeburn were $203,669,000 for Pool Braeburn and $189,544,660 for Pool V-3, which is $393,213,660; *see also* Rigmora Post-Trial Answering Br. at 38 n. 277, Ex. 1 (Strebulaev) at 2.

[300] Rigmora Post-Trial Br. at 36 (emphasis added).

[301] *Id.*; *see also id.* at 6 ("Amendment 20 created two new pools . . ." and "allocated *existing assets* and liabilities to them . . . ." (emphasis added)).

[302] LPA Am. 20 ¶¶ 21(b), 22(b) (stating initial deemed contributions $203,669,000 for Pool Braeburn and $189,544,660 for Pool V-3, which is $393,213,660 in deemed contributions total).

reduce the total amounts committed to the Fund through Amendment 20. As discussed above, the commercial context indicates the contrary.

Rigmora relies on a series of ATP communications documents to support its double counting theory.[303] Each of those documents were prepared for other purposes. Two of those documents show that ATP tabulated the limited partners' total capital commitments as more than $3.2 billion.[304] These are not figures that Rigmora stands behind.

Reducing Rigmora's $2.69 billion figure to eliminate double counting, Rigmora has contributed $2.3 billion to the Fund.

> ### c. The Capital Calls do not exceed the difference between the Contingent Subscription and Rigmora's contributions.

ATP has proven that Rigmora committed $2.425 billion and contributed $2.3 billion. The difference is $125 million. Given Rigmora's overall contributions, there is sufficient room to fund the Capital Calls of totaling approximately $101.7 million.

> ### 2. Paragraph 5(a)(ii) – Funding Purposes

ATP issued the Capital Calls for ten portfolio companies: Aethon, Apertor, Deep Apple, Evercrisp, Initial, Marlinspike, Red Queen, and Replicate of Pools V-1

---

[303] *See* Rigmora Post-Trial Br. at 39–40.

[304] JX-1237, PX-513, Tab "Amendment Summary," Tab "Amendment Summary," Cells G8, N10, U8, AC9, AC11 (reflecting cumulative commitments across Pools V-1, V-2, Braeburn, V-3, and IV of $3,276,929,505.56), JX-2000, Tab "Amendment Summary," Cells G8, N8, U8, AC8 (same).

and V-2, and Marengo and Ascidian of Pool V-3.[305] ATP issued these calls to provide six months of approved budget to carry forward research plans, partnership fees, and ATLS Fees.[306]

The LPA identifies partnership fees, ATLS Fees, and budgets expenses as appropriate purposes. Subsections 5(a)(ii)(A) through (C) state that "[u]nless otherwise approved by the holders of a majority of the Preferred Units in writing," the GP:

> may only call capital, as of any time, in amounts sufficient to enable the Partnership . . . to (A) pay Partnership . . . expenses then existing or reasonably anticipated to be incurred within the next six-month period, (B) pay other Partnership . . . non-discretionary items (such as taxes and tax distributions) and satisfy other Partnership . . . expenses and obligations incurred in the ordinary course of business, [and] (C) pay the Management Fee for the next 12-month period.[307]

Subsection 5(a)(ii)(E) authorizes the GP to call capital in amounts sufficient to "invest in Projects approved by the holders of a majority of the Preferred Units in writing in accordance with a budget therefor approved by such holders of Preferred Units."[308]

---

[305] *See* JX-1387 at 1; JX-1388 at 1; JX-1390 at 1; JX-1391 at 1; JX-1393 at 1; JX-1394 at 1; JX-1395 at 1; JX-1396 at 1; JX-1397 at 1; JX-1398 at 1; JX-1415 at 1; *see also* JX-1622.

[306] Trial Tr. at 109:1–110:24 (Harrison); *see also* LPA Am. 13 ¶ 17(d).

[307] LPA Am. 3 ¶ 5(a)(ii)

[308] *Id.* Amendment 3 originally provided for an ATC board of directors and made certain distinctions depending on whether a project was "being run through ATC" or not. *Id.* at 1–2. Amendment 14 excised ATC, and with it the ATC board of directors, from the LPA. JX-16 at 5 (LPA Am. 14).

Rigmora concedes that the stated purpose of the Capital Calls is proper under the LPA. Aside from Replicate, Rigmora does not dispute that it approved budgets for the calls at issue or that the calls were within the approved budgets. Nor does Rigmora dispute that partnership expenses and ATLS Fees are proper purposes for capital calls or that those expenses were improperly calculated.

Rigmora instead advances three arguments to avoid its payment obligation. First, Rigmora argues that ATP cannot call capital because ATP acted in bad faith.[309] Second, Rigmora argues that the approved budgets called for tranched funding conditioned on milestones set out in investment memoranda, which served as conditions to Rigmora's funding obligations, and which the projects did not achieve.[310] Third, as to Replicate, Rigmora argues that Replicate budget was subject to contingency set out in Amendment 22 that the LPs realize at least $300 million from a sale or financing of their interest in the Braeburn royalty, which has not yet occurred.[311]

### a.    Bad Faith

Rigmora argues that ATP cannot call capital because it acted in bad faith when making the Capital Calls. The LPA permits the General Partner to call capital only for a purpose enumerated in Paragraph 5(a)(ii).[312] The Cayman Islands' Exempted Limited Partnership ("ELP") Act, as adopted by the LPA, requires the General

---

[309] Rigmora Post-Trial Br. at 44–47.

[310] *Id.* at 40–43.

[311] *Id.* at 43–44; LPA Am. 22 ¶ 26.

[312] LPA Am. 3 ¶ 5(a)(ii).

