**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re:<br><br>Apple Tree Life Sciences, Inc., *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No.  25-12177 (LSS)<br><br>(Joint Administration Requested) |

**OMNIBUS OBJECTION OF RIGMORA BIOTECH INVESTOR
ONE LP AND RIGMORA BIOTECH INVESTOR TWO LP TO
DEBTORS' CASH MANAGEMENT MOTION AND WAGES MOTION**

Parties in interest Rigmora Biotech Investor One LP, by its general partner Unicorn Biotech Ventures One Ltd and Rigmora Biotech Investor Two LP, by its general partner Unicorn Biotech Ventures Two Ltd (collectively, the "**LPs**") hereby submit this omnibus objection to (ii) *Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing the Debtors To (A) Continue to Operate Their Cash Management System, (B) Honor Certain Pre-Petition Obligations Related Thereto, and (C) Continue to Perform Intercompany Transactions, (II) Granting Administrative Expense Status to Postpetition Intercompany Balances, and (III) Granting Related Relief* [D.I. 24] (the "**Cash Management Motion**"), and (ii) *Debtors' Motion for Entry of Interim and Final Orders to (I) Continue Employee Benefits Programs and (II) Grant Related Relief* [D.I. 23] (the "**Wages Motion**") and together with the Cash Management Motion, the "**Motions**") filed by the debtors and debtors in possession (collectively, the "**Debtors**") in the above-captioned chapter 11 cases.

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number include: Apple Tree Life Sciences, Inc. (4506); ATP Life Science Ventures, L.P. (8224); ATP III GP, Ltd. (6091); Apertor Pharmaceuticals, Inc. (3161); Initial Therapeutics, Inc. (2453); Marlinspike Therapeutics, Inc. (4757); and Red Queen Therapeutics, Inc. (8563). The location of the Debtors' service address in these chapter 11 cases is 230 Park Avenue, Suite 2800, New York, NY 10169.

## PRELIMINARY STATEMENT

1.      As an initial matter, the LPs' position remains that these bankruptcy proceedings serve no legitimate purpose and should not be resolved until the court in the Cayman Islands determines whether the general partner has the power or authority to act on behalf of the fund that is at the core of these petitions.  Any transactions by the Fund or additions of limited partners are otherwise voidable as a matter of law if and when the Cayman Court ultimately orders the Fund to be wound up.  The Cayman Court will determine whether the GP should be permitted to continue to hold the LPs' assets on trust and act as their fiduciary in connection with a winding-up, or whether independent fiduciaries should assume that role.  The Court of Chancery's decision only confirms that the GP has grossly mismanaged the fund.  The Court's recent determination that the GP overstated the LPs' contingent subscription by *$425 million* and sued the LPs on that basis is shocking.  Equally shocking are the GP's suggestions in this Court that, having contributed 98% of the capital to the Fund, the LPs are somehow seeking to destroy their own investment.  To be clear, the LPs do not seek to starve the portfolio companies, have offered for over six months to provide interim funding for the portfolio companies that the GP has rejected, have long urged the GP to appropriately fund and manage the portfolio companies in accordance with the available contingent subscription, and seek the appointment of independent fiduciaries in the Cayman Islands precisely to permit funding to be allocated to maximize the value of the Fund *to the LPs*. It is the GP's intransigence that puts the assets at risk.

2.      Nonetheless, the LPs do not object to the interim relief sought by the Debtors to permit the continued operation of each of the seven Debtors as legally distinct entities[2], consistent with their contractual obligations, the applicable law, and past practice.  But the sweeping and

---

[2] For the avoidance of doubt, as discussed below, the Fund does not have separate legal personality.

ill-defined relief sought by the Debtors appears to be far broader than that, effectively asking this Court to permit the Debtors to pool assets across the seven entities in direct contravention of the LPs' contractual rights, which the Delaware Court of Chancery affirmed less than two weeks ago. The Debtors ignore that the Fund is in effect a statutory trust subject to the terms of the parties' limited partnership agreement whereby the general partner holds the assets for the benefit of – and as a fiduciary of – the LPs that have contributed 98% of the capital to the Fund.  This Court should reject the Debtors' efforts to use relief sought under a first day motion (here, the Cash Management Motion) to accomplish an end run around the LPs' contractual and other rights as described below.

