**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| Apple Tree Life Sciences, Inc., *et al.*,[1] | Case No. 25-12177 (LSS) |
| Debtors. | (Jointly Administered) |
| | **Hearing Date: January 20, 2026 at 2:30 p.m. (ET)**<br>**Objection Deadline: January 6, 2026 at 4:00 p.m. (ET)** |

**DEBTORS' MOTION FOR AN ORDER (I) ENFORCING THE AUTOMATIC**
**STAY AND (II) IMPOSING SANCTIONS AGAINST RIGMORA**

The above-captioned debtors and debtors in possession (collectively, the "Debtors")
submit this *Motion for an Order (I) Enforcing the Automatic Stay and (II) Imposing Sanctions
Against Rigmora* (the "Motion"). In support of this Motion, the Debtors submit the *Declaration
of Eric D. Winston in Support of Debtors' Motion for an Order (I) Enforcing the Automatic Stay
and (II) Imposing Sanctions Against Rigmora* (the "Winston Declaration") filed concurrently
herewith and respectfully state as follows:

**PRELIMINARY STATEMENT**

1.      The Debtors commenced these seven chapter 11 cases (the "Chapter 11 Cases")
primarily because of the urgent need to preserve the Debtors' and their non-Debtor affiliates'
ongoing research and development of life-saving medications. This dire circumstance directly
flows from misconduct by Rigmora Biotech Investor One LP and Rigmora Biotech Investor Two
LP (collectively referred to as "Rigmora"), the subject of which the Delaware Chancery Court's

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification
number include: Apple Tree Life Sciences, Inc. (4506); ATP Life Science Ventures, L.P. (8224); ATP III GP,
Ltd. (6091); Apertor Pharmaceuticals, Inc. (3161); Initial Therapeutics, Inc. (2453); Marlinspike Therapeutics,
Inc. (4757); and Red Queen Therapeutics, Inc. (8563). The location of the Debtors' service address in these
chapter 11 cases is 230 Park Avenue, Suite 2800, New York, NY 10169.

decision of December 5, 2025 (the "<u>Delaware Chancery Judgment</u>") details at length.  *See* Docket No. 18 at Ex. B.

2.      The strict enforcement of the Bankruptcy Code's automatic stay—which went into effect immediately upon the filing of the Petitions—ensures that the Debtors can continue their vital mission and get a breathing spell from Rigmora's litigation gauntlet anywhere in the world. If Rigmora wants to take positions adverse to the Debtors, Rigmora can file whatever pleadings it wants in this Court to make its case.  Indeed, it already has—on December 12, 2025, Rigmora moved to dismiss [Docket No. 3] (the "<u>Dismissal Motion</u>") the chapter 11 cases of ATP Life Science Ventures, L.P. (the "<u>Partnership Debtor</u>"), Apple Tree Life Sciences, Inc. ("<u>ATLS</u>"), and ATP III GP, Ltd. ("<u>ATP III GP</u>," collectively with the Partnership Debtor and ATLS, the "<u>Management Debtors</u>"), asserting that the cases were filed in bad faith.  Rigmora alternatively requested this Court abstain in favor of a January 12, 2026, winding-up proceeding (the "<u>Existing Winding-Up Proceeding</u>") before the Grand Court of the Cayman Islands (the "<u>Cayman Court</u>") based on a petition Rigmora had filed in June 2025 (which asserted that the Partnership Debtor should be liquidated because Rigmora had "lost faith and confidence" in ATP III GP).

3.      Rigmora's submissions in this case seek to avoid this Court's jurisdiction in favor of moving forward with the Existing Winding-Up Proceeding.  As part of its unsuccessful play to shorten time on its Dismissal Motion, Rigmora pleaded with this Court on December 15, 2025 to lift the automatic stay to permit Rigmora to proceed with a "pre-trial review" (the "<u>PTR</u>") before the Cayman Court that had been previously scheduled on December 17, 2025, as the last procedural matter before the January 12 trial on Existing Winding-Up Proceeding.  This Court granted **limited** relief from stay:

> I will grant relief from stay for the pretrial conference to go forward
> in the Caymans on Wednesday. I don't know, it hasn't really been

> described to me what would be -- what substantively would go forward, what dates might be established by the court, or what's really left before the judge to decide before the January 12th trial date. So, the parties -- I think the parties and judge can discuss that, but I will say that I don't anticipate that the January trial date is going to go forward given the need for me to decide what was filed, which is a motion to dismiss.

Ex. F (December 15 Status Conference Transcript) 31:18-24.

4.    However, the transcript of the PTR shows that Rigmora far exceeded the limited relief from the stay that this Court provided.  As demonstrated below, Rigmora has proven itself incapable of complying with the automatic stay.  At the December 17 PTR, Rigmora did not limit its presentation (which lasted over one hour) to explaining to the Cayman Court that the Existing Winding-Up Proceeding could not proceed on January 12.   Nor did Rigmora limit itself to identifying what it intended to do before this Court.  Rather, Rigmora brazenly exceeded what this Court had permitted, including pronouncing that Rigmora would ***add a new*** basis for seeking a winding up of the Partnership Debtor to now include an assertion that ***the filing of chapter 11 by ATP III GP mandates the winding up of the Partnership Debtor (which itself is in chapter 11 and filed prior to ATP III GP) as a matter of Cayman Island law***, requesting the Cayman Court set a hearing in early February for this new relief,[2] and then specifically asking the Cayman Court to enter an order that granted such relief.  All along, Rigmora failed to inform the Cayman Court that section 541(c)(2) of the Bankruptcy Code expressly bars the very relief that Rigmora was hoping to have the Cayman Court grant.

