## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Apple Tree Life Sciences, Inc., *et al.*,[1] | Case No. 25-12177 (LSS) |
| Debtors. | (Jointly Administered) |
| | **Objection Deadline: January 20, 2026 at 4:00 p.m. (ET)**<br>**Hearing Date: January 27, 2026 at 10:00 a.m. (ET)** |

## MOTION OF RIGMORA BIOTECH INVESTOR ONE LP AND RIGMORA BIOTECH INVESTOR TWO LP FOR RELIEF FROM THE AUTOMATIC STAY

Parties in interest Rigmora Biotech Investor One LP, by its general partner Unicorn Biotech Ventures One Ltd, and Rigmora Biotech Investor Two LP, by its general partner Unicorn Biotech Ventures Two Ltd (collectively, the "**LPs**"), hereby move for an order granting relief from the automatic stay in the cases of debtors ATP Life Science Ventures, L.P. (the "**Fund**") and ATP III GP, Ltd. (the "**GP**"), to the extent necessary to permit the parties to proceed to trial in the case titled *In the Matter of ATP Life Science Ventures, L.P.*, Cause No FSD 151 of 2025 (JAJ) (the "**Cayman Trial**") before Hon. Justice Jalil Asif KC in the Grand Court of the Cayman Islands (the "**Cayman Court**"), as set forth in the proposed order attached as **Exhibit A**, and granting such other and further relief as may be just and proper.  In support of the Motion, the LPs submit the *Declaration of Mark Phillips KC in Support of Motion of Rigmora Biotech Investor One LP and*

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number include: Apple Tree Life Sciences, Inc. (4506); ATP Life Science Ventures, L.P. (8224); ATP III GP, Ltd. (6091); Apertor Pharmaceuticals, Inc. (3161); Initial Therapeutics, Inc. (2453); Marlinspike Therapeutics, Inc. (4757); and Red Queen Therapeutics, Inc. (8563). The location of the Debtors' service address in these chapter 11 cases is 230 Park Avenue, Suite 2800, New York, NY 10169.

*Rigmora Biotech Investor Two LP for Relief from the Automatic Stay* ("**Phillips Decl.**"), filed contemporaneously herewith.

## JURISDICTION AND VENUE

1.      The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      Pursuant to Rule 9013-1(f) of the Local Rules of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**"), the LPs consent to entry of a final order by the Court in connection with this Motion to the extent it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.[2]

3.      The bases for the relief requested herein are section 362(d) of title 11 of the United States Code (the "**Bankruptcy Code**"), Rule 4001 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Local Rule 4001-1.

## PRELIMINARY STATEMENT

4.      These cases were filed by the GP and the Fund (the "**Fund-Level Debtors**") mere weeks before a January 2026 trial in the Cayman Court.  The Cayman Trial was set to resolve a June 2025 petition by the LPs—who have contributed roughly 98% of the Fund's capital—seeking

---

[2]    Nothing in this motion shall constitute a waiver of any argument that the courts of the Cayman Islands have exclusive or concurrent jurisdiction to adjudicate the matters in the Cayman Islands proceedings, that this Court lacks jurisdiction to adjudicate those matters, that these bankruptcy cases should be dismissed as to the GP and the Fund, and that the Fund is not a proper debtor in this Court; nor shall the motion be construed as a submission to the jurisdiction of the Court; and all rights and remedies of the LPs are expressly reserved.

to replace the GP with court-appointed fiduciaries on the grounds (among others) that the LPs had lost all "trust and confidence" in the GP.  The LPs seek relief from the automatic stay to allow the Cayman Trial to go forward to resolve fundamental questions of Cayman law and Fund governance.

5.     That two-party trial in the Cayman Court was set to begin on January 12, 2026.  It would have resolved the LPs' June 2025 petition alleging that under governing Cayman law, the GP must be replaced with court-appointed fiduciaries, who would be responsible for maximizing the value of the Fund's investments.  The LPs alleged that they had justifiably lost all "trust and confidence" in the GP and that the "substratum" of the partnership had ceased to exist, meaning that it had "become impractical, if not actually impossible" for the Fund to carry on "in accordance with the reasonable expectations of its" partners under the current arrangement.[3]  In those circumstances, under Cayman law, the GP should "step aside" and allow independent scrutiny. The Cayman Court warned in a November judgment that Cayman precedent does not countenance managers who "cling to office" over their investors' objection, because they appear to be motivated by self-interest at best, "or the desire to forestall independent investigation into suspect dealings at worst."[4]  The Cayman Court remarked that there is "a real danger that the general partner is failing to heed" that precedent here.[5]

---

[3]    Ex. B, Cayman Amended Winding-Up Petition, Nov. 21, 2025 ("Amended Winding-Up Petition") ¶¶ 25–26, 66–67; Ex. C, *Re Belmont Asset Based Lending Ltd* [2010] CIGC J0121-2 at [13]; Phillips Decl. ¶ 98.

[4]    Ex. E, *In Re ATP Life Science Ventures LP* [2025] CIGC (FSD) 106 ("Cayman Judgment, Nov. 6, 2025") at [44]; Ex. D, *In Re One Thousand & One Voices Africa Fund I LP*, KY 2024 GC 62, 9 May 2024 at [46].

[5]    Ex. E, Cayman Judgment, Nov. 6, 2025 ¶ 44.

6.    Because this GP refused to heed that guidance and step aside, the LPs must resort to the Cayman Court to change the trustees and managers of the Fund assets (which as set out below are held on trust for the LPs).  The Cayman Trial is what is known as a "winding-up proceeding," and it is the kind of litigation a limited partner in a Cayman Islands exempted limited partnership ("**ELP**") like the Fund may bring to unwind the partnership when, among other things, it is irretrievably broken.  The Cayman Court considers whether the GP must, as a matter of law, be replaced and independent fiduciaries appointed to wind up the partnership in its current form. Contrary to what the GP has suggested, this does not necessarily mean that the Fund's portfolio companies will be liquidated or sold off in a fire sale; rather, it means that the Fund will have new, independent, trustworthy fiduciaries, subject to judicial oversight and charged with maximizing the value of the Fund.  Ultimately, it is a determination of Fund governance, not fundamentally different in kind from the corporate governance determinations made in a shareholders' meeting. By filing for chapter 11, the GP is not just improperly "clinging to office" but misusing this Court's automatic stay to avoid the Cayman Court's scrutiny and the mechanism for oversight of Fund governance that the Cayman Trial would provide.

7.    If relief is granted, the Cayman Court stands ready to resolve this governance dispute in a short trial of two days in February.  Justice Asif has postponed the January trial dates in deference to this Court and its automatic stay, Ex. F, *Unicorn Biotech Ventures One Ltd v ATP III GP Ltd (No. 4)* [2025] CIGC (FSD) 124 ("Cayman Judgment, Dec. 22, 2025") ¶¶ 9–10, but is holding time on his calendar for the February dates.  Justice Asif is deeply familiar with both the law and the facts in this case, having held numerous hearings, taken evidence and issued interim judgments over the course of the last six months, and the Cayman Court has exclusive jurisdiction to determine certain of the Cayman law questions before it.  Although Justice Asif has taken

parallel Delaware Chancery proceedings into account throughout that case and adjourned the trial due to these chapter 11 cases, he has fairly asked that the stay be lifted to allow his own trial to proceed.  Justice Asif observed that he, too, has a role to play, and that it "seems to me that it would be of real utility for the Delaware judge . . . to determine that the limited issues that the LPs wish to put before the Grand Court for determination should be excluded from the scope of the automatic stay so that a determination on those issues can be made."  *Id.* ¶ 19.

8.      This Court should grant that request and modify the stay to allow the Cayman Trial to promptly proceed.  The three factors that this Court has weighed when deciding whether to grant relief from the automatic stay all heavily favor relief: (i) there will be no "great prejudice" to the estate or the Debtor from continuation of a suit in another court; (ii) the hardship to the party seeking relief far outweighs any hardship to the debtor, and (iii) the LPs are likely to succeed on the merits in the underlying suit.  And, because a foreign winding-up proceeding is involved, comity also weighs in favor of relief.

9.      ***First***, lifting the stay will not cause any "great prejudice" to the Fund-Level Debtors: they are "debtors" in name only, with no funded debt and negligible operating debts balanced by over $100 million in cash on hand and billions of dollars in non-cash assets held in trust for the Fund's LPs.  They do not and cannot make any credible allegation of financial distress.  They claimed that they feared the LPs would not pay the nearly $100 million judgment for capital calls that the GP had issued minutes before filing its complaint in the Court of Chancery, but a quick look at the timeline shows how implausible that allegation is.  The Court of Chancery issued its post-trial opinion on Friday, December 5.  On Monday, December 8, the LPs reached out to the GP, via counsel, and proposed to pay within ten days of the Court's final order.  The very next day, Tuesday, December 9, without seeking swifter payment and with no credible reason to doubt

payment would come, the GP and the Fund filed these chapter 11 cases.  The LPs have now paid the judgment in full in cash, on December 22, 2025, five days before it was due.

10.    That is, the GP filed for bankruptcy days after obtaining a nearly $100 million judgment, which has been paid, in full and in cash, and added to the more than $2.3 billion that the LPs had already invested in the Fund, which the GP claims is now worth more than twice that amount.  The present bankruptcy cases have not been brought because of concerns about financial distress.  They have been brought because, despite making an order requiring the LPs to pay almost $100 million to the Fund, Chancellor McCormick refused to make the orders that the GP *really* wanted—orders that would have enabled the GP to use the Fund's capital in accordance with its own whims and without regard to the LPs' budget approval rights under the limited partnership agreement that governs the Fund (the "**LPA**").

11.    In all, the LPs have contributed approximately 98% of the capital of the Fund and on any view, their investment is now worth billions of dollars.  That means that for the Fund-Level Debtors, these cases have nothing to do with financial distress or managing liabilities, and everything to do with the GP's desire to maintain control over investments that the GP *holds on trust for the benefit of the LPs*, whose capital funded those investments.  The GP is right to fear that the Cayman Trial almost certainly will result in its replacement as the trustee and manager of those assets, but that is the legally-mandated and appropriate result (not to mention being consistent with the GP's fiduciary duties to the Fund's investors), and as such cannot be a source of "prejudice."  Nor is there any prejudice from the mere act of proceeding to trial; the parties have completed one trial on an expedited schedule already, in the Court of Chancery, and were on the verge of another when the GP balked.  There is no possible suggestion that the Cayman Court is not a fair or adequate forum.  A two-day hearing in the Cayman Islands in February is no hardship,

and it should not be a problem for the GP to address the critical issue of who is legally authorized to manage billions of dollars of biotech investments.

12.    The issues for trial in the Cayman Court are straightforward.  The Cayman Court would decide whether the Fund should be wound up, how it should be wound up (voluntarily or under an order for compulsory winding-up), and by whom it should be wound up (the GP or independent officers of the Cayman Court, for which role the LPs have proposed two professionals from Alvarez & Marsal).  Among other things, the Cayman Court would determine whether, as a matter of Cayman law, the bankruptcy petition filed by the GP on December 9, 2025 constituted the first step in a *voluntary* winding-up of the Fund under Cayman law.  If so, the GP does not presently have authority as a matter of applicable non-bankruptcy law to proceed with the Fund's chapter 11 case, and any post-petition disposition of the Fund's assets and alteration of the LPs' interests will be subject to subsequent invalidation by the Cayman Court.  The Cayman Court also would determine whether, as a result of the Court of Chancery judgment and compounded by the GP's assertions in these chapter 11 cases and its admitted purpose to use those cases to displace the LPs, the Fund should be subject to *compulsory* winding up either on the basis that the Fund's "substratum" is gone as a matter of Cayman law—meaning that it is no longer practical for the Fund to carry on its investment business in accordance with the reasonable expectations of its partners—or on the basis that the GP's failure to comply with its obligation to carry out a voluntary winding-up requires a compulsory winding-up instead.  No matter the outcome, the result in the Cayman Court would clarify whether the GP or some other party (such as an appointee of the Cayman Court) has authority to speak for the Fund in these cases and whether the GP's actions in these chapter 11 cases are, as a matter of Cayman law, void or subject to invalidation.

