## UNITED STATES BANKRUPTCY COURT
### DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| APPLE TREE LIFE SCIENCES, INC., *et al.*, | Case No. 25-12177 (LSS) |
| Debtors. | (Jointly Administered) |

## <u>MEMORANDUM OPINION</u>

1. **Motion of Rigmora Biotech Investor One LP and Rigmora Biotech Investor Two LP for Relief from the Automatic Stay (D.I. 125)**

2. **Amended Motion of Rigmora Biotech Investor One LP and Rigmora Biotech Investor Two LP for an Order Dismissing the Bankruptcy Cases of ATP Life Science Ventures L.P. and ATP III GP, Ltd. (D.I. 204)**

Apple Tree Life Sciences Venture, L.P. (the "Fund" or "Partnership") is a venture capital fund formed as a Cayman Islands exempted limited partnership. Since 2012, its mission has been to invest in pharmaceutical and medically-related start-up companies. It has investments in fifteen portfolio companies whose research spans from developing treatments for tumors and cancers to obesity. Unless extended, the Fund's term expires on February 6, 2029. Of the $2.525 billion in committed funding approximately $25 million remains subject to future capital calls.

Between December 9, 2025 and January 15, 2026, ATP III GP, Ltd (the "General Partner"), which is charged with managing the Fund, filed voluntary chapter 11 petitions for itself, the Fund and seven of its portfolio companies. Since that time, certain limited partners (the "Rigmora LPs") akin to "silent investors," have objected to nearly all requests for relief. They have also filed the instant motions to dismiss and for relief from stay, to which Debtors have objected. Put in its most charitable light, the motions and associated objections reflect a difference of opinion on how to maximize the value of a "closed-end"

venture capital fund nearing the end of its contractual and monetary lifespan. The General Partner believes the portfolio companies have promise such that continued funding over the next few years both brings value to the Fund and continues to promote the Fund's mission. The Rigmora LPs disagree believing that their investment in the Fund is best served by more selective funding, particularly of the Debtor portfolio companies, which are in the pre-clinical stage. The Rigmora LPs also contend that bankruptcy is not an option, the Fund has no problem to solve through bankruptcy and the Fund should be wound up in the Cayman Islands courts.

Having read the filings of the parties, received expert testimony on both venture capital funds generally and Cayman law and heard testimony from Debtors' representatives, the Rigmora LPs and certain of the Debtor portfolio companies, I am denying the motion to dismiss. I conclude that the Fund is eligible to be a debtor and that the Fund and the General Partner filed their cases in good faith.

But, I am granting limited relief from the stay to permit the partners to proceed with certain aspects of the winding up proceedings pending in in the Grand Court of the Cayman Islands. The winding up petition was filed by the Rigmora LPs on June 6, 2025 only one week after the General Partner sought relief in the Court of Chancery seeking, among other things, to enforce capital calls. While there was some jockeying among the partners for advantages in each court, ultimately, the Grand Court deferred trial on the winding up petition in order to provide the Court of Chancery the opportunity to rule on the matters before it. For its part, on December 5, 2025, the Court of Chancery ruled on matters it determined were ripe, reserved where they were not and deferred to the Grand Court on issues central to the winding up petition.

Under the unique circumstances of these cases, I will also defer to the Grand Court on two issues it is best positioned to resolve and grant limited relief from stay to permit the partners to proceed on the winding up petition so that the Grand Court can determine: (i) whether the Rigmora LPs can prove that they have justifiably and irretrievably lost all trust and confidence in the General Partner's ability to manage the Fund and (ii) whether the Fund has lost its substratum. The Rigmora LPs may also seek to have Joint Official Liquidators appointed to act in the stead of the General Partner if they are successful on one of the two grounds above. But the automatic stay is otherwise in place. The Rigmora LPs may not seek other relief from the Grand Court, including to transfer (or deem transferred) the rights or property of the Fund to the Joint Official Liquidators or to permit the Joint Official Liquidators to wind up the Partnership in the Grand Court. Further, this Court will not recognize a monetary judgment against the General Partner or the Fund. To be clear, while Debtors remain in bankruptcy the automatic stay is in force and will continue to apply to the Rigmora LPs and to any Joint Official Liquidators that may be appointed.

I recognize the challenging situation that any Joint Official Liquidators, to the extent appointed, may face. But, any challenges will be addressed when they surface and to the extent required, a protocol can be established to address any conflicts between the proceedings before me and any proceedings before the Grand Court.

**Background**[1]

*The Fund, the General Partner and the Portfolio Companies*

In 2012, Dr. Seth Harrison and Dr. Dimitry Rybolovlev, both doctors turned venture capitalists,[2] established Apple Tree Partners IV, L.P., which was later renamed to ATP Life Science Ventures, L.P.[3] The Fund is a venture capital fund that was established for the "sole purpose" of investing in "pharmaceutical, medical and other medically-related business projects."[4] The relationship is embodied in that certain First Amended and Restated Partnership Agreement and its twenty-two amendments (collectively, the "LPA").[5]

The Fund is a Cayman Islands exempted limited partnership ("ELP") formed under the Exempted Limited Partnership Act ("ELP Act").[6] It has one general partner, two majority limited partners and at least 12 non-contributing limited partners.[7] It is capitalized

---

[1] This Opinion constitutes my findings of fact and conclusions of law. My findings are derived from testimony presented at the January 20, 2026, February 19–20, 2026 and February 25–26, 2026, hearings as well as exhibits. Unfortunately, the parties did not agree to a joint set of exhibits. "JX __" refers to joint exhibits admitted at the hearing. "JA __" refers to joint authorities provided by the parties.

[2] Dr. Harrison received a Doctor of Medicine and a Master of Business Administration from Columbia University and trained as a surgeon at Columbia Presbyterian Medical Center. Hr'g Tr. 16:24–17:3, Jan. 20, 2026, Dkt No. 210. Dr. Rybolovlev received a Doctor of Medicine from Perm Medical Institute. JA-78, Post-Tr. Mem. Op., at 3.

[3] Hr'g Tr. 108:19–22, Feb. 26, 2026, Dkt. No. 426.

[4] JX-0, LPA ¶ 1(c).

[5] JX-0–JX-22.

[6] Exempted Limited Partnership Act (2025 Revision), JA-18. While I did not receive testimony on the benefits of forming a Cayman Islands exempted limited partnership, I assume they include favorable tax treatment, contractual flexibility and the ability to limit liability.

[7] The non-contributing limited partners are present or former employees of Apple Tree Life Sciences, Inc., a wholly-owned subsidiary of the Fund. JX-230, Second Witness Statement of Dr. Seth Harrison ¶¶ 29–32; JA-78, Post-Tr. Mem. Op., at 12 n.68.

by commitments from its contributing limited partners, which are referred to as "Contingent Subscriptions" in the LPA.[8] The term of the Fund expires on February 6, 2029; it can be extended for up to two one-year periods at the discretion of the General Partner.[9] By law, it cannot do outward facing business in the Cayman Islands.[10]

Debtor ATP III GP, Ltd., the General Partner, is a Cayman Islands company owned by Dr. Harrison.[11] As the managing director of the General Partner, Dr. Harrison manages the Fund[12] and he is on the board of many of the portfolio companies.[13] Dr. Harrison is also a limited partner; his Contingent Subscription amount is $75 million.[14]

The majority limited partners are controlled by Dr. Rybolovlev and his family trust (the "Family Office"). The Family Office manages its investments through Rigmora Holdings Limited ("Rigmora Holdings"), which has numerous investments in businesses unrelated to biotechnology and the Fund.[15] For its investment in the Fund, Rigmora Holdings formed Rigmora Biotech Investor One LP and Rigmora Biotech Investor Two LP (i.e., the Rigmora LPs), two special purpose entities.[16] The Rigmora LPs' original

---

[8] JX-0, LPA ¶ 5(a)(i).

[9] JX-18, LPA Amend. 18;  JX-20, LPA Amend. 20.

[10] JA-18, ELP Act § 4(1).

[11] H'rg Tr. 17:13–18:5, Jan. 20, 2026, Dkt. No. 210

[12] Hr'g Tr. 17:19–18:3, Jan. 20, 2026, Dkt, No. 210.

[13] Hr'g Tr. 102:20–24, Feb. 26, 2026, Dkt. No. 426.

[14] JA-78, Post-Tr. Mem. Op., at 48 n.270.

[15] Hr'g Tr 16:5–10, Feb. 25, 2026, Dkt. No. 425 ("So the trust has numerous investments in other businesses, in the cash funds, real estate, soccer club.").

[16] Hr'g Tr. 15:22–23, Feb. 25, 2026, Dkt. No. 425.

Contingent Subscription amount was $1.425 billion. Its current Contingent Subscription amount is $2.45 billion.[17]

Debtor Apple Tree Life Sciences, Inc. ("ATLS") is a Delaware corporation wholly-owned by the Fund and one of two management companies that oversee the Fund's investments.[18] It handles the operational aspects of the Fund. It employs all those involved in founding, managing and overseeing the portfolio companies and holds the Fund's leases and contract expenses in return for an annual fee.[19]

The Fund reached a value of approximately $6.5 billion in early 2025 and has distributed over $2 billion to its limited partners during its thirteen-year life.[20] The Fund currently holds and invests in fifteen portfolio companies (the "Portfolio Company(ies)") that are researching and developing treatments for conditions such as cancer, obesity and blindness.[21] Two are in the commercial stage, four in the clinical stage and nine in the pre-clinical stage.[22] All are located in the United States.[23]

---

[17] JA-78, Post-Tr. Mem. Op., at 55.

[18] Hr'g Tr. 18:6–11, Jan. 20, 2026, Dkt. No. 210; JA-78, Post-Tr. Mem. Op., at 12 n.68.

[19] Hr'g Tr. 18:17–23, Jan. 20, 2026, Dkt. No. 210; Hr'g Tr. 102:9–15, Feb. 26, 2026, Dkt. No. 426 (ATLS employs those in the roles of "Venture partner, entrepreneur in residence, principals, various consultants . . . general counsel, finance team, et cetera.").

[20] Hr'g Tr. 167:7–14, Feb. 26, 2026, Dkt. No. 426.

[21] *See generally* Hr'g Tr. 20:2–21:12, 25:5–9, Jan. 20, 2026, Dkt. No. 210.

[22] Hr'g Tr. 23:24–24:25, Jan. 20, 2026, Dkt. No. 210.

[23] JX-23 (Nine Square Series A SPA); JX-24 (Initial Series A SPA); JX-25 (Nereid Series Seed SPA); JX-26 (Non-debtor Aulos Series A SPA); JX-27 (Apertor Series A SPA); JX-28 (Marlinspike Series A SPA); JX-29 (Evercrisp Series A SPA); JX-30 (Red Queen Series A SPA); JX-31 (Non debtor Aethon Series A SPA); JX-32 (Deep Apple Series A SPA); JX-33 (Non debtor Ascidian Series A SPA); JX-34 (Non debtor Marengo Series B SPA); JX-35 (Non debtor Replicate Series A SPA); JX-147 (Non debtor Aulos Series A-1 SPA); JX-148 (Non debtor Replicate SPA); JX-149

Generally, the Fund makes investments through the purchase of preferred stock as memorialized in individual Series A, B, or C Preferred Stock Purchase Agreements.[24] Dr. Harrison described this investment model as "hub and spokes" with the two management companies and the Fund serving as the hub and the Portfolio Companies being the spokes. Using this model gave the management companies and the Fund "the ability to found, manage and control" the Portfolio Companies "until they're essentially old enough to go out on their own."[25]

*The Onset of Troubles*

As set forth in the LPA, the General Partner manages the Fund's business. From 2012 through 2022, the Fund appears to have run relatively smoothly. Dr. Harrison along with other members of his management team sourced deals and presented them to the Family Office and/or Dr. Rybolovlev for approval.[26] Dr. Harrison, Anna Batarina, Dr. Rybolovlev and Rigmora Holdings' CEO, Anna Kolonchina, had a close relationship and met frequently by Zoom or in person to make all the decisions about the Rigmora LPs' participation in the Fund.[27]

But, no later than the fall of 2022, Rigmora Holdings was in financial trouble. On October 11, 2022, Yuri Bogdanov, then a special advisor to the trustees of the Rybolovlev

---

(Non debtor Elstar Series A SPA); JX-150 (Non debtor Galvanize Series B SPA); JX-151 (Non debtor Galvanize Series C SPA); JX-152 (Non debtor Limelight Series A2 SPA).

[24] H'rg Tr. 111:5–112:4, Feb. 26, 2026, Dkt. No. 426.

[25] Hr'g Tr. 103:7–18, Feb. 26, 2026, Dkt. No. 426.

[26] Hr'g Tr. 110:14–112:4, Feb. 26, 2026, Dkt. No. 426.

