**THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| APPLE TREE LIFE SCIENCES, INC., *et al.*, | Case No. 25-12177 (LSS) |
| Debtors. | (Jointly Administered) |
| | **Re: Docket No. 1270** |

**MEMORANDUM**

This is my ruling on the Fund's motion to disqualify Quinn Emanuel from representing the non-Fund Debtors in these jointly administered bankruptcy cases ("Disqualification Motion").[1] As with everything else in these cases, the present dispute is at the same time simple on the surface and nuanced in application. I held a hearing on November 10, 2026. Certain agreed-to exhibits were admitted into evidence. No witness testimony was offered. For the reasons set forth below, I deny the motion.

***Background Facts***

Certain background facts are undisputed. On December 9, 2025, ATP Life Sciences Ventures, L.P. (the "Fund"), ATP GP III, Ltd (the "General Partner") and ATP Life Science Inc. ("ATLS," a wholly owned subsidiary of the Fund) each filed their voluntary petitions in this Court. Between December 15, 2025 and January 15, 2026, seven of the Fund's portfolio companies (the "Portfolio Debtors") joined them.[2] Reference in this

[1] Debtor ATP Life Sci. Ventures, L.P.'s Mot. to Disqualify Quinn Emanuel Urquhart & Sullivan, LLP from Representing Apertor Pharms., Inc.; Evercrisp Biosciences, Inc.; Initial Therapeutics, Inc.; Marlinspike Therapeutics, Inc.; Nereid Therapeutics Inc.; Nine Square Therapeutics, Inc.; Red Queen Therapeutics, Inc.; and ATP III GP, Ltd., Dkt. No. 1270. All references to the docket can be found at 25-12177.

[2] The Portfolio Debtors are: Apertor Pharmaceuticals, Inc., Evercrisp Biosciences, Inc., Initial Therapeutics, Inc., Marlinspike Therapeutics, Inc., Nereid Therapeutics Incorporated, Nine Square Therapeutics, Inc. and Red Queen Therapeutics, Inc.

Memorandum to "Debtors" means the Fund, the General Partner, ATLS and the Portfolio Debtors.

The Fund's bankruptcy case was filed four days after Chancellor Kathaleen St. Jude McCormick issued an 82-page post-trial Memorandum Opinion in litigation between the General Partner and the limited partners, Rigmora Biotech Investor One LP and Rigmora Biotech Investor Two LP (collectively, "Rigmora"). In her decision, Chancellor McCormick determined the rights between the parties relative to the Fund. The Fund, itself, was not a party to the litigation.[3]

The General Partner and Rigmora are also parties to a winding up proceeding in the Cayman Islands before the Honourable Justice Jalil Asif KC. Rigmora filed a winding up petition on June 6, 2025 which was held in abeyance pending the Chancery Court litigation. By the winding up petition, Rigmora sought to wind up the Fund pursuant to Cayman Islands law. They also sought the appointment of two joint official liquidators to be vested with all rights or property of the Fund. As part of the litigation in the winding up petition, Justice Asif determined that the proper parties to that proceeding were the General Partner and Rigmora.[4] When the Fund's bankruptcy case was filed, the winding up petition was automatically stayed.[5]

Rigmora moved to dismiss the bankruptcy cases and separately sought relief from stay to proceed with the winding up petition in the Cayman Islands. As detailed in my

---

[3] This litigation is discussed in my Memorandum Opinion issued in these cases. *See* MEMORANDUM OPINION, Dkt. No. 548 (Apr. 14, 2026). Familiarity with this Memorandum Opinion is assumed.

[4] *See id.* at 27–28 n.125.

[5] 11 U.S.C. § 362. The winding up proceedings are also discussed in the Memorandum Opinion.

Memorandum Opinion, after a combined evidentiary hearing, I denied the motion to dismiss and granted limited relief from stay so that Justice Asif could determine whether (i) Rigmora could prove that they justifiably and irretrievably lost all trust and confidence in the General Partner's ability to manage the Fund and/or (ii) the Fund had lost its substratum. I also permitted Rigmora to seek to have joint official liquidators appointed to act in the stead of the General Partner with respect to the Fund if they were successful in proving one of the two stated grounds.[6]

On July 10, 2026, Justice Asif appointed Alexander Lawson and Barry Lynch of Alvarez & Marsal Cayman Islands Limited as joint officeholders (the "Officeholders") to "act in relation to the affairs of the . . . [Fund] in the stead of and to the exclusion of . . . [the General Partner] within and outside of the Cayman Islands."[7] I recognized the appointment of the Officeholders on the terms set forth in a separate Order issued July 30, 2026.[8] From that point forward, the Officeholders, not the General Partner, were the decision makers for the Fund.