Partner to exercise its power to call capital in good faith in accordance with its fiduciary duties—which Cayman courts have held requires it to act in the interests of the Fund's limited partners.[313]  Rigmora argues that, as a plaintiff seeking specific performance, ATP must prove by clear and convincing evidence that it satisfied the LPA's requirements for all calls and that they are consistent with the ATP's fiduciary duties under Cayman law.[314]

It is unclear whether Rigmora is correct in interpreting Cayman law to mean that a General Partner must prove fiduciary compliance as a condition to enforcing capital calls.  Typically, a party relying on the absence of a condition to avoid a contractual obligation bears the burden of proving its absence.[315]  But ATP did not challenge this legal assertion.  And the accuracy of Rigmora's legal position does not alter the outcome in any event, because there is no factual basis to question ATP's good faith.

---

[313] *See* JX-2019, ELP Act § 19(1) ("A general partner shall act at all times in good faith and . . . in the interests of the exempted limited partnership."); JX-1 at 2 (requiring parties to carry on the limited partnership "in accordance with the provisions of the" ELP Act); *id.* ¶ 18(g)(i) (LPA governed by ELP Act); JX-2073, *Kuwait Ports Authority v Port Link GP Ltd* [2023] 1 CILR 50 at [34(iii)]; JX-2074, *Re Aquapoint LP*, CICA (Civil) Appeal No. 0014 of 2022, [2023], at [67].

[314] Rigmora Post-Trial Opening Br. at 44–47; *see also* Bloch Report ¶ 83.

[315] *See generally S'holder Representative Servs. LLC v. Shire US Hldgs. Inc.*, 2020 WL 6018738, at *17 (Del. Ch. Oct. 12, 2020), *aff'd* 267 A.3d 370 (Del. 2021) (TABLE); *AB Stable VIII LLC v. Maps Hotels & Resorts One LLC*, 2020 WL 7024929, at *48–50 (Del. Ch. Nov. 30, 2020), *aff'd,* 268 A.3d 198 (Del. 2021).

Harrison testified that the Capital Calls were for the purpose of funding six months of operations.[316]  ATP considered numerous scenarios, evaluating how much capital to call in order to continue funding operations.[317]  Harrison ultimately based the size of the Capital Calls on the portfolio companies' research plans and the partnership's expenses.[318]  He excluded his own Management Fee from the Capital Calls, so none of the money would be directed to him.[319]  Harrison then realized that ATP overcalled capital for Replicate based on the approved budget and corrected that Capital Call on June 1.[320]  Harrison's testimony was highly credible.

To argue bad faith, Rigmora states that ATP's "correspondence demonstrates that the capital calls were made at least in part to 'put pressure on' the [Limited Partners]."[321]  Rigmora bases this assertion on a May 14, 2025 email among ATP's outside attorneys.[322]  The email states: "The point of making the calls is to put pressure on [Rigmora], so let's put the pressure on [Rigmora]."[323]  On its face, this statement is not alarming.  Contractual rights can be a source of pressure.  That does not mean exercising them is an act of bad faith.  Moreover, a single line in a single email among outside counsel does not undermine the extensive evidence

---

[316] Trial Tr. at 110:12–16 (Harrison).

[317] *Id.* at 152:7–153:14 (Harrison).

[318] *Id.* at 110:17–24 (Harrison).

[319] *Id.* at 111:4–10 (Harrison).

[320] *Id.* at 109:24–110:5 (Harrison).

[321] *Id.* at 45.

[322] Dkt. 269 at 45 (citing JX-2155 at 2).

[323] JX-2155 at 2.

demonstrating Harrison's sincere concerns about the financial health of the portfolio companies.

Rigmora's grab-bag of other arguments similarly fail. Rigmora argues that ATP delayed capital calls to maximize its litigation position.[324] But the evidence does not point to that conclusion. ATP recognized the portfolio companies' urgent need for funding and knew that Rigmora would immediately file suit in the Cayman Islands as soon as ATP issued capital calls.[325] Rigmora describes the calls as improper because ATP did not intend to distribute all the capital called to portfolio companies as required under the LPA.[326] But ATP withheld some capital to ensure that the funds would not be subject to attachment by creditors leaving the companies without funding to pay severance to employees.[327] Rigmora emphasized in briefing how the anticipated amount of capital calls evolved leading up to this lawsuit.[328] But the evidence reflects that ATP ran scenarios and considered calling capital sufficient to fund ongoing work at the portfolio companies for periods of weeks, three months, six months, and the end of calendar year 2025-2026.[329] None of this supports a finding that ATP acted in bad faith.

---

[324] Rigmora Post-Trial Opening Br. at 45.

[325] *See* JX-2138 at 1–2.

[326] Rigmora Post-Trial Opening Br. at 45; LPA Am. 3 ¶ 5(a)(ii)(E).

[327] Yanchik Dep. Tr. 218:23–219:22.

[328] Dkt. 269 at 45-47.

[329] Trial Tr. at 152:5–19 (Harrison).

### b.    Milestones

Rigmora argues that the milestones set out in investment memoranda served as conditions to Rigmora's obligations to fund capital calls.  No evidence supports this assertion.

As discussed above,[330] no evidence suggests that anyone intended the performance milestones identified in the investment memoranda to serve as conditions to Rigmora's obligation to fund budgets that it approved.  Harrison and Rybolovlev never discussed nor negotiated the milestones.[331]  Rigmora lacked the substantive expertise to set or track performance milestones.[332]  Only two of the approved budgets contained any express milestones, and they were based on corporate strategy metrics.[333]  The fact that certain of the Rigmora-approved budgets contained express milestones suggests that the parties did not intend to condition the other budgets on milestones contained in the investment memoranda.  And although the Series A agreements of five companies (Marlinspike, Aethon, Aulos, Braeburn, and Replicate) originally contained milestone conditions, those conditions applied to the Fund's obligation to fund the companies, not the limited partners' obligation meet capital calls.[334]

---

[330] *See supra* § I.B.