3.      Attached as Exhibit A to this omnibus objection are the LPs' proposed revisions to the interim order approving the Cash Management Motion, which primarily focus on the Debtors' request for authority to engage in intercompany transactions as well as compliance with the Debtors' contractual obligations and applicable law.  The revisions seek to identify and delineate the scope of intercompany transactions as to which the Debtors seek approval on an interim basis, to ensure that any such transactions do not violate the contractual, property, and other rights of the LPs, and to address the segregated treatment of approximately $96 million in capital call contributions that are to be made by the LPs pursuant to the ruling of the Delaware Court of Chancery.  The LPs have also proposed modest revisions to the interim order approving the Wages Motion which are shown in Exhibit B and described further below.

## **BACKGROUND**

4.      The Motions have been filed on behalf of seven separate Debtors.

5.      Debtor ATP Life Science Ventures, L.P. (the "**Fund**") is a Cayman Islands exempted limited partnership ("**ELP**") that invests in biotechnology companies.  The Fund is in effect a "fund of one," as roughly 98% of the capital invested into the Fund was contributed by the

LPs. Ex. E, Chancery Court Post-Trial Op. at 5. The Fund is governed by a Limited Partnership Agreement (as amended, the "**LPA**") dated November 1, 2012, which is governed by the law of the Cayman Islands and is expressly subject to the Cayman Islands Exempted Limited Partnerships Act (the "**ELP Act**"). Ex. C, LPA ¶ 18(g)(i). Under applicable Cayman Islands law, "an ELP is not an entity with a separate legal personality," and "it cannot own property in its own right." Dkt. 4, Faulkner Dec. ¶ 20. Instead, "any rights or property" of an ELP "shall be held or deemed to be held by the general partner upon trust for the limited partners in accordance with the terms of the partnership agreement." *Id.* The general partner holds "the assets of the partnership on a statutory trust for the limited partners pursuant to section 16(1) of the ELP Act," and owes fiduciary duties to the limited partners. *Id.* ¶¶ 23, 29.

6.      Debtor ATP III GP, Ltd. (the "**GP**"), is a Cayman Islands Company, and the GP of the Fund. Debtor Apple Tree Life Sciences, Inc. ("**ATLS**") is a wholly owned subsidiary of the Fund that is responsible for satisfying various operational expenses of the Fund.

7.      Debtors Apertor Pharmaceuticals, Inc. ("**Apertor**"), Initial Therapeutics, Inc. ("**Initial**") Marlinspike Therapeutics, Inc. ("**Marlinspike**"), and Red Queen Therapeutics, Inc. ("**Red Queen**") are portfolio companies in which the Fund has invested pursuant to the LPA.

8.      Under the LPA, the GP may only call capital for portfolio companies for a project and within a budget approved by the LPs, up to the LPs' Contingent Subscription amount. Ex. C, LPA, ¶ 5(a)(i); Ex. F, LPA Amendment 3 at 2 (amending LPA ¶ 5(a)(ii)(E)); Ex. E, (Delaware Court of Chancery Post-Trial Memorandum Opinion) at 6 ("The LPA thus granted Rigmora the right to approve budgets for projects before the General Partner can call capital for those projects."). The Court of Chancery has confirmed that the LPs have an absolute contractual right to approve or disapprove budgets proposed by the GP. Ex. E at 73-76 (Delaware Court of

Chancery Post-Trial Memorandum Opinion ) ("The LPA grants Rigmora the discretion to approve budgets. . . . [N]one of the relevant tests support implying a good faith term.").  Indeed, the GP dropped its request that the Court deem the LPs to have waived their rights to approve or disapproved proposed portfolio company budgets in their discretion.  *Id.* at 44 n.257 ("In the Pre-Trial Order, [the GP] sought a declaration that Rigmora waived or otherwise forfeited its voting and budget approval rights, but dropped this request after trial").