5.    Rigmora knew that its gambit at the PTR implicated the automatic stay, and was inconsistent with what this Court granted, because before, during, and after the PTR, the Debtors'

---

[2]    After Rigmora first asked this Court for relief from stay—acknowledging its application to the PTR and the Existing Winding Up Proceeding.

counsel informed Rigmora's counsel that this conduct violated the automatic stay.  And knowing that its actions violated the automatic stay, Rigmora anticipated that its stay violations would be "weaponized" in Bankruptcy Court.  Ex. H (December 17 Cayman Hearing Transcript).  10:1-3 ("[N]othing that I'm saying to your Lordship today should be misrepresented or weaponised in Delaware").  Debtors' counsel then was forced to bring this conduct to this Court's attention later in the day at the December 17, 2025, hearing on first day motions (the "First Day Hearing").

6.     Rigmora did not care.  Every time it could have refrained, Rigmora moved ahead. And, even worse, Rigmora's submissions at the PTR resulted in the Cayman Court issuing a judgment *after* the December 17 PTR and this Court's First Day Hearing that heavily criticized the Debtors and its lead counsel for sending letters to Rigmora's counsel invoking automatic stay protections (using language that is common in chapter 11 cases that this Court sees every week). Rigmora's efforts to demonize the Debtors and their professionals in the Existing Winding-Up Proceeding, in violation of the automatic stay, have at least created substantial concerns of fairness for the Debtors should they need to return to the Cayman Court for any reason.

7.     For these reasons, the Debtors request the Court enter an appropriate order enforcing the stay against Rigmora by enjoining any further participation in the Existing Winding-Up Proceeding (or any proceeding in the Cayman Court) absent express and unambiguous prior order of this Court.

8.     Further, given the intentional, willful, and egregious nature of Rigmora's stay violations, the Debtors request that the Court award sanctions against Rigmora in the form of (a) attorney's fees incurred in connection with the PTR between December 15 and December 19 and the preparation of this Motion.  Such sanctions are narrowly tailored to deter any future efforts

by Rigmora to do things outside of this Court's purview or to abuse any limited relief this Court might grant.

## JURISDICTION AND VENUE

9.      The United States Bankruptcy Court for the District of Delaware (the "Court" or "Bankruptcy Court") has jurisdiction over these Chapter 11 Cases, the Debtors, property of the Debtors' estates, and this matter under 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated as of February 29, 2012.  This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A).

10.      Under Rule 9013-1(f) of the Local Rules of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), the Debtors consent to the entry of a final judgment or order with respect to this Motion.

11.      Venue of these cases in this District is proper under 28 U.S.C. §§ 1408 and 1409.

12.      The statutory bases for the relief requested in this motion are sections 105 and 362(a) of title 11 of the United States Code (the "Bankruptcy Code").

## BACKGROUND

13.      On December 9 and 15, 2025 (the "Petition Dates"), each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (the "Petitions").  A detailed description of the facts and circumstances of these Chapter 11 Cases is set forth in the *Declaration of Seth Harrison in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 18] (the "Harrison Declaration").

14.      As described in more detail in the Harrison Declaration, the Debtors commenced these Chapter 11 Cases because of Rigmora's breach of their contractual obligations to contribute capital in response to valid capital calls, and their attempts to wind up the Partnership Debtor through a forced liquidation to avoid the consequences of that breach, a tactic designed to destroy

the Partnership Debtor including its portfolio companies conducting vital research and development of life-saving drugs and therapies (the "Portfolio Companies").  Through these Chapter 11 Cases, the Debtors seek to stabilize their business, and, under the Court's supervision, restructure the Partnership Debtor's capital structure.

15.     Notably, on December 9, 2025, ATLS filed the first chapter 11 petition, then the Partnership Debtor, and finally ATP III GP.  Thus, to the extent it matters to any issue, the Partnership Debtor's estate formed, and had the benefit of the automatic stay, before ATP III GP filed its petition.

16.     The Debtors are operating their business and managing their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  On December 17, 2025, the Court entered an order [Docket No. 69] authorizing joint administration the Chapter 11 Cases. No request for the appointment of a trustee or examiner has been made in these Chapter 11 Cases, and no official committees have been appointed or designated.

A.    **The Debtors File Suit in Delaware to Enforce Rigmora's Contractual Obligations and Rigmora Files Retaliatory Proceedings in the Caymans.**

17.     In order to understand why Rigmora intentionally and willfully violated the automatic stay, a brief background leading up the PTR and Rigmora's actions relating thereto on December 17 follows.

18.     The prepetition relationship between the Debtors and Rigmora was governed by the *First Amended and Restated Limited Partnership Agreement* including its 22 amendments (the "LPA").  Formed in 2012, the Partnership Debtor operated successfully for many years as a venture capital firm in the life sciences.

19.     However, as further explained in the Harrison Declaration, in an email dated May 15, 2025, Rigmora refused to honor their contractual commitment to contribute capital to the

Partnership Debtor needed to operate seven of the Portfolio Companies engaged in the pre-clinical research of new therapies, and refused to discuss new budgets for four of the Portfolio Companies engaged in active clinical trials unless the Debtors agreed to shut down the pre-clinical companies. All of these Portfolio Companies are Delaware companies headquartered in the United States. The Rigmora's breach threatened the Debtors' continued operations and the jobs of more than 100 highly-talented scientists and researchers; therefore, on May 30, 2025, ATP III GP filed suit against Rigmora in the Delaware Chancery Court (the "Delaware Chancery Action"), seeking specific performance of Rigmora's duty to contribute capital in response to capital calls issued for the funding of Portfolio Companies with budgets that had previously been approved by Rigmora and to consider the approval of new budgets in good faith. ATP III GP simultaneously issued calls for the contribution of about $100 million in previously-committed capital.