13.    It is in this Court's interest, and the interests of all parties to these cases, for the Cayman Trial to proceed promptly and provide much needed clarity over the Fund's status and the GP's role with respect to the Fund.  Until the Cayman Trial is completed, any counterparty transacting with a Debtor in these cases does so on notice that the GP's actions regarding the Fund may be void as a matter of Cayman law—regardless of the outcome of these bankruptcy cases— and that the judge overseeing the pending Cayman Trial has expressed serious doubts as to the legality of the GP's proposed course of conduct.  It would be inefficient, unnecessarily expensive, and ultimately damaging to the Fund for these chapter 11 cases to proceed under that cloud.  There is no "great prejudice" from lifting the stay and moving ahead with the Cayman Trial here.

14.    ***Second***, and conversely, maintaining the stay would cause continuing substantial hardship for the LPs.  Even on the GP's case, the LPs have invested nearly $2.4 billion in cash in the Fund at this point, and according to the GP, their investment is worth at least twice that amount now.  The Fund-Level Debtors are not just solvent, but hold highly valuable assets—which are being managed by a fiduciary in which the sole substantial investors have utterly lost confidence, which has explicitly stated that it is attempting to remove them as limited partners, and which cannot possibly be acting in their interest.  The LPs have been attempting since June 2025 to put their investment in the hands of a competent, trustworthy trustee through the process that Cayman law and the LPA establish for that purpose.  If the GP had not filed for chapter 11 and sought to use the automatic stay to interrupt the Cayman process, the Cayman Trial would have gone forward next week and, in all likelihood, the GP would have been promptly removed and replaced.  Instead, the GP is using chapter 11 to shield itself not from creditors—like an honest debtor seeking to reorganize—but rather from the scrutiny of the Cayman Court and the investors to whom it owes fiduciary duties.  As a result, the LPs' assets have been thrown into an unnecessary bankruptcy by

a GP that lacks legal authority to act as a matter of governing Cayman law and that is completely disregarding its fiduciary duties and attempting to use these chapter 11 proceedings offensively to "replace" the LPs—the very beneficiaries of the trust for which the GP serves as trustee. Dkt. 18, First Day Decl. of Dr. Seth L. Harrison ¶ 17. The LPs are the real economic parties in interest, and maintaining the stay is harmful to them.

15. The GP's continued use of LP and Fund resources for its own ends, when it should be removed and replaced, is another form of ongoing hardship to the LPs. The GP has used the LPs' funds to bankroll its litigation in three courts so far—the Delaware Court of Chancery, the Cayman Court, and this Court—all while fighting to avoid its own legally mandated removal and maintain control over the LPs' assets. In the meantime, the LPs remain at the mercy of a self-dealing manager, deprived of a fiduciary they can trust, and watching the value of their investment be jeopardized by an unnecessary bankruptcy case, all while the GP continues to act (and spend) from a position it is not entitled to hold. When this Court focuses on the equities, and on preserving the value of the Fund-Level Debtors and the underlying biotech portfolio, it should have serious concerns about the GP's conduct here and the harm that it will continue to cause if its role in Fund governance is not promptly addressed by the proper proceeding in the Cayman Court.

16. ***Third***, the LPs easily satisfy the minimal showing of likelihood of success on the merits required to lift the stay. The GP does not have a viable defense to the LPs' claims in the Cayman proceeding. Even before the chapter 11 filings it was clear the GP should step aside, under governing Cayman precedent that Justice Asif himself referenced in November. But now, the Delaware Chancery decision, together with the GP's tactics in these chapter 11 cases, confirm unequivocally that there has been a loss of substratum, *i.e.*, that it is not practical for the Fund to continue as originally contemplated by the parties in the LPA, warranting a compulsory winding-

up order.  Further, the filing of the GP's chapter 11 case necessitates voluntary dissolution of the Fund under Cayman law and the LPA.

17.    ***Finally***, the interests of comity dictate that this Court and the Cayman Court should work cooperatively toward an orderly disposition, respecting each other's jurisdiction, with the goal of reducing both legal uncertainty and litigation costs.  Maintaining the automatic stay—one purpose of which is to avoid duplicative litigation and waste of a debtor's resources—to prevent a sister court on the eve of trial from promptly resolving essential questions that are squarely within its jurisdiction and expertise and that directly impact the conduct of the Fund's bankruptcy case, would be deeply at odds with both general principles of international comity and bankruptcy-specific comity principles of deference to proceedings pending in the debtor's place of organization.

18.    In short, in this highly unorthodox bankruptcy, all the equities strongly favor relief from the stay to permit the Cayman Trial to go forward.  Granting relief from the automatic stay to permit a short, immediate, long-scheduled trial on core questions of Fund governance to proceed under Cayman law in the Cayman Court is wholly appropriate.  The automatic stay is meant to be a shield against wasteful litigation, not a sword to be wielded to defeat the legal rights of creditors and owners—or to provoke yet more litigation.  Nor is the automatic stay appropriately a tool for forum shopping, whereby a debtor may litigate in a bankruptcy court of its choosing the same or similar issues that were already pending before another tribunal and were on the verge of trial at the time the bankruptcy case was filed.  While this Court may have its own issues to address regarding the GP as the chapter 11 cases progress, the first and most efficient step is to modify the stay to allow the Cayman Court to take up and resolve the issues that are ripe for trial before it.  Whether and how to wind up a solvent Cayman ELP when a GP and its LPs have reached a

governance impasse was squarely before the Cayman Court, is governed by Cayman law, and can and should be resolved there without delay.

19.     For all of these reasons, as further detailed below, relief from the automatic stay should be granted.

## FACTUAL BACKGROUND

### I.     The Fund

20.     The Fund, which is a Cayman ELP, was established on October 29, 2012, following discussions between Dr. Dmitry Rybolovlev and Dr. Seth Harrison about forming a vehicle to invest in biotechnology companies.  Ex. G, Chancery Pre-Trial Order, Sept. 5, 2025 ("Pre-Trial Order") ¶¶ 14, 22–23.  Dr. Harrison owns and controls the GP, which is a Cayman company, while the Rybolovlev family trust indirectly owns and controls the two LPs, which are managed by an entity known as Rigmora Holdings Limited ("**Rigmora Holdings**").  *Id.* ¶¶ 13, 15–20.  Besides the two LPs, the Fund's only other limited partners are Dr. Harrison and his family trust, who hold only small stakes in some pools of assets, as well as certain present or former employees of the Fund's GP-controlled subsidiary Apple Tree Life Sciences, Inc. ("**ATLS**") who have not contributed capital to the Fund and only have a contingent right to earn carried interest payments.  Dkt. 18, First-Day Decl. of Dr. Seth L. Harrison ¶ 25.  The Fund is in effect a fund of one, as roughly 98% of the capital invested into the Fund was contributed by the two LPs.  Ex. H, Chancery Post-Trial Op., Dec. 5, 2025 ("Post-Trial Op.") at 5.

21.     The Fund currently holds approximately 15 portfolio companies, including Braeburn, a highly valuable company with a commercial product called Brixadi, which is a treatment for opioid dependence.  Despite some early success driven in large part by the Braeburn investment, over the past six years the Fund has significantly underperformed its peers, as it invested hundreds of millions of dollars of capital contributed by the LPs into early-stage companies that have failed

to achieve significant development milestones.  Ex. I, Chancery Trial Tr., Oct. 16–17, 2025 ("Trial Tr.") at 202:22–203:13 (Prof. Ilya Strebulaev); *id.* at 437:18–438:20 (Dr. Ilonna Rimm).  The GP has caused six of these non-performing portfolio companies to file chapter 11 petitions in this Court.  Dkt. 15, Mot. for Joint Administration at 3; Voluntary Petition for Bankruptcy of Evercrisp Biosciences, Inc., No. 26-10000, Dkt. 1; Voluntary Petition for Bankruptcy of Nine Square Therapeutics, Inc., No. 26-10001, Dkt. 1.

22.    The Fund's assets are managed by the GP on trust for the benefit of the Fund's limited partners, to which it owes fiduciary duties.  *See generally* Phillips Decl. ¶¶ 24(b), 26–27, 57–81. The structure, management, and operation of the Fund are controlled by the terms of the LPA, which is governed by the law of the Cayman Islands and is expressly subject to the Cayman Islands' Exempted Limited Partnership Act ("**ELP Act**").  *See* Ex. J, LPA ¶ 18(g)(i).  The LPA has been amended 22 times.

23.    A Cayman Islands ELP is a unique entity.  An ELP has no legal personality separate from its partners.  *See, e.g.*, Ex. K, *Aquapoint LP (in Official Liquidation) v Xiaohu Fan* [2025] UKPC 56 at [48] (under Cayman Islands law, "an ELP is not a separate legal person and the property and rights of an ELP are held on trust 'as an asset of the exempted limited partnership in accordance with the terms of the partnership agreement', such that limited partners have a proprietary interest in the partnership assets"); Ex. L, *Kuwait Ports Authority v Williams* [2024] UKPC 32 at [35] (the "important distinctions between ELPs and companies" include that an "ELP has no separate legal personality"); Ex. E, Cayman Judgment, Nov. 6, 2025 ¶¶ 32–34 ("[A]n exempted limited partnership does not have any separate legal personality from the limited partners and the general partner."); *see generally* Phillips Decl. ¶¶ 24(a), 26–27, 31–56.

24.    The general partner of an ELP holds all of the ELP assets as a trustee for the limited

partners.  *See generally* Phillips Decl. ¶¶ 24(b), 26–27, 57–81.  Section 16(1) of the ELP Act

provides that the assets are held on statutory trust as follows:

> ***Any rights or property of every description of the exempted limited partnership***, including all choses in action and any right to make capital calls and receive the proceeds thereof that is conveyed to or vested in or held on behalf of any one or more of the general partners or which is conveyed into or vested in the name of the exempted limited partnership ***shall be held or deemed to be held by the general partner*** and if more than one then by the general partners jointly, ***upon trust as an asset of the exempted limited partnership in accordance with the terms of the partnership agreement***.

Ex. M, ELP Act § 16(1) (emphasis added).  Recent controlling Cayman Islands case law

interpreting this provision confirms that the sole beneficiary of this statutory trust is ***the limited***

***partners collectively***.  Specifically, the Court of Appeal of the Cayman Islands held in *Kuwait*

*Ports Authority v Port Link GP Ltd* [2023 (1) CILR 50]:

> ELPA s.16(1) . . . in substance . . . provides that the assets of an ELP are held by the general partner on ***a statutory trust for the limited partners***. . . . [B]ecause an ELP has no separate legal personality ***the only sensible construction of the words in ELPA section 16(1) is that the GP of an ELP holds its assets on trust for all the limited partners***.