[27] Hr'g Tr. 129:7–14, Feb. 26, 2026, Dkt. No. 426.

family trust and the Family Office,[28] authored "the latest version" of a memorandum describing Rigmora Holdings' financial situation and suggesting action ("Bogdanov Memorandum").[29]  It is very straight forward and unambiguous.  Mr. Bogdanov writes: "[w]e are in a liquidity crisis, the primary task is to provide for funding needs for the next 2-3 years[.]"[30]  He recommends: "[a] possible long-term solution could be to create or acquire a cash flow business ('cash cow') + create a liquidity reserve ('cash buffer') for unforeseen circumstances + tight investment control[.]"[31]  He also posits creating a new fund with a major partner, or alternatively, creating a new fund and setting up subscription rights for ordinary investors thereby ending up with two funds.[32]  Regardless, Mr. Bogdanov states that Rigmora Holdings' current model is not sustainable.[33]

---

[28]  Hr'g Tr. 16:15–20, Feb. 25, 2026, Dkt. No. 425.  Mr. Bogdanov holds a business and real estate valuation degree from the Finance University of Russia; he has no education or experience relevant to the medical or bioscience industries. Hr'g Tr. 14:23–15:4, 51:11–52:2, Feb. 25, 2026, Dkt. No. 425.

[29]  JX-199.

[30]  JX-199, at 2.

[31]  JX-199, at 2.

[32]  JX-199, at 3.

[33]  Mr. Bogdanov concludes his memorandum as follows:

> **Summary**
> 1. The existing model cannot be stable
> 2. Resolving the crisis by divesting assets and reducing liabilities without changing the model will create conditions for new crisis
> 3. It is an objectively challenging moment now that forces us to put every effort to extinguish the fire, but we need to think right now about long term (ten years and above) development model with risk closure (cash buffer) and sustainability (cash cow) mechanisms
> 4. The first priority in this case is to put a "plug" on expenses (no new projects, reducing investment expenses), the tasks of creating cash buffer and finding new business can be solved in parallel

Consistent with the Bogdanov Memorandum, the relationship between the Rigmora LPs and the General Partner began to strain around the end of 2022/beginning of 2023.[34] In October 2022, Dr. Rybolovlev started to question already approved budgets for the pre-clinical Portfolio Companies.[35] And, in 2023, the Rigmora LPs requested distributions from Braeburn, Inc., the Fund's most valuable Portfolio Company.[36] The General Partner declined that request for many reasons including that Dr. Harrison thought Dr. Rybolovlev was going to default on previous funding commitments.[37] Further, Dr. Harrison linked the request for distributions from Braeburn and Dr. Rybolovlev's desire to stop funding the pre-clinical Portfolio Companies.[38] This first Braeburn distribution request was ultimately withdrawn.[39]

In 2024, the Rigmora LPs made a second Braeburn distribution request; two days later, they sued the General Partner in the Cayman Islands to compel the distribution.[40] The lawsuit was settled and on December 20, 2024 the parties executed Amendment 22 to the

---

5.   The proposed solutions are not ideal, do not address all possible challenges, but at the strategic planning stage they enable a discussion on how to get on a sustainable development path[,]

[34] Hr'g Tr. 123:19–125:22, Feb. 26, 2026, Dkt. No. 426.

[35] Hr'g Tr. 125:2–125:8, Feb. 26, 2026, Dkt. No. 426.

[36] Hr'g Tr. 125:9–17, 126:12–20, Feb. 26, 2026, Dkt. No. 426.

[37] Hr'g Tr. 123:3–12, Feb. 26, 2026, Dkt. No. 426.

[38] Hr'g Tr. 125:9-17, Feb. 26, 2026, Dkt. No. 426.

[39] Hr'g Tr. 125:18-22, Feb. 26, 2026, Dkt. No. 426.

[40] Hr'g Tr. 127:4–15, Feb. 26, 2026, Dkt. No. 426.

LPA.[41]  Dr. Harrison tried to obtain funding for certain financially distressed Portfolio Companies as part of the settlement, but was not successful.[42]  He was successful, however, in getting the Rigmora LPs' commitment to discuss new budgets for three clinical and two pre-clinical stage companies as part of Amendment 22.[43]

Within days of executing Amendment 22, the General Partner requested new budgets for those companies included in the amendment.[44]  The Rigmora LPs agreed to funding for only one of the clinical stage companies.[45]  Given the Rigmora LPs' reluctance to approve further budgets, the General Partner subsequently proposed reallocating funding

---

[41]  Hr'g Tr. 19:15–22, Feb. 25, 2026, Dkt. No. 425;  Hr'g Tr. 127:16–128:1, Feb. 26, 2026, Dkt. No. 426.

[42]  Hr'g Tr. 128:9–129:1, Feb. 26, 2026, Dkt. No. 426.

[43]  Hr'g Tr. 19:15–22, Feb. 25, 2026, Dkt. No. 425;  JX-22, LPA Amend. 22 ¶ 2:

> 2. **Additional Paragraphs of Agreement**.  New Paragraphs 26, 27 and 28 are hereby added to the Agreement, to read in their entirety as follows:
>
> "26. Budgets for Certain Other Portfolio Companies.  From and after the date of this Amendment, the General Partner and the Subject Limited Partner shall discuss new budgets for the Partnership in accordance with the process set forth in this Agreement to allow it to invest in Ascidian Therapeutics, Inc., Aulos Bioscience, Inc., Nereid Therapeutics Incorporated, Nine Square Therapeutics Corporation and Replicate Bioscience, Inc. sufficient amounts to enable each of them to operate for a period of twelve months after the remaining unfunded  amounts, if any, under their respective existing approved budgets are expected to have been fully utilized, i.e., January 2025, in the case of Aulos Bioscience, Inc.; February 2025, in the case of Replicate Bioscience, Inc.; April 2025, in the case of Nereid Therapeutics Incorporated; May 2025, in the case of Nine Square Therapeutics Corporation and the first quarter of 2026, in the case of Ascidian Therapeutics, Inc. (provided that the General Partner and the Subject Limited Partner shall discuss, in the near term, a new budget to fund a major clinical trial of Ascidian Therapeutics, Inc.).  If any approval of a new budget is given by the Subject Limited Partner, such approval shall be contingent upon at least $300 million being realized (including through deemed distributions) by the Subject Limited Partner on a sale or financing of its interest in ATP LLC. . . .

[44]  Hr'g Tr. 130:13–130:22, Feb. 26, 2026, Dkt. No. 426.

[45]  Hr'g Tr. 130:23-131:8, Feb. 26, 2026, Dkt. No. 426.

from pre-clinical companies to clinical companies.[46]  That, too, was not accepted by the Rigmora LPs.[47]

By the end of 2024 Anna Kolonchina stepped down as Rigmora Holding's CEO and Mr. Bogdanov became a co-CEO and the new chief investment officer.[48]  Consistent with the Bogdanov Memorandum, his objective was made clear: minimize Rigmora Holdings' exposure—vis-à-vis the Fund—to pre-clinical stage Portfolio Companies by winding down or liquidating them.[49]  By email dated May 15, 2025, Mr. Bogdanov informed Dr. Harrison of the Rigmora LPs' views that further funding of early-stage companies would waste the Fund's assets because (i) such companies did not meet certain milestones and the remaining budgets were insufficient to achieve them, (ii) such companies lacked interest from outside investors and (iii) the agreed budgets for these companies did not allow additional capital calls.[50]  The Rigmora LPs were open to discussing, on a voluntary basis, new budgets for clinical stage companies but only "upon [Dr. Harrison's] agreement to wind down or liquidate" pre-clinical stage companies.[51]

The lack of funding compelled certain Portfolio Companies to reduce their workforces and halt research programs.  For example, Apertor reduced its headcount from

---

[46]  Hr'g Tr. 153:3–10, Feb. 26, 2026, Dkt. No. 426.  To the extent necessary, the Rigmora LPs' motion to strike as nonresponsive, at 153:23–24, is denied.

[47]  JA-78, Post-Tr. Mem. Op., at 32.

[48]  Hr'g Tr. 16:11–14, Feb. 25, 2026, Dkt. No. 425.

[49]  Hr'g Tr. 56:5–11, Feb. 25, 2026, Dkt. No. 425;  JX-200.

[50]  JX-200.

[51]  JX-200.

approximately twenty-two full-time employees to four.[52] Apertor was well on its way to deliver an IND within budget and on time, but the lack of funding prevented that from happening.[53] Evercrisp reduced its headcount from approximately twenty full-time employees to four.[54] Evercrisp relies on outside vendors for data sets which require payment to maintain access to and avoid losing such data sets.[55] Initial had delivered a molecule that was being considered as a clinical candidate but was unable to advance two regulatory toxicology studies.[56] Nine Square had received a term sheet for $30 million from a potential investor but was unable to produce key studies for it to move to contracting.[57] Red Queen was unable to carry forward its work on a COVID treatment.[58]

### The Chancery Court Litigation

Against this backdrop, on May 30 and June 1, 2025, the General Partner called approximately $106 million in capital to fund six months of operations for seven pre-clinical companies, three clinical companies and management fees.[59] Also on May 30, the General Partner commenced an action in the Court of Chancery of the State of Delaware seeking

---

[52] Hr'g Tr. 23:15–21, Feb. 26, 2026, Dkt. No. 426.

[53] Hr'g Tr. 24:9–10, Feb. 26, 2026, Dkt. No. 426.

[54] Hr'g Tr. 20:18–25, Feb. 19, 2026, JX-58.

[55] Hr'g Tr. 22:3–10, Feb. 19, 2026, JX-58.

[56] Hr'g Tr. 27:22–25, Feb. 26, 2026, Dkt. No. 426.

[57] Hr'g Tr. 30:6–18, Feb. 26, 2026, Dkt. No. 426.

[58] Hr'g Tr. 54:6–7, Feb. 19, 2026, JX-58.

[59] JA-78, Post-Tr. Mem. Op., at 35

declaratory judgment relief ("Chancery Court Action").[60]  The central dispute was whether, under the LPA, the General Partner was entitled to specific performance of the May 30 and June 1 capital calls.

On December 5, 2025, the Court of Chancery issued its comprehensive 82-page Post-Trial Memorandum Opinion.[61]  In the December 11 Order ("Order") implementing her decision, Chancellor McCormick ordered the Rigmora LPs to specifically perform their obligation to fund capital calls in the aggregate amount of $96,960,925.88.55 for Aethon, Apertor, Ascidian, Deep Apple, Evercrisp, Initial, Marengo, Marlispike, Red Queen and ATLS fees and partnership expenses.  She did not order specific performance of the capital call made for Replicate.  Chancellor McCormick declined to imply a good faith term into the Rigmora LPs' rights to budget approval under the LPA.  She reserved judgment on the General Partner's request for declaratory relief concerning the exculpatory and discretionary action provisions in the LPA and dismissed, as not ripe, a limited declaration regarding certain defaulting partner provisions in the LPA.[62]

The Rigmora LPs have appealed the Order.

### The Winding Up Petition

In response to the Court of Chancery Action, on June 6, 2025, the Rigmora LPs filed a winding up petition in the Grand Court (as subsequently amended, the "Winding Up

---

[60] *ATP III GP, Ltd. v. Rigmora Biotech Inv. One LP*, C.A. No. 2025-0607-KSJM (Del. Ch. May 30, 2025).

[61] JA-78, Post-Tr. Mem. Op.

[62] Partial Final J. and Order Pursuant to Rule 54(b), *ATP III GP, Ltd. v. Rigmora Biotech Inv. One LP*, C.A. No. 2025-0607-KSJM (Del. Ch. Dec. 11, 2025).

Petition").[63]  By the Winding Up Petition, the Rigmora LPs seek to wind up the Partnership

pursuant to Section 36(3) of the ELP Act and Section 92(e) of the Companies Act, and/or

pursuant to Section 35 of the Partnership Act (2025 Revision).[64]  They also seek the

appointment of two Joint Official Liquidators to be vested with "all rights or property of

every description of the Partnership, including all choses in action, held or deemed to be

held by the GP."[65]  The Winding Up Petition asserts three grounds for the relief sought: (1)

justifiable and irretrievable loss of trust and confidence; (2) loss of substratum; and (3) need

for an independent investigation into the Partnership's affairs.

Trial was scheduled for January 12, 2026 and the Grand Court set aside time for

preparation and to write its opinion.  Due to the bankruptcy filings, the Winding Up

Petition has yet to be heard.

***The Bankruptcy Filing***

Four days after the Chancery Court's Post-Trial Memorandum Opinion, on

December 9, 2025, ATLS, the Fund and the General Partner filed their voluntary

bankruptcy petitions.  Dr. Harrison testified that he sought bankruptcy protection for the

Fund, the General Partner, ATLS and seven of the pre-clinical Portfolio Companies "to

create a plan of reorganization that will preserve and maximize the value under the LPA for

all the limited partners."[66]  He premised his decision to file on three primary reasons.  First,

---

[63]  JX-62, Winding Up Petition;  JX-63, Amended Winding Up Petition.

[64]  JX-63, at 1, 52.

[65]  JX-63, at 52.

[66]  Hr'g Tr. 140:16–141:2, 156:1–5, Feb. 26, 2026, Dkt. No. 426.  When asked whether he "intend[s] to use the bankruptcy process to confiscate 50% of the Rigmora LPs' interest in the Fund[,]" Dr. Harrison testified: "No, I do not."  Feb. 26, 2026, 148:13–16.  When asked whether he intends "to use the bankruptcy process to have Rigmora declared a defaulting partner to avail [himself] of the

he believed based on the Rigmora LPs' past conduct, that they would refuse to pay the Chancery Court judgment.[67]  Second, even if the Rigmora LPs paid the judgment, funding would only last for six months, "essentially a bridge to nowhere."[68]  Third, the Fund lacked liquidity to meet its obligations and the LPA constrains its ability to raise capital.[69]

On December 9, 2025, Debtors' cash position was approximately $17.4 million— $17.3 million held between the Fund and ATLS and $100,000 held across Apertor, Evercrisp, Initial, Marlinspike, Nereid, Nine Square and Red Queen.[70]  The Fund has obligations of approximately $350 million—$221 million in unfunded commitments to certain Debtor Portfolio Companies under certain Stock Purchase Agreements and $130 million in management fees and expenses through February, 2031.[71]

---

option to impose a default charge[,]" Dr. Harrison testified: "No, it is not."  Feb. 26, 2026, 149: 10–14.