***Debtors' engagement of counsel***

Effective as of December 9, 2025, by a separate engagement letter, Quinn Emanuel agreed to represent the Fund, the General Partner, ATLS and certain of the Fund's portfolio companies as detailed in Exhibit B. In the engagement letter, the clients are referred to collectively as "ATP," the "Client," "you" and "yours."[9] The scope of the engagement is

---

[6] MEMORANDUM OPINION at 3,55, Dkt. No. 548 (Apr. 14, 2026).

[7] Ord. Recognizing Officeholders at 1, Dkt. No. 1000.

[8] *Id.*

[9] Exhibit B, at 2.

stated as "restructuring matters including" in the Fund's bankruptcy case.[10] The engagement is also defined as "restructuring-related litigation against" Rigmora.[11] Seth Harrison is designated as the person primarily responsible for the engagement and the person authorized to direct Quinn Emanuel and deal with any issues related to the engagement. As far as client confidences, the engagement letter reads: "except to the extent permitted by the applicable rules of professional conduct, we will not disclose any confidential information of yours to any other client or person."[12]

On May 5, 2026, I approved Quinn Emanuel's engagement for each of the Debtors over Rigmora's objection.[13] In a letter ruling, I determined that given the unique facts of this case, a $20 million retainer by the Fund in connection with the Chancery Court litigation did not create an actual conflict of interest requiring disqualification under 11 U.S.C. § 327(a).[14]

Separately, Debtors also moved to retain Murphy & King, P.C. to represent them in the bankruptcy case. That application was granted without objection.[15] The Fund does not seek to disqualify Murphy & King and appears satisfied that the work performed by Murphy

---

[10] *Id.* at 1.

[11] *Id.* at 2.

[12] *Id.* at 3.

[13] Ord. Authorizing the Debtors to Retain and Emp'g. Quinn Emanuel Urquhart & Sullivan, LLP as Co-Counsel for the Debtors Effective as of the Petition Date, Dkt. No. 623.

[14] Letter Ruling, Dkt. No. 621 (May 5, 2026).

[15] Ord. Under Sects. 327(a) and 1107(b) of the Bank. Code, Bankr. Rules 2014 and 2016, and Local Rules 2014-1 and 2016-1 Authorizing Retention and Emp't. of Murphy & King, Prof'l. Corp. as Bankr. Co-Counsel for Debtors Effective as of the Petition Date, Dkt. No. 301.

& King in these cases was solely on behalf of the Portfolio Debtors. Debtors also moved to retain Potter Anderson & Corroon LLP as co-counsel to all of the debtor entities, which was also approved.[16] The Fund does not seek to disqualify Potter Anderson & Corroon.

***The Fund's termination of Quinn Emanuel***

By letter from DLA Piper dated August 10, 2026, the Fund, at the direction of the Officeholders, terminated the engagement of Quinn Emanuel and Walkers (Cayman counsel) "in connection with the Chapter 11 proceedings, any proceedings in the Cayman Islands or in connection with the broader historical dispute between the Rigmora LPs and the Fund."[17] As reflected in the August 10 letter, the Officeholders retained DLA Piper to act for them. In that same letter, the Officeholders recognized that Quinn Emanuel and Walkers would continue to represent the General Partner in its personal capacity in the Cayman Islands winding up petition. Finally, the Officeholders excepted the Syntimmune litigation stating that it "is of a different character, being proceedings against a third party unconnected to the dispute with the Rigmora LPs."[18]

---

[16] Ord. Authorizing the Debtors to Retain and Emp. Potter Anderson & Corroon LLP as Co-Counsel to the Debtors and Debtors in Possession Pursuant to Sect. 327(a) of the Bankr. Code, Bankr. Rules 2014(a) and 2016, and Local Rule 2014-1, Effective as of The Petition Date, Dkt. No. 300.

[17] Exhibit E, at ¶ 2.

[18] Exhibit E, at ¶ 4.