[331] *Id*. at 33:11–14 (Harrison).

[332] Bogdanov Dep. Tr. at 31:2–9, 45:23–46:10, 46:11–15; Blöchlinger Dep. Tr. at 37:17–25; Yakovlev Dep. Tr. at 30:23–25.

[333] *Id*. at 33:23–34:5 (Harrison); JX-1192 at 2.

[334] *See* JX-2201; Trial Tr. at 140:5–10 (Harrison); *see, e.g.*, JX-1329 at 64, 167, 441, 586.

Moreover, treating milestones in dated investment memoranda as a fixed condition to future funding misaligns the budgeting process with the commercial realities of biotech investing.[335]  "[M]any very successful therapeutics have missed development milestones."[336]  Apparent "misses" were often successful pivots that increased value.  Deep Apple pivoted to obesity and secured a partnership worth up to $812 million with Novo Nordisk.[337]  Apertor's pivot led to a "breakthrough publication" demonstrating "incredible" platform value, ultimately leading to delivering clinical candidates.[338]  Information regarding portfolio companies' pivots were regularly reported to Rigmora in quarterly reports provided by ATP.[339]

Milestones were informative on many levels to Fund management.  But Rigmora did not staff anyone with a scientific background.  Rigmora went nearly thirteen years without requesting information about milestones.[340]  Its interest in milestones surfaced as a defense strategy in this action, and an unsuccessful one.  Rigmora cannot rely on the absence of milestone achievements to avoid its funding commitments.

---

[335] Trial Tr. at 105:3–11 (Harrison); *see* JX-1583 ("Robbins Rebuttal") ¶ 26.

[336] Trial Tr. at 189:11–18 (Robbins).

[337] Robbins Rebuttal ¶ 27.

[338] Trial Tr. at 253:13–254:3 (Liras).

[339] *Id.* at 255:13–256:21, 257:2–259:1, 262:8–264:9 (Liras); *see, e.g.*, JX-0560.

[340] Trial Tr. at 332:1–333:2 (Bogdanov).

### c.    Replicate

Replicate is different.  The Replicate budget was approved on February 12, 2025.[341]  Replicate was one of the five companies addressed in Amendment 22.  It is thus subject to the contingency set out in Amendment 22 stating that the LPs realize at least $300 million from a sale or financing of their interest in the Braeburn royalty.[342]  Neither event has occurred.  So Rigmora need not meet the call.

ATP advances a factual response to this outcome, but it is somewhat convoluted.  According to ATP, when the parties executed Amendment 22 in December 2024, they expected the then-current, unfunded budget amounts for each of the five projects listed in the new Paragraph 26—including Replicate—to last for a matter of weeks.  In the case of Replicate, the parties anticipated that the budget would run out in February 2025.  Paragraph 26 of Amendment 22 thus called for the discussion of a new budget sufficient to enable Replicate to operate for a period twelve months after that.[343]  ATP portrays the financing condition as inconsistent with the dire circumstances under which the parties executed Amendment 22.[344]

But the language of Amendment 22 is plain.  It conditions Royalty Financing on budget approval, providing that "[i]f any approval of a new budget is given by the Subject limited Partner, *such approval shall be contingent upon* at least $300 million being realized (including through deemed distributions) by the Subject Limited

---

[341] JX-1192.

[342] LPA Am. 22 ¶ 26.

[343] *Id.*

[344] ATP Post-Trial Reply Br. at 27–28; *see also* ATP Post-Trial Opening Br. at 29–31

Partner on a sale or financing of its interest in ATP LLC."[345]  At the time, Rigmora

indicated that it would not be difficult to obtain the Royalty Financing, and ATP

expected that Rigmora would "do and perform, or cause to be done and performed, all

such further acts and things . . . to carry out the intent and accomplish the purposes

of this Amendment . . . ," including securing Royalty Financing.[346]  Whether Rigmora

honored this commitment is not before the court.  But there is not Royalty Financing,

so the Replicate budget is not approved, and ATP may not enforce Capital Calls for

Replicate.

### 3.    Specific Performance

A grant of specific performance "is a specialized form of mandatory injunction

that requires a party to fulfill its contractual obligations."[347]  Specific performance is

appropriate when (1) a valid contract exists, (2) the plaintiff is ready, willing, and

able to perform, (3) money damages are inadequate, and (4) the balance of equities

tips in the plaintiff's favor.[348]  To obtain specific performance, a plaintiff must prove

these conditions by clear and convincing evidence.[349]

---

[345] LPA Am. 22 ¶ 26 (emphasis added).

[346] LPA Am. 22 ¶ Miscellaneous.

[347] *26 Cap. Acq. Corp. v. Tiger Resort Asia Ltd.*, 309 A.3d 434, 464 (Del. Ch. 2023); *see also supra* n.260 (explaining why this decision applies Delaware law on the request for specific performance).

[348] *See Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1158 (Del. 2010); *AbbVie Endocrine Inc. v. Takeda Pharm. Co. Ltd.*, 2021 WL 4059793, at *6 n.97 (Del. Ch. Sept. 7, 2021) ("It is elementary that the remedy of specific performance is designed to take care of situations where the assessment of money damages is impracticable[.]").