9.      ATLS receives an annual fee which is funded by the LPs (the "**ATLS Fee**").  The ATLS Fee is required to be applied towards certain Fund operating expenses including facilities overhead expenses and employee costs.  The GP is required to prepare a yearly budget for the ATLS Fee which is presented to the LPs for their approval.  In the event the LPs exercise their discretion to decline approval in any given year, the most recently approved budget applies by default.  Ex. G, LPA Amendment 20 (amending LPA ¶ 20(e)(ii)).

10.      For many years the GP proposed budgets, the LPs approved them, and the GP issued capital calls for specific portfolio companies with approved budgets.  Ex. H, ATP Post-Trial Br. at 20-21, 41.  After the GP filed suit against the LPs in the Court of Chancery on May 30, 2025, the LPs learned of several instances in which the GP had either (1) directed portfolio companies to issue interest-free loans for the benefit of other portfolio companies or (2) recycled proceeds from investments to invest in other portfolio companies rather than distributing those proceeds to the LPs, without seeking the LPs' consent (including to portfolio companies that did not have approved budgets, thereby breaching the terms of the LPA).[3]  The LPs objected to that use of funds

---

[3]    Specifically, the GP caused Marlinspike to issue a $1 million loan to Nereid, another portfolio company, even though Nereid did not have an approved budget at the time.  The GP also used distributions from a Fund investment and proceeds from refinancing convertible loan notes to provide funds to portfolio companies that were subject to the Chancery litigation, including to three portfolio companies that had no approved budgets (Nereid, Nine Square and Replicate), in contravention of the LPA.  Ex. J, Walkers Letter of September 9, 2025 ¶¶ 9, 11, 17, 20 (Replicate), 23-24 (Nereid and Nine Square).

as violating their rights under the LPA and Cayman law, and included them in their submissions to the Grand Court of the Cayman Islands (the "Cayman Court") as evidence that they had justifiably lost trust and confidence in the GP such that the Fund should be wound up.  Ex. I, Amended Winding Up Petition, ¶ 52.

11.    The Debtors' Application to Appoint a Claims Agent now suggests that the GP may have engaged in numerous intra-portfolio company transactions, with portfolio companies listed as creditors of other portfolio companies.  Dkt. 22, Ex. 1 (*e.g.*, Apertor's creditors include Initial Therapeutics and Nine Square; Initial Therapeutic's creditors include Apertor, Deep Apple, and Nine Square; and Red Queen's creditors include Ascidian).  That is profoundly troubling, as it suggests that the GP may have circumvented the LPA's requirement that capital be called from the LPs for a particular portfolio company in accordance with that portfolio company's budget, and not later redistributed among the portfolio companies as the GP sees fit.

12.    On May 30, 2025, the GP issued capital calls for Debtors Apertor, Initial, Marlinspike, and Red Queen; for certain other portfolio companies; and for Debtor ATLS's fee and partnership expenses.  Ex. K, Capital Calls.  The Court of Chancery's recent Post-Trial Memorandum Opinion and Partial Final Judgment and Order required the LPs to specifically perform certain of those capital calls, totaling $96,960,925.88.  Ex. E, Post-Trial Op. at 66; Ex. D, Partial Final Judgment ¶ 2.  More specifically, the Court's decision and judgment require specific performance of the capital calls issued to the LPs for Apertor, Initial, Marlinspike and Red Queen, totaling $26.8 million, and the capital call for the ATLS's fee and partnership expenses in the amount of $13.3 million for both LPs.  *See* Ex. K, Capital Calls, ($7.1m for Apertor); ($7m for Initial Therapeutics); ($6.3m for Marlinspike); ($6.4m for Red Queen); ($13.3m for LPs' portion of ATLS Fee).  The remaining $56.8 million of the $96.9 million in capital calls that the Court of