20.     In response, Rigmora immediately began to engage in retaliatory litigation. The table below lists many of the relevant matters leading up to Delaware Chancery Judgment, both in the Cayman Court and in the Delaware Chancery Court.

| DATE | ACTION | COURT |
|------|--------|-------|
| May 30, 2025 | ATP III GP calls capital and commences Delaware Chancery Action seeking expedited trial | Delaware Chancery Court |
| June 2, 2025 | Rigmora files writ against ATP III GP seeking to invalidate the capital calls (the "Writ Proceeding") | Cayman Court |
| June 6, 2025 | Rigmora commences Existing Winding-Up Proceeding to wind up Partnership Debtor | Cayman Court |
| June 12, 2025 | Rigmora files an *ex parte* application seeking interlocutory remedies, including the entry of an injunction barring the Partnership from (i) taking any additional steps towards having Rigmora declared to be Defaulting Partners for their breaches of the LPA, and (ii) calling any additional capital. | Cayman Court |
| June 13, 2025 | Delaware Chancery Court grants request for expedited trial and sets trial date for September 18-19, 2025 | Delaware Chancery |

7

| June 20, 2025 | Cayman Court grants Rigmora's *ex parte* application for provisional relief | Cayman Court |
| June 27, 2025 | Delaware Chancery Court denies Rigmora's request to stay the Chancery Action proceeding in favor of the Cayman Court proceedings | Delaware Chancery |
| August 1, 2025 | Cayman Court sets January 12, 2026, trial date for the winding-up petition (the "<u>Winding-Up Petition</u>") | Cayman Court |
| September 16, 2025 | Upon Rigmora's application, Delaware Chancery Court delays trial to October 16 and 17, 2025 purportedly due to prejudice caused by late "roll-off" production of documents from Debtors' privilege log | Delaware Chancery Court |
| September 17, 2025 | Rigmora files an application to appoint joint provisional liquidators to displace ATP III GP citing documents from roll-off production and threatens to proceed *ex parte* on an urgent basis | Cayman Court |
| September 19, 2025 | ATP III GP files motion to maintain status quo | Delaware Chancery Court |
| September 19, 2025 | Delaware Chancery Court conducts status conference at which it states that it likely would not have adjourned the trial if it had known of Rigmora's plan to seek provisional liquidators[3] | Delaware Chancery Court |
| October 16-17, 2025 | Trial | Delaware Chancery Court |
| October 20, 2025 | Rigmora agrees to the withdrawal of application to appoint joint provisional liquidators in the Cayman Islands | Cayman Court |
| October 27, 2025 | Consent order entered withdrawing emergency application to appoint liquidators | Cayman Court |
| October 31, 2025 | Court sets December 17, 2025, for PTR for Winding-Up Petition and the Writ Proceeding | Cayman Court |
| November 21, 2025 | Post-trial arguments | Delaware Chancery Court |
| November 28, 2025 | Partnership Debtor seeks to restrain Rigmora from using privileged documents in the Existing Winding-Up Proceeding and the Writ Proceeding | Cayman Court |
| December 1, 2025 | Court denies Partnership Debtor's privileged document application | Cayman Court |

---

[3]    True and correct copies of the September 19 status quo motion and the September 19 hearing transcript are attached as **Exhibits A** and **B** to the Winston Declaration.

IMPAC - 12620132v.4

| December 3, 2025 | Partnership Debtor notifies Rigmora of intent to appeal privilege ruling | Cayman Court |

21.     On December 5, 2025, Delaware Chancellor Kathaleen McCormick issued a detailed written decision, finding in ATP III GP's favor with respect to the Rigmora's obligation to fund all but one of the May 30 capital calls.  The Delaware Chancery Court ordered specific performance of payment of nearly $97 million in capital calls for portfolio company budgets as well as the management expenses of ATP III GP.  The Delaware Chancery Court did not agree with the Debtors' contention that Rigmora had committed to contribute more than $2.425 billion in capital or that Rigmora owed a duty to negotiate new budgets in good faith.[4]  Key findings include:

- "ATP has proven by clear and convincing evidence that Rigmora must meet Capital Calls within approved portfolio company budgets."

- "There is no factual basis to question ATP's good faith."

- "No evidence suggests that anyone intended the performance milestones identified in the investment memoranda to serve as conditions to [Rigmora's] obligation to fund budgets that it approved."

- "On balance, the equities favor ATP.  [Rigmora has] the funds available to meet the Capital Calls.  Moreover, the portfolio companies are developing treatments for serious medical conditions, including childhood blindness, various cancers, obesity, and neurodegenerative diseases.  The public interest strongly favors preserving potentially life-saving research programs."

22.     The Delaware Chancery Court directed the parties to settle a form of order.

23.     In the meantime, Rigmora pressed ahead with the Existing Winding-Up Proceeding and Writ Proceeding, and the parties exchanged witness statements in the Cayman Proceedings on December 8, 2025.  The Partnership Debtor's witness principal statement described the Delaware

---

[4]     Specific performance is an equitable remedy, meaning that ATP III GP must have acted with clean hands.

Chancery Judgment. ███████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████████

**B.     The Management Debtors File Petitions for Chapter 11 Relief, Rigmora Files the Dismissal Motion, and this Court Grants Rigmora Limited Relief from the Automatic Stay.**

24.     On December 9, 2025, upon filing of the Petitions, the automatic stay went into effect for ATLS, the Partnership Debtor and ATP III GP.  In a letter to the Delaware Chancery Court dated December 10, 2025, concerning the form of order granting relief in the Delaware Chancery Action, Rigmora acknowledged that the automatic stay applied to Rigmora, but sought entry of an Order requiring that the $97 million it owed to the Debtors be escrowed instead of paying it directly to them.[5]  The letter also sought to tar the Debtors for seeking bankruptcy protection.  Debtors' counsel responded that it was improper to have the funds paid into escrow, but proposed an order providing that the funds be paid into a segregated account at the Partnership Debtor, and that use of the funds would be subject to this Court's oversight.  The Delaware Chancery Court agreed with the Debtors and entered their proposed form of order.