Ex. O*, Kuwait Ports Authority v Port Link GP Ltd*, [2023 (1) CILR 50] at [54], [56] (emphasis

added).  Under the ELP structure, the GP owes its fiduciary duties to the limited partners alone

and may not manage Fund assets in its own self-interest.  Phillips Decl. ¶¶ 78, 80–81; Ex. N, Expert

Report of Michael Bloch KC ¶ 31 (citing Ex. O, *Kuwait Ports Authority v Port Link GP Ltd*, [2023]

1 CILR 50 at [35]).

25.    The GP cannot credibly dispute these fundamental points.  The GP's Cayman law

expert testified that "an ELP has no separate legal personality and exists only as its constituent

partners and cannot own property in its own right," and that "[an ELP's] general partner holds its

rights and property . . . on trust *for each of the partners*." Ex. N, Expert Report of Michael Bloch KC ¶ 30 (emphasis added) (quoting Ex. O, *Kuwait Ports Authority v Port Link GP Ltd*, [2023 (1) CILR 50] at [25], [54]).  And in the Cayman Court, the GP's counsel stressed that the Fund does not have separate legal personality and that the GP holds the Fund assets on trust.  Ex. Q, Cayman Hr'g Tr., Oct. 31, 2025 at 4:16:39 ("[L]imited partnerships have no separate legal personality. And that's a key distinction, obviously, from corporate vehicles in relation to winding up petitions".)

## II.    The Cayman Trial

26.    The Cayman Trial, which was originally scheduled to begin on January 12, 2026, is a trial of the LPs' June 6, 2025 petition to wind up the Fund.  The petition was based on "continued serious mismanagement and a lack of probity in the conduct of the affairs of the Partnership by the GP."  Ex. P, Cayman Winding-Up Petition ("Winding-Up Petition") ¶ 3.  The petition sought a compulsory winding-up on three grounds: (1) that the Rigmora LPs had justifiably lost trust and confidence in the GP's ability to manage the Fund's assets, (2) that the "substratum" of the partnership had ceased to exist, which means that "it has become impractical, if not actually impossible," for the Fund "to carry on its investment business in accordance with the reasonable expectations of its" partners, Ex. C, *Re Belmont Asset Based Lending Ltd* [2010] CIGC J0121-2 at [13]; Phillips Decl. ¶ 98, and (3) that a proper and independent investigation into the Fund's affairs by court-appointed fiduciaries was necessary.  Ex. P, Winding-Up Petition ¶¶ 25–26, 66–67; Ex. R, Petitioners' Cayman Skeleton Argument, Dec. 16, 2025 ("Cayman Skeleton") ¶ 23.   On November 21, 2025, the LPs amended the winding-up petition to include substantial additional evidence supporting these three grounds for winding up the Fund.  Ex. B, Amended Winding-Up Petition.

27.    The petition was motivated by the LPs' loss of confidence in the GP, their fiduciary. It did not—and does not—suggest that the Fund was insolvent, financially troubled, or in need of

financial reorganization (and in fact, it is not). Ex. F, Cayman Judgment, Dec. 22, 2025 ¶ 13; Ex. E, Cayman Judgment, Nov. 6, 2025 ¶¶ 44–45. The petition and trial in the Cayman Court—like the GP's last-second attempt to avoid it by filing chapter 11 in this Court—is about governance and control of highly valuable assets that the GP holds on trust for the benefit of the LPs, not financial distress.

28. After previously trying and failing to avoid facing the Cayman proceedings,[6] the GP ultimately joined the LPs in asking the Cayman Court to set a trial for January 2026. Ex. S, Cayman Hr'g Tr., Aug. 1, 2025, at 62:1–64:7. The parties proceeded to actively litigate through key phases of the Cayman proceedings, including numerous hearings and the submission of thousands of pages of legal argument and witness evidence. Dkt. 4, Faulkner Decl. ¶ 60. The GP's managing partner Dr. Harrison alone has submitted eleven affidavits and a witness statement in the Cayman proceedings, totaling over 400 pages. In the process, the LPs and GP have incurred significant time and cost. Dkt. 4, Faulkner Decl. ¶ 87. Because the GP is (improperly) paying its expenses from the Fund—approximately 98% of whose capital has been contributed by the LPs— the LPs have effectively been funding the GP's litigation expenses as well as their own. Although the GP's sole legitimate role is as a fiduciary to the Fund's limited partners, the GP has refused to step aside and has instead incurred tens of millions of dollars of improper expenses in an effort to remain in control of the LPs' assets despite the LPs' loss of confidence in the GP's ability to properly manage those assets.

---

[6] For example, on June 26, 2025, the GP filed an application in the Cayman Court to stay the Cayman proceedings. After fully briefing the application and requesting a hearing, the GP withdrew its stay applications on August 1, 2025 in the middle of the requested hearing before the Cayman Court on the applications. Ex. S, Cayman Hr'g Tr., Aug. 1, 2025, at 60:6–14, 64:17–27 (statement by counsel withdrawing stay applications); Dkt. 4, Faulkner Decl. ¶ 72.

29.     Contrary to the GP's unsupported assertions to this Court, Dkt. 55, Hr'g Tr., Dec. 15, 2025, at 17:10–17, an order by the Cayman Court to wind up the Fund would not imply the winding-up or fire sale of the Fund's portfolio companies.  Dkt. 4, Faulkner Decl. ¶ 41; Phillips Decl. ¶ 27(k).  If the Cayman Court appoints joint official liquidators ("**JOLs**") for the Fund, the JOLs will serve as fiduciaries who would owe duties to maximize the value of the Fund for the benefit of the limited partners—and who, unlike the GP, could be trusted to perform those duties faithfully.  Dkt. 4, Faulkner Decl. ¶¶ 38, 42; Phillips Decl. ¶¶ 136–43.  In that role, the JOLs will be charged with examining the Fund's assets, including its ownership interests in the portfolio companies, and determining how best to preserve their value within the construct of the LPA, including for example seeking funding as appropriate, continuing operations, conducting orderly asset sales.  Dkt. 4, Faulkner Decl. ¶¶ 14, 39–42; *see also* Phillips Decl. ¶¶ 131, 136–43.  The LPs have proposed to the Cayman Court two experienced and respected professionals from the New York-headquartered global consulting and restructuring firm Alvarez & Marsal to serve as JOLs—not, as the GP suggested to this Court, local Cayman Islands liquidators lacking experience with U.S. companies or familiarity with chapter 11.  Ex. B, Amended Winding-Up Petition ¶ 69.

## III.     The Delaware Court of Chancery Litigation

30.     On May 30, 2025, the GP filed suit against the LPs in the Court of Chancery of Delaware asserting an entitlement to drastic and sweeping relief, including asserting that the LPs were "defaulting" partners such that the GP could seize up to half their economic interest in the Fund, that the LPs had waived their contractual rights to approve or disapprove investments in and budgets for portfolio companies, and that the LPs could be compelled to contribute more than $2.85 billion to the Fund—over $400 million more than the $2.425 billion stated in their Subscription Agreements.  Ex. H, Post Tr. Op., at 36–37, 44 n.257, 46, 79.  The GP later amended

its pleadings to seek specific performance of over $100 million in capital calls it had issued only minutes before filing its complaint.  *See* Ex. G, Pre-Trial Order ¶ 74(d).

31.    The Delaware Chancery case proceeded in parallel with the Cayman winding-up proceeding.  The GP repeatedly took the position that the Delaware Chancery case should be resolved quickly, on an expedited basis, so that the Cayman Court could take account of the Delaware Court of Chancery's findings before the Cayman Trial then scheduled for January 2026.  Ex. T, ATP Opp. to Motion to Stay ¶ 31 ("Instead, this Court could helpfully address Delaware law disputes and provide appropriate and significant guidance for the Cayman court when deciding whether to wind up the Fund."); *see also* Ex. U, ATP Reply ISO Motion to Expedite at 2 ("Indeed, the Cayman winding up petition actually supports expedition because expedition here is the only mechanism to preserve the Fund before the Cayman courts hear Rigmora's improper gambit to remove ATP.").

32.    Trial in the Delaware Chancery action was held on October 16 and 17, 2025.  At closing arguments after trial on November 21, the GP urged the Court of Chancery to issue its decision by December 5, again claiming that the GP needed a quick decision so that the result could be included in the GP's pre-trial witness statements due in the Cayman Court in advance of the January 2026 Cayman Trial.  Ex. V, Chancery Post-Trial Arg. Tr., Nov. 21, 2025, at 110:11–19.  The Delaware Court of Chancery issued its decision on December 5, noting that it "worked hard to issue this decision promptly" at the GP's request.  Ex. H, Post-Trial Op. at 1 & n.1.

33.    Apart from ordering payment of most (but not all) of the disputed capital calls, the Delaware Court of Chancery's December 5 post-trial decision soundly rejected the GP's claims.  The Court of Chancery held that the LPs retain their contractual rights to approve and disapprove budgets for funding portfolio companies, that the LPs may exercise those rights in their absolute

discretion, that the LPs were correct in asserting that their capital contribution obligations were limited to the $2.425 billion reflected in their Subscription Agreements (and not the more than $2.85 billion claimed by the GP), and that the GP's request for a declaration that it had not willfully breached its duties by filing the Chancery lawsuit should be deferred to the Cayman Court. *See id.* at 1.[7]  Based on the Delaware Court of Chancery's determination that the LPs had already contributed $2.3 billion to the Fund, *id.* at 56, following the LPs' satisfaction of the $97 million judgment on December 22, 2025, the LPs' remaining commitment to the Fund is at most $28 million.[8]  That amount represents barely one percent of the LPs' overall commitment.  Put simply, the GP was wrong about its assumptions that it could somehow call more capital than the Subscription Agreements provided and that it did not have to manage the Fund within its commitments, as the LPs had been warning for years.

## IV.    The Chapter 11 Filings

34.    The GP never gave any warning—not to the Delaware Court of Chancery, the Cayman Court, or even the LPs to whom it owes fiduciary duties—that it intended to seek chapter 11 relief for itself or the Fund.  Dkt. 4, Faulkner Decl. ¶ 85; Ex. F, Cayman Judgment, Dec. 22, 2025 ¶ 5. On Friday, December 5, the Court of Chancery issued its decision; and on Monday, December 8, the LPs sent the GP a proposed final order calling for payment of $97 million within 10 days of entry of the order, a schedule the GP accepted (and the LPs ultimately paid the Delaware Chancery

---

[7]    By this time, the GP was no longer pursuing its claim for a declaration that the LPs were "Defaulting Partners" or that the GP was permitted to seize up to half of their economic interest in the Fund.