[67]  Hr'g Tr. 139:9–21, Feb. 26, 2026, Dkt. No. 426.

[68]  Hr'g Tr. 139:10–14, Feb. 26, 2026, Dkt. No. 426.

[69]  Hr'g Tr. 139:10–21, Feb. 26, 2026, Dkt. No. 426.

[70]  Hr'g Tr. 43:15–24, Feb. 26, 2026, Dkt. No. 426.

[71]  Hr'g Tr. 140:2–12, Feb. 26, 2026, Dkt. No. 426.  As discussed below, the Rigmora LPs dispute these obligations.

Debtors' respective schedules of assets and liabilities, reflect the following as of their respective petition dates:

| Debtor | Total Assets | Total Liabilities | Cash & Cash Equivalents |
|---|---|---|---|
| Fund[72] | $3,606,347,236.65 | $221,708,538.00 | $14,422,358.58[73] |
| GP[74] | $0.00 | 221,708,538.00 | $0.00 |
| ATLS[75] | $14,770,078.42 | $256,853.24 | $8,768,414.43 |
| Apertor[76] | $21,680,146.87 | $2,812,947.99 | $9,997.69 |
| Everscrisp[77] | $49,657,419.85 | $3,557,458.40 | $17,023.5 |
| Initial[78] | $22,565,392.61 | $2,740,526.00 | $21,777.86 |
| Marlinspike[79] | $38,509,944.84 | $3,151,747.56 | $84,783.08 |
| Nereid[80] | $428,657.88 | $13,177,849.49 | $17,430.70 |
| Nine Square[81] | $1,142,568.44 | $2,587,129.97 | $244,733.17 |
| Red Queen[82] | $23,796,371.50 | $290,577.69 | $36,045.75 |

---

[72] Dkt. Nos. 238 (sealed), 239 (redacted).

[73] Mr. Mandarino testified that the correct amount is $17.3 million.  Hr'g Tr. 43:15–23, 50:17–52:1, Feb. 26, 2026, Dkt. No. 426.

[74] Dkt. No. 241.

[75] Dkt. No. 236.

[76] Dkt. No. 429.

[77] Dkt. No. 446.

[78] Dkt. No. 431.

[79] Dkt. No. 433.

[80] Dkt. No. 441.

[81] Dkt. No. 439.

[82] Dkt. No. 435.

The Fund also holds a judgment against Alexion Pharmaceuticals in the approximate amount of $350 million in connection with the sale of a prior portfolio company, Syntimmune, Inc.[83]  That judgment has yet to be collected.[84]

The General Partner's Schedules list a contingent, unliquidated and disputed claim held by Rigmora Biotech Investor One LP in an undetermined amount based on the LPA.[85] The General Partner's Schedules also list a contingent, unliquidated and disputed claim held by Rigmora Biotech Investor Two LP in an undetermined amount based on the Management Contract.[86]  It also lists as assets, in an undetermined amount, any and all rights under the LPA and the Management Contract.

**Procedural Posture**

On December 9, 2025, ATLS, the Fund and the General Partner filed voluntary bankruptcy petitions in this court.  On December 15, 2025, Apertor, Initial, Marlinspike, and Red Queen filed their voluntary petitions.  On January 1, 2026, Evercrisp and Nine Square filed their petitions.  Finally, on January 15, 2026, Nereid filed its petition.  The bankruptcy cases have been consolidated for administrative purposes only.

---

[83] Hr'g Tr. 168:13–169:4, Feb. 26, 2026, Dkt. No. 426.  The "Notes Specific to Schedules of Assets and Liabilities" qualifying the Schedules describe the judgment this way: "Debtor ATP Life Science Ventures, L.P. is a potential beneficiary of an approximately $370 million Chancery Court damages award and judgment in *Shareholder Representative Services LLC v. Alexion Pharmaceuticals, Inc.*, No. 2020-1069-MTZ.  However, this is not yet a final judgment and as such has been listed in the Schedules and Statements as a contingent and undetermined claim or cause of action."  Global Notes, at 10, Dkt. Nos. 238 (sealed), 239 (redacted).

[84] *Id.*

[85] Schedule E/F, at 7, Dkt. No. 241.

[86] Schedule E/F, at 8, Dkt. No. 241; Hr'g Tr. 245:1–7, Feb. 26, 2026, Dkt. No. 426 (The Rigmora LPs have stated an "intent to try to claw back money that was spent by the GP defending the case in the Caymans[.]").

17

On December 12, 2025, the Rigmora LPs moved to dismiss the then-pending bankruptcy cases and, only secondarily, sought relief from stay to proceed with the Winding Up Petition.[87]  They also sought to have the Motion to Dismiss heard on December 17, 2025.  Movants informed me that the presiding judge, the Honorable Justice Asif KC, had a pre-trial conference scheduled on the Winding Up Petition for December 17 and trial set for January 12, 2026.  In these circumstances, Chambers reached out to the parties to schedule a status conference for December 15, 2025.

At the status conference, Counsel for the Rigmora LPs asked that I grant limited relief from stay to permit the parties to appear at the pretrial conference so that Justice Asif could ask questions, get input and have dialogue with counsel.  Our of courtesy to Justice Asif and his calendar, I granted that limited stay relief.[88]  I certainly did not grant relief from stay for the Rigmora LPs to file an eighteen page skeleton argument with the Grand Court outlining new arguments, nor did the Rigmora LPs ask me to grant such relief or indicate

---

[87] Mot. of Rigmora Biotech Investor One LP and Rigmora Biotech Investor Two LP for an Order (I) Dismissing the Chapter 11 Cases and/or (II) Granting Relief from the Automatic Stay, Dkt. Nos. 3 (sealed), 7 (redacted);  Mot. to Shorten Notice and Obj. Periods for the Mot. of Rigmora Biotech Investor One LP and Rigmora Biotech Investor Two LP for an Order (I) Dismissing the Chapter 11 Cases and/or (II) Granting Relief from the Automatic Stay, Dkt. No. 5.

[88] Hr'g Tr. 31:18–32:2, Dec. 15, 2025, Dkt. No. 55:

> I will grant relief from stay for the pretrial conference to go forward in the Caymans on Wednesday.  I don't know, it hasn't really been described to me what would be -- what substantively would go forward, what dates might be established by the court, or what's really left before the judge to decide before the January 12th trial date. So, the parties -- I think the parties and judge can discuss that, but I will say that I don't anticipate that the January trial date is going to go forward given the need for me to decide what was filed, which is a motion to dismiss.

that under Grand Court procedures or Justice Asif's own procedures it would be necessary to do so in order for the pretrial conference to go forward.[89]

First day motions were heard on December 17, 2025. Debtors' motion to make secured loans to certain of the Portfolio Companies was heard on December 30, 2025 at which time the parties presented an agreed-to interim order permitting use of up to $2,950,000 to pay certain expenses of certain Portfolio Companies.[90] On January 20, 2026, during the middle of the contested final hearing on the motion, the Rigmora LPs agreed not to object to another approximately $11.91 million in funding and loans to/borrowing of an amount not to exceed $6,050,620.[91]

---

[89] JX-68. The skeleton brief, among other things, seeks to inject different issues into the trial on the Winding Up Petition. The new relief sought includes a determination by the Grand Court of a ruling on "whether, as a consequence of the Chapter 11 Bankruptcy Proceedings, the Partnership has entered voluntary liquidation pursuant to paragraph 10(b) of the LPA." To be clear, stay relief is not granted to the Rigmora LPs to pursue this new theory.

[90] *Interim Order to (I) Make and Accept Secured Loans to Portfolio Companies, (II) Authorize to the Extent Outside the Ordinary Course of Business Payment of Management Company Expenses and (III) Grant Related Relief*, Dkt. No. 102.

[91] The Fund was authorized to provide funding as follows: (i) $979,780 to Apertor (ii) $997,656 to Initial Therapeutics, (iii) $699,500 to Marlinspike, (iv) $882,000 to Red Queen, (v) $1,446,684 to Evercrisp, (vi) $2,163,901 to non-Debtor Aethon Therapeutics, Inc., (vii) $210,000 to Nine Square Therapeutics, Inc., (viii) $835,000 to Nereid and (ix) $3,700,000 to non-Debtor Aulos Bioscience, Inc. The Debtor Portfolio Companies were also authorized to borrow up to $6,050,620 from the Fund. *Final Order to (I) Make and Accept Secured Loans to Portfolio Companies, (II) Authorize to the Extent Outside the Ordinary Course of Business Payment of Management Company Expenses and (III) Grant Related Relief*, Dkt. No. 206.

The Rigmora LPs did not go forward with their original motion to dismiss. Rather, on January 23, 2026, they filed the amended motion to dismiss presently before me.[92] Debtors filed an opposition[93] and the Rigmora LPs filed a reply.[94]

Separately, on January 6, 2026, the Rigmora LPs' filed their motion for relief from stay, which was originally scheduled to be heard on January 27.[95] Instead, on January 27, the parties submitted an agreed Scheduling Order for the two motions setting a hearing for February 25, which was So Ordered.[96] On January 30, Debtors filed their opposition to the motion for relief from stay[97] and the Rigmora LPs thereafter filed a reply.[98]

Discovery and discovery disputes ensued.

The motions were presented jointly on February 25 and 26. The evidence consists of live testimony from one expert witness and six fact witnesses as well as exhibits as reflected

---

[92] Am. Mot. of Rigmora Biotech Investor One LP and Rigmora Biotech Investor Two LP for an Order Dismissing the Bankruptcy Cases of ATP Life Science Ventures L.P. and ATP III GP, Ltd, Dkt. Nos. 204 (sealed), 205 (redacted) ("Am. Mot. to Dismiss").

[93] Debtors' Opp'n to Rigmora's Mot. to Dismiss, Dkt. Nos. 245, (sealed), 260 redacted).

[94] Reply in Supp. of Am. Mot. of Rigmora Biotech Investor One LP and Rigmora Biotech Investor Two LP for an Order Dismissing the Bankruptcy Cases of ATP Life Science Ventures L.P. and ATP III GP, Ltd., Dkt. Nos. 371 (sealed), 449 (redacted).

[95] Mot. of Rigmora Biotech Investor One LP and Rigmora Biotech Investor Two LP for Relief from the Automatic Stay, Dkt. No. 125 ("Mot. for Relief from Stay").

[96] Dkt. Nos. 211 (Certification of Counsel), 248 (Scheduling Order for Contested Motions).

[97] Debtors' Opp'n to the Rigmora LPs' Mot. for Relief from the Automatic Stay, Dkt. No. 244.

[98] Reply in Supp. of Mot. of Rigmora Biotech Investor One LP and Rigmora Biotech Investor Two LP for Relief from the Automatic Stay, Dkt. No. 370.

in the Amended Joint Exhibit List filed on March 4.  Argument was entertained on March 6

after which I took the matters under advisement.[99]

**Discussion**

    I.       **The Court will not Dismiss the Bankruptcy Cases of the Fund and the General Partner**

       *A.  The Fund can be a debtor under the Bankruptcy Code*

*The Parties' Positions*

While it was not their first argument,[100] the Rigmora LPs contend that the Fund is

not eligible to be a debtor under § 109 of the Bankruptcy Code[101] so its case must be

dismissed.  Their argument is fairly straightforward.  Under the ELP Act, as interpreted by

the Privy Counsel, a Cayman exempted limited partnership does not have a legal

personality and owns no property.  The Rigmora LPs further contend that the Fund "has no

assets or business in the United States—or anywhere at all."[102]

Debtors' argument is also straightforward.  Debtors contend that the Fund is eligible

to be a debtor as it is a partnership that has its place of business in the United States and has

property in the United States by way of its ownership interest in the Portfolio Companies,

---

[99] In the meantime, Debtors filed their Motion for Entry of Order (I) Authorizing Use of Funds to (A) Fund Portfolio Companies, (B) Pay Management Company Expenses and (C) Pay Chapter 11 Expenses, and (II) Granting Related Relief, Dkt. No. 228 and Debtors' Motion for Entry of Interim and Final Orders: (A) Authorizing the Debtors to Incur Post-Petition Debt, (B) Granting Super-Priority Administrative Expense Claims, (C) Scheduling a Final Hearing, and (D) Granting Related Relief, Dkt. No. 313.  A combined evidentiary hearing on these motions was held on February 19, 2025 and argument was heard on February 20.  A separate opinion will issue on these motions.

[100] This argument was not made in the original motion to dismiss, is the last argument in the current motion to dismiss and was barely, if at all, discussed by the Rigmora LPs' counsel at argument.  But, as it is a gating issue, I address it first.

[101] 11 U.S.C. §§ 101 *et seq.*

[102] Am. Mot. to Dismiss ¶ 87, Dkt. Nos. 204 (sealed), 205 (redacted).

which are all incorporated in the State of Delaware as well as cash it holds in accounts in banks located in the United States.