On August 28, 2026, the Fund Debtor moved to retain DLA Piper LLP in its bankruptcy case, which was granted.[19] The Fund Debtor has also moved to retain Orrick, Herrington & Sutcliffe LLP.[20] This application has not yet been approved.

Quinn Emanuel has not been terminated by the non-Fund Debtors and continues to represent each of them in these bankruptcy cases. Recently, the non-Fund Debtors objected to what has been called the Fund's Governance Motion.[21] The non-Fund Debtors' objection was signed by Quinn Emanuel.

***The Disqualification Motion***

The Fund filed the Disqualification Motion on October 27, 2026. The Fund contends that Quinn Emanuel must be disqualified because Rule 1.9 of the Model Rules of Professional Conduct bars Quinn Emanuel from opposing the Fund. In support, the Fund argues that because Quinn Emanuel was the Fund's counsel, it was in a position to receive confidential information which cannot now be used against it. The Fund also asserts that Quinn Emanuel will be unable to effectively represent the Portfolio Debtors and the General Partner because it will be constrained from using the Fund's confidential information and as such is conflicted under § 327(a). Alternatively, the Fund argues that Rule 1.7 bars Quinn

---

[19] Ord. (I) Authorizing the Fund Debtor to Retain and Emp. DLA Piper LLP (US) as Counsel, Effective as of July 10, 2026 and (II) Granting Related Relief, Dkt. No. 1155.

[20] Application of Debtor ATP Life Sci. Ventures, L.P. for an Ord. Authorizing and Approving the Emp. and Retention of Orrick, Herrington & Sutcliffe LLP as Co-Counsel, Effective as of September 28, 2026, Dkt. No. 1232.

[21] Objection by Apertor Pharms., Inc., Evercrisp Biosciences, Inc., Initial Therapeutics, Inc., Marlinspike Therapeutics, Inc., Nereid Therapeutics Inc., Nine Square Therapeutics, Inc., and Red Queen Therapeutics, Inc. to Mot. of Debtor ATP Life Sci. Ventures, L.P., for Entry of an Ord. Confirming its Rights with Respect to Portfolio Cos. (the "Objection"), Dkt. No. 1209. Apertor Pharmaceuticals, Inc. withdrew as a party to the Objection. Notice of Withdrawal of Apertor Pharms., Inc. as Party to the Objection, Dkt. No. 1334.

Emanuel from representing the non-Fund Debtors "to the extent" Quinn Emanuel still represents the Fund. At argument, the Fund's counsel framed the issue at the heart of the Disqualification Motion in this manner:

> MR. LITTERINE-KAUFMAN: Okay. So a brief overview of how we got here. When these Chapter 11 cases started, the debtors were all controlled by just one person, Dr. Harrison. Whether that was through his role as the sole shareholder of the GP or through his resulting managerial authority over the fund or through his appointment as the fund's representative on the portfolio companies' boards of directors, Dr. Harrison was, at the beginning, calling the shots across the board, and he tapped Quinn Emanuel to act as his restructuring counsel for all the debtors in these cases. And that worked at the time because the debtors were all pursuing the same agenda, so there was no actual adversity.
>
> But that all changed with the appointment of the -- and recognition of the officeholders to manage the fund debtor in the stead of the general partner. Suddenly, there were court-appointed neutrals on the scene who had to take a more even-handed approach. And to do so, they felt it necessary to depart from the course that Dr. Harrison and Quinn had charted for these cases.
>
> So the question presented by this motion is whether the law firm that Dr. Harrison tapped to pursue his agenda as the fund debtor's counsel in these Chapter 11 cases, the law firm that had unfettered access to the fund debtor's confidential information in furtherance of that representation for months and months, both pre-petition and post, the law firm that, until recently, implemented the fund debtor's entire legal strategy in these proceedings, the question is whether that law firm can now turn around and advocate positions adverse to the fund debtor in those very same proceedings. And I would submit the answer, under both the rules of professional responsibility and under Section 327(a) is, unambiguously, no.
>
> The breadth and depth of Quinn's exposure to the fund debtor's client confidences makes it effectively impossible for Quinn to now advocate against the fund without, in some way, making use of what it learned during those many months of representing the fund.[22]

[22] Hr'g Tr. 8:23–10:9, Nov. 10, 2026, Dkt. No. 1324.