[349] *West*, 342 A.3d at 321.

As discussed above, ATP has proven by clear and convincing evidence that Rigmora must meet Capital Calls within approved portfolio company budgets and the Contingent Subscription with the exception of Replicate.[350]  Rigmora must also fund calls issued for Fund expenses falling within those parameters.[351]  Excluding Replicate, Rigmora's portion of those calls is $96,960,925.88.  ATP also stands ready, willing, and able to perform.

Money damages are inadequate.  The LPA sets out deadlines for meeting Capital Calls.[352]  And timing matters.  As discussed above, the negative impacts of a funding default for early-stage life sciences companies can be fatal.[353]  The companies' research could ramp up again upon receipt of funding.[354]  But they cannot stay in a holding pattern indefinitely.[355]

Further, a contractual provision stipulating the parties' preference of specific performance favors granting specific performance.[356]  It is even more so when the agreement is between "sophisticated entities that bargained at arm's length."[357]  In the LPA, sophisticated parties stipulated that damages for funding defaults "cannot

---

[350] *See* JX-1 ¶ 5(a)(i).

[351] *See id.*

[352] LPA ¶ 5(a)(iii).

[353] Rao Report ¶ 67.

[354] *Id.* at 163:17–165:4 (Yanchik); *see also id.* at 114:2–12 (Harrison).

[355] *Id.* at 165:5–9, 166:6–167:2 (Yanchik).

[356] *See L-5 Healthcare P'rs, LLC v. Alphatec Hldgs., Inc.*, 2024 WL 3888696, at *7 (Del. Ch. Aug. 21, 2024).

[357] *See id.* (quoting *In re Cellular Tel. P'ship Litig.*, 2021 WL 4438046, at *72 (Del. Ch. Sept. 28, 2021)).

be estimated with reasonable accuracy."[358]   This language supports a finding that damages would be inadequate.

Rigmora argues that ATP cannot seek specific performance of the capital calls for Ascidian, Aethon, Evercrisp, or Fund expenses because ATP has already used other Fund proceeds intended for other purposes to invest in the companies.[359]   But rediverting funds to those companies was necessary to mitigate harm against them. The fact that ATP did so does not eliminate Rigmora's funding obligations.

On balance, the equities favor ATP.   Rigmora has the funds available to meet the Capital Calls.[360]   Moreover, the portfolio companies are developing treatments for serious medical conditions, including childhood blindness, various cancers, obesity, and neurodegenerative diseases.   The public interest strongly favors preserving potentially life-saving research programs.[361]

For these reasons, ATP is entitled to specific performance of the Capital Calls excluding Replicate, or $96,960,925.88.

## B.   Budget Approvals

ATP claims that Rigmora breached its implied duties of good faith, honesty, and rationality when reviewing and denying the budgets circulated on December 24

---

[358]   JX-0001 at 25 (LPA ¶ 5(c)).

[359]   Rigmora Post-Trial Br. at 47 (citing JX-2130 ¶¶ 17, 25 (listing payments for Ascidian, Aethon, Replicate, Evercrisp, and Fund expenses); PTO ¶ 64).

[360]   Trial Tr. at 473:1–6 (Yakovlev).

[361]   *Cf. Morabito v. Harris*, 2002 WL 550117, at *2 (Del. Ch. Mar. 26, 2002); *Bernard Pers. Consultants, Inc. v. Mazarella*, 1990 WL 124969, at *3 (Del. Ch. Aug. 28, 1990).

and for Marengo.[362]  ATP does not root its claim in fiduciary obligations, nor could it. Section 19(2) of the ELP Act eliminated any fiduciary obligations, so Rigmora does not owe fiduciary obligations to the Fund.[363]

Rather, ATP's claim is based in contract law.  Under English and Cayman common law, which govern this analysis,[364] a court may imply contract terms in one of two scenarios: when "the term must be necessary either to spell out what is so obvious that it goes without saying [the obviousness test] or to give business efficacy to the contract [the business-efficacy test]."[365]

ATP seeks to imply a specific set of obligations—to act honestly, rationally, and in good faith.[366]  These implied duties, referred to as "*Braganza* duties" after the

---

[362] ATP's claim first identified budgets for Marengo, Ascidian, and Aulos but it has since shifted to the budgets for Marengo, Aulos, Replicate, and Nine Square. *Compare* Compl. ¶ 179, *with* ATP Post-Trial Opening Br. at 66, 73.

[363] ELP Act § 19(2).

[364] LPA ¶ 18(g)(1) (stating that the "terms and provisions" of the LPA "shall be construed under the laws of the Cayman Islands, and Cayman law governs ATP's claim of breach"); PTO ¶ 25.  Cayman courts view English cases as persuasive authority when Cayman law does not provide direct guidance. Phillips Report ¶¶ 19–20.  Because no Cayman court has decided this issue, this opinion relies upon English authority when available.

[365] *USDAW v. Tesco Stores*, [2024] UKSC 28 at [102], available in the record as JX-2116; *see also Marks & Spencer v. BNP Paribas*, [2015] UKSC 72 at [20], available in the record as JX-2042; *Primeo Fund (In Official Liquidation) v. Bank of Bermuda (Cayman) Ltd.*, [2017] CILR 334 at [211], available in the record as JX-2056; *Cayman Shores v. Registrar of Lands*, [2021] (2) CILR 1 at [65]–[66], available in the record as JX-2120; Bloch Report ¶ 29.