Chancery specifically enforced were for non-debtor portfolio companies.  Although the Court of Chancery determined that these capital calls were within the LPs' remaining contingent subscription of $125 million, it rejected the GP's contention that the LPs were somehow obligated to contribute ***$425 million or more*** in additional capital to the Fund.  Ex. D,, Partial Final Judgment and Order, ¶ 4; Ex. E, Delaware Court of Chancery Post-Trial Memorandum Opinion at 47 ("What is the Contingent Subscription amount, $2.425 billion as Rigmora contends or over $2.85 billion as [the GP] argues?  . . .  Rigmora's Contingent Subscription is $2.425 billion.").

13.    The LPs have a vested interest in protecting their consent and approval rights in the Fund in which they own a 98% interest, and ensuring that the Fund, and by extension the remaining Debtors who are supported by the Fund's capital, continue to operate smoothly and preserve the value of the LPs' investment.  This does not mean, however, that the LPs must permit the Debtors to operate in ways that would violate the LPs' consent rights, as to the Debtors request in their Cash Management Motion.  If approved, there is a significant risk that the Cash Management Motion would allow the GP to (continue to) funnel the LPs' funds and assets that it holds in trust between the various Debtors without any regard—and in violation of—the LPs' consent rights. The LPs accordingly request that the Court adopt the modified interim cash management order enclosed herewith that balances the Debtors' requests for relief while protecting the LP's consent and approval rights.

## **ARGUMENT**

### I.    Any Order Approving the Cash Management Motion Should Limit the Debtors' Authority to Engage in Intercompany Transactions.

14.    Under the guise of seeking interim relief as to cash management systems, the Cash Management Motion seeks broad authority to engage in so-called "Intercompany Transactions"

among the Debtors, a term that is vaguely defined as "relationships with each other," which the Debtors claim "result[] in intercompany receivables and payables in the ordinary course of business." Dkt. 24 Cash Management Motion, at ¶ 21. Although the Debtors offer a few examples of what they refer to as "typical Intercompany Transactions," footnote 3 makes clear that the definition is not limited to those described in the Motion. *Id.* ¶ 22 n.3 ("The relief requested herein is applicable with respect to all Intercompany Transactions and is not limited to those Intercompany Transactions described in this Motion."). Nor does the relief sought in the Cash Management Motion offer or impose any guardrails to prevent the Debtors from engaging in intercompany transactions that violate the LPA and applicable law.

15. Notably, the Debtors offer no legal authority in the Cash Management Motion to support the proposition that section 363(c) authorizes the Debtors, under the veneer of "ordinary course" transactions, to engage in intercompany transactions that violate existing partnership or contractual obligations or applicable law. Actions that require setting aside the LPs' rights under the LPA and Cayman law are by definition not "ordinary course" transactions. The GP cannot seriously claim that it has in the ordinary course ignored the LPs' rights to approve or disapprove the budgets against which the GP can call capital, or that diverting capital called for a specific portfolio company to another purpose would be a step taken in the ordinary course.

16. If anything, Delaware courts have long recognized that chapter 11 proceedings do not supersede corporate governance rights that exist under applicable nonbankruptcy law. *In re Indianapolis Downs, LLC.,* 486 B.R. 286, 302 (Bankr. D. Del. 2013) ("It is axiomatic that commencement of a chapter 11 case does not suspend or displace non-bankruptcy law and contractual rights regarding corporate governance."); *see also In re Marvel Ent. Grp., Inc.*, 209 B.R. 832, 838 (D. Del. 1997) ("[T]he automatic stay provisions of the Bankruptcy Code are not

implicated by the exercise of shareholders' corporate governance rights.").  The consent rights of the LPs under the LPA fall squarely within the ambit of corporate governance rights that remain intact in chapter 11.