25.     ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

---

[5]     ████████████████████████████████████████████████████████████
████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████ █████████████████████████████████████████

███

26.    ████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████

27.    Late in the evening on December 13, 2025, Rigmora filed the Dismissal Motion, asserting that the chapter 11 cases of the Management Debtors had been filed in bad faith and this Court should dismiss or abstain in favor of the Existing Winding-Up Proceeding.  Rigmora did ***not*** assert that the Management Debtors were ineligible to be debtors.

28.    Rigmora also filed a motion to shorten time [Docket No. 5] ("Motion to Shorten"), requesting this Court to (i) hear the Dismissal Motion on an expedited schedule (by December 19, 2025), and (ii) allow the PTR on its Existing Winding-Up Proceeding in the Cayman Court to go forward.  This Court held a status conference regarding the Motion to Shorten on December 15, 2025.[8]  At that conference, Rigmora requested "relief from the automatic stay sufficient for that [PTR] to proceed as it would in the ordinary course."  December 15 Status Conference Tr. 6:4-6. Rigmora represented to this Court that it wanted to proceed with the PTR "update him as to what

---

█ ██████████████████████████████████████████████████████

█ ████████████████████████████████████.

[8]    A true and correct copy of the transcript of the December 15 Status Conference is attached as **Exhibit F** to the Winston Declaration.

IMPAC - 12620132v.4

has happened in this Court and what those filings have been made here." *Id.* at 6:9-13.  Rigmora did not inform the Court or the Debtors of its intent to put forth new arguments or to undermine the Bankruptcy Court's jurisdiction.  Rigmora did argue, without legal support, that the resolution of the Existing Winding-Up Proceeding "should come before anything that proceeds here in these Chapter 11 cases" and that the Bankruptcy Court's decisions concerning the Debtors' estate would be "subject to scrutiny of the Cayman Court." *Id.* at 19:9-10, 15-16.  However, even while displaying a fundamental misunderstanding of the Bankruptcy Court's authority, Rigmora still acknowledged that the automatic stay prohibited further litigation in the Cayman Court. *Id.* at 32: 22-25 ("Would it be more efficient for this Court, for Your Honor if we were to separate out our motion and move for now just to lift the automatic stay to permit the Cayman case to go forward…?").

29.    The Court denied Rigmora's Motion to Shorten, but, relying on Rigmora's representation that it intended to use the PTR in the Cayman Court only to "apprise the Cayman Judge as to the status of [the bankruptcy] proceedings and its potential impact on his proceedings," the Court granted Rigmora limited relief from the stay "for the pretrial conference itself to go forward, but **not any further than that at this point in time**." *Id.* at 32:14-16.  The Court further informed the parties that Court "[does not] anticipate that the January trial date is going to go forward." *Id.* at 31:25-32:1.

    **C.    Rigmora Violates the Automatic Stay by Presenting to, and Requesting Relief From, the Cayman Court Asserting a New Ground to Wind Up the Partnership Debtor.**

30.    ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████

31. 

32.     On December 17, 2025, counsel for the Debtors and Rigmora attended the previously scheduled PTR in the Cayman Court.  Rigmora made over an hour of argument to the Cayman Court in support of its new theory, which it termed the "Paragraph 10(b) Issues."[11]  This refers to paragraph 10(b) of the LPA (an *ipso facto* provision).  Paragraph 10(b) is not mentioned once in the Winding-Up Petition.

33.     Rigmora's counsel divided his argument into two parts: first counsel argued that ***as a result*** of the Debtors' bankruptcy filing, the "the Partnership Substratum is simply gone." December 17 Cayman Islands Hearing Tr. 16:4-20:15. This, of course, directly confirms that Rigmora's position is that ATP III GP's bankruptcy filing is the cause of the loss of Partnership Debtor property—a classic *ipso facto* circumstance and automatic stay violation against the Partnership Debtor.

34.     Then counsel proceeded to discuss Rigmora's "second topic," "the contractual and statutory consequences of the Chapter 11 proceedings…."  *Id.* at 21:16-18.  In the course of this

---

9 ████████████████████████████████████████████████

10 ███████████████████

11    A true and correct copy of the transcript of the December 17 Cayman Islands Hearing is attached as **Exhibit H** to the Winston Declaration.

IMPAC - 12620132v.4

argument, Rigmora's counsel made clear that though Rigmora understood the automatic stay to be in effect, Rigmora had no intention of complying with its restrictions.  Rigmora's counsel also sought cover for its actions, bizarrely asserting that Rigmora wanted to ensure that the automatic stay was not "weaponized" against Rigmora.  *Id.* 9:1-3.[12]

35.     Specifically, Rigmora's counsel made the following statements, among others, in blatant disregard of the constraints of the automatic stay and the Bankruptcy Court's authority:

- "[T]he commencement of the Chapter 11 proceedings in the circumstances of this case concedes that the substratum of the Partnership has now gone and that would be a sufficient basis for the court to wind up the Partnership on just and equitable grounds and to do so summarily."  December 17 Caymans Hearing Tr. 21:11-15.

- [Debtors' counsel] assert[ed] that the effect of what had happened in Delaware was to automatically stay these Cayman proceedings, such that the PTR and the January trial had to be vacated. Now, that is quite wrong as a matter of Cayman law…because it's a decision for the [Cayman Court] how to conduct these proceedings."  *Id.* at 26:1-7.

- "[T]he question is no longer whether the Partnership should be wound up…the question now is how and by whom the winding up should be conducted. Now, our preference is for a compulsory winding up order to be made."  *Id.* at 30:15-22.

- "The Chapter 11 stay is not a part of Cayman law. If it is to have effect in this jurisdiction, it would be as a result of a decision by your Lordship to exercise his own power to stay the proceedings."  *Id.* at 33:18-21.