[8]    The Court of Chancery ordered the LPs to pay the remaining capital calls only because it found that the LPs' "double counted" certain past contributions (an interpretation that is contrary to the plain words of the LPA, and which the LPs intend to contest on appeal to the Delaware Supreme Court).  Ex. H, Post-Trial Op. at 55–56.

judgment five days earlier than the order ultimately required, on December 22, 2025).  *See* Ex. W,

Email from Daniel Kaprow, Dec. 8, 2025 and attachment; Ex. X, Email from Andrew Berdon,

Dec. 10, 2025; Ex. FF, Chancery Court Order, Dec. 11, 2025 at 2; Chancery Court Rule 6(a)(1)(B)

("When the period is stated in days or a longer unit of time . . . [e]xclude intermediate Saturdays,

Sundays, and legal holidays when the period is less than 11 days."); Ex. Y, Email from Andrew

Berdon, Dec. 22, 2025.  Yet on Tuesday, December 9, out of the blue, and on the verge of the final

conference before the long-planned Cayman trial, the GP filed chapter 11 petitions for itself and

the Fund, as well as ATLS, a wholly owned subsidiary of the Fund that is responsible for paying

certain Fund expenses.  The Cayman Court described the chapter 11 petitions as "wholly

contradictory" to the representations that the GP's Cayman counsel had made to the Cayman Court

on December 8 seeking to expedite certain matters to enable the January trial to take place.  Ex. F,

Cayman Judgment, Dec. 22, 2025 ¶ 5.  As the GP's filings in this Court make clear, the primary

purpose of the GP's filings was to trigger the automatic stay to stop the Cayman Trial, *see* Ex. Z,

Correspondence to Cayman Court, Dec. 10, 2025, and to hold the Fund, and the LPs' interests,

hostage in this process while it seeks replacement investors.[9]

---

[9]    The GP has openly admitted that it seeks to use chapter 11 not to seek protection from creditors
       but to replace the 98% limited partners in the Fund and subvert their contractual and property
       rights.  Dr. Harrison stated in his First Day Declaration that one of the reasons for filing
       chapter 11 is to "potentially bring in new investors to replace the defaulting limited partners,"
       even though the limited partners did not default and instead paid the judgment early.  Dkt. 18,
       ¶ 17.  The Debtors then admitted, the day after payment was received leaving them with well
       over $100 million in cash on hand, that they still "intend to propose a plan of reorganization
       that . . . removes Rigmora," Dkt. 89 ¶ 9, and have sought this Court's permission to make
       payments to portfolio companies outside of the LPA's formal structure, including for portfolio
       companies without approved budgets, *id.* ¶¶ 6–7 (requesting debt financing for Aulos, Nereid,
       and Nine Square).

## V.        The LPs' Motion to Dismiss the Chapter 11 Cases

35.    On December 12, 2025, the LPs moved to dismiss the chapter 11 cases for the Fund-Level Debtors and ATLS, and for immediate relief from the automatic stay to allow the pretrial conference to go forward in the Cayman Islands as planned on December 17, 2025.  Dkt. 3.  As the LPs argued (among other things) in the motion to dismiss, the GP filed these cases in bad faith and not for a proper bankruptcy purpose; in any event, the Fund-Level Debtors' cases should be dismissed on grounds of abstention in favor of the Cayman Trial; and the Fund, as a statutory trust lacking separate legal personality, is not an eligible debtor under the Bankruptcy Code.  *Id.* ¶¶ 4, 61.

36.    The LPs also filed a motion to shorten time on their motion to dismiss.  Dkt. 5.  In a conference on December 15, 2025, this Court denied the motion to shorten time but granted relief from the automatic stay to allow the parties to proceed with the pretrial conference scheduled to take place on December 17, 2025, before Justice Asif in the Cayman Court.  Dkt. 55, Hr'g Tr., Dec. 15, 2025, at 31:18–19.  The Court indicated that the LPs could make a further motion for relief from the automatic stay if they wished, *id.* at 32:19–33:15, and the LPs do so now.

## VI.       The Cayman Islands Pretrial Conference

37.    As authorized by this Court at the December 15 conference, counsel for the parties appeared for the pretrial conference (known as a "Pre-Trial Review" or "**PTR**" in Cayman practice) scheduled in the Cayman Court on December 17 and filed the required "Skeleton Arguments" outlining their intended submissions the day before.  Ex. R, Cayman Skeleton.  The LPs informed Justice Asif of the Delaware Chancery decision, the proceedings in this Court, and the automatic stay.  The LPs made clear that they intended to comply with the U.S. automatic stay, as modified by this Court at the December 15 conference, and that any further proceedings before

Judge Asif could occur only if this Court granted further stay relief.  Ex. R, Cayman Skeleton ¶¶ 9, 12–13; Ex. AA, Cayman PTR Tr., Dec. 17, 2025, at 8:18–9:3.

38.    The LPs then explained that, in the event the automatic stay is lifted to permit the trial before the Cayman Court to proceed, the Cayman Court could conduct the trial on a streamlined basis in two days rather than the originally-scheduled five.  Ex. R, Cayman Skeleton ¶¶ 44–46; Ex. AA, Cayman PTR Tr., Dec. 17, 2025, at 5:12–24, 34:10–19.  Among other things, the LPs noted that the Delaware Chancery decision—which demonstrated that the GP had failed to manage the Fund's portfolio to the available capital and had essentially exhausted the Fund's capital commitments—meant that the Fund's substratum had been lost, which would warrant a compulsory winding-up order following trial.  Ex. R, Cayman Skeleton ¶¶ 12.2, 23–28.  The LPs also explained that (if permitted to proceed) they expected to show that Dr. Harrison had conceded that the Fund cannot carry on in accordance with the reasonable expectations of its partners (the definition of a loss of substratum) by asserting in his First Day Declaration in this Court his intent to "restructur[e] the Partnership's capital structure" and "bring in new investors to replace the defaulting limited partners."  *Id.* ¶ 26; Ex. AA, Cayman PTR Tr., Dec. 17, 2025 at 19:16–20:18.  Thus, the factual developments in the first part of December 2025 narrowed the scope of the issues that will need to be presented at trial.

39.    As the LPs' Cayman law expert Mark Phillips KC explains, if the Cayman Court were to issue a compulsory winding-up order following a two-day trial, that order would also appoint JOLs to carry out the winding-up and displace the GP.  Phillips Decl. ¶¶ 24(h), 100, 174–77.  Pursuant to Section 99 of the Companies Act, the winding-up order would also automatically render void any disposition of the Fund's assets, any alteration to the LPs' interests in the ELP,

and the addition of any new LPs dating back to June 6, 2025, barring a contrary order by the Cayman Court.  Phillips Decl. ¶¶ 24(i), 105–10, 116-27, 166.

40.    The LPs explained to the Cayman Court that, in the event the automatic stay is lifted, their "preferred approach would be for a compulsory winding up order to be made."  Ex. R, Cayman Skeleton ¶ 34.  Nonetheless, the LPs also noted that the GP's chapter 11 petition is also— as a matter of binding Cayman law—the first step in a voluntary winding-up of the Fund, providing another basis for the Cayman Court to grant the LPs' petition.  Ex. R, Cayman Skeleton ¶¶ 12.1, 30–32; *see also* Ex. AA, Cayman PTR Tr., Dec. 17, 2025 at 30:9–32:5, 35:1–36:18; *see also* Phillips Decl. ¶¶ 91–92, 147–53.  Although appointment of independent JOLs is not automatic in a voluntary winding-up, the LPs noted that the Cayman Court had previously appointed JOLs for a voluntary winding-up where "the overwhelming majority of the limited partners of [the] exempted partnership seek the appointment of a voluntary liquidator because they have lost confidence in the incumbent," as the LPs would do here.  Ex. R, Cayman Skeleton ¶ 35 (citing Ex. D, *In Re One Thousand & One Voices Africa Fund I LP*, KY 2024 GC 62, 9 May 2024 at [25]); *see also* Cayman Skeleton ¶ 12.3; Ex. AA, Cayman PTR Tr., Dec. 17, 2025 at 1:10–3:20, 31:10– 33:4.

41.    Given this Court's view that the automatic stay would not be modified in time for the parties to proceed with the originally scheduled Cayman trial date, and in light of the likelihood that the trial could be much shorter because it would no longer be necessary to reach certain issues in light of the Court of Chancery's ruling and the GP's recent actions, the LPs asked Justice Asif to consider his availability for a later, shorter trial limited to specific issues,[10] all subject to this

---

[10]    Specifically, Ex. R, Cayman Skeleton ¶¶ 12.1–12.3 ("[W]hether, as a consequence of the Chapter 11 Bankruptcy Proceedings, the Partnership has entered voluntary liquidation pursuant to paragraph 10(b) of the LPA; whether, as a consequence of the Chapter 11

Court's granting further relief from the automatic stay.  Ex. AA, Cayman PTR Tr., Dec. 17, 2025 at 8:18–19:3; 27:7–22; 33:5–11; 38:9–13.

42.    Justice Asif agreed with the parties that, in light of the automatic stay, "the trial cannot proceed on 12 January," when it was originally scheduled.  Ex. F, Cayman Judgment, Dec. 22, 2025, ¶ 9.  Justice Asif also agreed with the LPs that he would be able to deal with the remaining issues in short order if this Court grants relief from the automatic stay, concluding that "two days should be sufficient for the Court to determine the [issues specified by the LPs], which are largely matters of law and construction of the limited partnership agreement."  *Id.* ¶ 16.

43.    Justice Asif also emphasized the need for him to resolve those issues right away:

> My own view is that an orderly separation of the GP from the LPs needs to occur sooner rather than later to avoid the continuation of these obviously corrosive disputes between the parties on each side. It does not seem to me to be productive or a beneficial use of the parties' time and resources for this dispute to drag on for any longer than absolutely necessary.  The only people who are profiting from this dispute at the moment are the lawyers on each side.

*Id.* at ¶ 13.  Accordingly, the Cayman Court tentatively scheduled trial for the week of February 2, 2026, subject to continuance to a later date depending on a ruling from this Court on the question of the automatic stay.  *Id.* ¶ 14.  This trial was scheduled by reference to the GP's confirmation of the dates on which it and its legal team would be available, which were communicated to the Cayman Court through a joint communication that the GP's Cayman attorneys expressly approved and asked the LPs' Cayman attorneys to send to the Cayman Court.  Justice Asif did not set a procedural timetable because of the automatic stay.  *Id.*

---

Bankruptcy Proceedings and the Delaware Judgment, the Court should make an order for compulsory winding up of the Partnership on the basis that the Partnership's substratum has gone; or in the alternative, whether the Court should make an order appointing independent liquidators to conduct the voluntary winding up in lieu of the GP.").

44.    The Cayman Court also emphasized the importance of coordination between the Cayman Trial and these chapter 11 cases, and that he believed that a ruling from him would be useful in that regard:

> It does seem to me that, at the very least, it would be of real utility for the Delaware judge to authorise the preparation of amended pleadings on both sides in order to re-state what are the issues that the Grand Court will need to determine in due course. It also seems to me that it ***would be of real utility for the Delaware judge, as soon as possible, to determine that the limited issues that the LPs wish to put before the Grand Court for determination should be excluded from the scope of the automatic stay so that a determination on those issues can be made.*** A decision on those points is likely to be of real benefit to the parties and also to the Delaware court if the Chapter 11 proceedings are not dismissed and continue.
>
> For what it is worth, I will conclude by saying that I generally take the view that the conduct of the winding up of a Cayman exempted limited partnership, and by whom that winding up ought to be carried out, are more appropriately questions for the Grand Court to determine supported by Chapter 15 recognition in due course, rather than by Chapter 11 proceedings. It is for the Delaware judge to take whatever view of that indication that she wishes to take.

*Id.* ¶¶ 19–20 (emphasis added).

45.    Like this Court, *see* Local Rule 9029-2, the Grand Court of the Cayman Islands has adopted the Judicial Insolvency Network's *Guidelines for Communication and Cooperation between Courts in Cross-Border Insolvency Matters* and *Modalities of Court-to-Court Communication*, and can be expected to work cooperatively with this Court should the cases proceed in both forums.  Phillips Decl. ¶¶ 185–190.