The one thing the parties agree on is that this is a matter of first impression.

*Discussion*

Of course, we start with the Bankruptcy Code. Section 109 provides, in relevant part:

> Notwithstanding any other provision of this section, only a person that resides or has a domicile, a place of business, or property in the United States . . . may be a debtor under this title.

In turn, "person" is defined as including "an individual, partnership, and corporation."[103] As the Fund is a partnership, as long as it has a place of business or property in the United States, it may be a debtor under the Bankruptcy Code.

In essence, the Rigmora LPs' argument is that I should ignore a code-based determination of who may file a bankruptcy in favor of non-bankruptcy law determinations and/or definitions of "person" or characteristics thereof. Relying on Cayman law, the Rigmora LPs argue that the Fund's lack of personality and alleged inability to own property[104] prevent it from qualifying as a debtor. In essence, they argue that an ELP is a "special" kind of partnership that therefore does not qualify as a person for purposes of § 109.

In support of their argument, the Rigmora LPs rely most heavily on two cases decided by the Judicial Committee of the Privy Council, the highest court in the Cayman Islands, as well as the testimony of Mark Phillips, K.C. who was qualified during trial as an

---

[103] 11 U.S.C. § 101(41).

[104] The cases cited for the proposition that an alleged inability to own property means an entity cannot qualify to be a debtor address what is "property of the estate," a different concept.

22

expert on Cayman law.[105]  In two recent decisions, the Privy Council has addressed circumstances in which a limited partner can bring actions before the Cayman courts.  In *Aquapoint*,[106] the Privy Council ruled that a petitioning partner may seek to wind up an exempted limited partnership on "just and equitable grounds" under § 36(3)(g) of the ELP Act.[107]  In *Kuwait Ports*, the Privy Council ruled that a limited partner can bring a derivative claim when a general partner is unwilling to do so; it does not need leave to bring the action.[108]

Not surprisingly, neither opinion addresses the issues before me nor is the holding of either opinion that an ELP cannot own property.  Neither does either opinion address whether an ELP is eligible to be a debtor under title 11 of the United States Code.  But, in each decision, the Privy Council lists or mentions certain general characteristics of Cayman ELPs, as follows:

- an ELP is a form of partnership.[109]

- an ELP must have at least one general partner and one limited partner.[110]

---

[105] Without objection, Mr. Phillips was qualified as an expert in Cayman and English law including in insolvency and restructuring matters.  Hr'g Tr. 105–06, Feb. 25, 2026, Dkt. No. 425.  I sustained the hearsay objection to the admission of his declaration.  Debtors did not present an expert on Cayman law.

[106] JA-25, *Aquapoint LP (in Official Liquidation) v Xiaohu Fan* [2025] UKPC 56.

[107] At least that is the Privy Council's "present view" as it acknowledged that it had not received submissions on the point. JA-25, *Aquapoint* at [46].

[108] JA-27, *Kuwait Ports Authority v Williams* [2024] UKPC 32 at [85(1)].  If challenged, the limited partner must show that it has met the requisites for pursuing the lawsuit.  *Id.* at [85(3), (7)].

[109] JA-25, *Aquapoint* at [33].

[110] JA-25, *Aquapoint* at [33].

- an ELP has no separate legal personality.[111]

- "[t]he general partner of an ELP owes fiduciary duties to all the ELP's limited partners."[112]

- "[t]he general partner of an ELP holds the ELP's assets on trust for all the limited partners."[113]

- "[a] general partner is liable for all the debts and liabilities of an ELP to the extent of any deficit of assets . . . ."[114]

- the general partner conducts the management of the ELP's business; the limited partners may not take part in the management of the ELP's business at peril of losing thier limited liability status.[115]

Amplifying and discussing these cases, and others, Mr. Phillips testified that:

- a Cayman exempted limited partnership is a contractual relationship or arrangement among partners as to how to carry on a business with a view to making a profit.[116]

- a Cayman exempted limited partnership must have at least one general partner and one limited partner.[117]

---

[111] JA-27, *Kuwait Ports* at [35(1)];  JA-25, *Aquapoint* at [33].  Note, while the Rigmora LPs consistently represent that *this* exempted limited partnership has no legal personality, the Privy Council actually uses the phrase "separate legal personality."  Neither case discusses what this means in practical terms, but both cases address the relationship among partners, not, for example, the relationship between creditors and the partnership.  *Cf.* Am. Mot. to Dismiss ¶ 15, Dkt. Nos. 204 (sealed), 205 (redacted) ("The Fund's inability to own property, together with its lack of legal personality under governing Cayman law, means that the Fund is not a 'person' at all, much less a 'person' with 'assets' or a 'place of business' in the United States.").

[112] JA-27, *Kuwait Ports* at [35(3)].

[113] JA-27, *Kuwait Ports* at [35(4)].

[114] JA-25, *Aquapoint* at [33].

[115] JA-25, *Aquapoint* at [33].

[116] Hr'g Tr. 108:12–16, Feb. 25, 2026, Dkt. No. 425.

[117] Hr'g Tr. 109:4–13, Feb. 25, 2026, Dkt. No. 425.

- the general partner manages the partnership's business and is liable if there is a deficiency of assets.[118]

- the limited partners cannot take part in management of an exempted limited partnership and have limited liability except as provided by the partnership agreement.[119]

- a fundamental principle of exempted limited partnerships is that they do not have separate legal personality.[120]

The characteristics of a Cayman exempted limited partnership do not seem foreign; rather they seem very much like the characteristics of a general partnership or limited partnership formed under the laws of one of the fifty states. It is only the lack of separate legal personality—or the effect thereof—which might require some explanation.[121] As reflected above, the Privy Council cases address the lack of separate legal personality (to the extent they do) in the context of relationships among partners and the appropriate parties to sue and be named in lawsuits. But, neither *Kuwait Ports* or *Aquapoint* nor Mr. Phillips address what this means in practical terms, such as in relation to ownership of property.

This question is not academic because notwithstanding the above-stated characteristics, and as reflected in several of them, under the ELP Act, an exempted limited partnership can transact business, have assets and create debts. For example, section 18 of the ELP Act provides:

> [A] partner may lend money to, borrow from and transact other business with the exempted limited partnership so that an asset, debt or obligation of the exempted limited partnership shall thereby be created and with or without interest or security as the general partner shall determine, and shall have the

---

[118] Hr'g Tr. 113:11–20, 115:4–6, Feb. 25, 2026, Dkt. No. 425.

[119] Hr'g Tr. 114:18–21, Feb. 25, 2026, Dkt. No. 425.

[120] Hr'g Tr. 117:3–10, Feb. 25, 2026, Dkt. No. 425.

[121] To the extent that a Cayman ELP is a pass through entity for tax purposes, this too, is not a foreign concept.

25

same rights and obligations with respect thereto as a person who is not a partner, but the obligations of the exempted limited partnership to repay a debt to a general partner shall, at all times, be subordinated to the claims of secured and unsecured creditors of the exempted limited partnership.[122]

Further, section 4(2) of the ELP Act provides:

An exempted limited partnership shall consist of one or more persons called general partners who shall, in the event that the assets of the exempted limited partnership are inadequate, be liable for all debts and obligations of the exempted limited partnership, and one or more persons called limited partners who shall not be liable for the debts and the obligations of the exempted limited partnership save as provided in the partnership agreement . . . .[123]

---

[122] JA-18, ELP Act § 18; *See also id.* § 4(1):

An exempted limited partnership may be formed for any lawful purpose to be carried out and undertaken either in or from with the Islands or elsewhere . . . but an exempted limited partnership shall not undertake business with the public in the Islands other than so far as may be necessary for the carrying on of the business of that exempted limited partnership exterior to the Islands.

Section 2 of the ELP Act also provides:

**"insolvency of the exempted limited partnership"** means that the general partner is unable to pay the debts and obligations of the exempted limited partnership . . . in the ordinary course of business as they fall due out of the assets of the exempted limited partnership, without recourse to the separate assets of the general partner not contributed or committed to the exempted limited partnership . . . .

JA-18, ELP Act § 2

While he did not issue a legal ruling on the issue, Justice Asif refers to the partnership's assets in paragraph 9 of his December 22, 2025 Judgment as follows:

Whilst the Chapter 11 stay is not directly enforceable in the Cayman Islands and no application has been made to recognise the Chapter 11 proceedings here, the GP and all the partnership assets are based in the United States. Thus, even if either of the parties were to take steps to try to progress the matters before the Grand Court, there would probably be arguments in Delaware that they are in contempt, with potentially severe consequences for them and for all of the partnership's assets.

JA-76, *Unicorn Biotech Ventures One Ltd v ATP III, GP Ltd (No. 4)* [2025] CIGC (FSD) 124 at [9].

[123] JA-18, ELP Act § 4(2).

If an exempted limited partnership cannot create debt and have assets then the general partner would have no deficiency to be liable for and a limited partner would not need to limit its liability.[124]

Based on the legal authority cited and arguments of counsel, I conclude that an exempted limited partnership can own assets and create debt—even absent a separate legal personality from its partners.[125] This conclusion is also consistent with both the LPA and

---

[124] Mr. Phillips acknowledges that an exempted limited partnership has its own assets although he at all times qualifies that acknowledgement by stating that the assets are held on trust for the benefit of the limited partners. *See, e.g.*, Hr'g Tr. 171:3–6, 173:10–13, Feb. 25, 2026, Dkt. No. 425.

[125] The Rigmora LPs argue that the issue of whether the Fund has a separate legal personality has already been decided by Justice Asif and should therefore be binding on the parties for all purposes. But, as with the Privy Council decisions, Justice Asif does not opine on the question before me, nor does he conclude that the Fund cannot own assets. His ruling is also in the context of the proper party to litigation, specifically the proper parties in a winding up petition on just and equitable grounds of an exempted limited partnership to determine who bears the costs of defending the petition. As he stated:

> Given the statutory roles of the general partner and the limited partners, as provided for by the Exempted Limited Partnership Act, namely that the limited partners have no role in the management of the exempted limited partnership and do not owe any duties to the partnership or to the other limited partners; whereas the general partner is responsible for the management of the exempted limited partnership and does owe fiduciary and other duties to the limited partners, it is hard to see how a just and equitable petition would ever involve parties other than one or more limited partners on one side and the general partner, and possibly an intermeddling limited partner, on the other.
>
> *                    *                    *
>
> In addition, I consider there is a conceptual flaw in the argument that the petition should proceed as a dispute between limited partners and the exempted limited partnership. This is because an exempted limited partnership does not have any separate legal personality from the limited partners and general partner. Neither side appears fully to have grappled with the consequences of this in the arguments that they have advanced before me.

JA-75, *In Re ATP Life Science Ventures LP* [2025] CIGC (FSD) 106 at [30], [32].

*Compare In re Bernard L. Madoff Inv. Sec. LLC*, Adv. No. 12-01677, 2022 WL 4349859, at *2 (Bankr. S.D.N.Y. Sep. 19, 2022) (French funds sued by trustee moved to dismiss arguing that under French law they were "fonds commun de placement (FCP)," lacked personality and thus could not be sued. After considering competing expert submissions, the court concluded that French law did not state that FCPs could not be sued, only that the FCP's management company must assert the FCP's

the course of conduct of the Fund. For example, the LPA provides that the General Partner maintain books and records to "fully and accurately" record the "transactions of the Partnership" and that those books and records be maintained at a "principal office of the Partnership."[126] The LPA also requires the General Partner to provide the Rigmora LPs with the Fund's financial statements at the close of each fiscal year, which financial statements must include the statements of assets and liabilities and be audited by a firm of independent public accountants or auditors.[127] It provides that the "management, policies and control of the affairs, and the conduct of the business of the Partnership shall vest exclusively in the General Partner."[128] It provides for limited liability for the Rigmora LPs.[129] It also requires that the General Partner "not take any action that would be inconsistent with the treatment of the Partnership as a partnership for [United States Federal income tax] purposes."[130]

---

claim or defend it. Accordingly, court denied motion to dismiss concluding that the funds were the real parties in interest and could be represented by attorneys engaged by the management company.).

[126] JX-0, LPA ¶ 16(b).

[127] JX-0, LPA ¶ 16(e). The Fund did, in fact, retain Grant Thornton to provide audited financial statements for year 2024. JX-115. Grant Thornton's Report of Independent Certified Public Accountants as of and for the Year Ended December 31, 2024 presented the Fund's financials on a consolidated basis with its wholly owned subsidiaries and its Portfolio Companies. JX-112.

[128] JX-0, LPA ¶ 2(b). *See also id.* ¶ 2(j):

> U.S. Trade or Business. The General Partner shall use its reasonable best efforts to conduct the affairs of the Partnership and its subsidiaries so that no Foreign Limited Partner realizes income that is 'effectively connected with the conduct of a trade or business within the United States' with the meaning of Sections 871, 882 or 897 of the U.S. Internal Revenue Code of 1986 . . . .

[129] JX-0, LPA ¶ 3(b) ("No Limited Partner, in its capacity as such, shall be liable for the debtor or obligations of the Partnership . . . .").

[130] JX-0, LPA ¶ 2(m)(iv).