Counsel's opening fairly characterizes the Fund's position and the posture of this case. The Officeholders have changed the direction the Fund is taking. The Fund has now partnered with Rigmora. It has filed a motion to authorize it to enter into a Plan Support Agreement with Rigmora as the Plan Sponsor.[23] The Plan Support Agreement contains multiple deadlines: (i) November 23, 2026 for the Plan Debtor PortCos to join the Plan Support Agreement Motion; (ii) December 7, 2026 for the filing of a disclosure statement and Plan; (iii) January 11, 2027 for the issuance of an Order approving solicitation of the Plan; (iv) February 22, 2027 for the confirmation of the Plan and (v) March 22, 2027 for the Effective Date of the Plan.[24] The Fund has also teed up a motion to approve debtor-in-possession financing from Rigmora, which counsel represents is necessary to meet expenses in December.[25]

***Discussion***

***A. Rule 1.9***

Rule 1.9(a) provides that:

> A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing.[26]

---

[23] Mot. of ATP Life Sci. Ventures, L.P. for Entry of an Ord. (I) Authorizing the Fund Debtor to Enter Into and Perform Under the Plan Support Agreement and (II) Granting Related Relief, Dkt. No. 1282. The Plan Support Agreement contains defined terms, which I use in this paragraph. These terms mean exactly what they appear to mean.

[24] *Id.* at 11.

[25] Hr'g Tr. 69:4–18, Nov. 10, 2026, Dkt. No. 1324; Mot. of ATP Life Scis. Ventures, L.P. for Entry of an Ord. (I) Authorizing the Fund Debtor to Obtain Postpetition Financing on a Secured, Superpriority Basis, (II) Granting Liens and Providing Claims with Superpriority Admin. Expense Status, (III) Modifying the Automatic Stay, and (IV) Granting Related Relief, Dkt. No. 1280.

[26] MODEL RULES OF PRO. CONDUCT R. 1.9(a) (AM. BAR ASS'N, 2019).

As applied here:

One, the Fund is a former client of Quinn Emanuel. As of December 9, 2025, the Fund engaged Quinn Emanuel to represent it in its bankruptcy case. That engagement was approved. On August 10, 2026, the Fund terminated the engagement.

Two, the "same or a substantially related matter"[27] is the bankruptcy case itself or the restructuring of the Fund. That is the matter on which Quinn Emanuel was engaged. While Quinn Emanuel attempts to make some arguments at the fringes and narrow the dispute to the Governance Motion, that is of no moment. Even looking only at the Governance Motion, Quinn Emanuel negotiated the underlying Order at issue for the Debtors, including the Fund. The Fund now argues the Order at issue has one meaning/understanding while the non-Fund Debtors assert a different meaning/ understanding. Thus, the Governance Motion itself, constitutes a "same or a substantially similar matter."[28]

---

[27] MODEL RULES OF PRO. CONDUCT R. 1.9(a) (AM. BAR ASS'N, 2019).

[28] *Id.* During argument, Quinn Emanuel cited *Allegaert v. Perot*, 565 F.2d 246 (2d Cir. 1977) and *Kempner v. Oppenheimer & Co., Inc.*, 662 F.Supp. 1271 (S.D.N.Y. 1987) for the proposition that "the substantial relationship test is inapplicable where the law firm's alleged disqualification arises out of simultaneous representation of two clients if each client was aware of the other's relationship to the firm and had no reason to believe that confidences of one party would be withheld from the other." *Kempner*, 662 F.Supp. at 1277 (citing *American Special Risk Insurance Co. v. Delta America Re Insurance Co.,* 634 F.Supp. 112, 121 (S.D.N.Y.1987)). As such, they argued, there could be no violation of Rule 1.9 and therefore no basis to disqualify Quinn Emanuel. The Second Circuit's view does not have universal acceptance. *See Brennan's Inc. v. Brennan's Restaurants, Inc.*, 590 F.2d 168, 173–74 (5th Cir. 1979) (taking a per se approach to disqualification of counsel in subsequent litigation when he had previously jointly represented the plaintiff and defendant in a matter substantially related to joint representation; but remanding for a determination of whether co-counsel who had not previously represented either party should be disqualified). Given the Third Circuit's case-by-case approach to disqualification discussed *infra*, it is not apparent that the Third Circuit would follow either bright line test.