[366] Phillips Report ¶ 75.

eponymous case, apply in certain circumstances when a party exercises a unilaterally conferred discretionary power under a contract.[367]

*Braganza* involved an employment contract between BP Shipping Ltd. and an employee who died mysteriously on one of its ships.[368]  If the employee died by suicide, then BP Shipping had the discretion under the employment contract to deny his widow a contractual death benefit.[369]  The company denied the widow the death benefit, and the widow sued for breach of an implied contractual term.  The Supreme Court of the United Kingdom held that a party exercising a discretionary control of another's rights has an obligation to act "rationally (as well as in good faith) and consistently with its contractual purpose"[370] when a conflict of interest arises due to that control.[371]  The court emphasized that the "conflict is heightened where there is a significant imbalance of power between the contracting parties."[372]  To prevent abuse of discretion, the court will ensure the power is exercised in good faith and not arbitrarily, capriciously, or perversely.[373]

According to ATP, a court should imply *Braganza* duties when three factors are present: (1) the existence of a discretionary power granted to one party; (2) that

---

[367] *Braganza v. BP Shipping Ltd.*, [2015] UKSC 17, at Headnote, [18]–[19], available in the record as JX-2102.

[368] *Id.*

[369] *Id.* at Headnote, [10]–[11].

[370] *Id.* at Headnote, [30].

[371] *Id.* at Headnote, [18].

[372] *Id.*

[373] *Id.* at Headnote, [30]–[31].

power's potential to harm the other party's interests; and (3) a conflict of interest where the decision-maker could exercise the power to benefit themselves at the other party's expense.[374]  It is unclear whether English or Cayman courts apply the three-factor *Braganza* test for which ATP advocates.  The case law supplied by the parties does not frame *Braganza* in this manner, nor does either side's expert in Cayman law.  And the parties do not join issue on the precise requirements for implying contractual terms generally or *Braganza* duties specifically.[375]

It is clear, however, that contractual context matters in the analysis of whether to imply contractual terms.[376] In an effort to shortcut the analysis, Rigmora argues that a court can never imply *Braganza* duties in this specific context—on a limited partner of a Cayman exempted limited partnership.[377]

---

[374] *Id.* at [18], [30].

[375] *See generally* ATP Post-trial Opening Br. at 66-76, Rigmora Post-Trial Br. at 48–60.

[376] *Braganza*, [2015] UKSC 17, at Headnote [31] ("But whatever term may be implied will depend on the terms and the context of the particular contract involved.").

[377] Rigmora Post-Trial Br. at 50–51 (citing *In re Torchlight Fund LP*, FSD 103 of 2015 (RMJ), 25 September 2018, at [1189]–[1190], available in the record as JX-2061). *Torchlight* is remarkable in a few ways.  Justice Robin McMillan issued the decision *after* the parties settled the case. JX-2061.0002. He noted that "the Court was invited . . . to withdraw the Petition" in light of the settlement but had "independent discretion to decide whether to deliver its Judgment or not."  *Id.*  The Justice determined to deliver his Judgment in part because he believed that the two directors of the General Partner were improperly maligned by the allegations, which "the public is entitled to know."  *Id.*  He viewed issuing his determination a matter of "human rights as much as . . . as matter of commercial law."  *Id.*  He then issued a 366 page decision.

Rigmora's primary authority does not support a categorical exclusion. Rigmora relies primarily on *Torchlight Fund LP*, where a limited partner of a Cayman exempted limited partnership alleged the general partner owed *Braganza* duties when exercising a discretionary right to send a default notice to the limited partner without first consulting the limited partner.[378] In a brief discussion toward the end of a lengthy analysis, the Cayman court declined to impose *Braganza* duties.[379] The court first noted the relevance of Section 25(1) of the ELP Act, which limits court interference with remedies under partnership agreements.[380] Next, referencing Section 25(1), the court reasoned that:

> It is the view of this Court that those who enter into and participate in complex and sophisticated commercial arrangements must be taken to be fully aware of what they are doing and what the potential consequences may be. Not only are they bound in this case by the LPA but that LPA itself is further grounded in this instance by an express statutory provision [i.e., Section 25(1) of the ELP Act]. Therefore, taking into account the terms and context of this particular contract, the Court rules that the standard of review adopted in the judicial review of administration action [i.e., the implied duty] *does not apply nor does it have any relevance.*[381]

Rigmora interprets this passage to mean that a court can never imply a contractual duty of good faith under Cayman law where an express statutory

---

[378] *In re Torchlight Fund LP*, FSD 103 of 2015 (RMJ), 25 September 2018, at [1189]–[1190], available in the record as JX-2061.

[379] *Id.* at [1180], [1182].

[380] *Id.* at [1188].

[381] *Id.* at [1189] (emphasis added).

provision already governs.[382]   And that is a fair interpretation of *Torchlight*.   But, unlike *Torchlight*, no express provision of the ELP Act governs here.   Section 19(2) of the ELP Act eliminates general fiduciary obligations generally.[383]   It does not eliminate implied contractual obligations.   And the parties cite no statutory provision that governs a limited partner's discretion in approving budgets.   *Torchlight*, thus, does not categorically prohibit this court from implying contractual duties of good faith into the LPA.

 *Torchlight*, however, supports Rigmora's position in a more limited way. Fairly read, *Torchlight* stands for the proposition that a court will be reticent to imply *Braganza* duties in the ELP context because the power disparities that motivated *Braganza*—the power's potential to harm the other party's interest—are less present. *Braganza* involved a discretionary right wielded by a large multi-national corporation against its late employee's widow.[384]   Other cases implying *Braganza* duties involve discretionary rights wielded by an insurance corporation against an insured.[385]   The power disparities between the parties existed both at the time of contracting and at the time the counterparty exercised its discretionary right.[386]

---

[382] Rigmora Post-Trial Br. at 51.