17.    Indeed, the LPs are entitled to additional protections where, as here, a large portion of the cash in the possession of the GP and the Fund does not constitute property of any Debtor's estate, but rather is held by the GP in trust for the LPs.  As argued in the LPs' previously filed motion to dismiss and for relief from the automatic stay [Dkt. 3, at 32 n.7], because of the nature of the Fund under Cayman Islands law and the fact that the assets attributed to the Fund are held in trust by the GP for the LPs and other limited partners – who are the beneficial owners of such assets – any assets attributed to the Fund, including any cash in the Fund's bank accounts, are not even property of the estate under section 541(b)(1) and (d) of the Bankruptcy Code, but rather constitute property of the LPs.  Dkt. 4 Declaration of Liam Faulkner, ¶¶ 16-27 (describing nature of the Fund and ownership of its assets under Cayman Islands law); 11 U.S.C. § 541(b)(1), (d); *In re Columbia Gas Systems, Inc.*, 997 F.2d 1039, 1054 (3d Cir. 1993) (bankruptcy estate only includes property to the extent of debtor's equitable interest in such property, and where a debtor only possesses legal title to monies, such funds are not an asset of the bankruptcy estate); *In re SemCrude, L.P.*, 418 B.R. 98, 106 (Bankr. D. Del. 2009) (citing *Begier v. Internal Revenue Service*, 110 S. Ct. 2258 (1990)).  With respect to such assets, Section 363(e) of the Bankruptcy Code provides that "[n]otwithstanding any other provision of this section, at any time, on request of an entity that has an interest in property, used, sold, or leased, or proposed to be used, sold, or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale or lease as is necessary to provide adequate protection of such interest."  11 U.S.C. § 363(e).

18.     Accordingly, the Debtors should not be permitted to use the Cash Management Motion as a vehicle to enable the Debtors to run roughshod over the LPs property, contractual, and other rights.  Rather, any order approving the Cash Management Motion should incorporate the following revisions to the order as set forth in Exhibit A attached hereto.

19.     First, the scope of the term "Intercompany Transactions" needs to be narrowed from the vague and overly broad version proposed by the Debtors.  This is particularly important where, as here, the Debtors have provided no meaningful information with respect to the Intercompany Transactions that they characterize as historical practice and as to which they seek approval.  Indeed, the Debtors have not yet provided the LPs or parties in interest with any budget that might provide some insight into those expenditures, notwithstanding the request of the LPs yesterday morning for a copy of it.  Nor have they explained why any Intercompany Transactions are even needed during the interim period prior to a final hearing on the Cash Management Motion, or why the various bank accounts of each Debtor within the Cash Management System are not sufficient in amount to pay the anticipated expenses of that Debtor.

20.     To be sure, the LPs recognize that certain ordinary course Fund expenses historically paid by the specific Debtor ATLS (which as noted, is responsible for meeting Fund operating costs) and the Partnership's funding of portfolio companies with capital called from the LPs for those portfolio companies in accordance with their approved budgets, should continue in order to avoid any disruption to the Debtors' respective businesses.  That being said, there is no basis for the Debtors to use the cloak of a Cash Management Motion to transfer cash among affiliates without any explanation or rationale, particularly given the LPs' knowledge of instances such as those described above where the GP has violated the terms of the LPA.

21.    Accordingly, the LPs propose that the scope of intercompany transactions authorized under the interim order approving the Cash Management Motion be revised as set forth in the proposed order such that:  1) any such transactions authorized by the order shall not include intercompany transactions with any portfolio company without an approved budget, or in excess of an approved budget, absent written approval from the LPs, 2) any intercompany transactions by the Debtors that violate the LPA, the ELP Act, or applicable law shall be prohibited, including the use of capital called for a particular portfolio company for any purpose not authorized by the LPs or under the LPA, and 3) shall not involve transfers among portfolio companies.