- "All there is at this stage is the institution of [U.S. Bankruptcy] proceedings. That does not result in an automatic stay under Cayman law. The question is instead a matter for your Lordship's discretionary decision taking account of all the circumstances."  *Id.* at 37:10-13.

36.     When it was the Debtors' turn to speak, Debtors' counsel reinforced to the Cayman Court that the automatic stay was in effect and applied to the Existing Winding-Up Proceeding.

---

[12]    It is bizarre because the automatic stay cannot be "weaponized" against any person by a debtor; it applies automatically by act of Congress and acts taken in violation of it are deemed void.  *See Maritime Elec. Co., Inc. v. United Jersey Bank*, 959 F.2d 1194, 1206 (1991) ("Absent relief from the stay, judicial actions and proceedings against the debtor are void *ab initio*).

*Id.* at 39:15-22.  The Cayman Court agreed.  *Id.* at 42:7-13 ("[F]rom my point of view, the January trial is clearly not going ahead, both because of the consequences of the Delaware trial and also because of the Chapter 11 process.").   In reply, Rigmora's counsel attempted to defend their submissions as not violative of the automatic stay, *id.* at 50:3-11, but then proceeded to ***ask the Cayman Court for relief associated with its new theory and asked the Cayman Court to "reserve costs"***!  *Id.* at 56:14-15.

37.   

38.      At the First Day Hearing held before this Court later on the same day, the Debtors raised Rigmora's egregious violation of the automatic stay, filing as soon as they could the preliminary transcript of the PTR hearing in the Cayman Court hours earlier.[14]  In further disregard for the Bankruptcy Court's authority, Rigmora's counsel proceeded to entirely misrepresent its actions to the Bankruptcy Court.  Well aware that the Bankruptcy Court had the benefit of a transcript of the PTR directly contradicting Rigmora's story, Rigmora characterized its behavior

---

[13] ███████████████████████████████████████

[14]   A true and correct copy of the transcript of the First Day Hearing is attached as **Exhibit L** to the Winston Declaration.

IMPAC - 12620132v.4

as merely "flagg[ing] the change in circumstance occasioned by the GP's filing here in the Bankruptcy Court." First Day Hearing Tr. 26:18-19. It further represented that "***the bulk of the time*** that Rigmora's counsel spent in the Cayman proceedings was updating the Cayman Court as to the outcome of the Delaware Chancery proceeding." *Id.* at 25:2-5 (emphasis added). That representation is false, and as clearly displayed in the transcript, Rigmora counsel spent over an hour affirmatively arguing that the Debtors' Chapter 11 Cases justify the Cayman Court exercising control over the Debtors' estates by immediately winding up the Debtors' operations.

39.     The consequence of Rigmora's violations of the stay occurred on December 22, 2025, when the Cayman Court handed down its judgment arising from the December 17, 2025, PTR. That judgment ***criticizes*** the Debtors and counsel before this Court on all sorts of matters entirely irrelevant to the PTR. *See* Ex. K.[15]

### RELIEF REQUESTED

40.     The Debtors request entry of an order enforcing the automatic stay against Rigmora under Bankruptcy Code sections 105 and 362. Rigmora has repeatedly violated the automatic stay by continuing prepetition litigation, seeking to exercise control over property of the Debtors' estates, and by advocating for the immediate winding-up of the Partnership Debtor as the result of a bankruptcy filing. Considering the aggressive positions Rigmora has taken over the last week, the Court should enter an order (a) declaring the actions taken to have violated the automatic stay, and (b) enforcing the stay against Rigmora and reserving all rights of the Debtors. Additionally, the Court should ensure future compliance with the automatic stay and its orders by ordering further sanctions against Rigmora.

---

[15]     For example, the judgment speculates that counsel for the Debtors must have been drafting the First Day Declaration on December 8 and 9, which had nothing to do with the PTR and yet everything to do with Rigmora's hour-long argument at the PTR seeking to taint the Debtors for daring to seek chapter 11 protection.

16

41.    The Debtors may proceed by motion because they are not seeking to obtain an injunction; rather, they seek to enforce an existing injunction—the automatic stay.  The Debtors therefore do not need to file an adversary proceeding to obtain the relief sought in this Motion. *See, e.g.*, *In re Cont'l Airlines, Inc.*, 236 B.R. 318, 327 (Bankr. D. Del. 1999), *aff'd sub nom. In re Cont'l Airlines*, No. 90-932, 2000 WL 1425751 (D. Del. Sept. 12, 2000), *aff'd sub nom. In re Cont'l Airlines, Inc.*, 279 F.3d 226 (3d Cir. 2002) ("In this case, Continental is not seeking an injunction, it is merely seeking to enforce an injunction already in place."); *see also In re Cenargo Int'l, PLC*, 294 B.R. 571, 587 (Bankr. S.D.N.Y. 2003) (citing *Stonington Partners, Inc. v. Lernout & Hauspie Speech Prods. N.V.*, 310 F.3d 118 (3d Cir. 2002)) ("[T]his Circuit, like others that have reached the issue, holds that a U.S. court should act 'in order to protect its own jurisdiction.'").

## BASIS FOR RELIEF

### A.    Rigmora's Actions at the Cayman Court Hearing Constitute a Wilful Violation of the Automatic Stay.

42.     Upon the filing of a bankruptcy petition, Bankruptcy Code section 362 automatically operates as a stay, applicable to all entities of, among other things:

> (1)    the commencement or continuation, including the issuance or process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title;
>
> (3)    any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate;
>
> (6)    any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title;

11 U.S.C. § 362(a)(1), (3), (6).  The automatic stay imposed by section 362 of the Bankruptcy Code is one of the most fundamental protections afforded to a debtor.  *See Midlantic Nat'l Bank v. N.J. Dep't of Envt'l Prot.*, 474 U.S. 494, 503 (1986); *In re Nortel Networks, Inc.*, 669 F.3d 128,

137 (3d Cir. 2011). The automatic stay is designed to give the debtor a "breathing spell" that shields it from creditor harassment at a time when the debtor should be focusing on restructuring. *See Taylor v. Slick*, 178 F.3d 698, 702 (3d Cir. 1999), cert. denied, 528 U.S. 1079 (2000); *see also In re Computer Commc'ns, Inc.*, 824 F.2d 725, 731 (9th Cir. 1987) (the automatic stay is designed "to protect debtors and creditors from piecemeal dismemberment of the debtor's estate.").