## ARGUMENT

**The Court Should Grant Relief from the Automatic Stay
to Allow the Parties to Proceed with the Cayman Trial.**

46.    The LPs readily meet the legal standard for the requested narrow modification of the automatic stay.  Section 362(d) of the Bankruptcy Code provides that "[o]n request of a party in

interest and after notice and a hearing, the court shall grant relief from the stay . . . such as by terminating, annulling, modifying, or conditioning such stay . . . for cause, including the lack of adequate protection of an interest in property of such party in interest."  Bankruptcy Code § 362(d). The Third Circuit has observed that "Section 362(d)(1) does not define 'cause,' leaving courts to consider what constitutes cause based on the totality of the circumstances in each particular case." *In re Wilson*, 116 F.3d 87, 90 (3d Cir. 1997).

47.    This Court uses a "three prong balancing test" to determine whether there is "cause" to grant relief from the stay to permit a civil suit against a debtor to proceed outside the bankruptcy court.  *In re Scarborough-St. James Corp.*, 535 B.R. 60, 67 (Bankr. D. Del. 2016).  The Court considers:

> (i) Whether any great prejudice to either the bankruptcy estate or the debtor will result from continuation of the civil suit;
>
> (ii) Whether the hardship to the non-bankruptcy party by maintenance of the stay considerably outweighs the hardship to the debtor; and
>
> (iii) Whether the [non-bankruptcy party] has a probability of prevailing on the merits.

*Id.* at 68 (citing *In re Rexene Prods. Co.*, 141 B.R. 574, 576 (Bankr. D. Del. 1992)); *see also In re F-Squared Inv. Mgmt., LLC*, 546 B.R. 538, 548 (Bankr. D. Del. 2016).

48.    The Court also considers the "general policies underlying the automatic stay." *Scarborough-St. James*, 535 B.R. at 68.  Those policies focus on protecting the debtors from distress while they seek to reorganize:

> The purpose of the automatic stay is to prevent certain creditors from gaining a preference for their claims against the debtor; to forestall the depletion of the debtor's assets due to legal costs in defending proceedings against it; and, in general, to avoid interference with the orderly liquidation or rehabilitation of the debtor.  The stay is not meant, however, to be used by a debtor to pursue its creditors, as more litigation is hardly consistent with the concept of a breathing

spell for the debtor.  Instead, ***the stay is a shield, not a sword*** that should help the debtor deal with his bankruptcy for the benefit of himself and his creditors.

*Id.* at 67 (citation omitted, emphasis added).

49.     Where foreign proceedings are involved, bankruptcy courts consider comity as well. *See In re Soundview Elite Ltd.*, 503 B.R. 571, 584 (Bankr. S.D.N.Y.), *appeal dismissed*, 512 B.R. 155 (S.D.N.Y. 2014), *aff'd*, 597 F. App'x 663 (2d Cir. 2015); *see also In re Northshore Mainland Servs., Inc.,* 537 B.R. 192, 207–208 (Bankr. D. Del. 2015) (abstaining from adjudicating, and dismissing, chapter 11 cases in the interest of economy, predictability, and comity); *In re Cenargo Int'l, PLC*, 294 B.R. 571, 597, 606–607 (S.D.N.Y. 2003) (discussing having lifted the automatic stay in deference to a UK bankruptcy proceeding and the "special role of comity" in transnational bankruptcies).

50.     Each factor overwhelmingly supports relief from the stay.

> **A.     Allowing the Cayman Trial to Go Forward Will Benefit, and Not Prejudice, the Debtors and Their Estates as Well as the LPs and This Court.**

51.     Allowing the trial to proceed in the Cayman Court will not cause any "great prejudice."  The GP may rightly fear the Cayman Court will remove the GP from its role, but it is not "prejudice" to have to submit to the legally mandated processes for determining governance and control of the Fund.  As Justice Asif of the Cayman Court observed, it is "likely to be of real benefit" for this Court to have a determination of the relevant Cayman law issues before this Court proceeds further.  Ex. F, Cayman Judgment, Dec. 22, 2025 ¶ 19.  Prompt resolution of the Cayman Trial will benefit the Debtors, the Court, and all parties in interest because it resolves crucial questions antecedent to the questions arising in the Fund's bankruptcy case and avoids the likelihood that any actions taken by the GP on behalf of the Fund in this Court will be void as a

matter of Cayman law.  It does not threaten any delay, undue expense or other prejudice to the Debtor or its estate, and in fact avoids substantial waste of time and money.

52.     Under fundamental principles of bankruptcy law, corporate governance mechanisms dictated by applicable non-bankruptcy law apply throughout the chapter 11 case and are not blocked by the automatic stay.  *See, e.g.*, *In re Marvel Ent. Grp., Inc.*, 209 B.R. 832, 838 (D. Del. 1997) (shareholder vote to replace board of directors did not violate automatic stay); *see also, e.g.*, *In re Indianapolis Downs LLC*, 486 B.R. 286, 302 (Bankr. D. Del. 2013) ("It is axiomatic that the commencement of a Chapter 11 case does not suspend or displace non-bankruptcy law and contractual rights regarding corporate governance.").  The only reason that relief from the automatic stay is even necessary here is that the LPs need the help of the Cayman Court to compel the GP to do what it ought to do as a matter of its fiduciary duties under the LPA and Cayman law. *See, e.g.*, *In re Korean W. Presbyterian Church of L.A.*, 618 B.R. 282, 291 (Bankr. C.D. Cal. 2020) (modifying automatic stay to allow litigation of corporate governance issue in state court).  To the extent that the automatic stay applies to the Cayman Trial because the GP (a Debtor) is a defendant, *see* Bankruptcy Code § 362(a)(1), the underlying bankruptcy policy of respecting corporate governance arrangements supports lifting the stay in order for that proceeding to go forward.

53.     The Cayman Trial is effectively a request by the LPs—the Fund's owners—for a change in the Fund's governance.  Under U.S. bankruptcy law, the automatic stay does not prevent owners from taking steps to replace its directors or management.  *See, e.g.*, *Marvel*, 209 B.R. at 838.  The only distinction between the *Marvel* case and the situation here is that the proper mechanism for the LPs to have their say as to management of the Fund comes in the form of a judicial winding-up proceeding rather than a shareholder vote.  Here, both the ELP Act and the LPA, which incorporates the ELP Act, give the LPs the right to apply for a compulsory winding-

up of the Fund on just and equitable grounds, including a loss of substratum, under Cayman law. Ex. M, ELP Act § 36(3)(g) ("on application by a partner," the Cayman court may order winding up "as may be just and equitable"); Ex. J, LPA ¶ 10(b)(iii) ("The Partnership shall be wound up and dissolved . . . upon the entry of a decree of judicial dissolution of the Partnership pursuant to the ELP Law"), ¶ 18(g)(i) ("the parties expressly agree . . . that the ELP Law as now adopted or as may be hereafter amended shall govern this Agreement").  And both the ELP Act and the LPA recognize the need for a voluntary winding-up where the Fund's GP files a chapter 11 petition. Ex. M, ELP Act § 36(7); Ex. J, LPA ¶¶ 10(b)(i), 11(a), 11(f); Phillips Decl. ¶¶ 91–92, 147–53.  It is therefore in everyone's interest that there be clarity as to who speaks for the Fund and whether, under the Cayman law that governs the Fund, the Fund has already entered a winding-up as a result of the GP's bankruptcy filing and, if not, whether the Cayman Court will ultimately hold that it should be terminated.  That clarity can only be achieved through a modification of the automatic stay to allow the Cayman proceeding to resolve the parties' dispute over corporate governance.

54.    Indeed, a fundamental premise of chapter 11 is that the party seeking bankruptcy protection has the legal authority to do so and to act throughout the chapter 11 cases on behalf of the debtor.  *See In re FKF Madison Park Grp. Owner LLC*, 2011 WL 350306, at *3 (Bankr. D. Del. Jan. 31, 2011) ("A party cannot subject an entity to bankruptcy without authority."); *In re 3P Hightstown LLC*, 631 B.R. 205, 210 (Bankr. D.N.J. 2021) ("It is well-settled that applicable state law determines whether a bankruptcy filing was authorized.").  The GP filed these cases on the eve of a trial to determine the critical question of who has legal authority to act for the Fund and whether the partnership (i.e. the Fund) can continue or must be wound up.  Those questions are indisputably governed by Cayman law.  Ex. J, LPA ¶ 18(g)(i); *see also, e.g.*, *Fannin v. UMTH Land Dev. L.P*, 2016 WL 7042078, at *2 (D. Del. Dec. 2, 2016) (internal affairs doctrine, by which

the place of organization governs internal affairs, applies not only to corporations but also to "limited liability companies, business trusts, partnerships and limited partnerships") (internal quotation marks omitted).  Further, the Cayman Court has exclusive jurisdiction to conduct winding-up proceedings under the ELP Act.  Ex. M, ELP Act § 2 (defining "court" as "the Grand Court"); *id.* § 36(3)(g) ("[O]n application by a partner, creditor or liquidator, the court may make orders and give directions for the winding up and dissolution of an exempted limited partnership as may be just and equitable."); Ex. BB, Cayman Amended Defence to Winding-Up Petition ¶ 67B(c) (GP's filing acknowledging "the Cayman Court's winding up jurisdiction").

55.    It is properly for the Cayman Court to determine who is in charge of the management of the Fund under Cayman law, which in turn will inform who represents the Fund in this Court as debtor in possession.  *See, e.g.*, *In re Korean W. Presbyterian Church*, 618 B.R. at 290–91 (modifying automatic stay to allow state court to determine which faction had exclusive right to control debtor).  If the Cayman Court appoints JOLs, then that decision will set the stage for a motion for this Court to recognize the JOLs.  In the unlikely event the GP somehow prevails in persuading the Cayman Court to leave it in charge of the Fund, then the Cayman Court's ruling will remove that cloud over the effectiveness of this Court's ultimate decisions on any plan of reorganization and other core bankruptcy administration matters.  For the sake of all participants in these cases, and especially the Fund and the portfolio companies, it is important for these determinations concerning the Fund's management and status to be made promptly by the Cayman Court.

56.    Unless the open question of whether the GP can act for the Fund is promptly resolved, any disposition of Fund assets, alterations to the LPs' interests in the Fund, or admissions of additional investors, such as the GP is proposing, will be void as a matter of Cayman law regardless

of whether they are approved by this Court.  If the Cayman Court rules for the LPs and issues a compulsory winding-up order on the basis that the Fund's substratum has gone, any transactions involving the Fund after June 6, 2025, when the winding-up proceeding had commenced, are void as a matter of Cayman statute.  *See supra* ¶ 39; Ex. CC, Companies Act § 99.  Section 99 of the Companies Act, which applies by virtue of section 36(3) of the ELP Act, provides:

> When a winding up order has been made, any disposition of the company's property and any transfer of shares or alteration in the status of the company's members made after the commencement of the winding up is, unless the Court otherwise orders, void.

Ex. CC, Companies Act § 99.  The ELP Act further provides that "where a winding up order has been made," the winding up is retroactive, and is deemed to have commenced upon "the presentation of the petition for winding up," Ex. M, ELP Act § 36(10)(e).  In this case, that was June 6, 2025.  Putting these pieces together, if the Cayman Court enters a compulsory winding-up order, Cayman law deems any transactions by the Fund after June 6, 2025 to be void unless specifically approved by the Cayman Court.  Phillips Decl. ¶¶ 24(i), 105–10, 116–27, 166.