28

Further, under Cayman law, an ELP can be the subject of a winding up petition (such as is the case here). An ELP can also be restructured consistent with the provisions of Part 5 of the Companies Act (2025 Revision)[131] and the Companies Winding Up Rules (2023 Consolidation).[132] In that event, a restructuring officer may be appointed for the ELP (construed as a "company" under the Companies Act) who can propose a compromise or arrangement between the ELP and its creditors, which can include a reorganization of the share capital of the company.[133] For purposes of Part 5 of the Companies Act, limited partners of ELPs are to be generally treated as shareholders of a company.[134]

In a recent opinion, this Court determined that a Singapore real estate investment trust (REIT) was eligible to be a debtor under the Bankruptcy Code after accepting competing expert testimony on Singapore law.[135] In coming to its conclusion that the REIT was a business trust under Singapore law (and, thus could be a debtor under § 109)[136] the

---

[131] JA-19, Companies Act (2025 Revision).

[132] JA-18, ELP Act § 36(1), (3); JA-33, Companies Winding Up Rules (2023 Consolidation). Mr. Phillips testified that an exempted limited partnership can access the restructuring provisions of the Companies Act if it is insolvent. Hr'g Tr. 188:1–25, Feb. 25, 2026, Dkt. No. 425.

[133] JA-19, Companies Act § 91I. Mr. Phillips also testified that an exempted limited partnership can access the restructuring provisions of the Companies Act to present a compromise to its creditors. Hr'g Tr. 189:10–24, Feb. 25, 2026, Dkt. No. 425. But, he also suggests that this procedure would address only creditors, not investors in shares. *Id.* at 192:17-23.

[134] JA-18, ELP Act § 36(3)(b). The Rigmora LPs invoke the Companies Act, albeit § 92(e) in their Amended Winding Up Petition. JX-63, at 52.

[135] *In re EHT US1, Inc.*, 630 B.R. 410 (Bankr. D. Del. 2021) (determining whether a trust was a business trust for purposes of § 109).

[136] In *EHT*, the Court identifies and addresses a split of authority on the question of whether federal common law or the law of the jurisdiction in which the trust resides is determinative of whether the trust is a business trust. *Id.* at 423-425. Neither party briefed the appropriate law here. I am not ruling on that issue as the Rigmora LPs do not argue that the Fund is not a partnership, just that it does not have a legal personality.

29

Court accepted that the REIT might not have a legal personality. But, the Court concludes this "misses the point:"

> The question is not whether [REIT] is a legal person or legal entity. Congress has already determined that a corporation is a person and a business trust is a corporation. Thus, under the Bankruptcy Code, a business trust is a legal person.[137]

As applied here, the question is whether the Fund is a partnership. As it is, Congress has determined it may file a petition.[138]

Having considered the facts, legal authority and arguments of counsel, I conclude that the Fund is eligible to file a petition under the Bankruptcy Code. It is a "person" as defined in the Bankruptcy Code (i.e., a partnership) and has a principal place of business in New York.[139] While this is enough to qualify to be a debtor, I also conclude that the Fund has property in the United States (i.e., shares in the Portfolio Companies and $97 million in a bank account). The lack of separate legal personality under Cayman law is simply not relevant for these purposes.

---

[137] *EHT*, 630 B.R. at 428.

[138] Notwithstanding its lack of separate legal personality, an exempted limited partnership is defined as a "legal person" for at least one purpose under Cayman law. *See* Cayman Islands Beneficial Ownership Transparency Act (2026 Revision) § 3(f) ("A legal person for purposes of this Act means — (f) an exempted limited partnership . . . ."). The Rigmora LPs also refer to the Fund as a "legal person" in their pre-trial skeleton brief. JX-68, at [40] ("Cayman substantive law includes the Court's long-standing statutory jurisdiction – founded on the important public policy of the Court supervising legal persons that are created and exist under Cayman law alone – to wind-up local entities, including ELPs, such as the Partnership, which is registered under the ELP Act, and constituted and governed by that Act and the Cayman-law governed LPA.").

[139] JX-37, ATP Life Sciences Ventures L.P., Chapter 11 Petition. The place of business need not be a principal place of business. *In re Northshore Mainland Servs., Inc.*, 537 B.R. 192, 201 (Bankr. D. Del. 2015). And, in the case of a partnership, a place of business may be where the general partner conducts administrative and/or substantive business on behalf of the partnership. *In re Paper I Partners, L.P.*, 283 B.R. 661, 672–73 (Bankr. S.D.N.Y. 2002) (limited partnerships act through their general partners such that a partnership's place of business can be where its partner conducts business).

### B. *The Bankruptcy Cases were filed in Good Faith*

*The Parties' Positions*

The Rigmora LPs also contend that the Fund's and the General Partner's cases must be dismissed for cause because they were filed in bad faith. First, the Rigmora LPs argue that the cases are a two-party dispute and were filed to obtain a litigation advantage. Second, they argue that the cases serve no valid reorganizational purpose as neither the Fund nor the General Partner are in financial distress.

Debtors contend that the cases, when properly viewed, are not a two-party dispute as evidenced by the obligations owed to the Portfolio Company Debtors as well as the creditors at that level. They further contend that the cases were not filed to gain a litigation advantage, but to address acute financial distress.

*Discussion*

The Third Circuit has well-established case law holding that a bankruptcy case may be dismissed if it is not filed in good faith.[140] As this requirement is not in the Bankruptcy Code, it is "grounded in the 'equitable nature of bankruptcy' and the 'purposes underlying Chapter 11.'"[141] When raised, the debtor has the burden to establish that good faith exists.[142]

There is no definitive list of factors to examine. Rather, the test is of the "totality of the circumstances" kind, to determine where the petition falls along "the spectrum ranging

---

[140] *In re SGL Carbon Corp.*, 200 F.3d 154 (3d Cir. 1999).

[141] *In re LTL Mgmt., LLC*, 64 F.4th 84, 100 (3d Cir. 2023) (quoting *In re SGL Carbon Corp.*, 200 F.3d 154, 161–62 (3d Cir. 1999)).

[142] *LTL*, 64 F.4th at 100.

31

from the clearly acceptable to the patently abusive."[143]  The Third Circuit focuses on two

inquiries of particular relevance to the determination: (1) whether the petition serves a

legitimate bankruptcy purpose, e.g. by preserving a going concern or maximizing the value

of the debtor's estate, and (2) whether the petition is filed to obtain a tactical advantage."[144]

And, as the Third Circuit recently confirmed in *LTL*, a valid bankruptcy purposes "assumes

a debtor in financial distress."[145]

### i.    *Debtors are in Financial Distress*

As with good faith in general, there is no definitive list of factors courts examine to

see if a debtor is in financial distress.  And, there is no test "to apply rigidly" in the

evaluation.[146]  "What we can do, case-by-case, is consider all relevant factors in light of the

purposes of the Code."[147]  Broadly speaking, courts consider the debtor's balance sheet, its

ability to pay its debts, its ability to raise or borrow money and/or access to capital

---

[143] *In re 15735 Mem'l Corp.*, 589 F.3d 605, 618 (3d Cir. 2009) (quoting *In re Integrated Telecom Express, Inc.*, 384 F.3d 108, 118 (3d Cir. 2004)).

[144] *In re Integrated Telecom Express, Inc.*, 384 F.3d 108, 119-20 (3d Cir. 2004).

[145] *LTL*, 64 F.4th at 101 (quoting *Integrated Telecom*, 384 F.3d at 128).

[146] *LTL*, 64 F.4th at 102.

[147] *LTL*, 64 F.4th at 102.

32

markets.[148] Courts must also examine the nature and immediacy of the company's financial circumstances.[149]

The evidence presented shows, and the Rigmora LPs do not dispute, that the Portfolio Companies are in financial distress. The Rigmora LPs argue, however, that the Fund and the General Partner are not in distress and *LTL* mandates that I must isolate each debtor to make this determination.[150] Citing multiple pre-*LTL* cases,[151] Debtors argue I can consider the enterprise as a whole, or at least those entities that are in bankruptcy. I conclude that I can evaluate the financial distress of the Fund and the General Partner in the context of the affiliated cases. I also conclude that, like *LTL*, if I look at the Fund and the General Partner in isolation, my view of their financial condition may be informed by the financial condition of the Portfolio Companies.

As is well known in the bankruptcy/restructuring community, *LTL* addresses a singular fact pattern—the so-called "Texas two-step"—in the context of a mass tort

---

[148] *SGL Carbon*, 200 F.3d at 166. *See also Bedmar LLC*, Case No. 25-11027, 2025 WL 2496260, at *10 (Bankr. D. Del. Aug. 29, 2025) (footnote omitted) (quoting *In re Rent-A-Wreck of Am., Inc.*, 580 B.R. 364, 375-76 (Bankr. D. Del. 2018) ("An analysis of financial distress is a fact specific inquiry and courts consider such facts as: solvency; cash reserves; recent financial performance and profitability; the proportion of debt owed to insiders; realistic estimates of actual or likely liability; the threat of litigation; whether a debt is fixed, substantial, and imminent; current cash position or current liquidity; ability to raise capital; and overdue debts or the ability to pay debts as they come due. Any given case may touch on one or more of these factors.")).

[149] *LTL,* 64 F.4th at 103.

[150] In fact, very little time was spent by the parties examining or discussing the financial distress of the General Partner. But, the General Partner's schedules show no assets and $221 million in liabilities. They also reflect a contingent liability and a contingent asset, both in undetermined amounts for claims under the LPA and the Management Agreement. Summ. of Assets and Liab., Schedule E/F, at 7–8, Dkt. No. 241.

[151] *See generally In re EHT US1, Inc.*, 630 B.R. 410 (Bankr. D. Del. 2021); *In re Energy Future Holdings Corp.*, 561 B.R. 630 (Bankr. D. Del. 2016); *In re Mirant Corp.*, 2005 WL 2148362, at *7 (Bankr. N.D. Tex. Jan. 26, 2005).

bankruptcy case.  Before addressing the good faith question, the Third Circuit took a

"detour" to address a "problem particular to [that] case."[152]

> For good faith purposes, should we judge the financial condition of LTL by looking to Old Consumer—the operating business with valuable assets, but damaging tort liability, that the restructuring and filing here aimed to protect? Or should we look to LTL, the entity that actually filed for bankruptcy?  Or finally, like the Bankruptcy Court, should we consider "the financial risks and burdens facing both Old [Consumer] and [LTL]"?[153]

The Third Circuit landed on the second option—looking to the financial condition facing

the entity that filed bankruptcy and not a defunct predecessor entity that no longer

existed.[154]  Nevertheless, it held that the financial condition of the non-debtor defunct entity

was relevant to the extent it informed the view of debtor LTL's financial condition.[155]  This

approach respected the corporate separateness of the two entities (Old Consumer and LTL),

but did not render the non-bankruptcy entity wholly irrelevant to the analysis.[156]

LTL did not address a multi-debtor scenario because it did not need to.  Nor does it

suggest that every debtor in a multi-debtor case must, itself, be in financial distress.  Courts

looking at that scenario, in cases with hundreds of debtors to a relative few, conclude that in

affiliated debtor cases, courts can consider the interests of the group as a whole.  In EHT,

---

[152] LTL, 64 F.4th at 104.

[153] LTL, 64 F.4th at 104.

[154] LTL, 64 F.4th at 105 ("To say the financial condition of Old Consumer prior to the restructuring—which was not bolstered by such a contractual payment right—determines the availability of Chapter 11 to LTL would impose on the latter a look-back focused on the nonavailability of a funding backstop to what is now a nonentity.").

[155] LTL, 64 F.4th at 106.

[156] While LTL received all the tort liabilities of Old Consumer, it received an asset Old Consumer did not have, namely a payment right from J&J, which gave LTL direct access to J&J's "exceptionally strong balance sheet." LTL, 64 F.4th at 106.

this Court found an "identity of interest" between the parent debtors (formed under Singapore law) and its subsidiary debtors (US entities) because they were "part of a complex and integrated capital structure."[157] This Court concluded it was not bad faith to file the parent companies even though it was possible that funds could flow up to equity outside of chapter 11.[158] In *JER/Jameson*,[159] this Court ultimately dismissed one debtor in a four debtor case. The Court, nonetheless, ruled that it could consider the affiliate filings and noted that the debtor at issue was created as part of a larger enterprise. In that light, this Court considered all of the debtors "holistically."[160]

Here, the Fund was formed to make investments in start-up companies in the biomedical field. Each Debtor was designed to be part of that structure, which provided the Fund (managed by the General Partner and the management companies) "the ability to found, manage and control" each Portfolio Company. The Fund was formed as the investment vehicle. The General Partner was formed to manage the Fund. ATLS was formed to handle the operational aspects of the Fund. Each of the Portfolio Company Debtors is an investment of the Fund, with the Fund owning in excess of 75% of the equity of each Portfolio Company. Dr. Harrison and/or others employed by ATLS are on the board of each Portfolio Company Debtor. With a few exceptions, the Portfolio Companies

---

[157] *EHT*, 630 B.R. at 432.

[158] *EHT*, 630 BR at 431. It also concluded it was not bad faith even if the parent debtors could have filed insolvency proceedings in Singapore. *Id.*

[159] *In re JER/Jameson Mezz Borrower II, LLC*, 461 B.R. 293 (Bankr. D. Del. 2011).