Three, the first instance of material adversity to the Fund is the objection to the Governance Motion which was signed by Quinn Emanuel on behalf of the non-Fund Debtors. It is not yet known whether the non-Fund Debtors will object to the Plan Support Agreement or the DIP financing.

Four, having reviewed the Exhibits, I do not see that the Fund provided informed consent in writing for an adverse representation in the bankruptcy case. As examples, I point to two letters from Craig Martin of DLA Piper to Eric Winston of Quinn Emanuel. In his August 10, 2026 letter, Mr. Martin asks whether Quinn Emanuel is going to continue to represent the non-Fund Debtors in these bankruptcy cases.[29] In his August 21, 2026 letter, he writes:

> [T]he Officeholders do not consent to or waive any conflict of interest between the General Partner, ATLS, and any Debtor Portfolio Company and the Partnership. Thus, your firm cannot take any actions, applications or other steps on behalf of the General Partner, ATLS or any other party that are adverse to the Partnership in those matters on which it acts for or has acted for the Partnership.[30]

Quinn Emanuel's suggestion that its then-agreement to remain as counsel to the Fund in the Syntimmune litigation constitutes implied consent or waiver of any conflict is unpersuasive. The Syntimmune litigation is not restructuring-related nor Rigmora-related.

Given my findings, the question then is whether disqualification is the appropriate remedy for any violation of Rule 1.9 that may have occurred. In this Circuit, motions to

---

[29] *See* Exhibit E, at ¶ 5.

[30] Exhibit F, at 2.

disqualify are "generally disfavored" in light of a litigant's right to counsel of its choice.[31] This is a fact-intensive inquiry. And, the Fund has the burden of proof.[32]

In *Corn Derivatives*,[33] the Third Circuit states that Rule 1.9 serves several important purposes. First, it seeks to ensure that a former client's confidences cannot be used against it. Second, it seeks to maintain public confidence in the bar. And, third, it furthers the attorney's duty of loyalty to the client in the matter in which he is retained. In *Corn Derivatives*, two clients retained the same law firm to file an antitrust action, which ultimately was consolidated with other similar lawsuits to form a multidistrict litigation ("MDL"). When a settlement of the MDL was negotiated, one of the firm's clients supported the settlement of the litigation, but one did not. The law firm withdrew its appearance for the settling client and filed a notice of appeal for its other client. The Court disqualified the law firm ruling it was unfair to permit the law firm to use information about the strength and weakness of the case against its former client. Nonetheless, it recognized valid "countervailing considerations" that could counsel against disqualification in a given case. Those countervailing considerations included the increased cost of litigation to the current client because of the necessity of obtaining new counsel and the loss of the current client's chosen counsel.

Courts in this district recognize the teaching of *Corn Derivatives* in concluding that disqualification is never automatic even in the face of a finding of a rule violation. Thirty-

---

[31] *See Madukwe v. Delaware State Univ.*, 552 F. Supp. 2d 452, 457 (D. Del. 2008).

[32] *See id.* (quoting *Talecris Biotherapeutics, Inc. v. Baxter Int'l Inc.*, 491 F. Supp. 2d 510, 513 (D. Del. 2007)) (movant must "show clearly that 'continued representation would be impermissible.'").

[33] *See In re Corn Derivatives Antitrust Litigation*, 748 F.2d. 157, 162 (3d Cir. 1984).

eight years (and many lower court decisions) later, the Third Circuit weighed in again in *Boy Scouts*,[34] confirming and expanding upon *Corn Derivatives.* The Third Circuit instructs:

> Because the power to disqualify stems from a court's authority to supervise the attorneys appearing before it, a decision about whether to use that power is discretionary and "never is automatic." *Miller*, 624 F.2d at 1201. Even when an ethical conflict exists (or is assumed to exist), a court may conclude based on the facts before it that disqualification is not an appropriate remedy. Relevant factors depend on the specifics of the case, but generally include the ability of litigants to retain loyal counsel of their choice, the ability of attorneys to practice without undue restriction, preventing the use of disqualification as a litigation strategy, preserving the integrity of legal proceedings, and preventing unfair prejudice. *See Corn Derivatives*, 748 F.2d at 162; *see also TQ Delta, LLC v. 2Wire, Inc.*, No. 13-1835, 2016 WL 5402180, at *6 (D. Del. Sept. 26, 2016) (identifying these and other possible considerations). Sometimes disqualification is more disruptive than helpful even though an attorney may not have satisfied his or her professional obligations. And, indeed, courts in our Circuit often deny disqualification even when finding or assuming conflicts under the professional conduct rules. *See, e.g., TQ Delta*, 2016 WL 5402180, at *6–7 (denying motion for disqualification despite violation of Rule 1.9); *Bos. Sci. Corp. v. Johnson & Johnson Inc.*, 647 F. Supp. 2d 369, 374 (D. Del. 2009) ("[Counsel's] violation of Model Rule 1.7 notwithstanding, the court concludes that disqualification is not the appropriate remedy under the circumstances."); *Wyeth v. Abbott Lab'ys*, 692 F. Supp. 2d 453, 458–59 (D.N.J. 2010) (denying motion for disqualification even though there was "no dispute" that counsel violated Rule 1.7); *Elonex I.P. Holdings, Ltd. v. Apple Comput., Inc.*, 142 F. Supp. 2d 579, 583 (D. Del. 2001) (even were Rule 1.7 violated, disqualification would not have been warranted).[35]

Here, disqualification will be more disruptive than helpful. Quinn Emanuel has represented the General Partner and the Portfolio Debtors in connection with their restructuring efforts for the past eleven months. It has been representing parties adverse to Rigmora for years prior to that. As characterized by the Fund's counsel, that is the real crux of the "dispute:"

> MR. LITTERINE-KAUFMAN: So, under the same transaction or legal dispute prong [of Rule 1.9], the transaction here is the restructuring of the debtors and the legal dispute is the fight that's been going on between Dr. Harrison and the fund's financial backers over this restructuring and from before this restructuring.

---

[34] *See In re Boy Scouts of America*, 35 F.4th 149 (3d Cir. 2022).

[35] *Id.* at 160.

THE COURT: The financial backers being Rigmora?

MR. LITTERINE-KAUFMAN: Yes, Your Honor, the limited partners in the fund.

THE COURT: So the dispute [is] between Dr. Harrison and Rigmora, is that what you're saying is the same or substantially the same?

MR. LITTERINE-KAUFMAN: Yeah, I'm saying that that is a legal dispute that continues on. Yes.

* * *

THE COURT: . . . But the - - but what you're saying is that the officeholders are taking the Fund in a different direction.

MR. LITTERINE KAUFMAN: Correct, Your Honor. Yes.

THE COURT: But what you identified as the dispute was a dispute between Dr. Harrison and Rigmora.

MR. LITTERINE-KAURMAN: Correct, yes.[36]

To disqualify counsel now in the face of the looming deadlines put in place by the Fund and Rigmora unfairly disadvantages the non-Fund Debtors. Murphy & King may be able to step in for the Portfolio Debtors, but it has not performed work for the General Partner. Even so, the need for new counsel, or an expanded role for Murphy & King, may not be realistic within the current proposed timeline. And, the expense of getting up to speed would be enormous in a case that already has out-sized fees due to the disputes between the Debtors and Rigmora.

Moreover, Rule 1.9's concern with the sanctity of client confidences does not loom large in these bankruptcy cases. Debtors chose collective representation and jointly retained

---

[36] Hr'g Tr. 16:5-17; 17:21-18:1, Nov. 10, 2026, Dkt. No. 1324.

Quinn Emanuel to provide restructuring advice. As such, Debtors were "co-clients" or "joint clients."[37] Citing to both Delaware law and the Restatement (Third) of the Law Governing Lawyers, the Third Circuit has recognized that "[w]hen former co-clients sue one another, the default rule is that all communications made in the course of the joint representation are discoverable."[38] Here, the engagement letter was clear that all communications were to be run through Dr. Harrison; there was no attempt to shield the Fund's confidential information from any non-Fund Debtor (i.e. Quinn Emanuel's co-clients).[39] It is hard to imagine, therefore, that the Fund had any expectation the information it provided to Quinn Emanuel would not be shared with other Debtors. Further, as the Fund is a Cayman Islands exempted limited partnership, it is managed by the General Partner who has access to, if not physical possession of, the books and records of the Fund.