[383] ELP Act § 19(2).

[384] *Braganza*, [2015] UKSC 17 at [1189].

[385] *Equitas Ins. Ltd v Municipal Mut. Ins. Ltd* [2019] EWCA Civ [114]–[118], available in the record as JX-2047 (implying a term between insurers).

[386] *Braganza* does not provide clarity on the timing of when a court should assess these factors, and the parties did not specifically address this issue.   Generally, "[t]he test for the implication of a *Braganza* duty is one of necessity[.]" *Horlick v Cavaco*, [2022] EWHC 2935 (KB) at [175] (citing *Equitas Ins. Ltd v. Municipal Mut. Ins. Ltd*,

The ELP context is different.  As the *Torchlight* court observed: "those who enter into and participate in complex and sophisticated commercial arrangements must be taken to be fully aware of what they are doing and what the potential consequences may be."[387]  And that is factually true here—both Rigmora and ATP are highly sophisticated, and the LPA was heavily negotiated.  Moreover, the parties cite to no case in which applicable authorities have implied *Braganza* duties in the ELP context.  And if a court is unwilling to impose implied contractual obligations on a general partner as in *Torchlight*, then it will be an exceptional case that the court imposes implied obligations on a limited partner.

This case is not the exception.  Of the three *Braganza* factors identified by ATP, only two of the three are met.  The LPA grants Rigmora the discretion to approve budgets.  But the presence of other factors suggests that one cannot imply *Brananza* duties due to the existence of a discretionary right alone.  And Rigmora's ability to reject budgets can impede ATP's right to call capital and operate the Fund.  But it would be weird to describe the parties as conflicted concerning whether to call capital.  It is true that Rigmora's liquidity issues changed its investment strategy.  And a need for liquidity can provide a source of conflict in certain circumstances.  But at the end

---

[2019] EWCA Civ 718 at [150]–[151]).  The tests for necessity are the business efficacy and obviousness tests.  To satisfy those tests, a court will imply a term "in the way that the parties must have intended or reasonably expected it to work." *Equitas Ins. Ltd*, [2019] EWCA at [151].  This suggests that the court analyzes the *Braganza* factors ex ante.  *See also* Bloch Report ¶ 24 (citing *Arnold*, [2015] UKSC at [19]) (explaining a court should interpret a contract "as at the date that the contract was made").  But, again, it is unclear.  In this analysis, it does not matter.

[387] *Id.*

of the day, Rigmora owns over 98% of the Fund.  Rigmora is thus highly interested in the success of its portfolio companies.  And Rybolovlev's family-pharma goal, and desire to replicate his success at Uralkali, meant that he would ultimately consolidate funds behind only some of the portfolio companies and successful therapies.  Rigmora's liquidity needs might have hastened that process.  This, however, does not seem to be the type of conflict motivating *Braganza* duties.

Because the circumstances do not warrant implying *Braganza* duties, the analysis could end here.  But, again, the parties did not neatly join issue on the relevant legal framework, and ATP analyzes the business efficacy and obviousness tests as well the *Braganza* factors.  For completeness, so too does this decision.

In *USDAW v. Tesco Stores*, Lord Leggatt expounded on the business-efficacy and obviousness tests.[388]  The business-efficacy test involves two steps.  The court must first identify the relevant contractual purpose.[389]  The court must then ask "whether the implication of a term is necessary to give effect to that purpose and prevent it from being defeated."[390]  The implied term cannot conflict with existing provisions, and it must be "strictly necessary."[391]

Under the obviousness test, a court only implies a term if it is "so obvious it goes without saying."[392]  The court must assess what reasonable people in the

---

[388] [2024] UKSC 28 at [106].

[389] *Id.*

[390] *Id.*

[391] *Id.*

[392] *Id.* at [102].

positions of the parties at the time would have agreed.[393] Actual intent does not matter.[394] Regarding detailed commercial contracts, "[a] term should not be implied . . . merely because it appears fair or merely because the court considers the parties would have agreed it if it had been suggested to them . . . [it] is a stringent test."[395]

Neither test is satisfied. Starting with the first step of the business-efficacy test, the LPA's purpose is facilitating investment in "in pharmaceutical medical device and other medically-related companies and business projects."[396] ATP seeks to imply a "good faith, honestly, and rationally" modifier to Rigmora's discretion to approve budgets.[397] Inserting that term, however, is not strictly necessary for effectuating the LPA's purpose because ATP and Rigmora share economic incentives to approve budgets. They relied on the existing provision for years, approving budgets without issue, and the Fund operated without incident. No implication is needed.

The obviousness test also fails. At the time of contracting, Rigmora contributed nearly all the Fund's capital. It thus makes sense that Rigmora secured the absolute discretion to reject budgets and negotiated for the ability to preserve its capital by blocking budgets. It is not so obvious or goes without saying that a reasonable

---

[393] *Yoo Design Services v Iliv Realty Pte*, [2021] EWCA Civ 560 at [51], available in the record as JX-2113.

[394] *Id.*

[395] *Id.*

[396] LPA Am. 1 ¶ 1(c).

[397] ATP Post-trial Opening Br. at 66.

potential limited partner would have agreed to constrain its discretion to approve budgets.

Ultimately, none of the relevant tests support implying a good faith term. Because Rigmora had no implied duty to breach, ATP's claim fails.