22.    Second, the Interim Order needs to provide appropriate protections for approximately $96 million in additional contributions to the Fund that have been ordered by the Delaware Court of Chancery to be deposited into a segregated account on or before December 26, 2025.  The Court of Chancery ordered specific performance of capital calls for certain specified portfolio companies and for ATLS fees and partnership expenses.  Any interim order approving the Cash Management Motion should provide for the immediate creation of a segregated account into which the $96 million in funds will be deposited along with wiring instructions to be provided to the LPs, and further provide that (a) such funds not be withdrawn, used or encumbered absent further Court order or the written consent of the LPs, and (b) any use of such funds should be restricted to the purpose for which that capital was called and otherwise be consistent with, and not contravene, the LPA, the Delaware Court of Chancery's ruling, and applicable law.

23.    Third, the Interim Order should make clear that, with respect to any of the transactions or payments involving Banks, that any such authorization is subject to and contingent upon compliance with the LPA, the ELP Act, and any applicable state, federal or foreign law.

24. <u>Fourth</u>, the Interim Order should be revised to provide for a clear reservation of the LPs' rights, remedies and objections, both to any prepetition transactions as well as to any of the transactions for which the Debtors seek relief in the Cash Management Motion or otherwise, which is especially important given the interim relief sought and the LPs' lack of information (let alone timely information) from the Debtors when submitting this Objection on a compressed schedule.

## II.    The LPs Request Certain Modifications to the Employee Benefits Motion.

25. With regard to the Employee Benefits Motion, the LPs' objection is limited to the following provisions:  (a) any language that authorizes the Debtors to modify, change or discontinue the Employee Compensation and Benefits without the need for approval from this Court should be stricken; (b) the language any authority to pay prepetition obligations owed to Insiders; and (c) any authority to exceed the amounts set forth in sections 507(a)(4) and 507(a)(5) with respect to payments of pre-petition obligations of any individual employee (including where applicable state law would, in the absence of bankruptcy, otherwise require such payments).  The LPs thus propose following revisions to the order as set forth in Exhibit B attached hereto

26. WHEREFORE, the LPs respectfully request that the Court condition entry of any interim orders approving the Motions on inclusion of the revisions to the proposed orders as set forth in Exhibits A and B hereto.

Dated: December 17, 2025
Wilmington, Delaware

**RICHARDS, LAYTON &
FINGER, P.A.**

*/s/ Clint M. Carlisle*
John H. Knight (No. 3848)
Michael J. Merchant (No. 3854)
Blake Rohrbacher (No. 4750)
Daniel E. Kaprow (No. 6295)
Clint M. Carlisle (No. 7313)
Nicholas A. Franchi (No. 7401)
One Rodney Square
920 North King Street
Wilmington, DE 19801
Telephone:  (302) 651-7700
Facsimile:   (302) 651-7701
Email:   knight@rlf.com
              merchant@rlf.com
              rohrbacher@rlf.com
              kaprow@rlf.com
              carlisle@rlf.com
              franchi@rlf.com

Respectfully Submitted,

**DEBEVOISE & PLIMPTON LLP**

Shannon Rose Selden (admitted *pro hac vice*)
William H. Taft V (admitted *pro hac vice*)
Zachary H. Saltzman (admitted *pro hac vice*)
Natascha Born (admitted *pro hac vice*)
Carl Micarelli (admitted *pro hac vice*)
Sebastian Dutz (admitted *pro hac vice*)
66 Hudson Boulevard
New York, New York 10001
Telephone:  (212) 909-6000
Email: srselden@debevoise.com
              whtaft@debevoise.com
              zsaltzman@debevoise.com
              nborn@debevoise.com
              cmicarelli@debevoise.com
              spdutz@debevoise.com

*Co-Counsel for Rigmora Biotech Investor One
LP (by and through its general partner Unicorn
Biotech Ventures One Ltd) and Rigmora
Biotech Investor Two LP (by and through its
general partner Unicorn Biotech Ventures Two
Ltd)*