43.     The automatic stay broadly extends to all matters which may have an effect on a debtor's estate, enabling bankruptcy courts to ensure that debtors have the opportunity to rehabilitate and reorganize their operation. *See Manville Corp. v. Equity Sec. Holders Comm. (In re Johns-Manville Corp.)*, 801 F.2d 60, 62-64 (2d Cir. 1986); *see also Fid. Mortgage Investors v. Camelia Builders, Inc.*, 550 F.2d 47, 53 (2d Cir. 1976) ("Such jurisdiction is 'necessary to exclude any interference by the acts of others or by proceedings in other courts where such activities or proceedings tend to hinder the process of reorganization.'") (citation omitted). Indeed, the automatic stay is "undeniably broad" and encompasses "all legal obligations of the debtor, no matter how remote or contingent." *In re Baldwin-United Corp.*, 57 B.R. 759, 763-64 (S.D. Ohio 1985) (quoting H.R. Rep. No. 595, 95th Cong., 2d Sess. 309).

44.     It is settled law that the automatic stay applies worldwide and prohibits parties from running to foreign courts to seek relief against a debtor or debtor's property. As the Third Circuit has explained, "since 1987, United States courts have uniformly upheld the extraterritorial application of the automatic stay." *In re Nortel Networks, Inc.*, 669 F.3d 128, 138 (quoting David P. Stromes, *Note, The Extraterritorial Reach of the Bankruptcy Code's Automatic Stay: Theory vs. Practice*, 33 BROOK J. INT'L. L. 277, 281 (2007)) (noting that "[i]n the absence of an exception, the plain language of the automatic stay covers Appellants' participation in the U.K. proceedings because the U.K. proceedings are an attempt to 'assess' a claim against the Debtors

that arose pre-petition.").  And numerous other courts have affirmed that "the automatic stay applies extraterritorially."  *Nakash v. Zur (In re Nakash),* 190 B.R. 763, 768 (Bankr. S.D.N.Y. 1996)*; In re Elcoteq, Inc.*, 521 B.R. 189. 199 (Bankr. N.D. Tex. 2014); *see In re Rimsat, Ltd.*, 98 F.3d 956, 961 (7th Cir. 1996) ("The mere existence of a foreign proceeding affecting the debtor does not . . . invalidate the stay by giving it an impermissible extraterritorial reach.").

45.    Bankruptcy Code section 541(a) provides that the commencement of a case creates an estate comprising "all legal and equitable interests of the debtor in property as of the commencement of the case."  11 U.S.C. § 541(a); *In re NDEP Constr.*, 193 B.R. 710, 712 (Bankr. D. Del. 1995) ("Under Section 541 of the Code, [debtor's] bankruptcy filing [] created an estate composed of all [debtor's] legal or equitable interests as of the commencement of the case wherever located and by whomever held.").  The term "property of the estate" has been broadly interpreted to include "all kinds of property, including tangible or intangible property, causes of action…and all other forms of property..."  *Feiler v. Sims* (*In re Feiler*), 218 F.3d 948, 956 (9th Cir. 2000); *Westmoreland Human Opportunities, Inc. v. Walsh,* 246 F.3d 233, 241 (3d Cir. 2001) ("§ 541(a)'s legislative history demonstrates that the language of this provision was intended to sweep broadly to include all kinds of property, including tangible or intangible property, causes of action ... and all other forms of property currently specified in section 70a of the Bankruptcy Act.") (internal quotations omitted).

46.    Bankruptcy Code sections 541(a) and 362(a) work together because the automatic stay prohibits litigation to obtain possession or control of the estate's property "regardless of where such litigation is commenced."  *In re Nakash*, 190 B.R. at 768; *In re Elcoteq, Inc.*, 521 B.R. at 199.

47.    Not surprisingly, bankruptcy courts have repeatedly found that seeking relief under foreign insolvency laws or taking actions in foreign insolvency proceedings violates the automatic

stay.  *See, e.g.*, *In re Soundview Elite, Ltd.*, 503 B.R. 571, 584 (Bankr. S.D.N.Y. 2014) (staying

Cayman Islands proceeding); *Sec. Investor Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec., LLC*,

474 B.R. 76, 84 (S.D.N.Y. 2012)(holding that a proceeding initiated in the Cayman Islands by a

transferee seeking a determination of whether the transferee was required to return certain transfers

was an act "to exercise control over property of the estate in violation 11 U.S.C. § 362(a)(3)"); *In*

*re Nakash*, 190 B.R. at 769 (holding that an Israeli receiver's filing of a motion requesting a

Jerusalem Court to instruct the Israeli receiver to file a second involuntary petition against the

debtor and then filing of a second involuntary petition in Israel after the chapter 11 petitions had

been filed in the United States was a *prima facie* violation of the stay); *In re Rimsat, Ltd.*, 98 F.3d

956, 961 (7th Cir. 1996) ("By going back to the Nevis court for an order enlarging his powers over

the assets of the debtor he violated the automatic stay of proceedings relating to the debtor's estate

that went into effect when the bankruptcy petition was filed.").

48.    Despite representing otherwise to the Cayman Court, Rigmora cannot dispute that

the automatic stay applies to the Existing Winding-Up Proceeding, the writ proceeding, and any

future proceedings in the Cayman Court, which Rigmora has acknowledged in its application

numerous times, including at the December 17 PTR hearing.  Continued litigation in the Cayman

Ciyrt violates the automatic stay's restriction against continued litigation outside of the Bankruptcy

Court, and it impermissibly seeks to control the Debtors' estates by disposing of Debtor assets.