57.    Similarly, as a matter of Cayman law, if the Fund has already entered a voluntary winding-up, then the GP currently has no authority to act on behalf of the Fund except to wind it up in accordance with Cayman law and the LPA.  *See generally* Phillips Decl. ¶¶ 24(f), 147–50, 168–73.[11]  As a consequence, as a matter of Cayman law and the terms of the LPA, the GP's

---

[11]    That is because, under Cayman law, once a general partner has filed for bankruptcy, its role is limited: it may act only to wind up an ELP in accordance with Cayman law and contract. Phillips Decl. ¶¶ 24(c)–(f), 139, 147–53, 168–73.  Section 140 of the Companies Act (which applies to a voluntary winding-up by virtue of section 36(3) of the ELP Act) "dictates how the ELP's (i.e. limited partners') assets are to be applied by the GP" in that situation, Phillips Decl. ¶ 152, namely first applied "in satisfaction of [the ELP's] liabilities" and then distributed to its members according to their rights and interests.  Ex. CC, Companies Act § 140(1). Paragraph 11(b) of the LPA in turn requires the "General Partner or the liquidators, as applicable," to distribute among the Partners either "in cash or in kind" "the assets remaining after satisfaction of liabilities" to creditors.  Ex. J, LPA ¶ 11(b).

refusal to wind up the Fund in accordance with those provisions and its attempts to restructure the Fund and oust the LPs in this Court are beyond the scope of its powers to act for the Fund.  Phillips Decl. ¶¶ 152, 168–73.  As such, these *ultra vires* acts may be invalidated by the Cayman court.  *Id.* ¶ 102.

58.    For these reasons, moving forward with the chapter 11 cases of the Fund-Level Debtors without clarification of corporate governance under Cayman law creates the serious risk of competing and inconsistent results between the U.S. and Cayman courts.  If, hypothetically, this chapter 11 case were to result in a plan of reorganization that set forth a disposition of the Fund assets that the GP holds in trust for the LPs, any such result could be invalid as a matter of Cayman law and assets could be clawed back by the Cayman courts.  In such a circumstance, any actions that the GP undertook on behalf of the Fund in the interim—including any plan of reorganization that this Court might approve—would either be subject to rereview by the Cayman Court or automatically void with retroactive effect absent subsequent validation by the Cayman Court.

59.    Under the circumstances, therefore, gaining clarity as to the Fund's corporate governance and the GP's rights and obligations under Cayman law is, effectively, a gating item to moving forward with the Fund-Level Debtors' chapter 11 cases.  The parties' competing claims as to who has the right to speak for the Fund as debtor in possession under section 1107 of the Bankruptcy Code (if the Fund is even permitted to be a debtor at all) would otherwise cast a cloud over the effectiveness of any relief that this Court may give.  This uncertainty also impairs the ability of the Fund or its portfolio companies to attract new investment, as any investors will

necessarily be aware of this risk.[12]  Allowing the Cayman Trial to go forward at this time would remove that cloud.

60.     Because the GP is seeking relief in this Court that is directly contrary to Cayman law, the risk that the Cayman Court will ultimately refuse to validate or will hold void the GP's efforts to reorganize the Fund is particularly high.  The GP has asserted several times now that it will ultimately seek to oust, replace, or dilute the interests of the LPs in the Fund, Dkt. 18, First Day Decl. of Dr. Seth L. Harrison ¶ 17 (stating that one of the reasons for filing chapter 11 is to "potentially bring in new investors to replace the defaulting limited partners"); Dkt. 89 Mot. for Interim and Final Funding ¶ 9 (explaining that "the Debtors intend to propose a plan of reorganization that . . . removes Rigmora"), even though the LPs contributed approximately 98% of the capital and the GP may not add new limited partners without the LPs' consent.  And Justice Asif has already noted that, "at first blush," Dr. Harrison's "proposal for capital restructuring and the introduction of new investors" appear "to be outside the proper scope of the GP's powers." Ex. F, Cayman Judgment, Dec. 22, 2025 ¶ 21.

61.     The LPs intend to vigorously oppose any efforts by the GP to misappropriate the LPs' interests in the Fund.  This Court—and, if they were acting for proper reasons, the Fund-Level Debtors—should welcome the clarity the Cayman ruling can provide before it invests its own, the Debtors' and the LPs' time and resources in a process that may otherwise be futile.[13]

---

[12]   The GP has made much of the so-called "Russian effect," claiming that it cannot attract new investors because the LPs have a connection with an investor of Russian heritage, but the GP entirely ignores the fact that new investors may be—and ought to be—concerned about the GP's legal power to transact, not to mention Dr. Harrison's apparent willingness to try to oust existing investors entirely, litigate against them, and use their funds in violation of the GP's fiduciary duties.

[13]   It is for this reason that the LPs have asserted—and continue to assert—that the chapter 11 cases for the Fund-Level Debtors should be dismissed in their entirety.  At their core, these solvent-debtor cases are fundamentally about a corporate governance dispute under Cayman

### B.    Prompt Resolution of the Cayman Proceeding Will Not Cause Delay, Undue Expense or Other Prejudice to the Debtors or Their Estates.

62.    The first factor identified in *Scarborough-St. James*—lack of great prejudice to the Fund-Level Debtors or their estate—supports lifting the stay not only because of the benefit of having a resolution of the GP's authority as discussed above, but also because the Cayman Trial will not result in undue delay or dissipation of assets.  Quite the opposite; the Cayman Trial will allow for efficient resolution of a gating issue and will avoid the risk of inconsistent results in this international dispute.

63.    Importantly, the Fund is solvent and not in any financial distress, having more than $100 million in cash on hand against less than $500,000 in identified creditors' claims.  Because the movant LPs are far and away the holders of the largest economic stake in the Fund-Level Debtors' chapter 11 cases, there can be no legitimate concern about incurring expenses that will harm the stakeholders' interests.  The Cayman Trial does not involve a claim for damages, and it will not add to the liabilities of any estate in these chapter 11 cases.  The trial is being conducted by experienced counsel, who are deeply involved and who can and should be able to coordinate effectively with Debtors' U.S. restructuring counsel, as the Cayman Court has encouraged them

---

law, and while the LPs and their counsel have great respect for this Court, it is not best positioned to resolve these questions.  The Court should abstain in favor of another jurisdiction where, as here, moving forward with a chapter 11 plan would essentially be futile because any result would be subject to invalidation by a court in the Debtor's home country.  *See, e.g.*, *In re Spanish Cay Co.*, 161 B.R. 715, 725–26 (Bankr. S.D. Fla. 1993) (abstaining in favor of Bahamian court where "[t]he potential for a successful Chapter 11 reorganization in this case is questionable, at best, since certain orders of this Court may be given no effect in the Bahamas" and "it most likely would be futile to maintain a Chapter 11 case in the United States"); *Northshore Mainland Servs.*, 537 B.R. at 198, 207–208 (abstaining in favor of Bahamian insolvency proceedings where Bahamian Supreme Court refused to recognize U.S chapter 11 proceedings); *In re Compañía de Alimentos Fargo, S.A.*, 376 B.R. 427, 440 (Bankr. S.D.N.Y. 2007) (abstaining in favor of Argentine proceedings in circumstances where it was "unlikely that the Argentine court will simply accept the chapter 11 plan as the Argentine plan, and approve it").

to do.  In fact, the GP's U.S. counsel has been heavily involved in the Cayman proceeding from the outset, including by providing affidavit evidence in those proceedings.  The trial will be short, and the Cayman Court stands ready to conduct it and to issue a prompt decision.

64.    As this Court held in *Scarborough-St. James*, "no prejudice to the Debtor . . . would result from permitting the resolution of issues to proceed" in another court, where that court "is in a position to make [the] determination" of relevant issues and "has familiarity with the parties and the facts of the case as evidenced by the previous orders it has entered."  535 B.R. at 68; *see also, e.g.*, *In re Abeinsa Holding, Inc.*, 2016 WL 5867039, at *4 (Bankr. D. Del. Oct. 6, 2016) ("[T]he Oregon District Court is best positioned to take up the matter and, due to [the Oregon judge's] familiarity with the dispute and concurrent jurisdiction over the aspects involving PGE and the Sureties, render a final decision on all related matters."); *In re All Am. Props., Inc.*, 2010 WL 1541694, at *3 (Bankr. M.D. Pa. Apr. 15, 2010) ("Having addressed other issues related to the Franchise Agreement, the District Court is in a better position than this Court to promptly resolve this matter.  Therefore, Debtor will not be prejudiced by continuation of the litigation in the District Court, which has mastered the facts and law. . . .").

65.    The Cayman proceeding is far advanced.  It was weeks away from trial (including holiday weeks) when these cases were filed.  Discovery is closed, with massive amounts of evidence already presented.  No additional discovery is needed or anticipated.  At this point, the two-day trial will be focused on legal arguments regarding uncontested facts.  Both parties are certainly able to ready themselves for the streamlined trial in February on more limited issues than those that they were previously prepared to try in January.  *See, e.g.*, *F-Squared*, 546 B.R. at 548 (granting relief from stay where class action "was primed for a ruling on a motion to dismiss"); *see also In re SCO Grp.*, 395 B.R. 852, 857 (Bankr. D. Del. 2007) (considering "whether the

parties are ready for trial in the other proceeding" in weighing whether to lift stay), *Collier on Bankruptcy* ¶ 362.07[3][a] (relief may be granted "to permit litigation to be concluded in another forum, particularly if the . . . suit . . . is ready for trial"); *cf. In re Cont'l Airlines, Inc.*, 152 B.R. 420, 424–25 (D. Del. 1993) (increase in litigation expenses did not justify denial of relief from stay).  Because the parties have already expended significant efforts in the Cayman case, no prejudice to the Debtor would result from permitting the long-planned trial to proceed. *Scarborough-St. James*, 535 B.R. at 68 (lifting stay to allow litigation over termination of lease to proceed in Michigan state court).  Indeed, "[t]he longer the trial is delayed, the more burdensome it is to both parties to ready themselves again."  *SCO Grp.*, 395 B.R. at 858.

66.    The other purposes of the stay identified by this Court in *Scarborough-St. James*— avoiding giving a preference to certain creditors and avoiding interference with an "orderly liquidation or rehabilitation"—are not implicated here.  The Fund is undisputedly solvent, so there is no danger that any Fund creditors will go unpaid, and the Fund's assets are held in trust almost entirely for the very LPs who are seeking the requested relief.[14]  And, as discussed above, allowing

---

[14]    Although the LPs are seeking relief from the automatic stay because the GP is a defendant in the Cayman action, the LPs' view is that the requested relief does not implicate property of any of the Fund-Level Debtors' estates.  Under Cayman law, the GP holds the Fund's assets on trust for the Fund's limited partners.  *See supra* ¶¶ 22–25.  As such, by operation of section 541 of the Bankruptcy Code and applicable case law, it is the view of the LPs that the Fund's assets are not part of any Debtor's estate.  *See* Bankruptcy Code § 541(b)(1) ("Property of the estate does not include . . . any power that the debtor may exercise solely for the benefit of an entity other than the debtor."); *id.* § 541(d) ("Property in which the debtor holds . . . only legal title and not an equitable interest . . . becomes property of the estate . . . only to the extent of the debtor's legal title . . . but not to the extent of any equitable interest in such property that the debtor does not hold."); *In re SemCrude, L.P.*, 418 B.R. 98, 106 (Bankr. D. Del. 2009) ("[F]unds in the Defendants' possession held for third parties, such as the funds held in resulting trust . . . , are not part of the Defendants' bankruptcy estates") (citing *Begier v. IRS*, 496 U.S. 53 (1990)).  While this issue need not be decided in connection with the instant motion, it is likely to become relevant to the extent the Fund-Level Debtors' chapter 11 cases move forward, and the LPs reserve all rights accordingly.

the Cayman Trial to proceed would promote rather than hinder the goal of an orderly disposition of assets.