[160] *JER/Jameson*, 461 B.R. at 301 ("The Court concludes that it does not have to have blinders on and ignore events subsequent to the Mezz II filing, particularly the filing of its affiliates within ten days of its own bankruptcy filing. Nor does the Court have to ignore the fact that Mezz II was only created as part of the larger enterprise. Therefore, the Court concludes it must consider the Debtors holistically in order to determine if there is a realistic possibility that Mezz II can be rehabilitated.").

are wholly dependent on the Fund for their respective financing. In these circumstances, I conclude that I can consider Debtors holistically to determine if they are in financial distress.

On the filing of its petition, the Fund had approximately $17.4 million in cash. It was owed $97 million by the Rigmora LPs, but as discussed above, Dr. Harrison had concerns about collecting the Chancery Court judgment. The Fund also held the Syntimmune judgment and secured promissory notes from various Portfolio Companies of approximately $19.6 million. The General Partner could issue another $25 million in capital calls. The Fund's largest asset, by far, was its equity in the Portfolio Companies valued on the Schedules at $3.552 billion. Against these assets, it had liabilities of approximately $227 million in obligations to its Portfolio Companies under the Series A Stock Purchase Agreements and prospective management fees of $121 million owed to ATLS through February, 2031 (which, assumes the Fund is extended).

The Rigmora LPs had come to the end of their financial commitment under the LPA and had not agreed to increase their Contingent Subscription (indeed, the Rigmora LPs are seeking to get back the capital calls awarded in the Chancery Court litigation). The Fund had no agreement from any other funding source and no ability to borrow money without the consent of the Rigmora LPs.[161] Similarly, with the exception of certain syndications, the Portfolio Companies did not have an independent ability to raise capital. The $97 million capital call, even if collected, would only last, at most, six months and the $25 million remaining in capital calls, if honored, would only marginally increase the time before the Fund would have no available cash to support the Portfolio Companies and meet its own

---

[161] JX-0, LPA ¶ 2(i).

obligations. The General Partner tried to monetize the Syntimmune judgment, but the market did not produce an acceptable value.[162] The General Partner also considered an offer for Braeburn that was unacceptable.[163] In these circumstances, the Fund (through its general partner) and the General Partner determined to file bankruptcy petitions to provide liquidity and a go-forward path to maximize the value of the Fund.

The Rigmora LPs challenge not only the General Partner's business judgment, but also the alleged liabilities of the Fund. The Rigmora LPs' counsel spent significant time walking Dr. Harrison through each of the Stock Purchase Agreements to show, variously, that the Fund's obligations to invest further in the Portfolio Companies had to be in writing and/or were subject to the negotiation of acceptable milestones.[164] The Stock Purchase Agreements contain "entire agreement" provisions and provide that a commitment for future investment must be created in a writing.[165] The Rigmora LPs argue that the Fund has

---

[162] Hr'g Tr. 188:15–189:7, Feb. 26, 2026, Dkt. No. 426.

[163] Hr'g Tr. 188:15–189:7, Feb. 26, 2026, Dkt. No. 426.

[164] Hr'g Tr. 208:11–241:6, Feb. 26, 2026, Dkt. No. 426.

[165] For example, the Series A Preferred Stock Purchase Agreement with Deep Apple provides:

1.3   Sale of Additional Shares of Preferred Stock.

(c)   After the Initial Closing, the Company shall sell, and the Purchaser shall purchase, on the same terms and conditions as those contained in this Agreement as part of Additional Closings, up to an aggregate of 42,000,000 Additional Shares, at the request of the Board and upon the Company's achievement of certain milestones to be negotiated in good faith by the Company and the Purchaser after the Initial Closing (each, a "*Milestone*"). Following the agreement by the Company and the Purchaser of the terms and conditions of a Milestone, including the number of Additional Shares to be so purchased upon the achievement of such Milestone, the Company and the Purchaser will amend this Agreement to reflect such terms and conditions of such agreed upon Milestone, including the number of Additional Shares to be so purchased upon the achievement of such Milestone.
*          *          *

37

no enforceable obligations to the Portfolio Companies because there are no written

amendments to the Stock Purchase Agreements. Even so, the two parties to each of the

obligations, namely the Fund and the relevant Portfolio Companies, believe they exist.

Further, such liabilities are at least arguable as Dr. Harrison suggests that the Fund's actions

in depriving the Portfolio Companies of committed funding could be the basis for claims by

---

6.9    Amendments and Waivers. Any term of this Agreement may be amended, terminated or waived only with the written consent of the Company and the Purchaser.

\*     \*     \*

6.12    Entire Agreement. This Agreement (including the Exhibits hereto), the Restated Certificate and the other Transaction Agreements constitute the full and entire understanding and agreement between the parties with respect to the subject matter hereof, and any other written or oral agreement relating to the subject matter hereof existing between the parties are expressly canceled.

\*     \*     \*

6.16    No Commitment for Additional Financing. The Company acknowledges and agrees that the Purchaser has not made any representation, undertaking, commitment or agreement to provide or assist the Company in obtaining any financing, investment or other assistance, other than the purchase of the Shares as set forth herein and subject to the conditions set forth herein. In addition, the Company acknowledges and agrees that (a) no statements, whether written or oral, made by the Purchaser or its representatives on or after the date of this Agreement shall create an obligation, commitment or agreement to provide or assist the Company in obtaining any financing or investment, (b) the Company shall not rely on any such statement by the Purchaser or its representatives, and (c) an obligation, commitment or agreement to provide or assist the Company in obtaining any financing or investment may only be created by a written agreement, signed by the Purchaser and the Company, setting forth the terms and conditions of such financing or investment and stating that the parties intend for such writing to be a binding obligation or agreement. The Purchaser shall have the right, in its sole and absolute discretion, to refuse or decline to participate in any other financing of or investment in the Company, and shall have no obligation to assist or cooperate with the Company in obtaining any financing, investment or other assistance.

JX-32, at 2, 15–17.

38

the Portfolio Companies.[166] Ultimately, however, whether these obligations are valid or not does not rule the day.[167]

It is undisputed that as of its petition date, the Fund was balance sheet solvent. But, it is also undisputed that cash from Contingent Subscriptions (assuming collected) would fund, at most, another 6-9 months of Portfolio Company needs and the Rigmora LPs had not committed to further funding. It is also undisputed that the Rigmora LPs had filed the Winding Up Petition in the Grand Court. Further, if I credit Mr. Bogdanov's testimony (as opposed to his May 15, 2025 email) the Portfolio Companies are worth salvaging.[168] But, even in his May 15, 2025 email, Mr. Bogdanov purports to recognize the value of the Portfolio Companies: while the Portfolio Companies "in their current form" are not viable, there are "promising clinical stage companies" Rigmora Holdings wants to develop and "some early-stage companies" which might be salvaged with the right management.[169] Of necessity, this recognition acknowledges the need for additional funding for development or other type of financing even without addressing the Rigmora-disputed Fund obligations.

Further, as of the filing of the bankruptcy petitions, the need for further funding to maximize the value of both the Portfolio Companies and the Fund was not hypothetical or prospective. It was immediate. The Fund did not need to deplete its liquidity and/or wait

---

[166] Hr'g Tr. 242:11–243:7, Feb. 26, 2026, Dkt. No. 426. Debtors also suggest textual arguments under the Series A Stock Purchase Agreements based on the use of the words "shall" and "may" in various contexts.

[167] It is also not appropriate to determine this dispute in the context of a motion to dismiss.

[168] Hr'g Tr. 38:2–5, Feb. 25, 2026, Dkt. No. 425.

[169] JX-200.

for the Portfolio Companies to sue on the Rigmora-disputed obligations.[170]  Under the

totality of the circumstances it was facing, the near-term conclusion of the Contingent

Subscriptions is distress enough.  In fact, Rigmora Holdings was doing its own prospective

planning in the fall of 2025.  Rigmora believed a decision in the Winding Up Petition could

result in a distribution in kind of the Fund's interest in the Portfolio Companies to the

limited partners.[171]  In anticipation of such a ruling, Rigmora Holdings reached out to

biotech firms, including KKR's biotech branch.[172]  It also considered partnering with

RTW.[173]  Such arrangements of necessity contemplated additional financing sources to

support some or all of the Portfolio Companies.

Against this backdrop and the evidence presented, the Rigmora LPs' argument that

the Fund and the General Partner are not in financial distress for purposes of its Motion to

Dismiss rings hollow.[174]

---

[170] *In re Gen. Growth Props., Inc.*, 409 B.R. 43, 60 (Bankr. S.D.N.Y. 2009) (declining to adopt a rule that a debtor is not in financial distress if its principal debtor is not due for another one to three years).

[171] Hr'g Tr. 36:3–22, Feb. 25, 2026, Dkt. No. 425.

[172] Hr'g Tr. 37:12–38:10, Feb. 25, 2026, Dkt. No. 425.

[173] Hr'g Tr. 38:11–39:7, Feb. 25, 2026, Dkt. No. 425.

[174] Without citing to any authority, the Rigmora LPs argue:

> That the commitment has been exhausted does not mean the Fund is in financial trouble; rather it is an agreed consequence of the LPA. Certainly, it cannot provide grounds for the GP, without the LPs' consent, to use the Fund's assets to create a new or transformed Fund to which the parties never agreed.

Am. Mot. to Dismiss ¶ 54, Dkt. Nos. 204 (sealed), 205 (redacted).  While the exhaustion of capital commitments may not always result in a conclusion that a fund is in financial distress it also does not have to result in a conclusion that it must be wound up.

### ii.   The Cases Serve a Proper Bankruptcy Purpose

Dr. Harrison testified to three principal reasons the bankruptcy cases were filed. One, he was uncertain whether the Rigmora LPs would pay the $97 million Chancery Court judgment. Two, even if the Rigmora LPs paid the judgment, it would not be enough. The Portfolio Companies could not continue to live on "drip funding," but needed committed funding, or at least funding coming from a source committed to their respective projects. Three, the Fund lacked liquidity to meet its obligations.

Debtors backed each of these reasons by testimony that the Portfolio Companies are worth continuing to support and that their current research, or research in another direction (i.e., after a pivot), could prove fruitful, thereby maximizing the value of the Portfolio Companies and thus the Fund.[175] While Dr. Harrison can make no guarantees, he, Dr. Karson, Dr. Eisenberg and Dr. Liras genuinely believe in the research performed by the Portfolio Companies and that the science is worthy of continued funding.[176] Thus, Debtors

---

[175] Hr'g Tr. 216:19–24, Feb. 26, 2026, Dkt. No. 426 ("In addition, as I think has been testified to by others of my team and by myself, our job is to manage the companies in a very careful way to identify opportunities as they emerge because so many of them are at a quite early state, and it's impossible to predict research. And a research result can spring up, and that becomes your next path.").

[176] Each of Dr. Karson and Dr. Liras were wholly credible (as was Dr. Harrison). Dr. Karson joined Evercrisp in September 2024 after a 25-year career in early-stage biotech companies. Hr'g Tr. 11:24–12:9, Feb. 19, 2026, JX-58. One of Evercrisp's founders is a Nobel laureate. Id. at 14:16–22. Dr. Karson is requesting funding to deliver two specific data sets to further Evercrisp's research which could revolutionize the field of genetic medicine. Id. at 17:15–20:17. Dr. Liras' role within the enterprise is to "identify exciting breakthrough science that could deliver value." Hr'g Tr. 14:2–9, Feb. 26, 2026, Dkt. No. 426. He is a co-founder of Deep Apple, Evercrisp, Initial and Nine Square and on the board of each. Id. at 15:5–11. The scientists as the Portfolio Companies "are renown scientists [from] across the world, National Academy of Medicine, National Academy of Engineering, breakthrough prize winners, Nobel prize winners, amongst others." Id. at 14:9–14. Similar testimony convinced the Court of Chancery that the Portfolio Companies were worthy of continued support.

argue, the bankruptcy filings serve to preserve going concerns and to maximize the value of the estates, both proper bankruptcy purposes.

To counter this evidence, Mr. Bogdanov testified that the Rigmora LPs had never failed to meet a capital call and that they were prepared to pay the Chancery Court judgment. Mr. Bogdanov now testifies (in contradiction to his 2022 Memorandum) that Rigmora Holdings is willing to consider how to go forward with at least some of the Portfolio Companies.[177] And, the Rigmora LPs argue, in this court, that the Winding Up Petition will not necessarily result in a liquidation (or fire sale) of the Fund's entire portfolio.

The Rigmora LPs also relied on the testimony of Dr. Ilonna Rimm. Dr. Rimm was qualified as an expert in biotech investing. She testified variously that a prudent investor (or she) would not invest in the Portfolio Companies relying, primarily, on missed milestones.[178] While Dr. Rimm may disagree with the General Partner's assessment of the Portfolio Companies, I cannot say for purposes of a good faith argument that her opinion carries much, if any, weight.[179]

The General Partner, which is charged with making all operational decisions for the business under both the LPA and the ELP Act, has the view that the way to maximize the Fund is to continue supporting the Portfolio Companies, including the pre-clinical

---

[177] It is hard to credit some of Mr. Bogdanov's testimony. Except for perhaps Braeburn, funding the Portfolio Companies were and are not part of Rigmora Holdings' cash buffer strategy regardless of their respective merit. Mr. Bogdanov was sheepish when questioned on cross about the Bogdanov Memorandum suggesting he was embarrassed it showed the real motivation behind the Rigmora LPs' decision not to fund certain Portfolio Companies—a motivation that had nothing to do with the good of the Fund and everything to do with the good of Rigmora Holdings.