At the hearing, the Fund did not submit or adduce any evidence regarding what confidential information in particular could be improperly used by the non-Fund Debtors. Counsel submitted that neither it nor the Officeholders could supply that information because neither were there at the time of Quinn Emanuel's representation.[40] Counsel argued that I should assume that confidential information was available to Quinn Emanuel

---

[37] *See In re Teleglobe Communications Corp.*, 493 F.3d 345, 362–63, n.15 (3d Cir. 2007) ("Co-clients" and "joint clients" refer to "multiple clients engaging one or more common attorneys to represent them on a matter of interest to all.").

[38] *Id.* at 366 (internal citations omitted) (discussing co-clients in the context of parents and wholly-owned subsidiaries).

[39] *See id.* ("According to the Restatement, it is permissible for co-clients to agree in advance to shield information from one another in subsequent adverse litigation.").

[40] Hr'g Tr. 21:12-18, Nov. 10, 2026, Dkt. No. 1324.

based on their extensive representation of the Fund, including the 6000 plus hours billed to Debtors, as reflected in Quinn Emanuel's first and second quarterly fee applications.[41] Counsel represented that in those time entries, Quinn Emanuel billed for working on portfolio company cash flow budgets, enterprise valuations and the Series A Stock Purchase Agreements between the individual portfolio companies and the Fund.[42] Those examples, however, would seem to implicate the portfolio companies' respective information, not necessarily the Fund's information. Moreover, it is difficult to believe that the Fund could provide no evidence of its concern. Alvarez & Marsal is also filing reports of its time on the docket. Its staffing report for the period of July 1, 2026 through September 30, 2026 reflects 4,294.5 total hours.[43] It is not beyond the realm of reason to think that Alvarez & Marsal should have some sense of the Fund's data that could be improperly used against it.

Finally, this is not the archetypal situation where a lawyer "changed sides."[44] Here, one co-client has "changed sides."[45] The Officeholders, acting within their prerogative, are taking the Fund in a new direction. They are proposing a plan that deviates from the sale

---

[41] *See* Summary of First Interim Fee Application of Quinn Emanuel Urquhart & Sullivan LLP for Comp. for Servs. Rendered and for Reimbursement of Expenses as Co-Counsel to the Debtors and Debtors-in-Possession for the Period December 9, 2025 through March 31, 2026, Dkt. No. 707; Summary of Second Interim Fee Application of Quinn Emanuel Urquhart & Sullivan LLP for Comp. for Servs. Rendered and for Reimbursement of Expenses as Co-Counsel to the Debtors and Debtors-in-Possession for the Period April 1, 2026 through June 30, 2026, Dkt. No. 1051. No fee applications were offered or admitted into evidence.

[42] Hr'g Tr. 22:12-23:8, Nov. 10, 2026, Dkt. No. 1324.

[43] Notice of Filing of Quarterly Report of Fees and Expenses by Alvarez & Marsal Cayman Islands Ltd. for the Period from July 1, 2026 through September 30, 2026, Dkt. No. 1275.

[44] *See Kempner*, 662 F. Supp. at 1277; MODEL RULES OF PRO. CONDUCT R. 1.9(b) CMT. 3 (AM. BAR ASS'N, 2019).

[45] *See id.*

process/timeline undertaken and previously approved by the Court. This new direction/strategy is not something that Quinn Emanuel has worked on or provided advice on.[46] Quinn Emanuel has no insight into the Officeholders' strategy regarding the appropriate exit from these bankruptcy cases.

As the Fund recognizes, the crux of the dispute between the parties in these bankruptcy cases (and before), is between Dr. Harrison and Rigmora over the future of the Fund. With the filing of the Plan Support Agreement in which Rigmora is the Plan Sponsor, that dispute has come to a head. Stripping Dr. Harrison and the General Partner of their chosen counsel at this time and given the requested timeline does not seem appropriate and, indeed, it feels tactical.

Considering all the relevant factors in the context of this case, I will deny the Disqualification Motion. This decision does not absolve Quinn Emanuel of violations, if any, of the Rules of Professional Conduct. It simply holds that disqualification is not an appropriate remedy.

***B. Section 327***

The Rules of Professional Conduct and § 327 of the Code are distinct requirements/obligations.[47] While the Rules of Professional Conduct may inform retention

---

[46] *See Madukwe*, 552 F. Supp. 2d at 463 (D. Del. 2008) (in the context of determining whether a matter was substantially related for purposes of Rule 1.9, court recognizes that a "new regime" might make any acquired knowledge the firm has outdated so that disqualification is inappropriate). Further, there was no conflict of interest "for firm to represent terminated city employees after representing city for 27 years, due to intervening election; 'any insight [the firm] gained into the city's employment-related activities . . . [or] into the city's litigation strategy was extinguished with the transition from the [former] administration to the [new] administration." *Id.* at n.8 (quoting *Ramos v. Pavey*, 2005 WL 3556553, at *1–2, 5 (N.D. Ind. Dec. 27, 2005)).