## C.   Declaratory Relief

ATP also seeks two forms of declaratory relief: a declaration that ATP's filing of this action does not violate the Exculpation Provision and is consistent with the Discretionary-Action Provision of the LPA, and a declaration that parties have not amended the Global Default Provision.[398]

Declaratory relief "is appropriate only if there is an actual controversy between the parties."[399] The Delaware Supreme Court has articulated four prerequisites for to an "actual controversy":

> (1) It must be a controversy involving the rights or other legal relations of the party seeking declaratory relief; (2) it must be a controversy in which the claim of right or other legal interest is asserted against one who has an interest in contesting the claim; (3) the controversy must be between parties whose interests are real and adverse; (4) the issue involved in the controversy must be ripe for judicial determination.[400]

On the fourth factor specified by the high court, "[a] ripeness determination requires a commonsense assessment of whether the interests of the party seeking immediate

---

[398] PTO ¶ 74(f); Dkt. 266, [Proposed] Order and Final Judgment ¶¶ 2(b), 2(d).

[399] *Dana Corp. v. LTV Corp.*, 668 A.2d 752, 755 (Del. Ch. 1995).

[400] *XL Specialty Ins. Co. v. WMI Liquid. Tr.*, 93 A.3d 1208, 1217 (Del. 2014) (quoting *Stroud v. Milliken Enters., Inc.*, 552 A.2d 476, 479–80 (Del. 1989)).

relief outweigh the concerns of the court in postponing review until the question arises in some more concrete and final form."[401]  A dispute is ripe if "litigation sooner or later appears to be unavoidable" and "the material facts are static."[402]  Ultimately, Delaware's approach to declaratory relief and ripeness leaves the determination to the discretion of the court.[403] "The [c]ourt may . . . properly decline to entertain a declaratory judgment claim where another remedy is available and would be more 'effective or efficient.'"[404]

### 1.     The Exculpation And Discretionary-Action Provisions

ATP seeks a declaratory judgment that ATP's filing of this action was in good faith, falls within the Exculpation Provision, and was authorized under the

---

[401] *XL Specialty*, 93 A.3d at 1217 (citation modified); *see also Nask4Innovation Sp. Z.o.o. v. Sellers*, 2022 WL 4127621, at *4 (Del. Ch. Sept. 12, 2022) ("In determining whether a dispute is ripe, the Court must take a practical view of all relevant facts and make a common-sense determination of whether adjudicating a dispute at present is a prudent use of judicial resources.").

[402] *XL Specialty*, 93 A.3d at 1217 (quoting *Julian v. Julian*, 2009 WL 29371212, at *3 (Del. Ch. Sept. 9, 2009)) (citation modified).

[403] *See Stroud v. Milliken Enters., Inc.*, 552 A.2d at 480 ("The reasons for not rendering a hypothetical opinion must be weighed against the benefits to be derived from the rendering of a declaratory judgment.  This weighing process requires "the exercise of judicial discretion[.]"); *Horizon Pers. Commc'ns, Inc. v. Sprint Corp.*, 2006 WL 2337592, at *17 (Del. Ch. Aug. 4, 2006) ("The ripeness of a dispute is a matter entrusted to the discretion of the trial court." (quoting *UbiquiTel Inc. v. Sprint Corp.*, 2006 WL 44424, at *2 (Del. Ch. Jan. 4, 2006))) (citation modified).

[404] *Walton v. Walton*, 2025 WL 2555839, at *8 (Del. Ch. Sept. 2, 2025) (quoting *Reylek v. Albence*, 2023 WL 4633411, at *6 (Del. Super. July 19, 2023)); *see also Markusic v. Blum*, 2021 WL 2456637, at *4–5 (Del. Ch. June 16, 2021), *aff'd*, 284 A.3d 1017 (Del. 2022) (declining to issue declaratory judgment where concurrent litigation in another court would sufficiently address the controversy); *Burris v. Cross*, 583 A.2d 1364, 1370–76 (Del. Super. Ct. 1990) (same).

Discretionary-Action Provision.[405]    ATP seeks this declaration in part because Rigmora argues in the Cayman Litigation that ATP filed this action in breach of its fiduciary duties.

Rigmora argues that ATP's claim under the Exculpatory Provision is unusual. Exculpatory provisions shield a covered person from liability for covered claims. And there is no ripe claim here, because Rigmora does not argue in this dispute that ATP breached its fiduciary duties.[406]

Rigmora has the better of the argument here; ATP's request for declaratory judgment is not suitable for resolution in this forum.  Delaware law governs a gross negligence standard in the Exculpation Provision; but otherwise, Cayman law governs both the Exculpatory Provision and the Discretionary-Action Provision. Further, the underlying dispute around whether ATP's filing of this action constitutes

---

[405] Compl. ¶ 196; PTO ¶ 74(f); LPA ¶ 2(g) ("To the fullest extent permitted by law, neither the General Partner nor any of its affiliates shall incur liability . . . provided that in any such case (i) the General Partner's or such affiliate's course of conduct was in good faith and (ii) such course of conduct did not constitute willful fraud, willful misconduct, gross negligence as determined under the laws of the State of Delaware without regard to otherwise governing principles of conflicts of law ("Gross Negligence") or an intentional and material breach of this Agreement on the part of the General Partner[.]"; LPA ¶ 18(g)(iv) ("In determining what action, if any, shall be taken against a Limited Partner in connection with such Limited Partner's breach of this Agreement, the General Partner shall seek to obtain a favorable result (as determined by the General Partner in its sole discretion . . . . To the fullest extent permitted by law, each Limited Partner hereby specifically agrees that, in the event such Limited Partner violates the terms of this Agreement, such Limited Partner shall not be entitled to claim that the Partnership or any of the other Partners are precluded, on the basis of any fiduciary or other duty arising in respect of such Limited Partner's status as such, from seeking any of the remedies permitted under this Agreement or applicable law.").