This Court can and should address Rigmora's violations of the automatic stay, regardless of where

those violations occur.

**B.    Rigmora's Actions Before, During, and After the December 17 PTR Hearing Constitute a Wilful Violation of the Automatic Stay.**

49.    Apparently hoping to provide some cover for its violations, Rigmora repeatedly

assured the Cayman Court that its actions did not violate the automatic stay, even as it made

submissions that did precisely that.  Those statements should not be given credence and only serve to highlight that Rigmora was well aware that its actions would be viewed as a violation of the stay by both the Debtors and this Court.

50.     Rigmora's actions constitute a willful violation of the automatic stay because counsel to the Debtors has repeatedly notified Rigmora of the Debtors' bankruptcy cases and the effect of the automatic stay, and Rigmora has repeatedly acknowledged that the automatic stay is in effect.  Moreover, this Court explicitly told Rigmora that its actions were subject to the automatic stay's restrictions and outlined the narrow scope of the Court's relief from the stay.

51.     In a case directly on point, *In re Soundview Elite, Ltd.*, the bankruptcy court considered an eerily similar situation.  503 B.R. 571 (Bankr. S.D.N.Y. 2014).  There, the court considered whether creditors' decision to litigate postpetition a prepetition winding-up proceeding in the Cayman Islands violated the automatic stay.  The court found the automatic stay had been violated, explaining that the creditors violated the automatic stay by "act[ing] as if they could continue with business as usual even after they knew to a certainty that the U.S. bankruptcy case had been filed."  *Id.* at 586.  The court further noted that, "the further proceedings in the [Cayman Court] were, from the perspective of U.S. law, in violation of the stay and thus void" and that this conclusion was "not at all debatable or close."  *Id.* at 584.

52.     Here, Rigmora's behavior warrants even stronger condemnation because it and its counsel had prior notice that any attempts to litigate the Existing Winding-Up Proceeding—aside from informing the Cayman Court at the PTR of the bankruptcy cases and their effect on the January 12 trial ***not*** proceeding—would violate the stay.  They received this notice from both the Debtors and the Court, which explicitly informed the parties of the limited purpose for which it allowed the PTR to go forward.

53.     Even worse, Rigmora went well beyond any "informing" the Cayman Court of the effect of the automatic stay on the Existing Winding-Up Proceeding by offering a new theory to wind up the Partnership Debtor which it argued should be determined as a preliminary issue at a two-day hearing prior to the determination of the rest of the Winding-Up Petition thereafter, if required.

54.     That is precisely why counsel asked for, and the Cayman Court agreed to, set aside only two days for a trial, in early February, even though this Court said the January 12 trial was not going forward and the Dismissal Motion has not even been set for hearing or a briefing schedule established.  Indeed, counsel for Rigmora must have realized this because he specifically asked for directions whether he should submit new papers or "amend" the Existing Winding-Up Proceeding to add the new theory.  Either way, it violated the automatic stay.

55.     Even if Rigmora claims it did not intend to violate the automatic stay, its actions would still constitute a willful violation.  "Willfulness does not require that the creditor intend to violate the automatic stay provision, rather it requires that the acts which violate the stay be intentional."  *In re Denby-Peterson*, 941 F.3d 115, 123 (3d Cir. 2019) (quoting *In re Lansdale Family Rests., Inc.*, 977 F.2d 826, 829 (3d Cir. 1992)).  Rigmora willfully violated the automatic stay when it acted with knowledge that the Petitions had been filed.

**C.     The Court Should Declare the Actions Taken Violated the Automatic Stay and Enjoin Rigmora from Further Participation in the Cayman Proceedings.**

56.     As in all bankruptcy cases, the success of the Debtors' restructuring depends on the Debtors' ability to manage their estates subject to the exclusive jurisdiction of the Bankruptcy Court.  *See* 11 U.S.C. § 541(a).  The Debtors, as debtors-in-possession, must be able to control their assets wherever located.  *In re NDEP Corp.*, 193 B.R. 710, 712 (Bankr. D. Del. 1995) ("Under [s]ection 541 of the Code, [debtor's] bankruptcy filing [] created an estate composed of all

[debtor's] legal or equitable interests as of the commencement of the case wherever located and by whomever held.").

57.    In this case, the Debtors' successful restructuring requires that Rigmora be prevented from using the Existing Winding-Up Proceedings to dissipate Debtor assets.  Rigmora has proven itself unwilling to follow the Court's instructions with respect to the Existing Wind-Up Proceedings, despite many "off-ramps" provided by the Debtors to avoid the need to file this very motion.

58.    As a result, to facilitate a successful restructuring, this Court should do two things to send a clear message that what occurred was wrongful:  First, it should find that the actions taken by Rigmora violated the automatic stay, and all actions resulting therefrom are void.  Second, it should expressly enjoin Rigmora and its counsel from further attempts to proceed with litigation anywhere else but this Court or to exercise any control over the Debtors' estates.  This relief obviously should not be needed given the automatic stay already provides it, but having a court order specifically aimed at Rigmora and its counsel now is necessary.