### C.    The Stay Will Cause Hardship to the LPs That Outweighs Any Alleged Hardship to the Debtors.

67.    The second factor identified in *Scarborough-St. James*—hardship to the moving party outweighing any hardship to the Debtor—also strongly supports lifting the stay.  The hardship to the LPs of continuing these chapter 11 cases under the management of a conflicted fiduciary would be immense.  As a matter of law, the GP is a fiduciary for the Fund's limited partners, required to act solely in their interest.  Phillips Decl. ¶¶ 74, 81 ("[I]n light of its role as trustee, . . . 'the general partner of an ELP owes fiduciary duties to all the ELP's limited partners.' . . . the GP owes a fiduciary duty to the limited partners to act solely in the interests of the limited partners, subject to the terms of the ELP agreement.") (internal citations omitted).  But in practice, this GP has openly stated its intent to use these chapter 11 proceedings to ***displace*** the very LPs to which it owes absolute, one-way fiduciary duties—including duties of loyalty and care—under Cayman law.[15] This GP had lost the trust and confidence of the Fund's LPs long before filing these solvent chapter 11 cases without warning or consent.  That was the basis for the June 2025 winding-up petition that the Cayman Court set for trial in January 2026.  If it had not filed chapter 11, the GP was on track to be replaced in its role as fiduciary by independent court-appointed JOLs, who would be

---

[15]    While the GP's rationale for ignoring its fiduciary duties has yet to become fully clear, it may be that the GP is seeking to benefit certain underperforming portfolio companies at the expense of their shareholder, the Fund, and the LPs who have exercised their contractual budgetary authority to decline future equity funding after the companies have failed to meet operational milestones.  The LPs do not argue that, to the extent the portfolio companies themselves have limited resources or are insolvent, they may be in need of reorganization. The LPs are willing to discuss appropriate steps with respect to these underperforming entities in due course.  But that is not the subject of this motion, which seeks clarity as to the governance of the Fund itself.

answerable to the Cayman Court and responsible for actually acting in the best interests of all of the Fund's limited partners. Phillips Decl. ¶¶ 24(h), 100, 128–43. Continuing these cases at the direction of a GP that only kept its place by filing a solvent chapter 11 case to control billions of dollars of assets it holds in trust for the LPs is, in addition to being a blatant breach of trust, an expensive waste of the Fund's cash position and a distraction from seeking the orderly winding-up of the Fund's affairs.

68.    Bankruptcy courts have recognized that, where a case was close to trial as of the date of the bankruptcy filing, failure to grant relief from the automatic stay works hardship to the non-debtor party—particularly where, as here, the parties have expended substantial resources in preparing for the trial. *See Abeinsa Holding*, 2016 WL 5867039, at *4; *SCO Grp.*, 395 B.R. at 858–59; *see also In re Cooke*, 2007 WL 2102687, at *2–3 (Bankr. D. Del. July 13, 2007). This prejudice is especially acute where, as here, there are obvious reasons to be concerned that the bankruptcy filing is an effort at forum shopping by the Debtor. *Scarborough-St. James*, 535 B.R. at 70 (lifting stay where the "Debtor is not shying away from litigation; rather, Debtor seeks to litigate only issues of its choosing and in its preferred forum").

69.    The GP filed bankruptcy petitions for itself and the Fund—after securing a nearly $100 million Delaware Chancery judgment that the LPs had confirmed would be paid within 10 days— on the eve of the final pretrial conference in the Cayman Court. They did so without even consulting or informing their Cayman counsel. Ex. AA, Cayman PTR Tr., Dec. 17, 2025, at 24:1– 6; Ex. F, Cayman Judgment, Dec. 22, 2025 ¶ 5. By all indications, the GP's primary reason for filing these solvent chapter 11 cases for itself and the Fund was to stop the Cayman Court from deciding the Cayman Trial, to try to take the LPs' assets, and to try to replace the LPs as limited partners of the Fund. Ex. DD, GP Letter to Chancery Court, Dec. 11, 2025 ("[A] 'liquidation' is

exactly what [the GP] and its debtor affiliates are trying to avoid by commencing chapter 11 cases."); Dkt. 18, First Day Decl. of Dr. Seth L. Harrison ¶¶ 12 (describing how a "Cayman Islands winding up would be catastrophic for all stakeholders" and "[a]gainst this background [of Cayman proceedings], the Debtors felt compelled to commence these Chapter 11 Cases and seek the protection of the Court"), 17 ("The Debtors now seek the Bankruptcy Court's protection to preserve their valuable PortCos, [and] potentially bring in new investors to replace the defaulting limited partners").

70.    The continued delay of the Cayman Trial is also causing ongoing hardship in the form of lost governance rights.  Under the LPA—the Fund's governance document—the LPs have a right to seek a winding-up of the Fund under Cayman law if certain conditions have been met. Phillips Decl. ¶¶ 147–50; *see also* Ex. J, LPA ¶ 10(b)(i) (calling for winding-up upon the occurrence of an event under former section 15(5), now 36(7), of the ELP Act), *id.* ¶ 11(a) ("Following termination pursuant to Paragraph 10(b), the Partnership shall be wound up in an orderly manner."); *cf., e.g.*, *Marvel*, 209 B.R. at 838; *Indianapolis Downs*, 486 B.R. at 302.  That governance right can only be vindicated by allowing the Cayman Trial to proceed.  Justice Asif has already recognized the urgency of making this determination promptly, noting that "***an orderly separation of the GP from the LPs needs to occur sooner rather than later to avoid the continuation of these obviously corrosive disputes between the parties on each side***." Ex. F, Cayman Judgment, Dec. 22, 2025, ¶ 13 (emphasis added).  Delaying that necessary and legally-mandated separation is itself a hardship and the LPs' interest in vindicating their interests in the Cayman court far outweighs any interest of the Debtors in enforcing the automatic stay.

71.    The LPs, as owners of virtually all of the Fund's assets and therefore the core economic parties in interest in the Fund-Level Debtors' solvent chapter 11 cases, have an interest

in maximizing the Fund's value.  That interest is under attack by the GP in these cases.  Even though the GP's only proper role in the Fund is as a fiduciary for the Fund's limited partners, *see* Phillips Decl. ¶¶ 74–76, and the GP should be acting to maximize the Fund's value in accordance with the LPA, this GP appears to have other goals in mind.  The LPs are deeply concerned about, among other things, the GP's proposal for the Fund to provide debt financing to both debtor and non-debtor portfolio companies regardless of whether they have an approved budget as required by the LPA, as well as the GP's clearly stated intent to bring in new financing at the Fund level and use that financing to dilute the LPs' ownership interests.  Dkt. 81, Hr'g Tr., Dec. 17, 2025, at 18:10–13 ("We're going to be looking for debtor-in-possession financing, short term, and then a bridge to exit for some other investor who wants to come in and work with these portfolio companies."); Dkt. 89, Mot. for Interim and Final Funding ¶ 9 ("[U]ltimately the Debtors intend to propose a plan of reorganization to restructure the Partnership Debtor and the Portfolio Companies that provides the Portfolio Companies access to ongoing capital and removes Rigmora from interfering with the Portfolio Companies that are in pre-clinical and clinical stages").

72.     While the LPs firmly believe that the GP's stated strategy violates both the provisions and the principles of the Bankruptcy Code, it will take time, effort, and massive expense to litigate such issues in these chapter 11 cases.  These concerns can be much more efficiently and appropriately resolved by granting relief from the stay to allow the Cayman Court to address the parties' underlying governance dispute, thus clarifying who speaks for the Fund and what the nature of the GP's duties to the LP investors are under Cayman law.

**D.     The LPs Have Demonstrated a Sufficient Likelihood of Success on the Merits in the Cayman Proceeding.**

73.     As for the last factor this Court identified in *Scarborough-St. James*, 535 B.R. at 68, the LPs are likely to prevail on the merits in the Cayman proceeding.  Even a "slight showing of

possible success" in the Cayman proceeding would support this factor. *F-Squared*, 546 B.R. at

549 (internal quotation marks omitted); *see also Cont'l Airlines*, 152 B.R. at 426; *SCO Grp.*, 395

B.R. at 859; *In re ABC Learning Centres Ltd.*, 445 B.R. 318, 338–39 (Bankr. D. Del. 2010).  Here,

the likelihood is overwhelmingly in the LPs' favor.

74.    As set forth in the accompanying declaration of Mark Phillips KC, the LPs' argument

for a compulsory winding up of the Fund because its substratum is gone—*i.e.*, it cannot carry out

its business in accordance with its partners' reasonable expectations—is strong.  Phillips Decl. ¶¶

161–62; *see also* Ex. R, Cayman Skeleton ¶¶ 12.2, 23–28; Ex. AA, Cayman PTR Tr., Dec. 17,

2025, at 1–3, 15–21, 30–31.  That argument is based in substantial part on the Chancery Court's

post-trial opinion holding that the GP had unknowingly exhausted the capital commitments to the

Fund and is further confirmed by Dr. Harrison's assertion in his First Day Declaration that the

Debtors seek a "restructuring of the Partnership's capital structure," including bringing in "new

investors to replace" purportedly "defaulting limited partners."  Dkt. 18 at 17.[16]  Ousting the LPs

and implementing a new capital structure while dismissing the LPs' fundamental rights under the

LPA as "prepetition contractual limitations [that] do not bind the Debtors now," Dkt. 89, Mot. for

Interim and Final Funding ¶ 30 n.3, very obviously demonstrates that the GP cannot carry out its

business in accordance with its partners' reasonable expectations.

75.    The GP's assertions would be shocking in any context, given that the LPs have funded

approximately 98% of the Fund's investments, with billions of dollars over 13-plus years, and that

the supposed "default" refers to nonpayment of capital calls issued eight minutes before the

Delaware Chancery complaint was filed and paid five days before they were due under the Court

---

[16]    Of course, the LPs did not default, and instead paid the Chancery Court judgment in full five
days ahead of the deadline on December 22, 2025.  Ex. Y, Email from Andrew Berdon dated
December 22, 2025.

of Chancery's judgment.  It is particularly shocking given that the GP is the LPs' fiduciary.  The LPs' Cayman law expert Mark Phillips KC explains that the LPs may directly rely upon the GP's own statements about its intended capital restructuring and replacement of the LPs in making the LPs' arguments to the Cayman Court under the loss of substratum test.  Phillips Decl. ¶¶ 161–162.

76.    The LPs' case that the Fund is already in dissolution as a matter of Cayman law as a result of the GP's bankruptcy filing is equally strong.  Phillips Decl. ¶¶ 24(c)–(f), 147–153; *see also* Ex. R, Cayman Skeleton ¶¶ 12.1, 30–32; Ex. AA, Cayman PTR Tr., Dec. 17, 2025, at 1–3, 27–30, 35–36.  Under the plain terms of the ELP Act, the GP's voluntary filing of its own bankruptcy is an "event of withdrawal," which triggers the automatic dissolution of the Fund under the terms of the ELP Act and the LPA.  Ex. M, ELP Act § 36(7); Ex, J, LPA ¶ 10(b)(i) (calling for winding-up upon the occurrence of an event under former section 15(5), now 36(7), of the ELP Act); *id.* ¶ 11(a) ("Following termination pursuant to Paragraph 10(b), the Partnership shall be wound up in an orderly manner.").  As a result, the GP's only remaining power under Cayman law is to carry out the winding up of the Fund under the LPA and Cayman law, not to take any other actions in these chapter 11 cases or otherwise to act as management of the Fund.  Phillips Decl. ¶¶ 168–73.  The LPs pointed this out immediately upon the Fund's filing of its chapter 11 case.  Dkt. 3 ¶¶ 62–64.