[178] *See generally* Hr'g Tr. 204:4–227:5, Feb. 19, 2026, JX-58.

[179] Dr. Harrison testified that due to the slowing of financing from 2022 forward, it was a certainty that the Portfolio Companies would miss milestones, so he took that into consideration when making decisions. Hr'g Tr. 216:6–217:4, Feb. 26, 2026, Dkt. No. 426.

42

companies and its efforts outside of court in that regard were not successful. While the

General Partner may or may not be correct, I cannot find that view to be unreasonable.[180]

The Rigmora LPs' real issue is not that they believe that the General Partner is not

sincere in its position, but that it is wrong. Further, the Rigmora LPs contend that they

alone get to determine the future of the Fund, how the Fund will address its current

situation and whether "underperforming portfolio companies" should be "cut loose."[181]

They contend that the General Partner is ignoring the LPA and its duties thereunder in

determining that the Debtor Portfolio Companies are worth further investment and in filing

the bankruptcy petition for the Fund and the General Partner.[182] But, while that argument

may support other relief, it does not support dismissal on bad faith grounds. In this regard,

it is the Rigmora LPs that are ignoring the LPA. The LPA provides that, until removed, the

---

[180] *In re Soundview Elite, Ltd.*, 503 B.R. 571, 580-81 (Bankr. S.D.N.Y. 2014) (footnotes omitted) (declining to dismiss the bankruptcy case and holding: "Here I find that the Debtors' filings had a valid business purpose, and were not in bad faith. The Debtors' management was dealing with frozen assets and impaired liquidity—with an inability to reach the bulk of the Debtors' liquid assets before the Wilmington Trust interpleader action was resolved, and very limited liquidity with respect to the remainder. The Debtors' management also had the view—which may or may not be correct, but which cannot be said to be unreasonable—that it could realize more on the Debtors' illiquid assets than any court-appointed fiduciaries could. Although I readily accept as true the JOLs' argument that 'the explicit purpose' of the filings was to 'delay[ ] the Winding Up Proceeding and prevent[ ] the Grand Court from appointing [the Debtors' management's replacement],' that is insufficient, without more, to establish bad faith or unenumerated cause in the presence of the valid business purposes just described.").

[181] Am. Mot. to Dismiss, ¶ 53, Dkt. Nos. 204 (sealed), 205 (redacted) ("The fact that some *portfolio companies* may be financially troubled does not mean that the *Fund* or its *GP* are in financial distress. Rather, the need to decide whether to cut loose underperforming portfolio companies is to be expected in any managed fund that invests in portfolio companies, particularly when the investments are in start-ups. The GP may not like that the LPs are given a say in that process under the terms of the LPA, but that frustration with a contract it agreed to does not entitle the GP to a remedy under the Bankruptcy Code, and the failures of the least successful portfolio companies are not a reason to reorganize their financially healthy investor.").

[182] The Rigmora LPs do not argue that the bankruptcy filings were not authorized.

43

General Partner controls the affairs and conducts the business of the Fund.[183]  To date, the

General Partner has not been removed.[184]  On this point, the LPA is consistent with the ELP

Act, which provides that limited partners "shall not" be part of conducting the business of

the partnership[185] and that "[a]ny difference arising as to matters connected with the

business of the exempted limited partnership shall be decided by the general partner . . . ."[186]

Moreover, the evidence reveals that Rigmora Holdings is looking to maximize itself,

and not the Fund.  It is clear that Rigmora Holdings' real motivation behind its decision to

stop funding the early-stage companies was its own change in investment strategy in 2022.

Rigmora Holdings was facing its own "liquidity crisis" which would affect it for the next

two to three years.  It needed to create a cash buffer and the way to start was to "drastically

reduce" payments (i.e., capital calls) to the Fund.  With respect to biotech investments, only

commercial stage companies could possibly fit into Rigmora Holdings' new investment

---

[183] Paragraph 2(b) of the Limited Partnership Agreement provides:

> (b) Control.  The management, policies and control of the affairs, and the conduct of
> the business, of the Partnership shall be vested exclusively in the General Partner. The
> General Partner and Apple Tree Venture Management, LLC (the "Management
> Company") shall, at all time prior to any removal of the General Partner as general
> partner of the Partnership pursuant to Paragraph 4(a), be owned exclusively by Dr.
> Seth L. Harrison ("Dr. Harrison").

JX-0, LPA ¶ 2(b).

[184] While they brought the winding up proceeding, the Rigmora LPs have not sought to remove the
General Partner under Paragraph 4, "Removal of General Partner."  Hr'g Tr. 47:22–48:6, Feb. 25,
2026, Dkt. No. 426.  Paragraph 4 requires only ten days' notice of a "Removal Event" (i.e., criminal
conviction of entered against Dr. Harrison in relation to Partnership business, willful fraud, willful
misconduct or Gross Negligence (as defined) or various other violations).  JX-0, LPA ¶ 4(c).

[185] JA-18, ELP Act § 14(1).

[186] JA-18, ELP Act § 23.

strategy.  Except for perhaps Braeburn, the Fund was not part of Rigmora Holdings' new investment strategy regardless of the merit of the Portfolio Companies.[187]

The Rigmora LPs also contend that the filing of the bankruptcy case was to gain a tactical advantage in a two-party dispute.  They argue that the General Partner filed the Fund and the General Partner cases on December 9, 2025 to obtain the benefit of the automatic stay and prevent the Winding Up Petition from going forward on January 12, 2026.  They further contend that the bankruptcy cases are just a continuation of the disputes between the General Partner and the Rigmora LPs in a third court.

Debtors respond that this is not a two-party dispute as there are other stakeholders.  The bankruptcy cases involve all fifteen Portfolio Companies, their various employees and patients in ongoing clinical trials in addition to the pre-clinical companies which have been mothballed because of the lack of consistent funding.  The Committee argues that the creditors at each of the Debtor Portfolio Companies are also stakeholders.

I mainly agree with Debtors.  Only one aspect of these cases is a two-party dispute and that is the request before the Grand Court to appoint Joint Official Liquidators to replace the General Partner relative to the Fund.[188]  But, all other aspects of these bankruptcy cases involve multiple parties.  The Fund's bankruptcy (or even its winding up) impacts all of its Portfolio Companies, for which it is the principle, if not sole, source of

---

[187] Mr. Bogdanov was sheepish when questioned on cross-examination about the Bogdanov Memorandum suggesting he was embarrassed it showed the true motivation behind the Rigmora LPs' decision not to fund certain Portfolio Companies—a motivation that had nothing to do with the good of the Fund and everything to do with the good of Rigmora Holdings.

[188] While the Rigmora LPs and the General Partner are involved in all three cases, the disputes they seek to resolve are not the same.  In the Chancery Court action, the General Partner sought to establish the obligations of the Rigmora LPs under the LPA.  In the winding up petition, the Rigmora LPs seek to replace the General Partner.  In the bankruptcy cases, the General Partner and the Fund seek to reorganize their capital structure.

capital. This, in turn, impacts all creditors (employees, vendors, landlords) and partners to the Portfolio Companies—all of which can have a voice in these bankruptcy cases. The General Partner had been dealing with funding constraints for several years and, after the Chancery Court ruling, now knows that the remaining Contingent Subscription is $25 million, not another $400 million, as it argued in the Court of Chancery Action.[189]

Finally, the evidence does not inexorably point to the conclusion that Debtors filed to obtain the benefit of the automatic stay. As shown above, there is a valid bankruptcy purpose. But, under the circumstances here, it would not be fatal if it did.[190] Even cases cited by the Rigmora LPs show that a desire to stop pending litigation is only one of many factors a court can review in assessing good faith on a motion to dismiss.[191] Looking at the totality of the circumstances here, I conclude that these bankruptcy cases were filed in good faith, including those filed by the Fund and the General Partner.

---

[189] The General Partner took the position that Rigmora's Contingent Subscription was $2.85 billion. JA-78, Post-Tr. Mem. Op., at 46.

[190] *Soundview Elite*, 503 B.R. at 580 (footnote omitted) ("The JOLs' principal contention, instead, is that the Debtors admittedly filed their chapter 11 petitions to take advantage of the automatic stay, and that the petitions were filed at the 'eleventh hour'—to block the imminent appointment of liquidators in the Cayman Islands, who now are the JOLs. But while I agree with the JOLs that such was the Debtors' purpose, these facts, in the absence of more, are insufficient for me to find either bad faith or unenumerated cause. Indeed, if I or any other U.S. court were to consider a desire to invoke the stay to be sufficient, a very significant portion of perfectly unobjectionable chapter 11 cases could never be filed.").

[191] *See, e.g., Integrated Telecom*, 384 F.3d at 120 (recognizing that filing a bankruptcy case "merely to obtain tactical litigation advantages" is not a proper bankruptcy purpose); *In re Primestone Inv. Partners L.P.*, 272 B.R. 554, 557 (D. Del. 2002) (listing 12 factors courts consider in performing an analysis of whether case should be dismissed for one of the enumerated reasons in § 1112 (single asset case; few unsecured creditors; no ongoing business or employees; petition filed on eve of foreclosure; two party dispute which can be resolved in pending state court action; no cash or income; no pressure from non-moving creditors; previous bankruptcy petition; prepetition conduct was improper; no possibility of reorganization; debtor formed immediately prepetition; debtor filed solely to create automatic stay; and subjective intent of the debtor)).

**II.    The Court will not Dismiss the Bankruptcy Cases of the Fund and the General Partner under Section 305**

*The Parties' Positions*

In addition to, or in the alternative, the Rigmora LPs ask me to dismiss these cases "on grounds of abstention" under § 305 of the Bankruptcy Code. They argue that I should abstain based on considerations of comity, cost and efficiency, that the Winding Up Petition was first filed and that the Fund is organized under Cayman law. The Rigmora LPs also argue that the filing of the General Partner now mandates a winding up proceeding under the LPA and the ELP Act. Finally, they again assert that the Fund's and the General Partner's cases were not commenced for a proper purpose.

Debtors counter that dismissal/abstention is extraordinary relief, not a substitute for dismissal. They argue that all of the Partnership's assets are located in the United States and that resolution of disputes under the LPA may take place in Delaware courts. Further, Debtors contend that the Rigmora LPs' change in theory in its Winding Up Petition shows gamesmanship in its Cayman proceedings. Finally, Debtors contend it is more efficient to address all Debtors' obligations in these cases.

*Discussion*

Section 305 provides in relevant part:

(a) The court, after notice and a hearing, may dismiss a case under this title, or may suspend all proceedings in a case under this title, at any time if—

    (1) the interests of creditors and the debtor would be better served by such dismissal or suspension . . . .

47

This section is designed to provide a bankruptcy court discretion to decline to exercise jurisdiction over cases in certain circumstances.[192] It is "an extraordinary remedy that should be used sparingly and not as a substitute for a motion to dismiss under other sections of the Bankruptcy Code."[193] Ultimately, it is a matter of discretion.[194] Courts consider the totality of the circumstances.[195] The burden is on the movant.[196]

As I have already found, the bankruptcy cases were filed for a proper purpose. The Fund and/or the General Partner's business is conducted and its assets are located in the United States. The Fund and the General Partner also have creditors (some listed as disputed and/or contingent) in the United States—including $221 million asserted by the Portfolio Companies. A comprehensive resolution of claims can be achieved in this court.

For these reasons and others, neither do the dictates of comity require me to dismiss these cases. While certainly the Fund and the General Partner could expect that their disputes might be settled in the Cayman Islands court system, there is no evidence that the Portfolio Companies would expect to have their disputes with the Fund resolved there. The

---

[192] 2 Collier on Bankruptcy ¶ 305.01 (16th ed. 2026).

[193] *In re AIG Fin. Prods. Corp.*, 2024 WL 3967465, at *11 (D. Del. Aug. 28, 2024) (quoting 2 Collier on Bankruptcy ¶ 305.02), *appeal dismissed*, 2025 WL 2806745 (3d Cir. June 4 2025)).

[194] *In re Diamondhead Casino Corp.*, 2025 WL 2169864, at *15 (Bankr. D. Del. July 30, 2025) (quoting *In re Northshore Mainland Servs., Inc.*, 537 B.R. 192, 203 (Bankr. D. Del. 2015)).

[195] Those factors include "(1) the economy and efficiency of administration; (2) whether another forum is available to protect the interests of both parties or there is already a pending proceeding in state court; (3) whether federal proceedings are necessary to reach a just and equitable solution; (4) whether there is an alternative means of achieving an equitable distribution of assets; (5) whether the debtor and the creditors are able to work out a less expensive out-of-court arrangement which better serves all interests in the case; (6) whether a non-federal insolvency has proceeded so far in those proceedings that it would be costly and time consuming to start afresh with the federal bankruptcy process; and (7) the purpose for which bankruptcy jurisdiction has been sought." *Diamondhead Casino*, 2025 WL 2169864, at *15.

[196] *Id.*

Series A Stock Purchase Agreements provide that they are governed by Delaware law and that the parties submit to the jurisdiction of the various courts in the United States for any disputes arising under the agreements.[197] And, again, the Fund and the General Partner conduct their business in the United States and the Fund's assets are in the United States.