[47] *See Boy Scouts*, 35 F.4th at 158.

under the Code, they are not dispositive of the retention decision.[48] The Rules of Professional Conduct look out for the interests of the client.[49] Section 327 is estate-focused; it does not vindicate the rights of non-debtor parties.[50]

Section 327 is also written in the present tense.[51] "It only allows disqualifications for adverse interests that exist at the time of retention."[52] So, for example, current inter-debtor disputes can create an actual conflict of interest prohibiting joint representation of all debtors because of the possibility the professional would favor one estate over another even while attempting to serve all estates.[53]

Quinn Emanuel has already been retained under § 327(a) so the question is can Quinn Emanuel continue to serve in this capacity for the Portfolio Debtors and the General Partner under the current circumstances? The Fund's answer is no. It argues that an actual conflict exists because Quinn Emanuel's duties to the Fund limit its representation of the General Partner and the Portfolio Debtors. For this proposition, the Fund relies again on Rule 1.9 and the use of the Fund's confidences. The Fund also specifically points to claims

---

[48] *See Boy Scouts*, 35 F.4th at 159 ("We [the Court] never stated that violations of the Rules of Professional Conduct are themselves sufficient to create a § 327 conflict. Rather, we explained that the same facts showing Gilbert had violated its professional obligations under the Rules also meant it was not disinterested for purposes of § 327.").

[49] Bench Ruling Delivered May 29, 2020 on Debtors' Application to Retain Sidley Austin LLP as Attorneys for the Debtors and Debtors in Possession at 7, *In re Boy Scouts of America*, Case No. 20-10343 (Bankr. D. Del. June 2, 2020), *aff'd,* 630 B.R. 122 (D. Del. 2021), *aff'd,* 35 F.4th 149 (3d Cir. 2022), Dkt. No. 755.

[50] *Id.* at 4; *Boy Scouts*, 35 F.4th at 158.

[51] *Boy Scouts*, 35 F.4th at 158 n.5; *In re MUMA Servs., Inc.*, 286 B.R. 583, 591 (Bankr. D. Del. 2002) (quoting *Bank Brussels Lambert v. Coan (In re AroChem Corp.*), 176 F.3d 610, 623 (2d Cir. 1999)).

[52] *Id.* (citations omitted).

[53] *See In re BH & P*, Inc., 949 F.2d 1300, 1315 (3d Cir. 1991).

the Portfolio Debtors have asserted against the Fund under the Stock Purchase Agreements. No other party has joined in the Disqualification Motion, that is, no creditor of a portfolio company or of the General Partner has suggested Quinn Emanuel cannot effectively represent their respective estates.

Many of the same considerations inform the decision here and lead to the conclusion that Quinn Emanuel does not hold or represent an interest adverse to the estates of their current clients and can effectively represent them. First, the Fund terminated Quinn Emanuel. Quinn Emanuel does not currently represent the Fund in this or other matters.[54] Second, the previous co-client relationship between the Fund and the non-Fund Debtors means that Quinn Emanuel's duties to the Fund are not limited by virtue of the confidential information that it may possess. Third, Quinn Emanuel does not possess any information regarding the Fund's new strategies, including the Plan Support Agreement or the new proposed DIP funding. Fourth, Murphy & King is representing the Portfolio Debtors in connection with their claims under Series A Stock Purchase Agreements.

Accordingly, I conclude that Quinn Emanuel does not hold or represent an interest adverse to the estates of the Portfolio Debtors or the General Partner and is disinterested, as defined in the Code, vis-á-vis those estates. A separate order will issue.

Dated: November 24, 2026

Laurie Selber Silverstein
United States Bankruptcy Judge

---

[54] While the Fund raised Rule 1.7 of the Model Rules in its papers, it presented no evidence that the Fund is a current client of Quinn Emanuel's. I asked that question at argument and got a vague response. Accordingly, I find that Quinn Emanuel does not currently represent the Fund on any matters.