[406] Rigmora Post-Trial Br. at 61–62.

a breach of its fiduciary duties is central to Rigmora's Winding Up Petition in the Cayman Litigation.[407]  As a commonsense matter, this court has little reason to resolve the issue, which was not a core dispute in this litigation.[408]  The factual findings in this decision speak for themselves.  And Cayman court is well positioned to assess their implications under Cayman law.  Commonsense dictates reserving judgment on both of ATP's requests for declaratory relief concerning the Exculpatory and Discretionary-Action Provisions.

### 2.    Global Default Provisions

ATP seeks a declaratory judgment concerning the Global Default Provision, although the nature of the ATP's requested declaration has evolved over the course of this litigation.

In its Complaint, ATP requested a declaration that Rigmora is "in breach of its funding and budget approval obligations sufficient to qualify as a Defaulting Partner."[409]  ATP requested similar relief in the Pre-Trial Order.[410]  The Writ Injunction, however, prohibits ATP from "taking any steps against [Rigmora] to enforce any purported default provisions" related to the May 30 and June 1 capital calls.[411]  At trial, therefore, ATP withdrew any request contrary to the Writ

---

[407] JX-1417 ¶ 26; ATP Post-Trial Reply Br. at 44.

[408] *See id.*

[409] *Markusic*, 2021 WL 2456637, at *5.

[410] PTO ¶ 74(a)(iv) (requesting a declaration that Rigmora "breached [its] obligations under the LPA to fund and approve budgets sufficient to qualify as a Defaulting Partner").

[411] JX-1434 ¶ 1. *Compare* Compl. ¶ 183–92, *with* PTO ¶ 74(a)(iv).

Injunction.[412]  In post-trial briefing, ATP seeks a far more limited declaration, asking for "an order declaring that the Global Default provision[,]" Paragraph 5(c) of the LPA, "governs defaults" and "ha[s] not been altered or amended."[413]

As currently framed, ATP's request is so narrow as to be undisputed, as Rigmora does not deny that the Global Default Provisions have never been amended.[414]  Because there is not dispute between the parties on this point, there is no actual controversy.  ATP's request for declaratory relief is not ripe.  For that reason, it is dismissed.

### D.    Attorney's Fees

ATP requested attorney's fees under the "loser pays" principles of Cayman Island laws and the Common Law in the Complaint and in the Pre-Trial Order.[415] The Pre-Trial Order referred the court to ATP's pre-trial brief for a discussion of disputed issues, but ATP's pre-trial brief did not address the issue.[416]  Rigmora addressed this issue directly in pre-trial briefing, arguing that the American rule under Delaware law governs the issue of attorney's fees.[417]  ATP's post-trial opening brief made no mention of attorneys' fees.  ATP did not address this issue until its post-trial reply brief and then did so in a cursory fashion.

---

[412] ATP Pre-Trial Br. at 56 n.22.

[413] ATP Post-Trial Opening Br. at 82; Dkt. 266, [Proposed] Order and Final Judgment ¶¶ 2(b), 2(d).

[414] *See* Rigmora Post-Trial Br. at 60.

[415] PTO ¶ 74(g).

[416] *See generally* ATP Post-Trial Opening Br.

[417] Rigmora Post-Trial Br. at 62.

Whether a party has waived an argument by failing to raise it in briefing is a procedural matter, so Delaware law governs whether ATP's request for attorneys' fees has been waived.[418] "It is settled Delaware law that a party waives an argument by not including it in its brief."[419] "[A]n issue not raised in post-trial briefing has been waived, even if it was properly raised pre-trial."[420]

ATP's failure to meaningfully brief the issue of its entitlement to fees under Cayman law until its post-trial reply brief constituted waiver. Thus, to the extent that Cayman law supports awarding ATP its attorney's fees and expenses, which this decision does not address, the claim is denied.

## III.    CONCLUSION

Excluding the Capital Call for Replicate, Rigmora is ordered to specifically perform its obligation to fund the Capital Calls. ATP is not entitled to specific performance relating to the budgeting approvals. ATP's request for a declaratory judgment concerning the Exculpatory Provision or the Discretionary-Action Provision are held in abeyance. ATP's request for a declaratory judgment concerning the Global

---

[418] *See Wheeler v. Wheeler*, 636 A.2d 888, 891 (Del. 1993); *Americas Mining Corp. v. Theriault*, 51 A.3d 1213, 1264 (Del. 2012) (Berger, J., concurring) (unanimously holding that "the motion for reargument is procedurally barred under Delaware law, because the issue raised on reargument was not fully and fairly presented in the Defendants' opening briefs"); *Chaplake Hldgs., LTD. v. Chrysler Corp.*, 766 A.2d 1, 6 (Del. 2001).

[419] *Emerald P'rs v. Berlin*, 2003 WL 21003437, at *43 (Del. Ch. Apr. 28, 2003), *aff'd*, 840 A.2d 641 (Del. 2003).

[420] *Oxbow Carbon & Mins. Hldgs., Inc. v. Crestview-Oxbow Acq., LLC*, 202 A.3d 482, 502 n.77 (Del. 2019); *see also In re IBP, Inc. S'holders Litig.*, 789 A.2d 14, 62 (Del. Ch. 2001).

Default Provision is dismissed.  ATP is noted entitled to its attorney's fees under the Cayman law's loser-pays rule.  The parties are ordered to submit a form of order or competing forms of order implementing this decision within three business days.