**D.    The Court Should Award Contempt Sanctions.**

59.    Rigmora's behavior warrants an award of attorney's fees as well as punitive sanctions.  In *Soundview*, the debtors also sought contempt sanctions, and the court agreed that the creditors actions warranted sanctions but utilized its discretion to give the offending creditors an opportunity to comply with the automatic stay going forward.  *Soundview*, 503 B.R. 571, at 588.  However, the court reserved the right to implement sanctions if the violations of the automatic stay continued.  *Id.*

60.    The willful and egregious nature of Rigmora's actions means that the benefit of the doubt given by the court in *Soundview* would not apply here.  There is no question that Rigmora's actions were willful and deliberate and warrant sanctions.  *In re Atl. Bus. & Cmty. Corp.*, 901 F.2d

23

325, 329 (3d Cir. 1990) (upholding award of punitive damages, attorney's fees and costs for

violation of the automatic stay); *In re Odom*, 570 B.R. 718, 722 (Bankr. E.D. Pa. 2017) (quoting

*Univ. Med. Ctr. v. Sullivan*, 122 B.R. 919, 932 (E.D. Pa. 1990), *aff'd sub nom. In re Univ. Med.*

*Ctr.*, 973 F.2d 1065 (3d Cir. 1992) ("As a remedial measure, civil contempt sanctions are imposed

whether or not the offending party acted in good faith or without willfulness or a specific intent to

violate a court order.").  Counsel expressly advocated that the automatic stay is not a part of

Cayman Islands law[16]  and asked the Cayman Court to list a further two-day hearing. Counsel

encouraged the Cayman Court to treat the Debtors' decision to commence these Chapter 11 Cases

and to notify Rigmora of the automatic stay (and the severe consequences for violating it) as

somehow wrong, leading to the December 19 judgment.[17]

61.    The need to both redress the resources the Debtors have been forced to expend

addressing Rigmora's violation and deter Rigmora's continued interference with the Debtors'

estate makes both compensatory and punitive sanctions necessary.  *In re Cenargo Int'l, PLC*, 294

B.R. 571, 597 (Bankr. S.D.N.Y. 2003) ("[T]he automatic stay ensures that such decisions

[regarding a debtor's estate] are considered in an orderly way, on notice, and with the presumption

that parties who have violated the stay will not necessarily obtain the benefits of such violation

and might, indeed, be punished for it.  The rationale for this process would not need to be stated

---

[16]    Ex. H (Transcript of December 17 PTR Hearing) 37:10-18 ("That does not result in an automatic stay under
Cayman law. The question is instead a matter for your Lordship's discretionary decision taking account of all the
circumstances. And we do say the appropriate and the fair and just exercise of [the Cayman Court's] discretion is
the one that we propose, whereby we try to do something useful in January that will assist all concerned in relation
to progressing the orderly winding up of this Partnership"); ("[Debtors' counsel] assert[ed] that the effect of what
had happened in Delaware was to automatically stay these Cayman proceedings, such that the PTR and the
January trial had to be vacated. Now, that is quite wrong…because it's a decision for the [Cayman Court] how to
conduct these proceedings."); Ex. G (Rigmora Skeleton Brief) ("The Chapter 11 Bankruptcy Proceedings have
not triggered an "automatic stay" of these Cayman Proceedings").

[17]    *See* Ex. H 26:1-22 ("[Cayman Court] will no doubt have formed his own view on the appropriateness of a US law
firm writing personally to a Cayman attorney, threatening him with severe consequences in the event of any
knowing violation of the automatic stay.").

24

in a routine chapter 11 case, so deeply ingrained is the principle that the automatic stay is the cornerstone of the Bankruptcy Code.")

## **NOTICE**

62.     Notice of this Motion will be provided to: (a) Rigmora and its counsel; (b) the Office of the United States Trustee; (c) the Office of the United States Attorney for the District of Delaware; (d) each of the parties included on the Debtors' consolidated top 30 creditors list; (e) the Internal Revenue Service; (f) the attorney general for each state in which the Debtors operate; and (g) any party that has requested notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

[*Remainder of Page Intentionally Left Blank*]

WHEREFORE, the Debtors respectfully request that the Court enter an order, substantially in the form of the Proposed Order attached hereto as **Exhibit A**, granting the relief requested in this Motion, and granting such other and further relief to the Debtors as the Court may deem just and proper.

Dated: December 31, 2025
        Wilmington, Delaware

Respectfully submitted,

*/s/ L. Katherine Good*

Andrew M. Berdon, Esq. (admitted *pro hac vice*)
Patricia B. Tomasco, Esq. (admitted *pro hac vice*)
Rachel E. Epstein, Esq. (admitted *pro hac vice*)
Alain Jaquet, Esq. (admitted *pro hac vice*)
Rachel Harrington, Esq. (admitted *pro hac vice*)
**QUINN EMANUEL URQUHART
& SULLIVAN, LLP**
295 5th Avenue, 9th Floor
New York, New York 10016
Telephone: (212) 849-7000
Facsimile:  (212) 849-7100
Email: andrewberdon@quinnemanuel.com
        pattytomasco@quinnemanuel.com
        rachelepstein@quinnemanuel.com
        alainjaquet@quinnemanuel.com
        rachelharrington@quinnemanuel.com

L. Katherine Good (No. 5101)
Brett M. Haywood (No. 6166)
Shannon A. Forshay (No. 7293)
Ethan H. Sulik (No. 7270)
**POTTER ANDERSON & CORROON LLP**
1313 N. Market Street, 6th Floor
Wilmington, Delaware 19801
Telephone: (302) 984-6000
Facsimile:  (302) 658-1192
Email: kgood@potteranderson.com
        bhaywood@potteranderson.com
        sforshay@potteranderson.com
        esulik@potteranderson.com

-and-

Eric D. Winston, Esq. (admitted *pro hac vice*)
Razmig Izakelian, Esq. (admitted *pro hac vice*)
Ben Roth, Esq. (admitted *pro hac vice*)
**QUINN EMANUEL URQUHART
& SULLIVAN, LLP**
865 S. Figueroa Street, 10th Floor
Los Angeles, California 90017
Telephone: (213) 443-3000
Facsimile:  (213) 443-3100
Email: ericwinston@quinnemanuel.com
        razmigizakelian@quinnemanuel.com
        benroth@quinnemanuel.com

*Proposed Counsel to the Debtors and Debtors in Possession*

IMPAC - 12620132v.4