77.    Importantly, the Cayman Court has already expressed the "preliminary view" that the GP's actions in this case are "outside the proper scope of the GP's powers based on the limited partnership agreement which is binding upon the GP, and also having regard to applicable Cayman law on what a GP's obligations are in the context of a winding-up of a Cayman exempted limited partnership."  Ex. F, Cayman Judgment, Dec. 22, 2025 ¶ 21.  Indeed, as Phillips explains, the GP's failure to carry out a winding-up in accordance with the LPA and Cayman law itself provides a

ground for entry of a compulsory winding-up order, because the GP is not properly carrying out its duties.  Phillips Decl. ¶ 160.  These are ultimately issues to be decided by the Cayman Court, but the LPs have a strong case on all of them, supporting relief from the automatic stay to allow the Cayman proceeding to go forward.

78.    The strength of the LPs' winding-up petition is reflected in the GP's own attempts to prevent that trial from going forward.  Any general partner worthy of its limited partners' confidence should welcome judicial scrutiny rather than seek to sidestep the process entirely, or should step aside when asked.  As the Cayman Court stated in *In Re One Thousand & One Voices Africa Fund I LP*, KY 2024 GC 62, 9 May 2024 (attached as Ex. D):

> The best way for a manager who has lost the confidence of the investors to demonstrate their probity is to step aside, demonstrating confidence that their impugned management of the fund will be vindicated by independent scrutiny.  Instead, the importance of their continuing at the helm is apparently given priority over the wishes of the investors. . . . [T]he distinct impression is created that the determination to cling to office is motivated by self-interest at best, or the desire to forestall independent investigation into suspect dealings at worst.

*Id.* at [46].  Justice Asif remarked in November, before these chapter 11 filings, that the GP's conduct suggested "there is a real danger that the General Partner is failing to heed the words" of *One Thousand and One Voices*.  Ex. E, Cayman Judgment, Nov. 6, 2025 ¶ 44.  The GP's choice to fight multi-jurisdictional litigation at the LPs' expense over the course of almost a year with the very LPs to whom it owes fiduciary duties—and who have contributed approximately 98% of the capital to an extremely valuable fund that does not have any intrinsic financial distress according to the GP—is perhaps the strongest indication that the Fund cannot be carried on in accordance with its original purpose, the GP cannot regain the confidence of its investors, and the Fund should be wound up in accordance with the LPA and its governing law.

### E.    Principles of International Comity Support Lifting the Automatic Stay.

79.    In assessing relief from the stay in the chapter 11 cases of transnational businesses like the Fund-Level Debtors, U.S. bankruptcy courts can and do consider and respect the contributions that courts in other jurisdictions may make to resolving open issues, including by recognizing the need to cooperate across jurisdictions and, in some cases, to modify the stay to allow non-U.S. proceedings to move forward.  For transnational chapter 11 cases, it is essential—and protective of the orderly administration of the estate—for courts in each jurisdiction to acknowledge and work in cooperation with their sister courts in other jurisdictions.  This case presents a paradigmatic example of the need for that kind of deference and comity.  U.S. courts have recognized the importance of foreign courts' interests in being the ones to wind up their own domestic business entities.  *See Cunard S.S. Co. v. Salen Reefer Servs. AB*, 773 F.2d 452, 458 (2d Cir. 1985); *Northshore Mainland Servs.*, 537 B.R. at 207; *In re Spanish Cay Co.*, 161 B.R. 715, 724 (Bankr. S.D. Fla. 1993) (granting relief from automatic stay to allow party to institute winding-up proceedings in Bahamas); *see also In re Compañía de Alimentos Fargo, S.A.*, 376 B.R. 427, 434 (Bankr. S.D.N.Y. 2007) (collecting authorities regarding deference to foreign courts).

80.    The need for comity is pronounced here, where the Cayman courts have recognized that they have exclusive jurisdiction to consider a proceeding to wind up a Cayman Islands ELP such as the Fund, Ex. EE, *Family Mart China Holding Co Ltd v Ting Chuan (Cayman Islands) Holdings Corporation* [2023] UKPC 33 at 80; Ex. M, ELP Act § 36(3) (incorporating exclusive jurisdiction provision from § 92 of Cayman Companies Act), and where the Fund-Level Debtors have no financial distress that legitimately necessitates the use of chapter 11.

81.    Indeed, Justice Asif explicitly said that "I generally take the view that the conduct of the winding up of a Cayman exempted limited partnership, and by whom that winding up ought to be carried out, are more appropriately questions for the Grand Court to determine." Ex. F, Cayman

Judgment, Dec. 22, 2025 ¶ 20.  Having made this point, Justice Asif showed a great deal of deference to the U.S. courts.  He pushed his long-scheduled trial date so as not to force the parties to choose between complying with his order and the automatic stay.  *Id.* ¶ 14.  He instructed the parties not to do any work on preparing for the Cayman Trial until a hearing on this motion for the same reason.  *Id.* ¶ 18.  And he explicitly indicated that he was mindful of and intended to respect this Court's order partially lifting the stay.  *Id.* ¶ 9–10, 19.

82.    In return, Justice Asif asked only for the same courtesy and consideration.  He explained that "two days should be sufficient" for him to hold his trial and expressed confidence that "with goodwill and cooperation on both sides it ought to be feasible to have" that hearing.  *Id.* ¶ 26.  He also shared his view that holding the hearing would benefit all parties.  As he put it:

> It does seem to me that, at the very least, it would be of real utility for the Delaware judge to authorise the preparation of amended pleadings on both sides in order to re-state what are the issues that the Grand Court will need to determine in due course.  It also seems to me that it would be of real utility for the Delaware judge, as soon as possible, to determine that the limited issues that the LPs wish to put before the Grand Court for determination should be excluded from the scope of the automatic stay so that a determination on those issues can be made.  A decision on those points is likely to be of real benefit to the parties and also to the Delaware court if the Chapter 11 proceedings are not dismissed and continue.

*Id.* ¶ 19.  Before concluding, Justice Asif expressed concern that the GP's proposal in Delaware "for capital restructuring and the introduction of new investors" would be "outside the proper scope of the GP's powers" under the LPA and "applicable Cayman law on what a GP's obligations are in the context of a winding-up of a Cayman exempted limited partnership."  *Id.* ¶ 21.  Despite sharing these views, Justice Asif indicated that he would "not make an order at this stage imposing any procedural timeline for the preparation of amended pleadings" out of deference to the automatic stay.  *Id.* ¶ 18.

83.     There is no reason not to extend Justice Asif the requested comity.  This case does not implicate any of the grounds that might justify denial of comity, such as lack of due process or unequal treatment of creditors in the foreign court.  *See Vertiv, Inc. v. Wayne Burt PTE, Ltd.*, 92 F.4th 169, 180¬81 (3d Cir. 2024).

84.     *In re Soundview Elite Ltd.*, which both parties have cited, is instructive.  In that case, a Cayman court appointed liquidators for an insolvent Cayman company, and the liquidators proceeded to administer the company without regard to the automatic stay triggered by the company's chapter 11 filing.  503 B.R. at 584, 586–88.  The Bankruptcy Court found that these actions violated the automatic stay but granted retroactive relief from the automatic stay in order to validate the liquidators' actions.  *Id.* at 589.  In particular, the Bankruptcy Court noted that sections 97 and 99 of the Companies Act created a possibility of conflicting stays, *id.* at 590, and emphasized the importance of working cooperatively with the Cayman Court to achieve an orderly result:

> It's my desire, as a U.S. bankruptcy judge, to render comity to Cayman needs and concerns to the extent I can, and I'm confident that the Cayman Court, now that it knows my needs and concerns, would do the same for me.  That's especially so since we share common goals—maximizing value for stakeholders in the cases on our watch; ensuring the faithful performance of corporate responsibilities in those cases (and appointing independent fiduciaries when necessary); and, to the extent applicable, recognizing regulatory needs and concerns. . . .  Ultimately, the best course is for a comity driven approach under which each court cedes any applicable primacy to the other, by relief from the stay, which each nation authorizes its judges to grant.

*Id.* at 592.[17]

---

[17]   The Bankruptcy Court in *Soundview* denied dismissal on grounds of bad faith for reasons the LPs believe are inapplicable here.  This will be addressed in separate briefing on the LPs' pending motion to dismiss.  The Bankruptcy Court further ordered the appointment of a

85.    The same principle of comity that the court applied to lift the stay in *Soundview* also applies here.  Justice Asif has clearly indicated his intention to respect this Court's jurisdiction.  Ex. F, Cayman Judgment, Dec. 22, 2025 ¶ 9.  This Court should likewise allow the Cayman Court to proceed with the proposed two-day trial as requested by Justice Asif.  Relief from the stay to allow the Cayman Court to decide the relevant issues of Cayman law is all the more important given Justice Asif's concern that the GP's restructuring proposal appears to be "outside the proper scope" of the GP's powers, *id.* ¶ 21, an issue with which the Cayman Court is most familiar and which it is prepared to decide promptly.

## **CONCLUSION**

WHEREFORE, the LPs respectfully request the Court (a) enter an order, substantially in the form attached hereto as **Exhibit A**, granting relief from the automatic stay as requested herein, and grant such other and further relief as is just and proper.

---

chapter 11 trustee because of the need for investigation of management actions.  The LPs reserve the right to seek similar relief here if they consider it necessary or appropriate.

Dated: January 6, 2026                    Respectfully Submitted,
Wilmington, Delaware


**RICHARDS, LAYTON &**                    **DEBEVOISE & PLIMPTON LLP**
**FINGER, P.A.**

*/s/ Clint M. Carlisle*
John H. Knight (No. 3848)                Shannon Rose Selden (admiited *pro hac vice*)
Michael J. Merchant (No. 3854)           M. Natasha Labovitz (admitted *pro hac vice*)
Daniel E. Kaprow (No. 6295)              William H. Taft V (admitted *pro hac vice*)
Clint M. Carlisle (No. 7313)             Zachary H. Saltzman (admitted *pro hac vice*)
Nicholas A. Franchi (No. 7401)           Natascha Born (admitted *pro hac vice*)
One Rodney Square                        Carl Micarelli (admitted *pro hac vice*)
920 North King Street                    Sebastian Dutz (admitted *pro hac vice*)
Wilmington, DE 19801                      66 Hudson Boulevard
Telephone:  (302) 651-7700               New York, New York 10001
Facsimile:  (302) 651-7701               Telephone:  (212) 909-6000
Email:  knight@rlf.com                   Email: srselden@debevoise.com
        merchant@rlf.com                        nlabovitz@debevoise.com
        kaprow@rlf.com                          whtaft@debevoise.com
        carlisle@rlf.com                        zsaltzman@debevoise.com
        franchi@rlf.com                         nborn@debevoise.com
                                                cmicarelli@debevoise.com
                                                spdutz@debevoise.com


*Counsel for Rigmora Biotech Investor One LP*
*(by and through its general partner Unicorn*
*Biotech Ventures One Ltd) and Rigmora Biotech*
*Investor Two LP (by and through its general*
*partner Unicorn Biotech Ventures Two Ltd)*