Whether these cases are the most efficient and economical way to resolve these cases is certainly a legitimate question. But, I cannot conclude they are not. Since last May, it appears that the Rigmora LPs and Debtors have spared no expense in sparring with each other to the detriment of the Portfolio Companies and their respective employees and creditors. If Debtors are ultimately proven to be correct in their assessment of the Portfolio Companies, the value of the Fund has been diminished. Regardless, it is apparent the lawyers are the main beneficiaries of this all out litigation strategy. I do not see the run rate lessening even were I to dismiss these cases. And, because the Rigmora LPs do not seek to dismiss the Debtor Portfolio Companies' cases, litigation will proceed here regardless.

Because I cannot find that Debtors' interests as well as their creditors' would be better served by dismissal of these cases, I decline to abstain under § 305.

### III. The Court Will Grant Limited Relief from the Automatic Stay

Alternatively, the Rigmora LPs seek relief from the automatic stay to continue with the Winding Up Petition in the Grand Court.

---

[197] *See, e.g.*, JX-23 (Nine Square Series A SPA, ¶ 6.3 (Delaware law), ¶ 6.15 (California courts)); JX-24 (Initial Series A SPA, ¶ 6.3 (Delaware law), ¶ 6.14 (California courts)); JX-25 (Nereid Series Seed SPA, ¶ 7.3 (Delaware law), ¶ 7.14 (Delaware courts)); JX-26 (Non-debtor Aulos Series A SPA, ¶ 6.3 (Delaware law), ¶ 6.14 (New York courts)); JX-27 (Apertor Series A SPA, ¶ 6.3 (Delaware law), ¶ 6.15 (California courts)); JX-28 (Marlinspike Series A SPA, ¶ 6.3 (Delaware law), ¶ 6.14 (Massachusetts courts)); JX-29 (Evercrisp Series A SPA, ¶ 6.3 (Delaware law), ¶ 6.15 (New York courts)); JX-30 (Red Queen Series A SPA, ¶ 6.3 (Delaware law), ¶ 6.14 (Massachusetts courts)); JX-31 (Non debtor Aethon Series A SPA, ¶ 6.3 (Delaware law), ¶ 6.14 (New York courts)); JX-32 (Non-debtor Deep Apple Series A SPA, ¶ 6.3 (Delaware law), ¶ 6.15 (California courts)).

By the Winding Up Petition, the Rigmora LPs request that the Fund be wound up under Section 36(3) of the ELP Act and Section 92(e) of the Companies Act, and/or pursuant to Section 35 of the Partnership Act (2025 Revision).  In that connection, they seek the appointment of two Joint Official Liquidators to be vested with "all rights or property of every description of the Partnership, including all choses in action, held or deemed to be held by the GP."[198]  The Winding Up Petition asserts three grounds for the relief sought: (1) justifiable and irretrievable loss of trust and confidence; (2) loss of substratum; and (3) need for an independent investigation into the Partnership's affairs.  Through its skeleton brief filed in connection with the final case status conference, the Rigmora LPs seek to inject different issues into the trial on the Winding Up Petition, including a determination by the Grand Court on "whether, as a consequence of the Chapter 11 Bankruptcy Proceedings, the Partnership has entered voluntary liquidation pursuant to paragraph 10(b) of the LPA."[199]

The Winding Up Petition was filed on June 6, 2026 against both the Fund and the General Partner.[200]  The General Partner sought to stay the case, but at an August 1 hearing, agreed to a trial on the merits in January 2026.[201]  Justice Asif thereafter entered a "directions order" providing a schedule leading up to the trial, deadlines for the General Partner's filing of a defense (June 20), the Rigmora LPs' filing of its reply to defense (September 3), discovery (originally September, extended through October) and a case

---

[198] JX-63, at 52.

[199] JX-68, at 5.

[200] JX-62, ¶ 2.

[201] Hr'g Tr. 86:11–87:2, Feb. 25, 2026, Dkt. No. 425.

management conference on (October 31).[202] At the October 31 case management conference, Justice Asif provided further deadlines for witness statements (December 5), the final case status conference (December 17) and "trial bundles" (December 18). A five-day trial was scheduled to commence on January 12.[203] I understand Justice Asif set aside time for preparation and to write his opinion.

*The Parties' Positions*

The Rigmora LPs' arguments fall into five buckets. One, the Winding Up Petition is a governance dispute, an issue they believe should be decided by the Grand Court. Two, any disposition of the Fund's assets or alteration of the Rigmora LPs' interests in the Fund approved in these cases will be void if the Grand Court enters a compulsory winding up order.[204] Three, the *Rexene* standard for relief from stay is satisfied because (i) the Fund will suffer no harm as it is solvent, not in distress and the Winding Up Petition does not include a claim for damages, (ii) any hardship to the Fund is outweighed because the Rigmora LPs are being denied the right to maximize the Fund on their terms and (iii) only a slight probability of success is necessary. Four, comity compels relief from stay.

Debtors' opposition falls into four buckets. One, the General Partner's management rights are property of its estate. Two, any argument that the General Partner's rights ended on the filing of its bankruptcy petition (whether under the LPA or the Act) are unenforceable *ipso facto* provisions. Three, the Rigmora LPs do not meet the *Rexene*

---

[202] Hr'g Tr. 87:3–87:19, Feb. 25, 2026, Dkt. No. 425.

[203] H'g Tr. 87:19–8:2, Feb. 25, 2026, Dkt. No. 425.

[204] The Rigmora LPs also contend that because the General Partner filed for bankruptcy, it could only act to wind up the Fund in accordance with the LPA and thus filing the case was *ultra vires*. I note only that the Rigmora LPs did not move to dismiss the Fund's case as unauthorized. Mot. for Relief from Stay, ¶ 57, Dkt. No. 125.

51

standard because (i) Debtors are prejudiced as the Rigmora LPs seek to displace the General

Partner and Debtors are in financial distress, (ii) there is no prejudice to the Rigmora LPs

because they can raise all issues here, including seeking the appointment of a chapter 11

trustee or conversion of the cases and (iii) the Rigmora LPs cannot prevail on the merits

because the relief they seek violates the Bankruptcy Code. <u>Four</u>, for this same reason,

comity does not apply.

*Discussion*

> Section 362(d)(1) of the Bankruptcy Code provides:
>
> On request of a party in interest and after notice and a hearing, the court shall
> grant relief from the stay provided under subsection (a) of this section, such as
> by terminating, annulling, modifying, or conditioning such stay . . . for cause.[205]

"Cause" is not defined by the Bankruptcy Code. Rather, "it is a flexible concept,

determined on a case-by-case basis."[206] Courts consider the totality of the circumstances

when determining whether cause exists.[207] As both parties recognized, courts in this district

often analyze requests to continue prepetition litigation against a debtor in another forum

using the three-part balancing test articulated in *Rexene*:

> (i)   Whether any great prejudice to either the bankruptcy estate or the debtor
>       will result from continuation of the civil suit;
>
> (ii)  Whether the hardship to the non-bankruptcy party by maintenance of
>       the stay considerably outweighs the hardship to the debtor; and
>
> (iii) Whether the creditor has a probability of prevailing on the merits.[208]

---

[205] 11 U.S.C. § 362(d)(1).

[206] *In re F-Squared Inv. Mgmt., LLC*, 546 B.R. 538, 548 (Bankr. D. Del. 2016) (citing *In re Tribune*, 418 B.R. 116, 126 (Bankr. D. Del. 2009)).

[207] *In re Wilson*, 116 F.3d 87, 90 (3d Cir. 1997).

[208] *F-Squared*, 546 B.R. at 548 (citing *In re Rexene Prods. Co.*, 141 B.R. 574, 576 (Bankr. D. Del. 1992)).

"The movant has the initial burden of proof to put forth a prima facie case for cause before the debtor must then rebut the case."[209]

Ultimately, I need not decide the interesting and nuanced issue of whether the Winding Up Petition constitutes a dispute over governance rights (which subsist in bankruptcy absent "clear abuse")[210] or is a simple contract dispute. Regardless, I have determined that limited relief from stay should be granted to permit certain aspects of the Winding Up Petition to proceed. First, the Winding Up Petition is (essentially) fully ready to go to trial. Justice Asif has indicated his willingness to hear argument and evidence and the dispute before him involves a Cayman exempted limited partnership governed by Cayman law. Certainly, the General Partner would anticipate being hailed into a Cayman court to resolve this dispute.

Second, while the Winding Up Petition was undoubtedly filed in response to the commencement of the Chancery Court Action, it was not filed in reaction to the bankruptcy cases or any specific relief sought in these cases. It was filed six months before these cases existed.

Third, while there will be additional expense to relevant estates, this is outweighed by the potential, but real, concerns raised by applicable Cayman law. As courts have recognized, when proceedings are occurring simultaneously in different countries, there can be "inconsistencies and conflicts."[211] Section 99 of the Companies Act provides:

---

[209] *In re Scarborough-St. James Corp.*, 535 B.R. 60, 68 (Bankr. D. Del. 2015) (citing *Rexene*, 141 B.R. at 577).

[210] *In re Johns-Manville Corp.*, 801 F.2d 60 (2d Cir. 1986).

[211] *Soundview Elite*, 503 B.R. at 590 (citing *In re Maxwell Commc'ns*, 93 F.3d 1036, 1041 (2d Cir. 1996)).

53

**Avoidance of property dispositions, etc.**
When a winding up order has been made, any disposition of the company's property and any transfer of shares or alteration in the status of the company's members made after the commencement of the winding up is, unless the Court otherwise orders, void.[212]

In their motion, the Rigmora LPs suggest that if a plan is confirmed, it may not be recognized in the Cayman Islands, but rather may be void.[213]  Debtors provide no substantive response to this argument.  This possibility weighs heavily in favor of relief from stay.

Moreover, the automatic stay is temporal in nature, not permanent.  It is meant to centralize disputes in one forum and to provide a breathing spell for the debtor.  But, it is not meant to permanently block the resolution of a dispute.  So, for example, in *Rexene* the question was simply which forum was best suited to liquidate the creditors' claim, not whether it would be resolved at all.  The issue in the Winding Up Petition is not before this

---

[212] JA-19, Companies Act § 99.

[213]  The ELP Act further provides that "where a winding up order has been made," the winding up is retroactive, and is deemed to have commenced upon "the presentation of the petition for winding up," Ex. M, ELP Act § 36(10)(e).  In this case, that was June 6, 2025.  Putting these pieces together, if the Cayman Court enters a compulsory winding-up order, Cayman law deems any transactions by the Fund after June 6, 2025 to be void unless specifically approved by the Cayman Court. Phillips Decl. ¶¶ 24(i), 105–10, 116–27, 166.

\*         \*         \*

For these reasons, moving forward with the chapter 11 cases of the Fund-Level Debtors without clarification of corporate governance under Cayman law creates the serious risk of competing and inconsistent results between the U.S. and Cayman courts. If, hypothetically, this chapter 11 case were to result in a plan of reorganization that set forth a disposition of the Fund assets that the GP holds in trust for the LPs, any such result could be invalid as a matter of Cayman law and assets could be clawed back by the Cayman courts.  In such a circumstance, any actions that the GP undertook on behalf of the Fund in the interim—including any plan of reorganization that this Court might approve—would either be subject to rereview by the Cayman Court or automatically void with retroactive effect absent subsequent validation by the Cayman Court.

Mot. for Relief from Stay ¶¶ 56, 58, Dkt. No. 125.

court, nor is there a suggestion that it could be even in some other fashion. While Debtors suggest that the Rigmora LPs could seek a chapter 11 trustee or to convert the case, those remedies serve distinctly different purposes and are decided under distinctly different standards.[214]

Under the above circumstances and considering the arguments of counsel as well as the potential for conflict between the laws of the United States and the Cayman Islands, I will grant limited relief from stay to afford the parties the ability to seek relief from the Grand Court that is distinctly within its purview. Specifically, I will grant relief from stay so that the partners can proceed on the Winding Up Petition so that the Grand Court can determine: (i) whether the Rigmora LPs can prove that they have justifiably and irretrievably lost all trust and confidence in the General Partner's ability to manage the Fund and (ii) whether the Fund has lost its substratum. The Rigmora LPs may also seek to have Joint Official Liquidators appointed to act in the stead of the General Partner if they are successful on one of the two grounds above.

I will not grant relief from stay for the Rigmora LPs to pursue their newly minted "10(b) claim." Whether the General Partner's bankruptcy filing has dissolved the Fund is a matter of US law for purposes of these cases and one which I will decide when and if necessary. Further, the Rigmora LPs may not seek any other relief from the Grand Court, including to transfer (or deem transferred) the rights or property of the Fund to the Joint Official Liquidators or to permit the Joint Official Liquidators to wind up the Partnership in the Grand Court. Further, this Court will not recognize a monetary judgment against the

---

[214] *See Soundview Elite*, 503 B.R. at 583 (appointing chapter 11 trustees notwithstanding the existence of joint official liquidators).

General Partner or the Fund.  To be clear, while Debtors remain in bankruptcy the automatic stay is in force and will continue to apply to the Rigmora LPs and to any Joint Official Liquidators that may be appointed by the Grand Court.

Again, I recognize that any Joint Official Liquidators appointed may be in a challenging position.  But, those challenges will be addressed as necessary.  In that event, I would expect parties to work together to construct a protocol to be presented to both courts such that maximum cooperation can be achieved.

**Conclusion**

For the reasons set forth above, I will deny the amended motion to dismiss and grant limited relief from the automatic stay.  Separate orders will enter.

Dated:  April 14, 2026

LAURIE SELBER SILVERSTEIN